**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION**

| | |
|---|---|
| **EMERSON EUGENE STEVENS,** | ) |
| **Petitioner** | ) |
| | ) |
| **v.** | ) |
| | ) |
| **ADRIANNE BENETT,** | ) |
| **Chair, Virginia Parole Board,** | ) |
| **Respondent.** | ) |

**APPENDIX
TO
PETITION FOR WRIT OF HABEAS CORPUS**

Jennifer L. Givens
VSB #42269
Deirdre M. Enright*
The Innocence Project
University of Virginia School of Law
580 Massie Road
Charlottesville, VA 22903
434-924-2912

*Licensed in MS and DC

COUNTY of AMELIA       )
                               )
                               )
STATE of VIRGINIA        )

### AFFIDAVIT of JAMES ROBERTSON

I, James Robertson:

1.   I was one of the jurors who voted to convict Emerson Stevens of murder in 1986.  The jurors were bused in from Essex County to sit on the jury in Lancaster.

2.   I recall that the prosecution presented evidence that a hair was found on Emerson Steven's shirt, and that this hair belonged to the victim.

3.   I am aware that many years have passed since we convicted Emerson Stevens, and I know that forensic science has made extraordinary progress since 1986.  I have also been told that Emerson Stevens continues to maintain his innocence of this crime.

4.   I support Emerson Steven's efforts to have mitochondrial DNA testing done on the hair that the prosecutor said belonged to the victim.

Further, Affiant sayeth not.

James B. Robertson

Subscribed and sworn to before me this 22 day of April, 2011.

NOTARY PUBLIC
Chesterfield Co.

ANGELA DAVIS
NOTARY
PUBLIC
REG # 347227
MY COMMISSION
EXPIRES
04/30/2012
COMMONWEALTH OF VIRGINIA

**1**

COMMONWEALTH OF VIRGINIA     }
    }
CITY OF TAPPAHANNOCK     }

## AFFIDAVIT OF JUNE P. BAIRD

I, June P. Baird, give the following statement under penalty of perjury:

1. I was a juror in the trial of Emerson Stevens for the murder of Mary Harding in Lancaster, Virginia in 1986. At the time of the trial, I resided in Essex County. The jurors were brought from Essex to Lancaster each day on a bus. At the end of the trial, Emerson Stevens was convicted of the murder of Mary Harding.

2. Although the trial was a long time ago, I remember many pieces of evidence that were presented to us. For instance, I remember that the medical examiner testified about the wounds on the victim's back, and how they were made by a knife. There was testimony that Emerson Steven's father threw away Emerson Steven's bloody knife, which added to making Stevens seem guilty. I remember that the detectives who testified seemed very certain of the facts. I remember Emerson Steven's daughter trying to establish his alibi and getting easily confused during cross-examination, as any child would. There was testimony that Emerson Stevens was a peeping tom, and there was testimony about people seeing Emerson's truck near the victim's house.

3. I considered most of the evidence we were presented to be circumstantial evidence – it didn't directly connect Emerson Stevens to the murder, but it also didn't make him appear innocent.

4. I also remember that the detectives found a hair on a shirt that belonged to Emerson Stevens. There was an expert who had analyzed the hair with a microscope and who testified about the hair at trial. The prosecutor told us that this hair belonged to the victim. This hair was the only direct evidence that I remember from the trial, and it was certainly the most important piece of evidence to me.

5. Without the hair, I don't believe I could have found Emerson Stevens guilty.

6. I have been informed by representatives of The Innocence Project at UVA School of Law that the hair that was recovered from Emerson Steven's shirt still exists and may be available for DNA testing.

7. I am well aware that science has made huge progress since 1986, and that DNA is now often used to prove the innocence of people who have previously

2

been found guilty. This seems like precisely the sort of case in which DNA testing would be appropriate.

8. I fully support conducting DNA testing of the hair in this case. Our verdict was based on the facts as they were presented to us in 1986, and we did the best we could with that information.

9. If relevant information is available now, that wasn't available then, it should be presented in court.

FURTHER, AFFIANT SAYETH NAUGHT.

JUNE P. BAIRD

Signed and sworn before me this _20th_ day of April, 2011.

Deirdre M Enright
NOTARY PUBLIC

Commonwealth of Virginia
Deirdre M. Enright - Notary Public
Commission ID: 317872
My Commission Expires 03/31/2014

3

COMMONWEALTH OF VIRGINIA )
)
CITY OF TAPPAHANNOCK )

## AFFIDAVIT OF MARGARET RENNOLDS

I, Margaret Rennolds, give the following statement under penalty of perjury:

1. I was a juror in the 1986 trial of Emerson Stevens for the murder of Mary Harding in Lancaster, Virginia. It is my understanding that my jury was the second jury to hear the case. At the time of the trial, I resided in Essex County. The jurors were brought from Essex to Lancaster every day on a bus. At the end of the trial, we convicted Emerson Stevens of the murder of Mary Harding.

2. I was chosen by the other jurors to be the foreperson of the jury.

3. One of the pieces of evidence I remember was a hair that was recovered from a shirt that belonged to Emerson Stevens. The prosecution presented evidence that the hair that was on this shirt was similar to Mary Harding's hair. The prosecution argued that Stevens had Harding's hair on her shirt because he killed her.

4. I have been informed by a lawyer from The Innocence Project at UVA School of Law that the hair that was recovered from Emerson Stevens's still exists and may be available for DNA testing.

5. I fully support conducting DNA testing of the hair. If the hair that was recovered from Stevens's shirt did not actually belong to Mary Harding, that is important evidence that Stevens may not be guilty of her murder.

FURTHER AFFIANT SAYETH NAUGHT.

*Margaret K Rennolds*
Margaret Rennolds

Signed and sworn before me this 28ᵗʰ day of April, 2011.

*Matthew Engle*
Notary Public

MATTHEW L. ENGLE
NOTARY PUBLIC
REG # 316141
MY COMMISSION EXPIRES
8/31/2014
COMMONWEALTH OF VIRGINIA

4

Benjamin N. Cardozo School of Law, Yeshiva University

# FBI MICROSCOPIC HAIR REVIEW FACT SHEET

### Genesis of the Review

In July 2013, the Innocence Project and the National Association for Criminal Defense Lawyers (NACDL), joined by pro bono partner Winston & Strawn LLP, announced a historic partnership with the Federal Bureau of Investigation (FBI) and the Department of Justice (DOJ) to review nearly 3,000 criminal cases in which the FBI conducted microscopic hair analysis of crime scene evidence and made a positive association between that evidence and a known hair sample. The agencies agreed to undertake a joint review after three men who had served lengthy prison sentences were exonerated by DNA testing in cases in which three different FBI hair examiners provided testimony which exceeded the limits of science and contributed to the wrongful convictions. Advances in science and technology have demonstrated that some forensic sciences previously accepted as valid and reliable were shown through DNA testing to be flawed. While other forensic disciplines have experienced technological advancements, microscopic hair comparison analysis remains largely unchanged in its methodology and has been proven inaccurate and unreliable for positive identification.[1] To date, 74 people have been exonerated by DNA in cases where microscopic hair comparison testimony was a factor.

### The Review Process

The review focused on specific cases in which FBI Laboratory testimony or reports included conclusions and probabilities that were scientifically invalid among cases processed by its laboratory prior to 2000, when mitochondrial DNA testing on hair became routine at the FBI. As of April 14, 2015, the FBI had reviewed over 500 cases. Transcripts were obtained in 269 trials in which hair evidence was used to inculpate the defendant(s). The review was conducted using consensus criteria issued by the FBI Laboratory that defined the limits of the science to distinguish between erroneous testimony and appropriate testimony based on what was known about microscopic hair comparison at the time FBI agents provided testimony. Only 11 transcripts of the first 269 were shown to have appropriate testimony proffered by FBI examiners.

## Results from the Review of the First 269 Transcripts

- Of the 269 transcripts, 96% (N=258) contained one or more types of testimonial errors
- All but two of 29 FBI examiners provided testimony that contained erroneous statements or authored lab reports with such statements
- FBI examiner testimony containing at least one error in cases originating from 82% of states and the District of Columbia. More than half of these cases are represented by nine states.

### Capital Cases

- Of the 35 capital cases where transcripts were obtained and positive associations were made, 94% of the cases had errors
- Nine defendants whose cases included erroneous testimony have been executed and five died of other causes while on death row.

[1] Houck and Budowle, J Forensic Sci. 2002 Sep;47(5):964-7.

Benjamin N. Cardozo School of Law, Yeshiva University

The 41st state jurisdictions in which FBI examiners provided erroneous testimony were distributed among the following states:

| | | | | |
|---|---|---|---|---|
| Alabama | Georgia | Massachusetts | Ohio | Vermont |
| Alaska | Hawaii | Michigan | Oklahoma | Virginia |
| Arizona | Idaho | Minnesota | Oregon | Washington |
| Arkansas | Illinois** | Mississippi | Pennsylvania | West Virginia |
| California | Indiana | Missouri | Rhode Island | Wisconsin |
| Colorado | Kansas | Montana | South Carolina | |
| Connecticut | Louisiana | New Hampshire | South Dakota | |
| Delaware | Maine | New Jersey | Tennessee | |
| Florida | Maryland | New York | Texas | |

*One case in North Carolina included appropriate testimony that was later found to be an erroneous microscopic hair comparison analysis. The case resulted in a wrongful conviction and the individual has since been exonerated.
**Capital cases converted to life sentences when state abolished death penalty

Of the 268 transcripts with testimonial errors, there were a total of 33 capital cases with erroneous testimony – nine of these individuals were executed. The capital cases were distributed among the following jurisdictions:

| | | | |
|---|---|---|---|
| Arizona | Illinois** | Oklahoma | Texas |
| California | Missouri | Pennsylvania | |
| Florida | Ohio | Tennessee | |

## Impact

While the FBI primarily uses microscopic hair comparison today to identify hairs for DNA testing, some state and local laboratories still conduct microscopic hair comparison analyses. At present, there are no national standards requiring "appropriate" testimony as defined by consensus standards for the limits of science by the FBI Laboratory. The widespread and systemic use of scientifically invalid and erroneous language that FBI examiners used in laboratory reports and trial testimony has potentially far reaching consequences. The FBI was responsible for training hundreds of state and local hair examiners across the country. This review focuses on FBI cases exclusively and doesn't account for their potential influence in state-level cases throughout the country and testimony in other forensic science pattern disciplines that suffer equally from the use of invalid statistics or probabilities.

In light of these findings, the DOJ and the FBI have committed to working with the Innocence Project and NACDL to take the following steps:

- Conduct an independent investigation of the FBI Laboratory protocols, practices and procedures to determine how this occurred and why it was allowed to continue for so long.
- Continue aggressive measures and review the process to determine whether additional steps could be taken to secure the transcripts and/or lab reports and review the hundreds of remaining cases that may contain invalid scientific statements.
- Strongly encourage the states again to conduct their own independent reviews where its examiners were trained by the FBI.

6



U.S. Department of Justice

---

*950 Pennsylvania Ave., NW, Room 2261*
*Washington, DC 20530*

December 30, 2014

Sandra Levick
Chief of the Special Litigation Division
Public Defender Service for the District of Columbia
633 Indiana Avenue, NW
Washington, D.C. 20004

Re:   United States v. Michael A. Jones, Case No. F-3048-96

Dear Ms. Levick:

We recently undertook a review of certain evidence that was presented in the above-captioned case. Enclosed please find a letter dated December 23, 2014, which we sent to the prosecutor in this case. We are also forwarding the letter to the Innocence Project and the National Association of Criminal Defense Lawyers.

We are sending this letter to you as the last known counsel of record of whom we are aware. If you know of a lawyer who represented the defendant in this matter at a later point, please provide us with the contact information for that lawyer. Please also send an acknowledgement of your receipt of this letter. You may reach us at the following email address: USAEO.HairReview@usdoj.gov.

Thank you for your cooperation on this matter.

Sincerely,

*Jew for*

Norman Wong
Special Counsel

Enclosure

7



**U.S. Department of Justice**

*950 Pennsylvania Avenue, NW, Room 2261*
*Washington, DC 20530*

December 23, 2014

Honorable Ronald C. Machen
United States Attorney
District of Columbia
Judiciary Center Building
555 4th Street, N.W.
Washington, D.C. 20530

      Re:    United States v. Michael A. Jones, Case No. F-3048-96

Dear Mr. Machen:

      We write to advise you of the results of a review by the United States Department of Justice (the "Department") and the Federal Bureau of Investigation ("FBI" and collectively with the Department "DOJ") of laboratory reports and testimony by FBI Laboratory examiners in cases involving microscopic hair comparison analysis. Through this review, we have determined that a report or testimony regarding microscopic hair comparison analysis containing erroneous statements was used in this case. This error and the process through which it was identified are explained in more detail below. We ask that you determine the actions your office should take in light of this error.

## I.   Background

      DOJ has been engaged in a review of microscopic hair comparison reports and testimony presented by the FBI Laboratory before December 31, 1999, after which mitochondrial DNA testing became routine. The science underlying microscopic hair comparison is not the subject of this review. However, in some cases, FBI Laboratory examiners exceeded the limits of science by overstating the conclusions that may appropriately be drawn from a positive association between evidentiary hair and a known hair sample. This is in contrast to cases in which the FBI Laboratory report and examiner testimony presented conclusions that may appropriately be drawn from a positive association. Thus, the purpose of this review is to ensure that FBI Laboratory reports and examiner testimony regarding microscopic hair comparison analysis met accepted scientific standards and to identify those cases in which those standards were not met so that any appropriate remedial action may be taken.

## II.   Error Identified in this Matter

We have determined that the microscopic hair comparison analysis testimony or laboratory report presented in this case included statements that exceeded the limits of science in one or more of the following ways and were, therefore, invalid: (1) the examiner stated or implied that the evidentiary hair could be associated with a specific individual to the exclusion of all others - this type of testimony exceeded the limits of the science; (2) the examiner assigned to the positive association a statistical weight or probability or provided a likelihood that the questioned hair originated from a particular source, or an opinion as to the likelihood or rareness of the positive association that could lead the jury to believe that valid statistical weight can be assigned to a microscopic hair association - this type of testimony exceeded the limits of the science; or (3) the examiner cites the number of cases or hair analyses worked in the laboratory and the number of samples from different individuals that could not be distinguished from one another as a predictive value to bolster the conclusion that a hair belongs to a specific individual - this type of testimony exceeded the limits of the science. (A copy of the documents upon which our determination is based is enclosed.)[1] We take no position regarding the materiality of the error in this case.

## III.   Potential Victim Notification

We recommend that you promptly advise the appropriate victim advocate in your office of this error, so that he/she may determine how and when to inform the victim or the victim's family that this matter may be the subject of further litigation and that they may be contacted by the defense.

## IV.   Potential DNA Testing

In the event that your office determines that further testing is appropriate or necessary or the court orders such testing, the FBI is available to provide mitochondrial DNA testing of the relevant hair evidence or STR testing of related biological evidence if testing of hair evidence is no longer possible, if (1) the evidence to be tested is in the government's possession or control, and (2) the chain of custody for the evidence can be established.

## V.   Potential Waiver of Procedural Defenses

In the event that the defendant seeks post-conviction relief under 28 U.S.C. §2255, based on the Department's disclosure that microscopic hair comparison laboratory reports or testimony used in this case contained statements that exceeded the limits of science, in the interest of justice, the United States is waiving reliance on the statute of limitations under Section 2255(f) and any procedural-default defense in order to permit the resolution of legal claims arising from the erroneous presentation of microscopic hair examination laboratory reports or testimony.

---

[1] You should be aware that after reviewing transcripts and laboratory reports in a number of different cases, the FBI conducted additional review of this case. However, certain aspects of the approach of the additional review were rejected by the DOJ. Accordingly, the results embodied in the attached report represent the official results of the FBI's review of this case.

2

## VI.    Report of Action Taken

To assist us in monitoring the status of cases involving microscopic hair analysis comparisons, we ask that you please advise us by February 2, 2015, if you intend to take any action based on the information that we are providing to you.  Please send this information to USAEO.HairReview@usdoj.gov, and let us know if we can be of any assistance.

## VII.    Additional Notifications

You should be aware that we are also notifying the defense, as well as the Innocence Project and the National Association of Criminal Defense Lawyers of the error.  These organizations have expressed an interest in determining whether improper reports or testimony affected any convictions and, if so, to ensure appropriate remedial actions are taken.  To assist them in their evaluation, we will provide them with information from our files, including copies of FBI Laboratory examiners' reports and testimony, as well as our assessment of those reports and testimony.

If you have any questions regarding this matter please contact us at the email address provided above.

Sincerely,

Jenn for

Norman Wong
Special Counsel

Enclosures

3

12/01/2014

# Response Sheet

*Please send completed form within 14 days to:*

**FBI POC**
FBI Laboratory
Quantico, VA 22135
**Fax: 703-632-7714**
**Email:** FBICaseReview2@ic.fbi.gov (please include in the subject line "IP and NACDL response" and the name of the defendant)

Referenced FBI Case Number: **95A-HQ-1171525**

Court Docket Number:

Subject(s)/Defendant(s): **Michael A. Jones**

**Findings of the Innocence Project (IP) and National Association of Criminal Defense Lawyers (NACDL):**

__ The IP and NACDL concur with the conclusion reached by the FBI Microscopic Hair Comparison Analysis Review that the materials reviewed contain no instances of Error 1, Error 2, or Error 3.

_X_ The IP and NACDL concur with the conclusion reached by the FBI Microscopic Hair Comparison Analysis Review that the materials reviewed contain the following Error Types:

__ Error 1

_X_ Error 2

__ Error 3

__ The IP and NACDL disagree with the conclusion reached by the FBI Microscopic Hair Comparison Analysis Review because, contrary to that conclusion, the IP and NACDL have found that the materials reviewed contain the following error types:

__ Error 1

__ Error 2

__ Error 3

Comments:

__ The IP and NACDL would like to meet with the FBI (in person or by phone) to discuss the differing opinions regarding the appropriateness of FBI testimony and/or lab reports.

This document is the property of the Federal Bureau of Investigation.
Do not disseminate further without the prior written authorization of the FBI Office of the General Counsel.
03/26/13



**U.S. Department of Justice**

Federal Bureau of Investigation

Washington, D.C., 20535-0001

### MICROSCOPIC HAIR COMPARISON ANALYSIS
### RESULT OF REVIEW

Date:    November 13, 2014

To:      Innocence Project
         Microscopic Hair Comparison Analysis Review Team

From:    Federal Bureau of Investigation
         Microscopic Hair Comparison Analysis Review Team

FBI File Number: 95A-HQ-1171525
Criminal Docket Number: F-3048-96
Defendant: Jones, Michael A.
Victim: Woldeab, Tsehay
Contributor: Metropolitan Police Department
300 Indiana Aveune, NW, Room 5059
Washington, DC 20001

 _X_ Trial    __ Plea    __ Stipulation
 _X_ Transcript enclosed
 ___ Lab Report enclosed

      Pursuant to the Letter of Agreement between our organizations, this letter serves to provide your office with the results from the Federal Bureau of Investigation (FBI) Microscopic Hair Comparison Analysis Review regarding the analysis of testimony and lab reports provided in the above-referenced case. Please notify the FBI, within 14 days of receipt of this letter, as to whether or not the Innocence Project (IP) agrees with the FBI's conclusions.

The FBI has conducted its review of the report issued in this case and found it to contain:

__ **Appropriate Statements**                    __ **Inappropriate Statements**

The FBI has conducted its review of the FBI testimony transcript and/or stipulation in accordance with the November 9, 2012 agreed upon scientific standards between the IP and FBI with the following results:

__ **Error Type 1:** The examiner stated or implied that the evidentiary hair could be associated with a specific individual to the exclusion of all others. This type of testimony exceeds the limits of the science.

 _X_ **Error Type 2:** The examiner assigned to the positive association a statistical weight or probability or provided a likelihood that the questioned hair originated from a particular source, or an opinion as to the likelihood or rareness of the positive association that could lead the jury to believe that valid statistical weight can be assigned to a microscopic hair association. This type of testimony exceeds the limits of the science.

__ **Error Type 3:** The examiner cites the number of cases or hair analyses worked in the lab and the number of samples from different individuals that could not be distinguished from one another as a predictive value to bolster the conclusion that a hair belongs to a specific individual. This type of testimony exceeds the limits of the science.

__ **Appropriate**

This document may contain information protected by the Privacy Act of 1974 and is provided by the FBI to your agency solely for authorized law enforcement purposes. The information contained herein may not be further disclosed or disseminated without the express consent of the FBI.

# Response Sheet

*Please send completed form within 14 days to:*

**Cherise B. Dreyfus**
FBI Laboratory
2501 Forensic Way
Quantico, VA 22135
**Fax: 703-632-7714**
**Email:** FBICaseReview2@ic.fbi.gov (please include in the subject line "IP response" and the name of the defendant)

Referenced FBI Case Number: <u>95A-HQ-1171525</u>

Court Docket Number: <u>F-3048-96</u>

Subject(s)/ Defendant(s): <u>Jones, Michael A.</u>

## Findings of the Innocence Project (IP):

___ The IP concurs with the conclusion reached by the FBI Microscopic Hair Comparison Analysis Review, or

___ The IP disagrees with the conclusion reached by the FBI Microscopic Hair Comparison Analysis Review for the following reasons:

___ Error 1

___ Error 2

___ Error 3

___ Appropriate

___ The IP would like to meet with the FBI (in person or by phone) to discuss the differing opinions regarding the appropriateness of FBI testimony and/or lab reports.

This document may contain information protected by the Privacy Act of 1974 and is provided by the FBI to your agency solely for authorized law enforcement purposes. The information contained herein may not be further disclosed or disseminated without the express consent of the FBI.

Version 6/3/2013

## FBI Microscopic Hair Comparison Analysis Review
### Evaluation Form

| Case Information: | |
| --- | --- |
| Case Number: | 95-HQ-1171525 |
| Defendant(s): | Michael A. Jones |
| Date of Review: | 11/05/2014 |
| Standard Applied: | MHCA Standards dated 11/9/2012 |

| Review of Testimony: | |
| --- | --- |
| Date of Testimony: | **Unknown** |
| Testifying Examiner: | **Fram** |
| Name of Prosecutor: | **Pierce** |
| Name of Defense: | **Threatt** |

Testimony Results (mark as appropriate):
Inappropriate Statements :      ☒  Yes      ☐  No

Limiting Language
Included in Testimony?      ☒  Yes                    ☐  No
Identify by Page and Line Number(s):
**Page 362, Line 1-11**
**Page 362, Line 22-25**
**Page 412, Line 14 to Page 413, Line 15**
**Page 414, Line 5-15**
**Page 415, Line 4-7**

If testimony contained Inappropriate Statements, cite each by Error type, page(s) and line number(s):
**Page 361, Line 19-21 – Error 2**
**Page 362, Line 12-21 – Error 2**
**Page 363, Line 20-22 – Error 2**
**Page 401, Line 11-16 – Error 2**
**Page 413, Line 16-17 – Error 2**
**Page 414, Line 17-18 – Error 2**

Approved By:   _Marc E. Bea_                    Date:      11/05/2014

Page 1 of 1

14

SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

CRIMINAL DIVISION

```
---------------------------X
                           :
UNITED STATES OF AMERICA   :
                           :
                           :
         v.                :Criminal Action No. F-3048-96
                           :
MICHAEL A. JONES,          :
                           :
         Defendant.        :
---------------------------X
```

Washington, D.C.

Friday, October 18, 1996

The above-entitled action came on for a continuation of trial before the Honorable **A. FRANKLIN BURGESS**, Associate Judge, and a jury, in Courtroom Number 219.

THIS TRANSCRIPT REPRESENTS THE PRODUCT OF AN OFFICIAL REPORTER, ENGAGED BY THE COURT, WHO HAS CERTIFIED THAT IT REPRESENTS THE NOTES AND RECORDS OF THE PROCEEDINGS OF THE CASE, AS RECORDED.

APPEARANCES:

On behalf of the Government:

JOHN PIERCE, Esquire
NANCY BUKAS, Esquire
Assistant United States Attorneys

On behalf of the Defendant:

GLENNON THREATT, Esquire
Washington, D.C.

KATHY E. JACKSON,
OFFICIAL COURT REPORTER              Telephone:  879-1064

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

## TABLE OF CONTENTS

### (Witnesses)

| | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| **On behalf of the Government:** | | | | |
| Tsehaye Woldeab | -- | --- | 282 | -- |
| Gashaye Zinabu | 298 | 310 | 328 | -- |
| Damon Brown | 331 | 338 | 349 | -- |
| Robert Fram | 354 | 401 | 414 | -- |
|     voir dire | | 382 | | |
| | | | | |
| **On behalf of the Defendant:** | | | | |
| Edward Truesdale | 422 | 443 | -- | -- |

## EXHIBITS ADMITTED

On behalf of the Government:

6-A through 6-L.................................... 366
7................................................. 379
9 and 10.......................................... 380
7-A through 7-D................................... 390
11-A through 11-D................................. 399

## MISCELLANY

Proceedings, October 18, 1996.........................281
Afternoon session....................................353
Certificate of Court Reporter........................450

\* \* \* \* \* \*

1          Go ahead, Mr. Pierce.

2          Thereupon,

3                    ROBERT FRAM,

4     having been called as a witness for and on behalf of the

5     Government, and having been first duly sworn by the

6     Deputy Clerk, was examined and testified, as follows:

7                    DIRECT EXAMINATION

8          BY MR. PIERCE:

9     Q     Good afternoon, Mr. Fram.

10    A     Good afternoon.

11    Q     State your name and spell your name for the

12    jury, please.

13    A     It's Robert B. Fram, and that's F-r-a-m.

14    Q     How are you employed, sir?

15    A     I am a Special Agent with the Federal Bureau

16    of Investigation.

17    Q     How long have you been with the FBI?

18    A     I have been with the FBI approximately fifteen

19    years.

20    Q     What have your responsibilities been with the

21    FBI?

22    A     Originally, I worked as a laboratory

23    technician in the serology unit, at the FBI laboratory

24    here in Washington.  I then became an FBI agent, and

25    work in Buffalo, New York, for about four years, doing a

                                                  354

FORM OSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1    variety of investigative matters, and I was brought back

2    to the Hair and Fiber Unit of the laboratory, here in

3    town in 1989, and I have been there since then.

4         Q    What are your current responsibilities?

5         A    Currently, I work in the hair and fiber unit.

6    I examine evidence, which is sent to the laboratory from

7    throughout the country.  These are FBI cases as well as

8    other Federal, State, local law enforcement agencies.  I

9    look at evidence from criminal cases, for the presence

10   of hairs and fibers, and I attempt to associate them

11   back to a source.

12        Q    Are you an agent or an analyst with the FBI?

13        A    I am an agent.

14        Q    What was your educational background before

15   you went to the FBI?

16        A    I have got a Bachelor's degree from

17   Anthropology from one of the City Universities of New

18   York City.  And I have a Masters degree in Physical

19   Anthropology, from the Pennsylvania State University.

20        Q    Did you join the FBI after your Master's

21   Degree?

22        A    Yes, right after graduate school.

23        Q    Can you explain to the jury what it is that

24   your unit does at the FBI?

25        A    Yes.  We examine evidence that comes in from

355

18

1    criminal cases. Clothing, weapons, other items from a

2    crime scene. What we're looking for is evidence of

3    hairs and fibers that may have transferred. This is all

4    based on the idea that when two people come in contact

5    with each other, or a person comes in contact with an

6    object, things can transfer between them and among that

7    is hairs and fibers.

8       By looking for these hairs and fibers on the

9    evidence, I attempt to find a source of these hairs and

10    fibers and show a possibility of contact between the two

11    people, or between the person and an object.

12      Q    What has your training been in this area?

13      A    The training consists of looking at thousands

14    of specimens of hairs and fibers, reading available

15    literature, discussing cases, and case work with

16    qualified examiners, taking courses taught by the FBI

17    and outside the FBI and then, finally going through a

18    series of oral Board certifications.

19      Q    What does your normal day consist of?

20      A    My normal day is examining hairs and fibers

21    and making comparisons.

22      Q    How many a day? Any idea?

23      A    It all depends. On any given item, that you

24    may process to find hairs and fibers, there can be

25    hundreds of hairs and fibers on those things. So, it's

356

19

1    -- I'd say yearly, it's thousands and thousands of hairs

2    and fibers that I look at.

3        Q    Do your responsibilities also include

4    testifying in Court about your findings?

5        A    Yes, it does.

6        Q    How many times have you testified?

7        A    Somewhere close to sixty times.

8        Q    Where do you testify?

9        A    Throughout the country.  I have also testified

10   in Barbados, West Indies, Virgin Islands.  I think

11   that's been about it.

12       Q    Any estimate on the number of cases that you

13   have worked on since you have been a hair and fiber

14   analyst with the FBI?

15       A    I would guess, it's somewhere around two to

16   three thousand cases that there have been.

17       Q    Can you explain to the jury?  I believe that

18   you mentioned that your examinations are microscopic?

19       A    Yes.

20       Q    Can you explain to the jury what you look for

21   when you examine hair and fiber evidence?

22       A    Sure.  When I look, do my hair and fiber

23   examinations, I use what is called a comparison

24   microscope.   And this is just two microscopes side by

25   side, jointed by an optical bridge, which lets me look

                                                    357

1   at one set of eye pieces and see a split screen. So I

2   can look at a hair on one side, which might be a hair

3   from a known sample from an individual. A known sample

4   is, I know this hair belongs to this person, it was

5   actually pulled from that person.

6      And then, on the other side, on the other

7   microscope, is a hair found on an item of evidence that

8   I am trying to compare.

9      And that way, it lets me look at the two hairs

10  side by side at the same time, from the root of the hair

11  all way to the tip of the hair, and compare all the

12  microscopic characteristics. That lets me see them

13  without having to put one hair on, try to remember what

14  it looks like, and put the other one on. This is

15  actually side by side at the same time, to decide if all

16  those characteristics are the same.

17      And fibers are done the same way. There are

18  some additional exams that are done with fibers which

19  will determine the actual type of fiber, whether it's a

20  polyester or nylon or acrylic. But, the basic

21  comparisons are done with that comparison microscope.

22    Q   You use the word, pulled. Are there different

23  manners of obtaining known hair samples?

24    A   Yes. A good known hair sample starts out with

25  plucking, or pulling, about twenty to twenty five hairs,

358

21

1   from a person, if it's possible, and then, in addition

2   to that, also combing the person's hair.  And the reason

3   for that is when you pull hair out of a person's head,

4   generally what you're getting are actively growing hairs

5   that you're forcibly removing from that person's head,

6   the root, stretched out, the root being under the skin,

7   the hair is growing from beneath the skin, so the tip of

8   your hair is actually the oldest part of your hair,

9   because it's been growing out all that time.

10          When you comb the hair, what you're getting

11  are hairs that have gone through their growth cycle.

12  head hairs go through about a two to six year growth

13  cycle on the average.  Hopefully, you're going to

14  regenerate those hairs, after they fall out.  In cases

15  like mine, it doesn't always work that way (laughter) --

16  but the hairs you're going to get combing are those

17  hairs that are ready to fall out.  These are the hairs

18  that you'll find on your shirt, when you comb, after you

19  comb your hair.  Those hairs are a little different,

20  because they're in a different stage of the growth

21  cycles.

22          So, what you wan to see is the all you want

23  to see is the -- all the stages of that growth.  And

24  that's why it's good to have a pulled and a combed hair

25  sample.

                                                    359

1      Q    Can you identify what some of the

2   characteristics are, what you call them, when you're

3   examining a hair, in order to make comparisons from one

4   hair to another?

5      A    A hair is made up of three main areas, and as

6   corny as it sounds, if you think of a pencil, it's the

7   easiest way to think of it, the coating of let's say, a

8   yellow pencil, that yellow coating is like the cuticle

9   of the hair.  The cuticle is the protective coating of

10  the hair.  It's made up of overlapping scales, like

11  scales on a fish of shingles on a roof of a house.

12  Those can vary, in how big they are,  how far away from

13  the hair they protrude, and how close to the hair they

14  are, how thick the whole cuticle is, because the cuticle

15  is made up of many layers of these scales.

16          Moving into the hair is the cortex of the

17  hair.  That's the main portion of the hair.  This is

18  like the wooden part of a pencil.  In that cortex is

19  pigment granules, and that's what give the hair its

20  color.  The pigment varies in how much it is, how it is

21  arranged in the hair, how it's distributed throughout

22  that hair.

23          Also, in the cortex are things called ovoid

24  bodies, which are just dark ovular, oval bodies.

25  Really nobody knows what they are.  They appear in

360

23

1    hairs, and they vary in how many there are, their size,

2    where they are in the hairs, and there are also things

3    called cortical fusi, which are just air spaces in the

4    hair.

5           And then finally, moving in towards the center

6    of the hair is called the medulla, and that's like the

7    lead or the graphite running through the center of the

8    pencil.   In some hairs, you don't see the medulla, in

9    some hairs, it's just small, broken pieces of medulla,

10   there's large spaces between it, and that's called

11   fragmentary.

12          In some hairs, there's long pieces of medulla,

13   with small breaks in it, called discontinuous, and in

14   some hair's there's a continuous medulla, which is

15   running through the length of the hair.   And again, the

16   medulla varies in the width, and whether it's very dark,

17   or clear, and very cellular looking.

18          So, all different characteristics found in the

19   hair are compared, and for me to conclude that a hair

20   found on an item is consistent with something from a

21   specific individual, I have to find all those

22   characteristics to be the same throughout the length of

23   the hair, distributed the same way.   If there is any

24   differences in those characteristics, then I conclude

25   it's not consistent in coming from that person.

                                            361

24

1        Q     You have used the word, consistent, how would

2     you describe what, in your science, those of you who

3     work in it, how do you measure the -- the means of

4     comparing hairs, I mean, is there a definitive, absolute

5     that hairs are from the same person, or how does that

6     work?

7        A     Yes.  Hair comparisons are not a basis for

8     absolute personal identification.  It's not like a

9     fingerprint, where I can look at a hand and say, it came

10    from that person and nobody else in the world.  But, I

11    haven't compared everybody's hair in the world, and on

12    very rare occasions, you may see two hairs that are so

13    close, that you can't significantly say it came from

14    that person, as opposed to that person.  It's very rare,

15    though.  I have seen it, I think, two times in my

16    career, and neither of the two times have been in my own

17    cases.  It's a rare enough thing that if anybody in our

18    unit gets a hair, two hairs that look so close, they'll

19    show it around.  I've never had that in my case, but

20    it's very rare to find two people whose hairs I can't

21    distinguish between.

22              Again, you know, I can't say that it's a

23    fingerprinted identity.  But, the terminology I use is,

24    it is consistent.  They are the same microscopically and

25    it's consistent with coming from that person.

                                                          362

25

1      Q      These two cases that you have mentioned, are
2    you saying that people were able to bring you two hairs
3    of two known people, two different people, and you
4    weren't able to distinguish them?
5                   MR. THREATT:  Objection, Your Honor.
6                   THE COURT:  Basis?
7                   MR. THREATT:  Relevance.
8                   THE COURT:  Overruled.
9                   THE WITNESS:  Yes.  These were two known
10   samples that were so close.  Now, when you're looking at
11   hairs, you look at a known sample from an individual,
12   there is a slight degree of variation between the hairs
13   on one person's head.  If I took a hair from the back of
14   my head, and a hair from my side of my head, there may
15   be some slight differences.  But, when you get a known
16   sample from that individual, you see what that range of
17   variation is, and you expect that range of variation to
18   be small enough that it doesn't overlap two other
19   people.
20                   Now, there are times, and these two times were
21   the rare times, where there was a little bit of an
22   overlap.  But, even though you may look at it and say, I
23   see a slight difference there, it's not significant
24   enough for us to associate a hair to an individual.  It
25   wouldn't be significant to do that.

                                                        363

26

1          BY MR. PIERCE:

2      Q    If you were trying to further show a group of

3  people that you were teaching this science to, for

4  instance, what some of these characteristics look like,

5  would anything assist you in doing that?

6      A    I brought some pictures that I can use as

7  illustration.

8              MR. PIERCE:  Do you want to look at these?

9              MR. THREATT:  I did looked at them.

10             THE COURT:  Do you want to look at them again?

11             MR. THREATT:  No.

12             MR. PIERCE:  May I approach, Your Honor?

13             THE COURT:  Yes.

14             BY MR. PIERCE:

15     Q    I'm showing you what's been premarked as

16  Government's Exhibit 6-A through 6-L, and ask you to

17  take a look at those.

18             (A pause.)

19             Are those the photos that you brought with

20  you?

21     A    Yes, they are.

22     Q    Those photos don't apply to this case, do

23  they?

24     A    No, they do not.

25     Q    Can you explain or tell us what group that

                                                    364

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1    body of photos comes from?

2         A    These are all pictures of Negroid hairs.    We

3    classify hairs in three racial groups.    These are

4    Caucasian hairs, Negroid hairs, and Mongoloid hairs.

5    Mongoloid being Asian, American Indian, and Eskimo.

6    These are all examples of different hairs of Negroid

7    characteristics.

8         Q    Can you hold those up one at a time and

9    explain what some of the characteristics are of those

10   photographs, in reference to some of the terms you have

11   already used.

12            MR. THREATT:   Objection, Your Honor.

13            THE COURT:   Do you want to come up to the

14   bench?

15            MR. THREATT:   I would like to.

16            THE COURT:   All right.

17         Step down.

18            (At the bench.)

19            MR. THREATT:   Your Honor, I'm objecting

20   because I think if these photographs are going to be

21   shown to the jury, they need to be in evidence first.

22            MR. PIERCE:   That's my fault.

23            THE COURT:   Do you have any objection to their

24   being admitted?

25            MR. THREATT:   Yes, I do.   On the basis of

                                                      365

1  relevance.

2         MR. PIERCE:  I will be offering them, if we

3  could argue it now.

4         THE COURT:  Yes.  I think they're relevant in

5  this sense, that they can help the jury understand what

6  a hair looks like under a microscope, Mr. Threatt.

7         MR. THREATT:  Your Honor, if they're being

8  offered for that purpose.  I think they're being offered

9  to assist in the comparison, as to the consistency for

10 my client's hair.

11        THE COURT:  They're specifically not being

12 admitted for that purpose.  I'm going to admit them.

13        MR. THREATT:  All right.

14        (In open Court.)

15        THE COURT:  All right, step up.

16        I'm going to admit, Government's Exhibit

17 Number 6-A through 6-L, ladies and gentlemen.   As

18 you've heard, these are not pictures of hairs taken in

19 this case.  They're coming into evidence to help you

20 understand what hairs look like under a microscope so he

21 can help explain.

22                 (Thereupon, Government's Exhibit Number

23                 6-A through 6-L was admitted into

24                 evidence.)

25        BY MR. PIERCE:

                                              366

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1    Q    If you wouldn't mind holding up 6-A and I am

2  going to ask you first to show it to the Judge and then

3  to the jury.

4        (The witness complied.)

5    A    I actually picked out one to show

6  specifically.

7    Q    Okay.

8    A    If I can do it out of order here.

9    Q    Very well.  What number is that?

10   A    This is 6-I.

11       THE COURT:  Fine.

12       THE WITNESS:  This is a just a quick example

13  that I saw for the medulla.  The central portion of the

14  hair.  This dark opaque area is called the medulla.

15  Again, in this hair, at least, in this small piece of

16  hair that you're seeing in one view of the microscope,

17  it's continuous through it.  It's relatively thick and

18  it's dark.

19       There may be hairs such as 6-C, which has a

20  fragmentary medulla.  And again, the medulla is just

21  small pieces of broken areas with large spaces.  It's

22  narrower in the medulla here.  These are just some of

23  the differences in the medulla that you will see.

24       BY MR. PIERCE:

25   Q    Is there -- are there some photographs in

367

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

30

1    there that will help you describe pigments -- excuse me

2    --

3                (Juror coughing.)

4                (A pause.)

5                JUROR:  Thank you.  I'm okay.

6                BY MR. PIERCE:

7         Q    -- that help you describe pigmentation, for

8    instance, pigment distribution, or ovular granules?

9         A    Yes, this is 6-E, and what you're seeing here

10   is all this dark, kind of clumpy material.  That's the

11   pigment granules.  That's one feature that you see in

12   Negroid hair, is that the pigment granules are clumped.

13   In Caucasian hairs, they're more spread out and even.

14   In Mongoloid, they're what you call patchy or cloudy.

15   They're not actual clumps of pigment.  They're just

16   concentrations, small concentration in areas.

17               MR. PIERCE:  Would the Court mind if we

18   published those three that we've seen so far?

19               THE COURT:  I don't think you need to do that

20   now.

21               BY MR. PIERCE:

22        Q    Any others that help describe pigment

23   distribution or other pigment characteristics?

24        A    6-K.

25               THE COURT:  Yes.

                                                        368

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-628-6313

1          THE WITNESS:  6-K.

2          THE WITNESS:  Is an example of a -- another

3    hair which has a little bit more even pigment

4    distribution, not as much pigment here.  This is still a

5    Negroid hair, there is still some clumping.  But, you

6    see, it's just not as dark because the general hair

7    color is not as dark base, because of the pigment

8    granules.  Again, the pigment granules give the hair

9    its color.  So, it's not as dense.  There's some

10   clumping, but not nearly as much as the other picture.

11         BY MR. PIERCE:

12   Q    How about something that shows an example of

13   this cortical fusi that I think you referenced?

14   A    I don't see one that has that.  Typically, you

15   will see the cortical fusi toward the root, down near

16   the root.  Usually, in a club of a hair that's pretty

17   much finished with its growth cycle.  The reason for

18   that is while the hair is finishing up its growth, it

19   tends to dry out, and that's when we start getting these

20   hair spaces in the hair. Generally, in hair, that's

21   growing, you don't see the fusi.

22   Q    What about ovoid bodies?  Anything in there

23   that helps you describe that?

24   A    On 6-L.

25         THE COURT:  Yes.

369

1        THE WITNESS:  It may be hard to see. There's

2    right where my finger is, a small ovoid body, a small

3    dark, round, area.  Again, in this area, a small dark

4    oval body, and those are the oval bodies, and those can

5    vary.

6        BY MR. PIERCE:

7        Q    The photograph that you have in your left hand

8    there, what number is that?

9        A    This is 6-A.

10        THE COURT:  Yes.

11        BY MR. PIERCE:

12        Q    Do you also rely on color when you examine

13    hairs?

14        A    Yes.

15        Q    And is this an example of one with color that

16    you can compare with another in there with color?

17        A    Sure.  Again, this is a very dark hair, very

18    dense pigment, and although you don't really see the

19    definition in this particular picture, when you're using

20    a microscope, and scanning the hair, you can focus in

21    and out and pick up more of what's in there than you're

22    going to pick up in just one photograph, but, but you

23    can see a vast difference between 6-K and 6-A.  Again,

24    these are two different individual hairs.

25        Q    How many times are these hairs magnified that

370

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

1   are contained in these photographs?

2

3       A    All these photographs are magnified two

4   hundred fifty times.

5       Q    Do you change the magnification throughout

6   your examination in a particular case?

7       A    You generally do.  Generally, I start off at

8   about forty power, and then work my way up to two

9   hundred fifty power.

10      Q    Why do you do that?

11      A    To see different characteristics, at forty

12  power, which is low power on the microscope, you can see

13  the general look of the hair, you can see the -- get the

14  diameter changes along the lines of the hair.  You can

15  see just what the hair looks like, the general color of

16  it, and then you want to go to a higher magnification to

17  be able to see the pigment granules and the ovoid

18  bodies, and all those characteristics.  So, you're

19  really looking at it on different levels.  You don't

20  really go any further than two hundred and forty power,

21  and I don't go any less than forty power. hours.

22      Q    Are there any other particular characteristics

23  among those photographs that you'd like to point out?

24      A    Yeah.  On 6-F.

25           THE COURT:  Yes.

371

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

1          THE WITNESS:   Is an example of the cuticle.

2    If you look outside of the dark area of the hair, you

3    can just see a small, very thin, clear area, and then a

4    fine line.   That's the cuticle of the hair, and that's

5    made of these scales.

6          And in some hairs, such as this one, it's

7    very, you can barely see the scales, because they lay

8    very close to the hair.   In some hairs, they'll be

9    further away from here, and you can actually see the

10   individual scales sticking out along the length of the

11   hair.

12         BY MR. PIERCE:

13   Q    Any other particular characteristics?

14   A    I think that's about it with these.

15   Q    Were you provided some hair samples to compare

16   in the case of United States versus Michael Jones?

17   A    Yes, I was.

18   Q    Now, I'm going to show you first what's been

19   received as Government's 3, and ask whether you

20   recognize whether that's been processed by your lab?

21   A    Yes, I do.

22   Q    How do you so recognize that?

23   A    It has a laboratory number and a cue number

24   and initials on it.

25   Q    What do those indicate to you?

372

1      A    It indicates that our laboratory received the

2  evidence and that it was processed in the laboratory.

3      Q    Do you see any initials on those?

4      A    Yes, I do.

5      Q    What initials is there?

6      A    It's DWD.

7      Q    Who is DWD?

8      A    Special Agent Douglas Dietrick.

9      Q    Do you work with Douglas Dietrick?

10     A    Yes, I do.

11     Q    When -- when a case is brought into your

12  laboratory, is it handled by just one examiner?

13     A    Generally, the case is handled by one

14  examiner, yes.

15     Q    The findings that are made, are those

16  verified?

17     A    Yes, they are.  Whenever a hair association is

18  made, another examiner in the unit has to look at that

19  hair association and confirm it.

20     Q    Did you look at the hairs in this case, United

21  States versus Michael Jones?

22     A    Yes, I did.

23     Q    So, you've examined all of the evidence that

24  came through your lab?

25     A    The hairs, yes.

                             373

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1       Q       Showing you what's been premarked Government's

2    Exhibit 7 --

3       A       Okay.

4       Q       -- can you tell us what that is?

5       A       Yes.  This is a bag that contains --

6               MR. THREATT:   Objection, Your Honor.

7               THE COURT:  Basis?

8               MR. THREATT:  He's showing the exhibit.  It's

9    not in evidence yet.

10              THE COURT:  I will allow it.

11              BY MR. PIERCE:

12      Q       If you can just describe it without showing it

13   to the jury at this point.

14      A       It's a bag that contains two plastic pill

15   boxes.  The pill boxes are what debris we move from an

16   item is placed into, originally when the item is

17   processed.  And then, also three cardboard slide

18   mailers, and these are just cardboard, little packages

19   that each can contain one or two microscope slides.  And

20   it's simply just a way to not have the microscope slides

21   broken.

22      Q       Are you able to determine, from examining the

23   information on that exhibit, whether that's related to

24   this case?

25      A       Yes, I can.

                                                      374

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

1      Q    How are you able to do that?

2      A    Again, it has the lab numbers written on it.

3    Laboratory numbers are the way we identify each case

4    submission that comes in.  Also, the cue numbers, the

5    item numbers and the initials DWD.

6              MR. PIERCE:  We offer Government's 7, Your

7    Honor.

8              THE COURT:  Any objection?

9              MR. THREATT:  Yes, there is, Your Honor.

10             THE COURT:  Step up.

11             (At the bench.)

12             MR. THREATT:  Is he going to say these hairs

13   came from the hat which is already admitted into

14   evidence?

15             MR. PIERCE:  I believe that is where it came

16   from.

17             THE COURT:  Does --

18             MR. THREATT:  Does it contain any hair which

19   is a sample supposedly taken from my client?

20             MR. PIERCE:  I think there's a sample

21   contained in these exemplars and slides.

22             MR. THREATT:  I am going to object to hairs

23   taken from my client because there is no foundation

24   testimony laid.  If he intends to testify as to a

25   comparison, I believe that the Government has not

                                              375

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1   introduced any foundation or chain of custody of a

2   sample taken from my client. Without a comparison

3   sample, I think this is irrelevant.

4       MR. PIERCE: Frankly, Your Honor, I thought

5   that counsel and I had an agreement for chain of

6   custody. I will not call Truesdale to say I took hairs

7   from this witness.

8       MR. THREATT: Your Honor, I offered as to the

9   chain of custody of the hat. I did not know that they

10  had not intended to call Detective Truesdale.

11      MR. PIERCE: I mentioned to counsel after

12  lunch that I don't know that we would be calling

13  Detective Truesdale in our case in chief.

14      I don't think he has anything from going over

15  my notes. So, I would have covered foundation on

16  obtaining hair samples from Truesdale, had I called him.

17  But I did not know that chain of custody would be an

18  issue.

19      THE COURT: Is your request that Mr.

20  Truesdale be here to ask questions?

21      MR. THREATT: I am not getting ahead of

22  myself. Yes, is the answer to the Court's question, but

23  the witness is getting ready to testify about a

24  comparison that he didn't conduct. Then, the chain of

25  custody is not established.

376

1    THE COURT:  Obviously, the Government does not

2    need to establish a chain of custody.   He says he

3    thought you had an understanding.  I thought you said

4    that was the only understanding that this detective was

5    going to be here.

6        MR. THREATT:  It was --

7        THE COURT:  And implied so you could cross-

8    examine.

9        MR. THREATT:  Yes, Your Honor.

10        THE COURT:  I thought we could solve this

11    problem by having Truesdale here so you can question

12    him, at some point.

13        MR. PIERCE:  He'll be available.

14        THE COURT:  If that's your concern.  If you

15    have another problem, let me know.

16        MR. THREATT:   That's my objection.

17    Otherwise, I have to object to the comparison testimony.

18        MR. PIERCE:  This witness did make comparison

19    from the known to unknown samples.

20        MR. THREATT:  That's the point of this all.

21        THE COURT:  His point is, he wants Truesdale

22    to ask questions of, I assume, on this and other issues.

23        MR. THREATT:  Yes, sir.

24        THE COURT:  Do you want to have him here

25    before we ask this guy questions, before chain of

377

1  custody can be established, or are you satisfied to

2  agree on chain of custody and have them here so you can

3  ask him about this and other --

4       MR. THREATT:  From a logical -- does it make

5  sense for me to reserve my objection contingent upon

6  Detective Truesdale testifying?

7       THE COURT:  Yes.  I assume he's going to

8  promise that Truesdale would be available.

9       MR. PIERCE:  We will make him available.

10      THE COURT:  If that's the case, I would like

11  to have him go ahead and testify.

12      MR. THREATT:  As would I, Your Honor.

13      THE COURT:  You can ask Truesdale what you

14  want.  That would require -- I thought he said you said,

15  you weren't going to object to chain of custody as to

16  admissibility.  You can cross-examine Truesdale on

17  things beyond chain of custody.

18      MR. THREATT:  Yes, Your Honor.

19      THE COURT:  Is that acceptable?

20      MR. THREATT:  Yes.

21      Is the Court talking about cross-examining as

22  to issues other than the hair or otherwise?

23      THE COURT:  I am basically saying Mr. Threatt,

24  that he can cross-examine about the hair and about the

25  chain of custody.  It will have been admitted.   He can

378

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

41

1    bring to the Court's attention defects in it, for

2    purposes of their consideration. Also, he can call

3    Truesdale in his case, and cross-examine him as an

4    adverse witness. I will let him do that. He's a police

5    officer, and a primary witness on a relevant matter.

6         MR. THREATT: That's my primary concerns.

7    Thank you.

8         THE COURT: Okay.

9         (In open Court.)

10        We're going to let the agent testify about

11   this. We're going to admit this into evidence.

12   Government's Exhibit Number 7. The material in it, he

13   will be allowed to testify about it.

14        Go ahead, Mr. Pierce.

15             (Thereupon, Government's Exhibit Number

16             7 was admitted into evidence.)

17        BY MR. PIERCE:

18        Q   The items in Government's Exhibit 7, are those

19   known or unknown?

20        A   These would be -- the two pill boxes are from

21   the unknown, and in the slide mailers are slides from

22   both the unknown and the known samples.

23        (A pause.)

24        Q   Showing you what's been premarked Government's

25   Exhibit 9 and 10, do you recognize those?

                                                    379

1   A   Yes.

2   Q   What do you recognize them to be?

3   A   Exhibit 1 -- I can't make out what that is.

4   Q   It's a 10.

5   A   10.   Okay.   Is the envelope that contained a

6   pulled head hair sample from a Michael Antonio Jones.

7       Exhibit 9 is an envelope containing combed

8   head hair from a Michael Antonio Jones.

9   Q   Were you able to make comparisons then from

10  those known samples for Michael Antonio Jones that were

11  provided to you and compare them to hairs obtained from

12  the hat?

13  A   Yes.

14      MR. PIERCE:   We'd offer 9 and 10, Your Honor.

15      THE COURT:   Those will be admitted, subject to

16  the same condition.

17      MR. THREATT:   Subject to the same discussion

18  at the bench, Your Honor.

19      THE COURT:   Yes.

20          (Thereupon, Government's Exhibits 9 and

21          10 were admitted into evidence.)

22      Mr. Pierce, I'm afraid we're going to have to

23  interrupt at this point.   I have a couple other cases we

24  have to call.

25      MR. PIERCE:   Very well.

                                              380

**43**

1          THE COURT:  Ladies and gentlemen, let me let

2   you go back for fifteen minutes, and we'll get right

3   back into this case.  I have another case I have to

4   call.

5          (The jury left the courtroom t 2:23 p.m.)

6          (The witness left the witness stand.)

7          THE COURT:  Mr. Threatt, can you stand by,

8   please, sir?

9          MR. THREATT:  I will, Your Honor.  I won't

10  leave.

11         (Recess at 2:24 p.m.)

12  (3:40 p.m.)

13         THE DEPUTY CLERK:  Returning to Your Honor's

14  Trial Calendar, United States versus Michael A. Jones,

15  Docket Number F-3048-96.

16         THE COURT:  Let's bring the jury in.

17       Come on back up, Agent.

18         (The witness complied.)

19         (The jury came into the courtroom.)

20         THE COURT:  Okay, you may proceed, Mr. Pierce.

21         MR. PIERCE:  Your Honor, before I ask the

22  witness questions about the particular exhibits in this

23  case, I want to offer him as a expert in hair and fiber

24  analysis.

25         THE COURT:  Do you have any objection, Mr.

381

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6318

1    Threatt?

2            MR. THREATT:  I do, Your Honor, and I'd ask

3    for an opportunity to voir dire him.

4            THE COURT:  Okay.

5            MR. THREATT:  Thank you.

6                    VOIR DIRE EXAMINATION

7            BY MR. THREATT:

8       Q    Good afternoon, Mr. Fram.

9       A    Good afternoon.

10      Q    When you were being questioned by Mr. Pierce,

11   you indicated you were an agent, as opposed to an

12   analyst; is that correct?

13      A    My title is Special Agent; that's correct.

14      Q    Okay.  Is there some technical distinction

15   between an agent and an analyst?

16      A    Not that I am aware of.  In the laboratory,

17   the agents in the laboratories are examiners, but my

18   title is Special Agent.

19      Q    Okay.  Are you an examiner in terms of what

20   you do on a day-to-day basis?

21      A    Yes, I am.

22      Q    Okay.  Now, let me ask you a little bit about

23   your educational qualifications.  I see that your

24   Bachelors and Masters degrees are in physical

25   anthropology; correct?

                                              382

1  A  That's correct.

2  Q  Okay.  Is that a biological science, sir?

3  A  It's covered a variety of things.  We went

4 into genetics and biology.

5  Q  Okay But, your degree is not in a biological

6 science; is that correct?

7  A  Not purely a biological science; that's

8 correct.

9  Q  Okay.  Now, and you received your Masters in

10 1980; is that correct?

11  A  Yes.

12  Q  Okay, have you had any education in biological

13 sciences, particularly with respect to human biology

14 since receiving your Masters degree?

15  A  Human biology, I don't recall.  I have seen

16 several DNA courses.  I don't recall taking any biology,

17 other than what was covered in the  DNA courses, since

18 then.

19  Q  Okay.  Now, so the answer to the question

20 would be, no; is that correct?

21  A  Well, again, not a strict course.  They cover

22 biology in the DNA courses that we took.  I did not take

23 a biology course after graduate school.

24  Q  Okay.  So that would mean in about sixteen

25 years, is that correct?

383

1       MR. PIERCE: Objection. Vague.

2       MR. THREATT: I will rephrase the question.

3       BY MR. THREATT:

4       Q    That would mean since you got your Masters in

5   1980, it's been about sixteen years since you had a

6   course in human biology; correct?

7       A    Again, other than the DNA courses that I have

8   taken in the last few years, I have not taken a strict

9   biology courses.

10      Q    Okay. Now, the ability to make determinations

11  and comparisons about human hair would be covered under

12  the field of human biology; would it not?

13      A    No, I don't remember any course in biology

14  talking about human hair comparisons, no.

15      Q    Okay. So, none of the courses that you had in

16  biology had anything to do with hair; is that right?

17      A    No, I don't know of any biology course that

18  would, again, talk about the microscopic characteristics

19  of the hairs.

20      Q    Okay. So, what in your educational

21  background, in terms of your Bachelors and your Masters

22  prepared you for being qualified as an expert to do

23  comparisons on human hair, sir?

24      A    In my college courses and graduate school, I

25  used a microscope, I learned how to work independently

                                            384

47

1    to do research, and in reality, doing this kind of work
2    is doing research projects.  Every case, I do one, doing
3    comparisons, and stockpiling information that I'm
4    seeing, all this was experience I got through my
5    undergraduate degree in, and more so my graduate degree,
6    by doing independent research, using microscopes, just
7    being able to work independently.
8        The rest of the training in hair and fiber
9    analysis, is, you can't get anywhere, other than being
10   trained at the job because really there is nobody else
11   who does hair and fiber comparisons, other than
12   something like a laboratory worker.
13       Q    Okay.  Let's go to that then.  Now, I see in
14   the, your specialized training that you have had one
15   year of training in the Hair and Fiber Unit of the FBI
16   laboratory; is that correct?
17       A    That's correct.
18       Q    Okay.  Now, hair and fiber covers a
19   tremendous, broad scope of everything from carpet fibers
20   all the way to human hairs, which are the focus of this
21   case; is that correct?
22       A    Yes.  There are many different kinds of
23   fibers, and there's human hairs, animal hairs, yes.
24       Q    Okay.  Now, in the one year of training that
25   you've had in the hair and fiber unit of the FBI

385

FORM CSR - LASER REPORTERS PAPER & MFG. CO.   800-626-6313

1   laboratory, how much of that time has been devoted to

2   the comparison of human hair?

3       A    Initially, about half the training year is

4   hairs, the other half fiber.  You do hairs first and in

5   reality, the rest of the year, you're still going back

6   and doing hairs.  So, really, I train for about a year

7   with hairs, and then the second half, primarily do

8   fibers, but still went back and doing hair work.

9       Q    Okay.  What year did you have this training

10  course, sir?

11      A    This would be in 1989.

12      Q.   Okay.  Now, in the intervening seven or so

13  years, have you had any additional training courses in

14  hair and fiber?

15      A    Well, in reality doing case work is training.

16  I am still learning things.  You're still practicing the

17  science every time I do a case, we get proficiency

18  tests.  There are blind proficiency tests that come

19  through the unit from time to time.  So there are things

20  keeping me up on my training in doing hair comparisons

21  and fiber comparisons.

22      Q    Mr. Fram, that's very interesting, but my

23  question is, since 1989, how many times have you had

24  additional training in hair and fiber?

25      A    And, again, I answered that, everything I'm

                                                386

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

1    doing is additional training.  At least, I consider it

2    that.  It's been continuous since 1989.

3         Q    But, what you mean is, on the job activity, as

4    opposed to a pedagogical type of an environment; is that

5    correct?

6         A    If you are talking about attending a school, I

7    teach a hair and fiber school.  But, I have not taken

8    another course.

9         Q    Okay.  Now, have you testified as a qualified

10   expert in the District of Columbia, with respect to

11   cases involving the comparison of human hair?

12        A    Yes, I have.

13        Q    Okay.  How many times, sir?

14        A    I would guess, I would guess, somewhere

15   between five and ten times.  I am really not sure.

16        Q    Okay.  And when was the most recent instance

17   that you testified in the District of Columbia as a hair

18   and fiber qualified expert?

19        A    I am going to guess it's been a couple of

20   years, but I really can't remember a specific time.

21        Q    Okay.    Have you ever been offered as an

22   expert and denied?

23        A    No.

24             MR. THREATT:  Okay.   Your Honor, I have

25   completed my voir dire.  With the completion of that, we

                                                   387

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

50

1    have no objection to this gentleman's qualifications.

2            THE COURT:  Ladies and gentlemen, ordinarily

3    we don't let people give opinion in evidence.  But, we

4    have an exception to this rule, people, what we call

5    expert witnesses.  We're going to let Agent Fram testify

6    as an expert witness in hair and fiber analysis.  Now,

7    an expert is allowed to give his opinion because of he

8    has become expert by virtue of education or training or

9    experience, or some combination of those things.  So, he

10   can give his opinion and give the reasons for those

11   opinions.  But, you're not bound by that opinion, if you

12   should find it's not supported by sufficient reason or

13   outweighed by other evidence, or not supported by

14   education or experience, sufficient to you, you may

15   disregard it in whole or in part.  So, give the agent's

16   opinion the weight you think it deserves after you

17   consider it along with everything else, as a form of

18   evidence.

19           Go ahead, counsel.

20           MR. PIERCE:  Thank you, Your Honor.

21               DIRECT EXAMINATION - continued

22           BY MR. PIERCE:

23       Q    The items, the hairs that were obtained from

24   the hat, that's been received as Exhibit 3, were those

25   analyzed in your unit?

                                                     388

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1     A     Yes.

2     Q     And you actually analyzed those as well;

3   right?

4     A     Yes, I did.

5     Q     Were photographs taken of those hairs under a

6   microscope?

7     A     Yes, it was a photograph taken of a

8   representative hair, one of the hairs.

9     Q     Showing you Government's Exhibit Number 7-A

10   through 7-D, do you recognize those?

11     A     Yes, I do.

12     Q     What do you recognize them to be?

13     A     These are photographs of the hair from the

14   known sample, from the defendant.

15     Q     And the known sample is again is what?

16     A     That was hairs that was taken from the

17   defendant, so I know them to be hairs from him and

18   that's the sample I used.

19     Q     You don't know the defendant, do you?

20     A     No, I don't.

21     Q     It wasn't part of your activity in this case

22   to actually have any contact with the defendant; is that

23   right?

24     A     No, that's correct.

25     Q     You just know him as Michael Jones?

389

```
 1        A    Yes.
 2             MR. PIERCE:    Offering 7-A through 7-D, Your
 3     Honor.
 4             THE COURT:   Those will be admitted.
 5                     (Thereupon, Government's Exhibit Numbers
 6                     7-A through 7-D were admitted into
 7                     evidence.)
 8             BY MR. PIERCE:
 9        Q    Looking at -- I think I may have misspoke.
10     Did I ask you whether those were from the hat or the
11     known sample?
12        A    Originally you said that, but I said, these
13     are from the known.
14        Q    Thank you.  So, that those were, those are
15     blowups of hairs that were furnished to you, to your
16     LaB, from Michael Jones?
17        A    That's correct.  Identified as coming from
18     Michael Jones.
19        Q    Now, if you could hold them up one of those
20     that helps you explain, what are some of the
21     characteristics that you noticed, looking at the known
22     hair sample from Mike Jones?
23        A    What this is, it's four photographs.  It's a
24     series so it's taken from four areas along the hair.
25     This is not a picture of the entire hair.  When you look
```

390

1    at a hair, two hundred fifty power, the field of view

2    that you're looking at the hair is a tiny, little part

3    of the hair, because it's being blown up so large.

4        Q    Let me ask you this, if I could interrupt for

5    a moment.  Those four photographs, if you lay them side

6    by side, is that a continual part of those hairs?

7        A    No, no, it's four areas along the shaft of the

8    hair.

9        Q    Is there any measurement that you can use to

10   describe to this jury, how long a portion of a hair

11   comprising those four photographs would be?

12       A    I am not really sure.  It all depends on

13   angles.  I am not really sure.  It's probably --

14       Q    Would you measure it in millimeters?

15       A    Yes, it would be millimeters.

16       Q    Not inches?

17       A    No.

18       Q    Okay.  I'm sorry.  I interrupted you.  What

19   are some of the characteristics you noticed about those

20   hairs?

21       A    The first picture is taken down towards the

22   root end of the hair --

23          THE COURT:  What exhibit number, could you

24   tell us that?

25          THE WITNESS:  I'm sorry.  This is 7-D.

                                  391

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1          This would be taken down towards the root of

2     the hair.  And as I spoke earlier, all these dashes in

3     here are the voids, these are the air spaces that you

4     see in a hair that's coming towards the end of its

5     growth cycle, actually shed, it's kind of drying up.

6               BY MR. PIERCE:

7          Q    Are you pointing to the interior part of the

8     line in that photograph?

9          A    Yes, these little --

10         Q.   I just want the record to reflect where on

11    that photograph --

12         A    Towards the center of the hair.  Inside of the

13    hair.

14              THE COURT:  Thank you.

15              THE WITNESS:  In addition, you can see the

16    pigment, which is not very heavy.  But, there is some

17    clumping, especially toward the outside of the hair.

18    The pigment is, tends to go towards the outside of the

19    hair, as opposed to being towards the center of the

20    hair, close to the pigment.

21              BY MR. PIERCE:

22         Q    Is that any other word that you would use to

23    describe pigment, or phrase that you could use to

24    describe pigment?

25         A    No, that's the term that's used.

                                                    392

1      Q      Is it coloration?

2      A      Well, the pigment gives the color.

3      Q      I see.

4      Q      -- but it's the pigment that's giving it the

5   color.

6      Q      What other characteristics in those --

7      A      Again, this is down towards the root, and the

8   cuticle is a thin cuticle.  You can see the, between the

9   dark area of the hair to where it clears, right towards

10  the outside, that's the cuticle.  The pigment, at times,

11  the hair is a very nice line that divides the pigment

12  from the cuticle.  You see this fine, perfectly straight

13  line, where the pigment is inside it, and then there's a

14  small, thin area of the cuticle.  And in this, you don't

15  have that.  It's not a very good delineation there.

16  The pigment kind of varies in how close to the edge it

17  gets.

18          If you move down along the hair --

19      Q      If you could identify the photograph.

20      A      7-C.  -- the pigment gets a little heavier,

21  and again, the hair is growing out from the roots, so if

22  the hair is producing pigment towards the end of the

23  cycle, it slows down that pigment production, which is

24  why eventually hair can turn light, because that pigment

25  production slows down.  And here, it's a little denser,

393

1   because it's a little -- little older, that part of the
2   hair.  And again, the pigment is not very dense, not as
3   dark as some hairs you see.  You don't see the voids any
4   more because they tend to stay down near the root.  The
5   cuticle is still thin, very good separation in terms of
6   pigment.
7       Q    As a general question, not particularly about
8   these photographs we're looking at now, but if someone
9   used dye in their hair, or otherwise colored their hair,
10  is that something that you could see through a
11  microscope?
12      A    Yes.  What you see, a person who dyes their
13  hair, the dye is going to dye the hair up to the skin
14  line, because it's not going to get inside the follicle
15  to get to the roots.  What you're going to see is a fine
16  line where you will have the natural color and then all
17  of a sudden, that dyed color, the rest of the hair.  If
18  it's a regular, or a good dye job, it's going to
19  actually get inside some of the hair so you're going to
20  see some of the dye inside the cuticle, so instead of
21  seeing a clear, or somewhat yellowish cuticle, you're
22  going to see the color where it was dyed.  So, if it's
23  dyed a reddish-brown, you're going to see that right in
24  the cuticle of the hair.  If it's something like a
25  rinse, it may not necessarily get inside the cuticle,

394

FORM CSR-LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1    but you're going to still see that nice fine delineation

2    of line between where it was dyed and where it's not

3    dyed.

4        Q    That would be another example of a

5    characteristic of a hair that you'd look for?

6        A    Right.

7        Q    Okay.  I'm sorry to interrupt you.  Getting

8    back to 7-A through D.

9        A    Then 7-B.

10        THE COURT:  Yes.

11        THE WITNESS:  Again, further down on the hair,

12    again the pigment is still not very clumpy, not very

13    heavy.  These small dark, oval bodies of the ovoid

14    bodies that I spoke of, there's not a lot of them, these

15    areas here, which are some kind of disruption or very

16    large voids are unusual.  You don't see that very

17    often.  You see it in a few hairs, but it's an unusual

18    characteristic.  It's large, almost like bubbles,

19    through the hair.

20        And then, finally, the last picture of this

21    hair, just again, this is probably down towards the tip

22    end, a little darker, because it's the older portion, so

23    the pigment was more actively being produced.  Again, no

24    view of the ovoid bodies, but there weren't a lot of

25    ovoid bodies in it.

                                                        395

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

1          BY MR. PIERCE:

2          Q    You also collected hairs from the hat that you

3    referred to, that I referred to as Exhibit 3; is that

4    right?

5          A    They were collected, yes.

6          Q    How was that done in your laboratory?

7          A    The way something like a ski hat would be

8    processed is, initially you would look at it under

9    stereoscope, a low-powered microscope, and you'd

10   actually pick off hairs.  When you get this kind of

11   material, kind of a loose knit, which makes it so you

12   can stretch it, the hairs tend to get interlocked in the

13   fibers, as opposed to something like a windbreaker, a

14   very smooth type knit, type woven jacket, it's really

15   not going to hold on to anything.

16         So, in something like this, you'd first look

17   under a stereoscope and actually pick off hairs, and you

18   treat the inside separately from the outside.

19         And then, after you pick the hairs from the

20   one side, you then scrape it.  A lot of our evidence is

21   scraped, which is holding the item, or suspending it

22   from a hook, you know, in a special room that we have,

23   over some paper, and scraping it with just a regular

24   kitchen spatula, and that knocks off loosely adhering

25   debris.  That's all collected, placed in a pill box, and

                                               396

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1    then from that pill box, hairs and fibers are taken out

2    and placed under glass microscopes.

3            So, the hat was both picked and scraped.

4        Q    When you say, pill box, like the items in

5    Number 7?

6        A    That's correct.

7        Q    Government Exhibit 7  I'm sorry.

8            When you use the expression, tip, are you

9    referring to the root portion of the hair, or the end of

10   the hair?

11       A    The tip end is the furtherest end away from

12   the skin line.  The root is underneath the skin and the

13   tip is furtherest away.

14       Q    When you make scrapings from the -- a hat like

15   the one you see before you, I take it that fibers also

16   fall off; is that right?

17       A    Fibers can fall off, too, yes.

18       Q    If you're examining a fiber or a hair, do you

19   have any difficulty distinguishing between the two?

20       A    No.

21       Q    Why not?

22       A    Because of all the hair characteristics that

23   make up a hair, they're very different from fibers.  The

24   only fibers that are actually hairs would be something

25   like wool, which is hair from sheep.  Something like

397

60

1   rabbit fur, some of the fur coats are made from

2   different animal fur, but the animal hairs are very

3   different from human hairs.  So, it's readily

4   distinguishable.

5       Q    You don't have any difficulty telling the

6   difference between animal hair and human hair, or human

7   hair and fibers, then?

8       A    That's correct.

9       Q    Okay.  Were any photographic enlargements made

10  of hairs obtained from the head?

11      A    Yes, it was.

12      Q    Handing you Government's 11-A through D.  Do

13  you recognize those?

14      A    Yes, I do.

15      Q    What do you recognize them to be?

16      A    These are four photographs again, of four

17  areas from one of the hairs, removed from the hat.

18      Q    And how is it you're able to recognize that

19  those are photographs of the hair from that hat?

20      A    It has the item number written on the back of

21  the photograph.

22      MR. PIERCE:  Offer Government's 11-A through

23  D, Your Honor.

24      MR. THREATT:  No objection.

25      THE COURT:  Okay.  They will be admitted.

398

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

61

1      (Thereupon, Government's Exhibit Numbers

2      11-A through D were admitted into

3      evidence.)

4          BY MR. PIERCE:

5      Q    Can you describe the characteristics of the

6   hair that's blown up and enlarged in, or a portion of

7   it, a portion of which is enlarged in Government's 11-A

8   through D?

9      A    Yes.   Starting with Exhibit 11-D, again, this

10  is a picture taken near the root end of the hair, again,

11  the cortical fusi, the air spaces, the cuticle being

12  thin, not very good delineation, the pigment not very

13  dense, some clumping, but not very heavy.

14          Moving to the next exhibit 11-C, again, the

15  cuticle is still somewhat thin, again the pigment

16  varying in how close it is to the cuticle, the pigment

17  getting a little denser here, again, you don't see any

18  of the cortical fusi, because it's away from the root.

19  Again, not very dense pigment, but a little heaver than

20  before, still a little bit towards the outer edge of the

21  hair as opposed to be centralized.

22          Again, moving along --

23      Q    If you could identify the photograph number

24  please.

25      A    11-B, the other characteristics pretty much

399

1   the same.  Again, in this hair it is this large bubble-

2   type feature that we saw in the other hairs, which were

3   seen in these hairs, as well.

4      Q    When you say, other hairs, you're referring to

5   the ones blown up in Government's Exhibit 7?

6      A    From the known sample.   Seven.

7           Again, it's a feature that unusual, and you

8   don't see very often.

9           And then again, 11-A, further down still

10  getting a little heavier, still not very heavy clumping,

11  not very dense, cuticle, still thin, with not very good

12  delineation between the pigment, and another ovoid body,

13  dark ovoid body.

14     Q    Did you line up hair obtained from the hat

15  next to a hair obtained from the head of Michael Jones

16  and compare them in a microscope?

17     A    Yes.

18     Q    Are those the two hairs that have been

19  enlarged in Government 7-A to D, and 11-A to D?

20     A    Well, these are two of the hairs, but this is

21  just one hair out of the known and one hair from the

22  hat.  So, to do the comparison, I compare the hair from

23  the questioned item and from the known item from root to

24  tip, all along, to make sure those characteristics are

25  the same.

                                                    400

63

1      Q    Independently then, of taking that photograph,

2  or those photographs, and examining them, you made an

3  examination of a known hair and an unknown hair from the

4  hat, side by side?

5      A    That's correct.

6      Q    With what results?

7      A    I found that the hairs exhibit the same

8  microscopic characteristics, the hairs removed from the

9  ski mask exhibit the same microscopic characteristics as

10  hairs from the known sample from the defendant.

11      Q    Did you form a professional opinion from that?

12      A    Yes, I did.

13      Q    What is that?

14      A    I concluded that the hair, hairs found from

15  the hat were consistent with having come from the

16  defendant.

17      MR. PIERCE:  Pass the witness, Your Honor.

18      THE COURT:  Mr. Threatt.

19      MR. THREATT:  Yes, Your Honor.

20            CROSS-EXAMINATION

21      BY MR. THREATT:

22      Q    Again, Agent Fram, how are you?

23      A    Good, thank you.

24      Q    When you were beginning to talk in general

25  about the nature and characteristics of human hair, you

401

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1   talked for a moment about the difference between hairs,
2   which come from different parts of the body; is that
3   correct?

4       A    I don't remember talking about that.

5       Q    Okay, well maybe I'm mischaracterizing your
6   testimony.  Do you remember saying that the hairs may be
7   different taken from the front or the back of the head,
8   or --

9       A    Yes.  What I said is, there is a slight
10  variation on hairs from around a person's head, and you
11  get a known sample, and you can see that variation, you
12  know what that range of variation is.

13      Q    Okay.  Now, you got some hairs from the hat.
14  Isn't it true that you can't conclusively tell what part
15  of a human body those hairs came from?

16      A    No, that's not true.

17      Q    Okay.  It is true, were you able to tell what
18  part of the human body the hairs that came from the hat
19  were from?

20      A    Yes, they were head hairs.

21      Q    Okay.  And would head be head, as opposed to
22  face, or moustache, or are all those characterized as
23  being head hair?

24      A    No.  Head hairs is top of the head.  There are
25  head hairs.  There are facial hairs.  There are chest

                                                402

65

1 hairs, underarm hairs, pubic hairs.

2  Q Okay.  Again, focusing on the hairs that you

3 recovered from the hat, all -- how many hairs did you

4 recover?

5  A Again, I didn't recover them.  There were

6 several hairs that were removed from the hat.

7  Q How many hairs were recovered from the hat

8 that were identified as being human hair?

9  A There were several human head hairs, that were

10 removed from the hat.  I don't know a specified number.

11  Q Is it because there was not a specific number,

12 or are you unfamiliar with the results of the

13 examination, sir?

14  A No, I didn't count the number.  There were

15 several hairs.

16  Q Okay.  As part of the process, don't they do

17 something as simple as just counting to see how many of

18 them you get?

19  A No.  When you're comparing hairs, several are

20 removed, I'm comparing all of them, but I don't

21 necessarily note the exact number, several to me, means

22 something.  There's a certain number in there.

23  Q I -- let me tell you why I ask about the

24 specific number, Agent Fram, because you're familiar

25 with the Handbook of Forensic Science that's published

403

FORM GSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1      by the Federal Bureau of Investigation, through the U.S.

2      Department of Justice; correct?

3          A    Yes.

4          Q    Okay.  And in that handbook, they talk about

5      the guidelines for the number of hairs that you want to

6      get in a hair comparison so that you can make sure that

7      the comparison is as good as possible.  You're familiar

8      with that; right?

9          A    Right.  You're talking about a known sample.

10         Q    That's right, and the number is twenty five;

11     is that right?

12         A    The number you ask for is twenty to twenty

13     five.

14         Q    Okay.  Now, let me ask you with respect to the

15     known sample, do you know how many hairs were part of

16     that sample?

17         A    I don't know a specific number, no.

18         Q    Wait a minute.  Isn't this a guideline that

19     not only is something you operate with, during the

20     period of time you've worked at the FBI; correct?

21         A    Number twenty five is a guideline; it's

22     something you like to get.  The first thing I do when I

23     get a known sample is I determine if I've got a suitable

24     known sample.  If I do, I go on.  Knowing the number is

25     kind of a moot point, because I've decided that I've got

                                                        404

1    a suitable sample --

2        Q    How did you decide --

3        A    -- for comparison.

4        Q    Agent Fram, how did you decide if you didn't

5    know how many they are?  I mean, why do they have a

6    guideline?

7        A    First of all, you can estimate about how many

8    hairs you have, and I felt I had a suitable number.

9    From there, I do the comparison.  But, again, it's a

10   guideline.  It's not a mandatory twenty five.  If you

11   get twenty four, you don't not do the exam.  It's a

12   guideline to try to shoot for.  It's mainly to tell

13   people to collect enough hair that wouldn't have.  There

14   are times when you may get one hair as a known sample,

15   and that's not enough, and we call the contributor and

16   tell them, we need more.  So, we tell them something

17   like twenty five, hoping they're going to give us that,

18   but realizing they may not.

19           But, I've got to decide whether in my mind,

20   I've got a suitable known sample, and in this case I

21   did.  I may very well have had more than twenty five

22   hairs, but I'm just not sure of the number.

23       Q    Let me try some yes and no questions with you,

24   Agent Fram.

25           Is it correct that the FBI guideline for the

                                                    405

1   number of hairs for a suitable known sample is twenty

2   five?  Yes or no?

3        A    That's correct, but that's the guideline.

4        Q    Okay, now, is it correct, or not, that you

5   don't know whether or not you had twenty five hairs in a

6   known sample?  Yes or no.

7        A    Well, again, I'm not sure of the number.  All

8   I know is that I had a suitable number.

9        Q    Okay.  Does that mean that you don't know?

10  Yes or no, sir?

11       A    I just said, yes, I don't know the number.

12       Q    Okay, yes, you don't know the number.

13            Now, let me talk about the hairs, the number

14  of hairs in the sample that you collected from the hat,

15  that were collected from the hat.

16            Did you participate in that collection

17  process?

18       A    No, I did not remove the hairs from the hat.

19       Q    Okay.  So, when you first saw the hairs from

20  the hat, where, were they already on slides, or in a

21  glass dish?

22       A    No, they were on a glass microscope slide.

23       Q    Okay.  Is it fair to say that there is some

24  way you can be conclusively sure that the microscopic

25  slide sample that you saw actually had the hairs that

                                                    406

FORM CSR-LASER  REPORTERS PAPER & MFG. CO.  800-626-6818

1    came from the hat?

2         A    It's fair to say, yes.

3         Q    Okay.  And that's because of the numbers and

4    stuff that you use on those exhibits.  You just talked

5    about that earlier; right?

6         A    Right, the hair number, right.

7         Q    Okay.  And that's intended to make sure that

8    there are no mistakes; is that correct?

9         A    That's correct.

10        Q    Which is the same reason we have things like

11   guidelines; is that correct?

12        A    That's correct.

13        Q    Okay.  Now, let me ask you a little bit

14   again, about these characteristics, because I was

15   confused a little when you were talking about these

16   Negroid and Caucasian, etcetera.  Are you saying to me

17   that the characteristics of a hair, in terms of Negroid,

18   Mongoloid, etcetera, is that based on the race of the

19   individual that the hair comes from?

20        A    I don't think I understand your question.

21        Q    Let me try asking it in a different way,

22   because my intention is to give you a precise question

23   that you can give me a clear answer to.

24             Okay.  You said that hairs are generally

25   divided, human hairs, into three groups; correct?

                                                    407

1      A      That's correct.

2      Q      Negroid, Mongoloid, and I think the third was

3   Caucasian; is that correct?

4      A      That's correct.

5      Q      Okay.  Now, how is it that the hairs are

6   differentiated based on their inherent characteristics

7   are based on the race of the person that they come from?

8      A      Well, it's kind of the same thing.  The racial

9   characteristics found in the hair are exhibited by

10  people of that racial group.

11     Q      Okay.  Then, let me ask you this, Agent Fram.

12  Is it fair to say that in the African American

13  community, you have people that come from complexions of

14  being almost Caucasian with blue eyes, all the way to

15  blue-black with completely brown eyes; is that correct?

16     A      I don't know that I can answer that.

17     Q      Didn't you take training in physical

18  anthropology?  You've got a degree in human science,

19  don't you?  So, you know about the differences between

20  race and racial characteristics, don't you?

21     A      Yes.

22     Q      Okay.  So, you're telling me then that you've

23  got some way of deciding that an individual hair is

24  Negroid, as opposed to Caucasian?

25     A      That's correct.

                                        408

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

71

1    Q    Okay. How is that based? Is it based on the
2  race of the person that it comes from?

3    A    Again, if I look at a hair, and I see that it
4  has Caucasian characteristics, I expect it to come from
5  a Caucasian individual --

6    Q    You expect it to.

7    A    Sometimes --

8    Q    But, you don't know; is that correct?

9    A    No, I'm saying that it's consistent with a
10  Caucasian individual. I'm trying to finish my sentence.

11    Q    I'm sorry. I didn't mean to cut you off.
12  Please take your time.

13    A    There are times that there may be mixed racial
14  characteristics. Someone of some mixed racial group
15  will exhibit characteristics of more than one race, and
16  you'll see that also. But, when I see a hair that has
17  Caucasian characteristics, I conclude it's from a
18  Caucasian individual, etcetera.

19    Q    Okay. And you talked about your experience
20  and in instances where people in your office would,
21  indeed, share hairs that were unique or inconsistent; do
22  you remember that?

23    A    That's correct.

24    Q    Okay. In your experience, have you ever
25  identified a hair as being Negroid and found out that it

409

FORM-CSR-LASER   REPORTERS PAPER & MFG. CO.   800-528-6313

1    came from someone of another race?

2        A    No.

3        Q    And, indeed, how are you able to determine the

4    race of an individual?  Do you have some sort of a

5    guideline in a handbook, or do you just try and get, be

6    sufficient?

7             (No response.)

8             How do you determine race?  You made a

9    comparison saying that the hairs in the known sample are

10   consistent with the hairs that came from the hat.  And

11   one of the characteristics is race; isn't that correct?

12       A    That's correct.

13       q    So, what you're saying is that, you believe

14   that the hat -- that the person that had the had on was

15   black -- was a Negroid; is that correct?

16       A    That's correct.

17       Q    Okay.  And you can do so without having ever

18   seen that person; is that right?

19       A    That's correct.

20       Q    Okay.  I guess that would mean, then, a

21   Mongoloid person couldn't have hair with Negroid

22   characteristics; is that correct?

23       A    That's correct, I wouldn't expect that.

24       Q    No.  My question is, can they?  Not, do you

25   expect it.

                                              410

1      A    A person who is a pure Mongoloid individual

2    would not have Negroid characteristics in their hairs.

3      Q    Did you use the word "pure"?  Did you use the

4    word "pure", sir?

5      A    Yes, I did.

6      Q    Okay.  Are there pure raced people?

7      A    I'm not talking about pure race.  I'm saying

8    somebody who is a Mongoloid individual who have

9    Mongoloid hairs.

10      Q    But, you used the word "pure", sir.

11      A    That's correct.

12      Q    Okay.  Okay.  So then, the person who had the

13    hair in this case in the hat you believe, was from a

14    pure Negroid?

15      A    In terms of the hair characteristics, that's

16    right.  I'm talking about racial groups in terms of hair

17    characteristics.

18      Q    Agent Fram, I mean, let's be honest with the

19    jury.  You're here to talk about more than hair.  The

20    purpose of this identification is to give the Government

21    some assistance in identifying the perpetrator of this

22    crime; isn't that right?

23            MR. PIERCE:  Objection, Your Honor.

24            THE COURT:  Overruled.

25            BY MR. THREATT:

411

1     Q    Isn't that right?

2     A    I'm not here to help anybody any way.  I'm

3  here to do an examination and report my findings,

4  whatever they may be.

5     Q    Okay.  Let me ask you a little bit more about

6  your findings.

7         There was a report that was prepared as a

8  result of the investigation that was done on these

9  hairs; is that correct?

10    A    That's correct.

11    Q    Okay.  Have you familiarized yourself with

12  that report?

13    A    I've seen it.

14    Q    Is it true that the report says:  It is

15  pointed out that hair comparisons do not constitute a

16  basis for absolute personal identification?  Yes or no?

17    A    Yes, it does.

18    Q    Is it also true that this individual report

19  says that:  With respect to the hairs, these hairs could

20  have originated from Michael A. Jones; is that also

21  correct?

22         MR. PIERCE:  I'd object, Your Honor, on the

23  grounds of hearsay.

24         THE COURT:  He's an expert.  He can answer.

25         BY MR. THREATT:

412

FORM CSR - LASER REPORTERS PAPER & MFG. CO. 800-889-6318

1    Q    The word, could, c-o-u-l-d, is that correct?

2    A    That's what the report says, yes.

3    Q    Not probably?

4    A    It says, could have.

5    Q    Okay, it says, could have. Does that mean

6    that they could not have come from Michael A. Jones?

7    A    No, it does not.

8    Q    And indeed, Officer -- I mean, Special Agent,

9    this type of hair comparison evidence can be

10   conclusively exclusionary, but it cannot be conclusively

11   identifying, can it?

12   A    That's true. If you get a good hair sample

13   from an individual and the hairs are different, I

14   conclude it did not come from that person. And again,

15   as I explained earlier, this is not a fingerprint.

16   Again, in my experience, it's rare to find two people

17   whose hairs I can't distinguish between.

18   Q    Let's talk about the development of this

19   stuff, because twenty years ago, when you were using

20   serology, people were convicted on the basis of that and

21   then DNA later on proved them to be innocent; isn't that

22   correct?

23        MR. PIERCE: Objection, argumentative.

24        THE COURT: I sustain the objection.

25        MR. THREATT: It is possible --

413

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

1          THE COURT:   Not for that ground.   I don't know

2    if his expertise extends to that.

3          MR. THREATT:   Okay.

4          BY MR. THREATT:

5     Q.   Okay.   Let me ask you this.   Just, other than

6    your examination and the samples that you saw, and the

7    beautiful photographs that you've shown them, isn't it a

8    fact, yes or no, that the state of science is not to a

9    point that you can say, as a qualified expert with any

10   degree of scientific certainty, that the hairs in the

11   known sample came from the same person as the hairs in

12   the hat, yes or no?

13    A    Again, as I've said, I can't say that, to the

14   exclusion of anybody else.   It's not a personal means of

15   identification.

16    Q    Thank you very much.

17    A    All I can say is it's consistent with coming

18   from him.

19    Q    Thank you very much, Agent Fram.

20          THE COURT:   Redirect?

21          MR. PIERCE:   I have a couple of questions,

22   Your Honor.

23          THE COURT:   All right.

24                REDIRECT EXAMINATION

25          BY MR. PIERCE:

                                                        414

1     Q   The language on the report to which Mr.

2   Threatt refers, is that standard language in your

3   reports?

4     A   Yeah, there's two different ways of saying it.

5   You can say, it could have originated, or is consistent

6   with coming from the person.  Those are interchangeable,

7   they mean the same thing.

8     Q   I take it the language of the report is not

9   going to be more powerful than that in terms of

10   identification?

11     A   No, if there's an association, that's the

12   statement.

13     Q   What are some of the different -- what are

14   some of the different ways that you can tell whether a

15   hair is from a head, or an armpit, or a chest, or other

16   parts of the body?

17     A   There's different characteristics, in terms of

18   the size of the hair, the diameter variation along the

19   hair, pubic hairs have something called buckling, which

20   is little buckles in the hair as you go along the shaft,

21   the tips are different between head and pubic hairs,

22   limb hairs are much finer, there's many different

23   characteristics that differ between the different body

24   areas.

25     Q   Also, facial hair, does that contain different

415

78

1    characteristics?

2       A     Facial hairs are much coarser, they are --

3    they have a crustational shape, if you take the hair,

4    cut it, and look straight down at the hair, it will have

5    somewhat of a triangular cross-sectional shape which

6    none of the other body areas will have.  It's far more

7    coarser that the medulla, the central portion is much

8    coarser and continuous.

9        MR. PIERCE:  That's all I have for the

10   witness, Your Honor.

11        THE COURT:  Thank you very much.  Step down.

12   I appreciate your help.

13        (The witness left the witness stand.)

14        MR. PIERCE:  May I have just a moment, Your

15   Honor?

16        THE COURT:  Yes.

17        (A pause.)

18        MR. PIERCE:  The Government rests, Your Honor.

19        THE COURT:  Mr. Threatt, do you want to come

20   to the bench?

21        MR. THREATT:  Yes, I do, Your Honor.

22        MR. PIERCE:  May I rest with the caveat that

23   all my exhibits are in?

24        THE COURT:  Yes, we'll let you do that.  I'm

25   going to let Mr. Pierce check with my clerk and make

416

COMMONWEALTH OF VIRGINIA   )
                                 )
CITY OF CHARLOTTESVILLE     )

## AFFIDAVIT OF MYRON T. SCHOLBERG

I, Myron T. Scholberg, do hereby swear and affirm the following under penalty of perjury:

1. I am a former FBI hair and fiber analyst, forensic consultant, and part-time employee of the Commonwealth of Virginia's Northern Virginia Crime Lab in Merrifield, Virginia. I retired from the FBI in 1985 after 21 years working in the bureau. For eighteen of those 21 years in the FBI, I worked in the FBI laboratory in Washington D.C. in the hair and fiber unit. For ten years I was an examiner in that unit. For eight years I was the unit chief. After retiring from the FBI, I began working privately as a forensic consultant and on a part-time basis as a hair and fiber analyst for the Commonwealth of Virginia. I have provided a current copy of my CV as Attachment A to this affidavit.

2. My area of expertise was side-by-side microscopic comparison of hairs and fibers. I have been qualified as a hair and fiber comparison expert and testified in court approximately 600 times, including courts in approximately 48 states, the Virgin Islands, Puerto Rico, and Okinawa, Japan. Although I have testified for both the prosecution and defense, in the majority of these cases I testified as a witness for the prosecution.

3. In my capacity as a hair and fiber examiner for the Commonwealth of Virginia, I examined hairs recovered during the investigation of the 1985 murder of Mary Harding in Lancaster, Virginia. Specifically, I examined three hairs that were recovered from a red plaid shirt inside the truck of suspect Emerson Stevens ("Exhibit 25" at trial) and compared them to known hairs of Stevens and Harding.

4. I was qualified as an expert witness and testified for the Commonwealth in both the February 1986 and July 1986 trials of Emerson Stevens. My testimony from both trials is provided as Attachment B (February 1986 testimony) and Attachment C (July 1986 testimony). I have reviewed my testimony for both trials. In this affidavit, when I refer to my trial testimony, I am referring to the July 1986 trial of Emerson Stevens, which, in my understanding, resulted in his conviction of first-degree murder.

5. In my testimony, I summarized how I made a microscopic comparison of hairs or fibers. This involves looking at two hairs under a microscope at the same time. I testified that I would ordinarily view them at approximately 350 magnification. When examining a hair, I looked for characteristics on the three major parts of the hair: the cuticle, cortex and medulla. Some examples of characteristics that I looked at were size and shape of the scales on the cuticle, the color of the cuticle, the pigment granules in the cortex, size and shape of the pigment graduals and location in the cortex.

6. I testified that the most positive conclusion that I could reach with respect to hair comparison was that the hairs are microscopically alike in all identifiable characteristics and could have originated from a certain individual. I testified that a reputable hair examiner can never say that a hair originated from a certain individual and not from somebody else in that race group. Microscopic hair examination is also useful as a tool of exclusion. I did not, and would not have, offered any statistical likelihood that a specific hair originated from a particular individual. As far as I know, there is no reliable statistical study of the likelihood that two unrelated people will have hair that is microscopically alike. In my own professional experience, I have examined hairs that were from different sources that appeared alike under the microscope.

7. In my testimony, I acknowledged that hair examinations are a subjective type of examination, and that the conclusion is an opinion. I also said that hair examination is not an exact science and that the conclusion I arrived at is not a positive identification. In my testimony I also acknowledged it was possible that a different examiner looking at the same hairs could arrive at a different conclusion.

8. I testified that I examined three hairs that had been recovered from Exhibit 25, the red plaid shirt, and compared them to known hairs from the defendant and the victim. 1 concluded that two of these recovered hairs were brown hairs of Caucasian origin that were microscopically like the known head hairs of the suspect, Emerson Stevens, and therefore could have originated from Mr. Stevens. I further concluded that the third recovered hair, which was also a brown hair of Caucasian origin, was microscopically alike in all identifiable characteristics to known head hairs of the victim, Mary Harding. Therefore, I concluded that the third recovered hair could have originated from Ms. Harding. I testified that these conclusions were the most positive conclusions I could arrive at.

9. During cross-examination, I acknowledged that it could have originated from another person if the hair characteristics were the same.

10. It is my understanding that there was very little physical evidence linking Mr. Stevens to the crime, except for my testimony that one of the hairs recovered from Exhibit 25 could have originated from the victim. It is not a proper characterization of my testimony to state that a hair "matched" the victim, or anyone else. Microscopic hair analysis should never be used to positively identify anyone; it should only be used to exclude.

11. In 2009, The National Academy of Sciences has published a report, *Strengthening Forensic Science in the United States: A Path Forward*, that specifically addressed the science of forensic hair and fiber comparison, among other disciplines. The portion of the report addressing hair and fiber comparison is provided as Attachment D to this affidavit.

12. The NAS Report specifically addressed the uncertainties of microscopic hair comparison. It found that "a conclusion of a 'match' means only that the hair could have come from any person whose hair exhibited—within some levels of measurement uncertainties—the

same microscopic characteristics, but it cannot uniquely identify one person." The report noted that hair analysis was limited in important ways. Specifically, the report noted that courts have "recognized that testimony linking microscopic hair analysis with particular defendants is highly unreliable." I agree with these conclusions, and this is why I was always careful to state my conclusions that specific hairs "could have" originated from a particular individual.

13. The NAS Report concluded that advances in science now allow for much more precise and accurate comparisons of unknown hairs to known hair samples, primarily through nuclear and mitochondrial DNA testing: "In a very high proportion of cases involving hair evidence, DNA can be extracted, even years after the crime has been committed. Although the DNA extraction may consist of only mitochondrial DNA (mtDNA), such analyses are likely to be much more specific than those conducted on the physical features of hair." In my opinion, DNA technology is so much more specific and reliable that it has rendered my field of expertise, microscopic hair and fiber comparison, largely obsolete, although it can still serve as a useful tool of exclusion.

14. I have been informed by counsel for Stevens that the hairs that were recovered from Exhibit 25 at trial, which I concluded could have originated from Mr. Stevens and Ms. Harding, likely still exist. It is also my understanding that the Virginia Department of Forensic Science is now capable of extracting mitochondrial DNA profiles from hairs, even if the roots of the hairs are not attached. Mitochondrial DNA testing is able to generate far more accurate and reliable results than microscopic hair comparison. In my opinion, DNA testing should be done in this case to provide results that are more accurate than what I was able to provide in my original hair comparison.

FURTHER AFFIANT SAYETH NAUGHT.

_Myron T. Scholberg_
MYRON T. SCHOLBERG

Signed and sworn to before me this 22ⁿᵈ day of March, 2011.

_Matthew L._
NOTARY PUBLIC

MATTHEW L. ENGLE
NOTARY PUBLIC
REG # 316141
MY COMMISSION
EXPIRES
8/31/2014
COMMONWEALTH OF VIRGINIA



# COMMONWEALTH of VIRGINIA

## DEPARTMENT OF STATE POLICE

BUREAU OF CRIMINAL INVESTIGATION

November 22, 1985

DETAILS OF INVESTIGATION CONCERNING

Mary Keyser Harding - Victim
Emerson Eugene Stevens - Accused

ABDUCTION/MURDER
Case No. 85-81-0697

This document contains neither recommendations nor conclusions of the Virginia State Police. It is the property of the Virginia State Police and is loaned to your agency; it and its contents are not to be distributed outside your agency.

85-81-0697

SCIENTIFIC AND TECHNICAL REPORTS,
INDENTIFICATION RECORDS, PRIOR ARRESTS:

1. Final Autopsy findings from the office of the Chief Medical
   Examiner, Richmond.  (See pages 2 - 9C attached).  *Dr. Fierro
   did not die from drowning; probably did not die from bleeding.
   probable suffocation, asphyxiation.*
2. Request for laboratory examination to compare items from victim's
   body to items related to the accused Emerson Stevens.  *hair*
   (See pages 10 - 14 attached)

3. Report of laboratory analysis regarding certain items in #2
   above request.  Shows hair found on Emerson Stevens' shirt
   in his pickup is same as victim's head hair. (See pages 15 - 16
   attached).

4. Report of laboratory analysis regarding certain items in #2
   above request.  Shows shirt mentioned in #3 above also contained
   hair matching Emerson Stevens.  (See pages 17 - 18 attached).

5. Criminal Record of Emerson Stevens.  (See page 19 attached).

*Odontologist . Dr. Kangas . Dr. Sayar .*

*Forensic . Elmer Miller . rope & blood .*

1

COMMONWEALTH OF VIRGINIA
DEPARTMENT OF HEALTH
**OFFICE OF THE CHIEF MEDICAL EXAMINER**
CENTRAL DISTRICT
9 NORTH 14TH STREET
RICHMOND, VIRGINIA 23219
(PHONE (804) 786-3174

[X] Resident
[ ] Non-resident

AMENDED

SEP 1985
RECEIVED
OFFICE OF
CHIEF MEDICAL EXAMINER
Richmond, Va.

**REPORT OF INVESTIGATION BY MEDICAL EXAMINER**

DECEDENT __Mary__ __Keyser__ __Harding__ AGE: __24__ RACE: __W__ SEX: __F__
First name / Middle name / Last name

ADDRESS __Rt. 2__ __Lancaster__ (M) W S D OCCUPATION: __Bookkeeper__
Number and Street

__Lancaster__ SSN _____ EMPLOYER __Bank of Lancaster__
City or County / Zip Code

TYPE OF DEATH (Check one only)
Sudden in apparent good health / Suspicious / Violent or Unnatural [X]
Unattended by physician / Unusual / Means - weapon
In prison, jail, or police custody

*Cutting In strument*

| | Last Seen Alive | Injury or Illness | Death | Medical Examiner Notified | View of Body | Police Notified | If Motor Vehicle Accident Check One Of The Following |
|---|---|---|---|---|---|---|---|
| DATE | 8-22-85 | 8-22-85 | 8-23-85 | 8-27-85 | 8-27-85 | 8-23-85 / 8-27-85 | DRIVER |
| TIME | 10 pm | | 3 am ? | 4:30 pm | 5:45 pm | | PASSENGER / PEDESTRIAN |

NOTIFICATION BY __Sheriffs Office__ OFFICIAL TITLE _____

Address __Lancaster__

| | LOCATION | CITY OR COUNTY | TYPE OF PREMISES (E.G. HIGHWAY, ETC.) |
|---|---|---|---|
| INJURY OR ONSET OF ILLNESS | Ottoman | Lancaster | Home & Neighborhood |
| DEATH | Ottoman | Lancaster | |
| VIEWING OF BODY BY MEDICAL EXAMINER | Morattico | Lancaster | Dock |

| DESCRIPTION OF BODY | | NOSE | MOUTH | EARS | RIGOR | | LIVOR | | NON FATAL WOUNDS | |
|---|---|---|---|---|---|---|---|---|---|---|
| Clothed [ ] Unclothed [X] Partly Clothed [ ] | Blood | | | | Jaw | | Color | | Abrasion [ ] Burn [ ] | |
| Hair Color____ Beard____ Mustache____ | Froth | | | | Neck | | Anterior [ ] | | Contusion [ ] Slab [ ] | |
| Pupils: R____ L____ Eyes: Color____ | Other (Sand, dirt) water, etc.) | | | | Arms [ ] | | Posterior [ ] | | Gunshot [ ] Incised [ ] | |
| Body Heat____ Scars, Tattoos, etc.____ | | | | | Legs [ ] | | Lateral [ ] | | Laceration [ ] Fracture [ ] | |
| | WEIGHT____ LENGTH____ | | | | Complete [ ] | | Regional [ ] | | Scalp [ ] Chest [ ] Face [ ] | |
| | | | | | | | | | Neck [ ] Arms [ ] Back [ ] | |
| | | | | | | | | | Abdomen [ ] Legs [ ] | |

| FATAL WOUNDS (GUNSHOT, STAB, ETC.) | size shape | burn/powder | Location. Top of head / L, R of midline | PLANE, LINE OR DIRECTION |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |

CAUSE OF DEATH: Asphyxia and cutting wounds

MANNER OF DEATH: (Check one only)
Accident [ ] Suicide [ ] Homicide [X]
Natural [ ] Undetermined [ ] Pending [ ]

AUTOPSY Yes [X] No [ ]
AUTHORIZED BY: __Medical Examiner__
Pathologist __Dr. M.F. Fierro__
Autopsy No. __369/85__

I hereby declare that after receiving notice of the death described herein I took charge of the body and made inquiries regarding the cause and manner of death in accordance with §32.1-283, Code of Virginia; and that the information contained herein regarding such death is correct to the best of my knowledge and belief.

__8/29/85__ __Lancaster__ __(signature)__
Date / City or County of Appointment / Signature of Medical Examiner

__A. B. Gravatt, M.D.__
Name of Medical Examiner (Type or Print)

CME Form No. 1 Revised 3/80

A COPY... 1985

85-81-0697
C106951

2.

**MEDICAL ATTENTION AND HOSPITAL OR INSTITUTIONAL CARE:**

| NAME OF PHYSICIAN OR INSTITUTION | ADDRESS | DIAGNOSIS | DATE |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

**CIRCUMSTANCES OF DEATH:**

| | NAME | Offical Title or Relationship to Decedent | ADDRESS |
|---|---|---|---|
| FOUND DEAD BY | William Parks | | Morattico |
| LAST SEEN ALIVE BY | Talked to sister on phone | 10 pm on 8-22-85 | |
| WITNESSES TO INJURY OR ILLNESS AND DEATH | | | |
| | | | |
| | | | |

**NARRATIVE SUMMARY OF CIRCUMSTANCES SURROUNDING DEATH:**

Mary abducted from home on night of August 22, 1985. Found in Rappahannock river close to shore in about 2 1/2 feet of water approximately 1/2 mile down river from Seafood plant in Morattico. Body in state of decomposition, bloated.

Heavy rope tied tight around neck – was looped around neck 4 times. Rope tied to large cinderblock – heavy chain tied to the rope and end of chain tied around right leg just above knee.( Rope and chain removed by Crime Lab personnel).

Multiple trauma on back, shoulders hips, probably after death due to scraping back and forth due to rough water, waves in river, probably striking cinderblock and other materials in water.

Cause of death – strangulation – homicide

Deputy Chief Medical Examiner Note: Autopsy disclosed   trauma of the shoulders, back and hips were due to a cutting instrument and not to postmortem artifact.

icology sent:   Yes ☐   No ☒
od ☐
ne ☐
er_____ ☐

DECEDENT_____

86



COMMONWEALTH OF VIRGINIA
DEPARTMENT OF HEALTH
OFFICE OF THE CHIEF MEDICAL EXAMINER

CENTRAL DISTRICT
9 NORTH 14TH STREET
RICHMOND, VIRGINIA 23219
PHONE: (804) 786-3174
REPORT OF AUTOPSY

Autopsy No. _069-85_
Date/Day_ 8/28/85 _
Time _ 9 AM _

**DECEDENT** _ Mary Keyser Harding _

First　　　　　　Middle　　　　　　Last

Autopsy Authorized by: ___Dr. Gravatt - Lancaster Co.___

Body Identified by: Comparison of antemortem and postmortem dental records by Dr. Kaugers, DDS

Persons Present at Autopsy: Dr. Ross R. Smith
S. Dennison　　J.K. Davis, Cpt.-LSD
　　　　　　　　B.A. Boles-LSD

| Rigor: Complete | | jaw | | neck | | arms | | legs | | passed | X |
|---|---|---|---|---|---|---|---|---|---|---|---|

Livor: color _Indeterminate_ _____distribution: _____

Age _20's_ Race _W_ Sex _F_ Length _60"_ Weight _74_ Eyes _Indet._ Pupils: R _____ L _____
Hair _Medium length brown hair_ Mustache _—_ Beard _—_ Body Heat _Ambient_
strands present on vertex; pubic hairs brown

Clothing, Personal Effects, External wounds, scars, tattoos, other identifying features:
The body is received in a sealed grey metal casket sealed with phillip's head screws
inside is　a zippered black plastic pouch.
External examination: White female bloated with skin slippage; hand skin is absent
except for skin and fingernail of left ring finger under golden band on left ring finger.
Ring is inscribed 10K C̃ pattern; no inscription. Red-pink nail polish on left great toe;
skin stocking present. Right sole shows pink spots measuring from 1/8 to ¼". For
remainder of external examination and injuries see body diagrams.
Radiographs negative for missiles and foreign bodies.
PATHOLOGICAL DIAGNOSES:
Six cutting wounds; right hip, right flank, and right base of neck:
- Wounds measure 4½, 5, 4-3/4, 4-3/8, 4-3/4" in length and vary from ½" to 2½" deep.
- Margins are clean and without hack marks.
- Irregular cutting wound right lower midback 7/8" x 1", L-shaped.
- All wounds cut skin, are devoid of bridging in the base with the flank wounds cutting
  back muscles.
Ligature marks of neck, circumferential measuring ½" to 2-3/4":Chain & rope about neck at
- No deep injury to neck.　　　　　　　　　　　　　　　　　　　　　　scene.
Contusion left anterior tibia.
Subcutaneous discoloration anteromedial thighs (section submitted).
Black pattern marks posterior right calf, anterior right tibia and right axilla.
Stellate black mark right medial buttock.
Rust mark posterior right leg and medial aspect right leg.
No defense injuries of hands or forearms.
Marine animal soft tissue artifact of eyes, mouth, right knee.

Cause of Death: Asphyxia and cutting wounds

Provisional Report _8/28/85_
Final Report _11/11/85_

The facts stated herein are true and correct to the best of my knowledge and belief.

8/28/85　　　　　　　　　OCME - Richmond

Date Signed　　　　　Place of Autopsy　　　　Signature of Pathologist
　　　　　　　　　　　　　　　　　　　　　M.F. Fierro, M.D.
　　　　　　　　　　　　　　　　　　　　　9 N. 14th Street
　　　　　　　　　　　　　　　　　　　　　Richmond, VA 23219

Page 1 of 3

## GROSS DESCRIPTION

| | |
|---|---|
| KIN: | Venous vascular mottling, slippage of epidermis, no other holes. |
| PLEURA: | 50 ml of bloody effusate bilaterally in each pleural cavity. No holes in parietal pleura. Right apex underlying cut No. 1 shows no hole. |
| ERITONEUM: | No hemoperitoneum. Dry. |
| ERICARDIUM: | Intact. Gas formation. |
| EART: | 140 gms. Right heart is not dilated. Coronary arteries are within normal limits. Myocardium is soft and flabby but free of gross scars. Valves within normal limits |
| ORTA: | No atherosclerosis; yellow tan with none to very slight trace hemolytic staining. |
| ECK ORGANS: | The tongue, posterior pharynx, hyoid, anterior and lateral strap muscles, esophagus and trachea are free of injury. No subcutaneous hemorrhages. |
| UNGS: | Left: 210 gms. Right: 320 gms. Airways are pink, red and dry. No fluid. Parenchyma is pale, pink purple and on cut section free of gross lesions. No aqueous emphysema. Minimal purple softening and discoloration. Tracheo-bronchial tree is free of any debris. |
| YMPH NODES: | Within normal limits. |
| IVER: | 710 gms. Tan brown with gas formation, dry; no congestion. |
| ALLBLADDER: | Gas formation of the wall, the lining is within normal limits and shows residual amber orange sticky bile. No stones. |
| PLEEN: | 120 gms. Purple. Soft. |
| ANCREAS: | Moderately autolyzed; otherwise within normal limits. |
| DRENALS: | Autolyzed; orange yellow. |
| . TRACT: | The esophagus contains damp food in the esophagus which is otherwise dry. |
| TOMACH: | Contains 100 ml of thick, non-watery lightly digested food contents with green peas, carrot slivers, bean husks, tomato, and possibly onion within the stomach. The gastric mucosa is tan and pale and within normal limits. The small and large bowel show gas formation but are otherwise within normal limits. Appendix is present. |
| DNEYS: | Right: 85 gms. Two old healed irregular depressed scars of the upper and lower pole on the right and a single depressed scar on the lower pole of the left kidney. |
| ADDER: | Dilated with gas formation of the wall and devoid of urine. No injury. |
| NITALIA: | The right labia is ragged and shows marked slippage of skin. No discrete injuries identified. The vaginal vault is clean and damp. No watery secretions. The cervix is transverse and within normal limits. The uterus is non-pregnant and lined by thin tan endometrium. The ovaries and tubes are present and within normal limits. |
| AIN & ENINGES: | The brain is liquified within a gray intact dura which is devoid of epidural, subdural or subarachnoid staining. Upon opening, the liquified brain shows no areas of localized staining. |
| JLL: | No lacerations, abrasions or bruises of scalp. Petrous ridge of left temporal bone is wedged and is devoid of temporal bone hemorrhage. |
| 3S & ERTEBRAE: | Ribs are within normal limits. No fractures. Vertebra: The cervical spine is opened and is free of injury. The cut of the right lateral neck, No. 1, has left a slightly irregular nick, less than 1/16" of the lateral aspect of a right cervical vertebra without any injury to vessels. The carotid, jugular, subclavian, brachycephalic and axillary arteries are intact. |
| VIS: | No fractures. |
| REMITIES: | No defense injuries; no epidermis remaining except for skin retained on the left ring finger held in place by the ring. |

| OTHER LABORATORY PROCEDURES: | TOXICOLOGY XX BACTERIOLOGY | DENTAL CHART X  X—RAY X | FINGER—PRINTS X — |
|---|---|---|---|
| | PHOTOGRAPHY XX SEROLOGY  XX | FORENSIC SCIENCE X | PPLMS |

ISPOSITION OF EVIDENCE

| TYPE (Clothing, Bullets, Etc.) | NAME OF RECIPIENT | ADDRESS | OFFICIAL TITLE | DATE |
|---|---|---|---|---|
| Hair: Plucked exemplars of head and pubis, residual head and pubis hair, hair adherent o midback, rusty material behind right knee, left ring finger skin for trace evidence nder nail, material recovered from left ear, pleural effusate for blood grouping and one for blood grouping, oral, anal and vaginal swabs and smears for sperm and acid phosphatase. | | | | |
| Ring | R A Roles-LSD | | | |

MICROSCOPIC DESCRIPTION AND CASE SUMMARY

| Tissue | Description |
|---|---|
| cardium: | Marked autolytic change; no scarring. |
| g: | Marked autolysis with some gas formation.  Residual alveolar outline, where present, are of normal configuration.  No scarring.  No crystals. |
| er: | Marked gas formation; no scarring. |
| in: | Marked autolysis with gas formation; no hemorrhage. |
| n of leg site of ck staining: | The epidermis is largely soft in one area.  Special stains for iron are positive .  No subcutaneous hemorrhage. |
| n-right k: | Margin of cut: the epidermis is sloughed.  No discernable extravasation of blood.  Margins are clean. |
| n right gh: | Skin in subcutaneous tissue shows loss of the overlying epidermis.  The dermal collagen is intact.  There is no hemorrhage nor inflammation. |
| achea: | The trachea lining is exfoliated.  No debris is identified.  There is no hemorrhage in the paratracheal areolar tissue. |
| ratracheal t & muscle: | No hemorrhage. |
| scle of an- rior neck: | No hemorrhage. |

CASE SUMMARY AND COMMENT:

This 24 year old white female, homemaker, was last known to be alive at 10 p.m. on August 22, 1985, when she talked to a relative on the phone.  Her body was recovered from the Rappahannock River four days later.  Her body was nude with a heavy rope looped four times about the neck and tied to a large cinder block.  A heavy chain was tied to the rope and looped about her legs.

Postmortem examination revealed circumferential ligature impression marks about the neck. There were cutting wounds of the right base of the neck, right hip and right flank.  There was no immediately lethal or large blood vessel injury to the neck discernable in the moder- ately decomposed tissues.  The cutting wounds were 4 1/4 to 4 3/4 inches in length, fairly uniform, roughly parallel and varied from 1/2 to 2 1/2 inches in depth.  Margins were clean and without hack marks, most consistent with a linear blade.  There was a patterned black mesh-like mark of the right sacral region indicating the back rested for a time against an item having the same peculiar patterned configuration.  Ovoid black marks about the leg and right axilla were consistent with rusty impressions left by the chain and scanning electron microscopy confirmed the presence of iron as a constituent of the deposited material.

The lungs were light weight, the temporal bones free of hemorrhage and the stomach contained

Pathologist ____M.K.XFperro, M.D.____     Autopsy No. ___369-85_____

Date Completed ___11/11/85_____     Decedent ____Mary K. Harding_____

CME FORM NO. 10A-REVISED 12/80

6     Continued  page 2

**89**

MICROSCOPIC DESCRIPTION AND CASE SUMMARY: (Con't)
Page 2 of 2
Decedent:  Mary K. Harding
Autopsy#369-85

contained non watery lightly digested food.  The tissues were pale.  Postmortem
toxicology on pleural effusate disclosed concentrations of ethanol consistent
with her degree of decomposition.  A gastric drug screen was negative.  Identifi-
cation was accomplished by comparison of antemortem and postmortem dental records.

The postmortem findings are consistent with death due to asphyxia by the ligature
and/or from the cutting wounds.  The absence of any clear findings of drowning
make drowning a less likely possibility.

CAUSE OF DEATH:  Asphyxia and cutting wounds.


_____
Signature of Pathologist

M. F. Fierro, M.D.

**90**

Page 3 of 3
Mary Keyser Harding
CME 369-85
8/28/85

Multiple cutting wounds, six:

1. Cutting wound curvilinear right upper shoulder at base of neck 4-3/4" long, 2½" deep, 8½" from top of head. Margins laterally are clean and void of bridging. The posteromedial end is blunt; the anterior superior shoulder end is sharp.
   - No major vessels, spinal cord or vertebral injury.

2. Right posterior back, horizontal 4" long, ½" deep, 1" gaping, 19½" from top of head, cut transects skin, soft tissue and into fat.

3. Subjacent to #2, right back, 4-3/4" long, ½" deep, 20½" from top of head, wound penetrates skin and subcutaneous fat.

4. Subjacent, roughly horizontal to Nos. 2 and 3, 4-3/4" long, 3/4" deep with blunt lateral margin gaping 3/4", 21" from top of head, wound severs skin, soft tissue and muscle.

5. Subjacent to Nos. 2,3, and 4, roughly horizontal, 5" long, 1" deep, with a blunt medial and sharp lateral margin, 22½" from top of head, wound penetrates into subcutaneous fat

6. Oblique of the right upper lateral buttock, 4¼" long with a 3" segment penetrating ½" deep into dermal fat, 26" from top of head.

7. Irregular cut roughly L-shaped medial to wound No. 6 with 7/8" and 1" arms.

POSTMORTEM TOXICOLOGY:

| | |
|---|---|
| Vial #1 Pleural Effusate: | 0.10% ethanol by weight by volume. |
| | Negative for methanol, isopropanol and ketones. |
| Vial #2 Pleural Effusate: | 0.04% ethanol by weight by volume. |
| | Negative for methanol, isopropanol and ketones. |
| Gastric Contents: | Drug screen - none detected. |

Blood group O positive.

_____
M.F. Fierro, M.D.
9 North 14th Street
Richmond, VA  23219

R

**BODY DIAGRAM**



Front

Back

eye soft tissue absent (marine artifact)

see neck detail for chain/rope ligature marks

black mark 1¾ x 1¼ 2½ x 1¼ (abrasion)

venous mottling skin slippage

adherent curled hair

skin split skin dries 3¼ x 1¼ artefact

Cut 1 4¾ 2½" deep 8½" ↑↑ Cut 2 4" deep (ends 15½" ↑↑ Cut 3 4½ 20½ ↑↑ ½ deep ↓ Cut 4 4¾ 4½ ¾ deep blunt fat ↓ end 5" 22½ fat ¾ deep blunt tissue skin split Cut 5 4¼ 26" 3" to ↑↑ derm fat ½½

blunt

2 3 4 5 6 7

1" 26" ↑↑

irreg cut 7

striae

not/me mgt blisters

golden bond Testin present + ring Slippage of skin finger

irregular varying depth less 1 skin (artifact)

½ x ½"

black marks ⅞ x ¾ 3/4 3½/8 ¾½

cut contusion 2 1½ x ⅜

½" black mark ↓ 1¼ 3/4" 1½"

rust R back of leg 3¼ x 4"

1½ x 1" triangle 1½ x ½ Blache marks

rust

great toe nail polish epidermis present

skin defect

R sole pink spots ⅛ - ¼

skin defect 1¼ x 1½ irreg.

Decedent's Height 60 inches

COMMONWEALTH OF VIRGINIA
OFFICE OF THE CHIEF MEDICAL EXAMINER

Name Mary K Harding

Examined By _____ Date 8/28/85

369-85

9

92

BODY DIAGRAM—HEAD



Right

Left

½" superficial cut (fresh)

0 ³/₈"
0 ³/₈"
cut

impression mark 1"
½"

impression mark

1½"

1"

⁵/₈" wide

Decedent's Name   Mary K Harding

Examined
By   OOO Neno   Date 8/25/85

369-85

COMMONWEALTH OF VIRGINIA
OFFICE OF THE CHIEF MEDICAL EXAMINER
CME Form—184

9A

BODY DIAGRAM—HEAD



Front

Back

skin defect
ragged edges
artefact.

Chin

2"

Impression
mark

eye
eyebrows
ragged edges

ovoid
defect
bruising

1/4

Teeth
present
restoration on
xray.

R lat incisor
absent - post
loose mortem.
no lip laceration

3/4

partialy absent
artefact.

Impression
mark 2³/₄" – 1½"

Decedent's Name ___Mary K. Harding___

Examined
By ___Warrior___ Date _8/2/85_

___369-85___

Commonwealth of Virginia
Department of General Services
Division of Consolidated Laboratory Services
**BUREAU OF FORENSIC SCIENCE**

### CERTIFICATE OF ANALYSIS

September 11, 1985

Central Laboratory
P.O. Box 999
Richmond, Virginia 23208

TO:  Office of the Chief Medical Examiner
ATTN:  Dr. M. F. Fierro
9 N. 14th Street
Richmond, Virginia  23219

Tel. No. (804) 786-4707

Your Case #    369-85

FS Lab #    85-04739

Victim(s):     HARDING, Mary Keyser

Suspect(s):    ---

Examiner:    J. C. Valentour,
Ph.D

Evidence Submitted By:  Dr. M. F. Fierro

Date Received    8-29-85

Two (2) vials of pleural effusate and a container of gastric contents.

RESULTS OF EXAMINATION:

*from decomposition*

Vial #1 Pleural Effusate:    0.10% ethanol by weight by volume.
Negative for methanol, isopropanol and ketones.

Vial #2 Pleural Effusate:    0.04% ethanol by weight by volume.
Negative for methanol, isopropanol and ketones.

Gastric Contents:    Drug screen - none detected (synthetic narcotics,
stimulants, tranquilizers, sedatives and barbiturates).

_____
Toxicologist

JCV:tjb

IN FUTURE CORRESPONDENCE REFERENCE THIS MATTER PLEASE REFER TO THE FS LAB # ABOVE

DGS-24-021(C) (REV. 4-84)

Page __1__ Of __1__
95

TO: DEPARTMENT OF GENERAL SERVICES
DIVISION OF CONSOLIDATED LABORATORY SERVICES
BUREAU OF FORENSIC SCIENCE

Do not write in Block

FS LAB #

INVESTIGATING OFFICER: D. M. Riley, Special Agent
Dept of state Police

AGENCY AND ADDRESS: P. O. Box 9108
Richmond, Va.

DATE: Sept. 9, 1985
85-82-0597

AGENCY CASE #: _____

TELEPHONE #: (    ) 266-2441

NAME OF VICTIM(S): Mary K. Harding          AGE _____ RACE _____ SEX _____

NAME OF SUSPECT(S): None          AGE _____ RACE _____ SEX _____

DATE AND TYPE OF OFFENSE: 8-22-85 Abduction and Murder          COURT DATE _____

BRIEF STATEMENT OF FACT AND EXAMINATIONS REQUESTED: Victim was abducted, murder and put in river.

Serlogy, latent, trace, soil, paint

This evidence is being submitted in connection with a criminal investigation and has not been examined by another laboratory.
If a previous submission to us in this case has been made please give our FS lab # _____
Specify manner of return of evidence: _____ Mail _____ Personal Pick-up

EVIDENCE SUBMITTED: (Itemize and describe)

200. Green paint from chain on victim. compare with items
201. Yellow flake from rope which was tied to victim. Compare with
202. White t-Shirt found by citizen examine for blood, hairs and fibers and compare with victim.
202-A H airs and fibers removed from 202, compare with hairs from victim.
202-B Red substance removed from 202 examine for blood and compare with victim.
300. Hair from Steven's boat examine and compare with victim.
301. Anti-freeze bottle with stain, examine for blood and compare with blood of victim.
302. Rag with stain, examine for blood and compare with blood of victim.
303. Black rubber boots with stains examine for blood , and compare with blood of victim.
303-A. Trace removed from 303, examine for hair and compare with hair from victim.
304. White rubber boots examine for hair and blood and compare with victim's hair and blood.
305. Mop with broken handle examine for hair and blood and compare with victim.
306. Rubber gloves with stains examine for hair and fibers and compare with victim.
307. Mop brush with handle, examine for hair and blood and compare with same from victim.
308. Spool of twine examine and compare with twine on rope from victim, items 4 &5.
309. Piece of rope from boat examine blood, fibers, soil, and compare with items 4 & 5.
10. Trace from boat examine and compare with hair from victim and tems 3,4,5.
11. Hair and trace from boat examine and compare with items 3,4,5, and hair from victim.
12. Red stain on boat examine for and compare with blood of victim.
13. Stain on boat , examine for blood and compare with blood of victim.
14. Stain on boat, examine for boat and compare with blood of victim.
15. H air from boat examine and compare with hair from victim.
16. Stain on boat examine for blood and compare with blood of victim.
17. Hair on boat examine and compare with hair of victim.

linquished by (Print) _____

(Sign.) _____ Date: _____    Relinquished by (Sign.) _____ Date: _____

ceived by (Sign.) _____ Date: 1/12/   Received by (Sign.) _____ Date: _____

linquished by (Sign.) _____ Date: _____    Relinquished by (Sign.) _____ Date: _____

ceived by (Sign.) _____ Date: _____    Received by (Sign.) _____ Date: _____

CLS FS 002 (REV. 12-79)          (Use additional page if necessary)

TO: DEPARTMENT OF GENERAL SERVICES
DIVISION OF CONSOLIDATED LABORATORY SERVICES
BUREAU OF FORENSIC SCIENCE

Do not write in Block

FS LAB #

INVESTIGATING OFFICER: D. M. Riley, Special Agent
Dept. of State Police

AGENCY AND ADDRESS: P. O. Box 9108
Richmond, Va.

DATE: Sept. 8, 1985

AGENCY CASE #: _____

85-04739

TELEPHONE #: (   )   266-2441

NAME OF VICTIM(S):   Mary K. Harding

AGE _____ RACE _____ SEX _____

NAME OF SUSPECT(S):

AGE _____ RACE _____ SEX _____

DATE AND TYPE OF OFFENSE:   8-22-85   Abduction and Murder

COURT DATE _____

BRIEF STATEMENT OF FACT AND EXAMINATIONS REQUESTED: Victim was abducted and murder
and then put in the river. Serlogy latent trace soil paint

This evidence is being submitted in connection with a criminal investigation and has not been examined by another laboratory
If a previous submission to us in this case has been made please give our FS lab # _____
Specify manner of return of evidence: _____ Mail _____ Personal Pick up

EVIDENCE SUBMITTED: (Itemize and describe)

318. Two burlap bag from boat examine for hairs and fibers and compare with victim. 3,4, and 5.

319. Blue fiber from boat examine.

320. Trace evidence from deck of boat examine for ~~paint~~ *paint* and compare with 3,4, and 5.

321. Rope from boat examine fibers and ~~paint~~ and compare with 4 and 5.

322. Hair and trace from boat examine and compare with victim and 3,4, and 5.

323. Piece of rope from boat examine and compare with 4 and 5

~~324~~. Red stain from boat examine for blood and compare with blood of victim.

~~325~~. Stain from boat examing for blood and compare with blood of victim.

326. Latent from boat examine and compare with victim.

327. Latent from boat examine and compare with victim.

328. Latent from boat examine and compare with victim.

329. Latent from boat examine and compare with victim.

330. Latent from boat examine and compare with victim.

831. Latent from boat examine and compare with victim.

#5 changed per McCann 9/16/85

#1. Chain removed from victim.

#2. Cinder block and rope from victim.

#3. Rope removed from victim.

330A - Hair

Relinquished by (Print) D.M. Riley

(Sign.) DMRiley   Date: 9/12/85

Received by (Sign.) [signature]   Date: 9/12/85

Relinquished by (Sign.) [signature]   Date: 9/12/85

Received by (Sign.) K. L. Young   Date: 9/12/85

# /only (Chain)

Relinquished by (Sign.) K. L. Young   Date: 9/7/85

Received by (Sign.) B. L. Katz   Date: 10/9/85

Relinquished by (Sign.) # /only (Chain) B. L. Katz   Date: 10/9/85

Received by (Sign.) [signature]   Date: 10-9-85

DCLS FS 002 (REV. 12-79)

(Use additional page if necessary)

TO: DEPARTMENT OF GENERAL SERVICES
DIVISION OF CONSOLIDATED LABORATORY SERV...
BUREAU OF FORENSIC SCIENCE

INVESTIGATING OFFICER: D. M. Riley, Special Agent
Dept. of State Police

AGENCY AND ADDRESS: P. O. Box 9108
Richmond, Va.

DATE: Sept. 8, 1985

AGENCY CASE #: _____

Do not write in Block

FS LAB #

TELEPHONE #: ( )   266-2441

NAME OF VICTIM(S): Mary K. Harding

AGE ____ RACE ____ SEX ____

NAME OF SUSPECT(S):

AGE ____ RACE ____ SEX ____

DATE AND TYPE OF OFFENSE: 8-22-85  Abduction and Murder

COURT DATE _____

BRIEF STATEMENT OF FACT AND EXAMINATIONS REQUESTED: Victim was abducted and murder
and then put in the river. Serlogy latent trace soil paint

This evidence is being submitted in connection with a criminal investigation and has not been examined by another laboratory
If a previous submission to us in this case has been made please give our FS lab # _____
Specify manner of return of evidence: _____ Mail _____ Personal Pick-up

EVIDENCE SUBMITTED: (Itemize and describe)

318. Two burlap bag from boat examine for hairs and fibers and compare with victim, 3,4, and 5.
319 Blue fiber from boat examine
320. Trace evidence from deck of boat examine for soil and compare with 3200. 3,4, and 5.
321 Rope from boat examine fibers and soil and compare with 4 and 5.
322. Hair and trace from boat examine and compare with victim and 3,4, and 5.
323. Piece of rope from boat examine and compare with 4 and 5
324. Red stain from boat examine for blood and compare with blood of victim.
325. Stain from boat examine for blood and compare with blood of victim.
326. latent from boat examine and compare with victim.
327. Latent from boat examine and compare with victim.
328. Latent from boat examine and compare with victim.
329. Latent from boat examine and compare with victim.
330. Latent from boat examine and compare with victim.
331. Latent from boat examine and compare with victim.

3. Chain removed from victim.
4. Cinder block and rope from victim.
5. Rope removed from victim.

Relinquished by (Print) _____
(Sign.) _____ Date: ____
Received by (Sign.) _____ Date: ____
Relinquished by (Sign.) _____ Date: ____
Received by (Sign.) _____ Date: ____
Relinquished by (Sign.) _____ Date: ____
Received by (Sign.) _____ Date: ____
Relinquished by (Sign.) _____ Date: ____
Received by (Sign.) _____ Date: ____

DCLS FS 002 (REV. 12-79)          (Use additional page if necessary)

TO: DEPARTMENT OF GENERAL SERVICES
DIVISION OF CONSOLIDATED LABORATORY SERVICE
BUREAU OF FORENSIC SCIENCE

Do not write in Block

FS LAB #

INVESTIGATING OFFICER: Special Agent D. M. Riley

AGENCY AND ADDRESS: Va. State Police
P. O. Box 9108
Richmond, Va.

DATE_____ Sept. 9, 1985

AGENCY CASE #: _____

85-81-0697

TELEPHONE #: (    )   266-2441

NAME OF VICTIM(S):    Mary K Harding

AGE _____ RACE _____ SEX _____

NAME OF SUSPECT(S):

AGE _____ RACE _____ SEX _____

DATE AND TYPE OF OFFENSE: 8-22-85 Abduction and Murder        COURT DATE _____

BRIEF STATEMENT OF FACT AND EXAMINATIONS REQUESTED: Victim was abducted , murder then
put in the river.

Serlogy TRACE, soil ,Trace, latent paint.

This evidence is being submitted in connection with a criminal investigation and has not been examined by another laboratory.
If a previous submission to us in this case has been made please give our FS lab # _____
Specify manner of return of evidence: _____ Mail _____ Personal Pick-up

EVIDENCE SUBMITTED: (Itemize and describe)

400. Red plaid shirt from bed of truck examine for hair and trace and compare with victim and 3,4, and 5.
401. light colored shirt from truck examine and compare with hair and trace of victim and 3,4,5
402,3 Three beer cans from truck examine and compare iwith victim's fingerprints.
403a Plastice oil can with stain examine for blood and compare with victim.
403.2 Piece of rope from truck examine for blood and compare with victim.
405. Blue swab found in truck examine for blood and compare with victim.
406. Trace evidence from truck bed examine for hairs and paint and compare with 200,201, 3,4,5.
407. Trace evidence from bed of truck examine and compare with 200, 201, 3, 4, 5.
408. Paint sample from bed of truck examine and compare with 200, and 201
409. Hairs from seat of truck examine and compare with hair of victim.
410. Hairs from seat of truck examine and compare with hairs of victim.
411-A Hairs from red plaid shirt under seat examine and compare with hairs of victim.
411. Read plaid shirt found under seat of truck examine for fibers and blood. Kathie received.
412. Blue temp with stains from truck examine for blood and hairs and fibers. Kathie received.
413. E Red cloth behind seat , examine for fibe and hairs and compare with victim.
414. Blue jacket with stains from truck examine for blood and hairs and compare with victim.
415. Three beer cans examine for latents and comp are with victim's.
416. Floormatts from truck examine for blood and hairs and compare with victim's.
417.
416-A Stain from 416, examine for blood and compare with victim.
416-B Soil and trace from 416 examine also, compare hair if any with hair of victim.
417. Paint sample from driver's front tire examine and compare with 200.

elinquished by (Print) _____

(Sign.) _____ Date: _____    Relinquished by (Sign.) _____ Date: _____

ieceived by (Sign.) _____ Date: _____    Received by (Sign.) _____ Date: _____

elinquished by (Sign.) _____ Date: _____    Relinquished by (Sign.) _____ Date: _____

eceived by (Sign.) _____ Date: _____    Received by (Sign.) _____ Date: _____

DCLS FS 002 (REV. 12-79)        (Use additional page if necessary)

TO: DEPARTMENT OF GENERAL SERVICES
DIVISION OF CONSOLIDATED LABORATORY SERVICES
BUREAU OF FORENSIC SCIENCE

Do not write in Block

FS LAB #

INVESTIGATING OFFICER: S/A D. M. Riley
Dept of State Police

AGENCY AND ADDRESS: P.O. Box 9108
Richmond, Va.

DATE __Sept. 9, 1985__

AGENCY CASE # _____

TELEPHONE #: ( 266-2441

NAME OF VICTIM(S): Mary K. Harding.

AGE ____ RACE ____ SEX ____

NAME OF SUSPECT(S):

AGE ____ RACE ____ SEX ____

DATE AND TYPE OF OFFENSE: Abductions and murder  8-22-85

COURT DATE _____

BRIEF STATEMENT OF FACT AND EXAMINATIONS REQUESTED: On the above date the victim was abducted murder and put in river.

Latents.

This evidence is being submitted in connection with a criminal investigation and has not been examined by another laboratory

If a previous submission to us in this case has been made please give our FS lab # _____

Specify manner of return of evidence: _____Mail _____Personal Pick-up

EVIDENCE SUBMITTED: (Itemize and describe)

418. Latent from, truck examine and compare with victim's prints.
419. Latent from truck examine and compare with victim's prints.
420. Latents from truck examine and compare gx with victim's prints.
421. Latents from truck examine and compare with victim's prints.
422. Latents from truck examine and compare with victim's p rints.
423. Latents from truck examine and compare with victim's prints.
424. Head hair from William Keith Wilmer
425. Pubic hair from William Keith Wilmer
426. Known fingerprints of William Keith Wilmer
427. Know n fingerprints of Earl Steve Smith
428. Head hair from Earl Steve Smith
429. Pubic hair from Earl Steve Smith

430. Underdum hair Brenner Eugene Steven

Relinquished by (Print)_____

(Sign.)_____ Date:_____

Received by (Sign.)_____ Date: /12/ ____

Relinquished by (Sign.)_____ Date:_____

Received by (Sign.)_____ Date:_____

Relinquished by (Sign.)_____ Date:_____

Relinquished by (Sign.)_____ Date:_____

Received by (Sign.)_____ Date:_____

Received by (Sign.)_____ Date:_____

DCLS FS 002 (REV. 12-79)

(Use additional page if necessary)

Commonwealth of Virginia
Department of General Services
Division of Consolidated Laboratory Services
BUREAU OF FORENSIC SCIENCE

## CERTIFICATE OF ANALYSIS

October 11, 1985

Northern Laboratory
2714 Dorr Avenue
P. O. Box 486
Merrifield, Virginia 22116

Tel. No. (703) 573-8636

TO: Department of State Police
ATTN: Special Agent D. M. Riley
P.O. Box 9108
Richmond, Virginia  23227

Your Case #   85-81-0697

FS Lab #  85-04739

Victim(s):   HARDING, Mary K.

Examiner: Myron T. Scholberg

Suspect(s):  STEVENS, Emerson

Date Received  8/28/85

Evidence Submitted By: Dr. Fierro, Medical Examiner

Item CME-2.  Head hairs from victim
             Pubic hairs from victim

Evidence Submitted By:  D. M. Riley

Dater Received: 9/12/85

Item 300.   Hairs from Steven's boat
Item 310.   Hairs from boat
Item 311.   Hairs from boat
Item 317.   Hairs from boat
Item 320A.  Hairs from deck of boat
Item 322.   Hairs from boat
Item 409.   Hairs from seat of truck
Item 410.   Hairs from seat of truck
Item 411A.  Hairs from red plaid shirt
Item 413.   Hairs from red cloth
Item 414.   Hairs from blue jacket
Item 416B.  Hairs from floor mats of truck
Item 424.   Head hairs from William Keith Wilmer
Item 425.   Pubic hairs from William Keith Wilmer
Item 428.   Head hairs from Earl Steve Smith
Item 429.   Pubic hairs from Earl Steve Smith
Item 430.   Head hairs from Emerson Eugene Stevens
            Pubic hairs from Emerson Eugene Stevens
            Underarms hairs from Emerson Eugene Stevens

IN FUTURE CORRESPONDENCE REFERENCE THIS MATTER PLEASE REFER TO THE FS LAB # ABOVE

DCLS FS 006-N (REV. 5-78)

85-04739

Evidence Submitted By:  D. M. Riley                    Date Received: 9/23/85

    Item 501.  Hairs from green plaid shirt
    Item 503.  Debris from pocket of green plaid shirt


RESULTS OF EXAMINATION:

    Items 300, 310, 311, 317, 320A and 322.    Numerous Caucasian hairs of various types
                                               and colors were observed in these items.
                                               However, there were no hairs found that
                                               were microscopically like the head hairs
                                               and pubic hairs identified as originating
                                               from the victim (Item CME-2).

    Items 409, 410, 413, 414,and 416B.    There were no hairs like those identified
                                          as originating from the victim found in
                                          these items.

    Item 411A.  A single head hair of Caucasian origin found in this item  is
                microscopically like the head hairs from the victim and, accordingly,
                could have originated from her.

                No other hair identifications were effected in this item (did not test)

    Item 501.  No hairs like the victim's were found in this item.

    Item 503.  There were no hairs found in this item.

Other examinations are continuing.  You will be advised of the results of those
examinations and the disposition of the items of evidence by a separate report.


STATE OF VIRGINIA
CITY/COUNTY OF_____Fairfax_____, to-wit:

    THIS day personally appeared before me,____Sharon L. Childs_____, a notary public, in and for said city/county in the

Commonwealth of Virginia,_Myron T. Scholberg_____, who signed the foregoing Certificate of Analysis, before me, and after being duly sworn,
made oath (1) that he performed the analysis and/or examination the results of which are herein contained, (2) that said analysis and/or examination was performed
in a laboratory operated by the Division of Consolidated Laboratory Services of the Commonwealth or authorized by such Division to conduct such analysis and/or
examination and (3) that this Certificate of Analysis is true and correct.

    Given under my hand this___/64th day of October_____, 19 85

    My commission expires November 12_____, 19 88
slc                                                    Page____2__of__2

**Commonwealth of Virginia**
Department of General Services
Division of Consolidated Laboratory Services
**BUREAU OF FORENSIC SCIENCE**

**CERTIFICATE OF ANALYSIS**

October 29, 1985

Northern Laboratory
2714 Dorr Avenue
P. O. Box 486
Merrifield, Virginia 22116

Tel. No. (703) 573-8636

TO: Department of State Police
Attn: D. M. Riley
P.O. Box 9108
Richmond, VA 23227

Your Case # 85-81-0697

FS Lab # 85-04739

Victim(s): HARDING, Mary K.

Examiner: Myron T. Scholberg

Suspect(s): STEVENS, Emerson Eugene

Date Received 8/28/85

Evidence Submitted By: Dr. Fierro, Medical Examiner
Item CME-2 Head hairs from victim
Pubic hairs from victim

Evidence Submitted by: D. M. Riley                    Date Received:  9/12/85
Item 411A   Hairs from red plaid shirt
Item 430   Head hairs from Emerson Eugene Stevens

Evidence Submitted by: D. M. Riley                    Date Received:  9/23/85
Item 501   Hairs removed from green plaid shirt

Evidence Submitted by: B. I. Robertson               Date Received:  10/18/85
Item 700   Material recovered from or under tree near victim's bedroom
Item 701   Material recovered from or under tree near victim's bedroom
Item 702   Material recovered from tree outside victim's bedroom

RESULTS OF EXAMINATION:

Item 411A   Brown head hairs of Caucasian origin found in this item are
microscopically like the head hairs from the suspect (item 430)
and, accordingly, could have originated from him.

IN FUTURE CORRESPONDENCE REFERENCE THIS MATTER PLEASE REFER TO THE FS LAB # ABOVE

Page _____ Of _____ 2

DCLS FS 006-N (REV. 5-78)

17

85-81-0597

103

85-04739

Item 501    There were no hairs like the suspect's hairs found in this item.
Item 700 through 702    There were no human hairs or any fibers of value for comparison purposes found in these items.

Other hair examinations are being held in abeyance.   You will be advised of the results of any subsequent requested examinations and the disposition of the items of evidence by a separate report.

STATE OF VIRGINIA
CITY/COUNTY OF_____Fairfax_____, to-wit:

THIS day personally appeared before me,_____Robert D. Moeser_____

Commonwealth of Virginia,___Myron T. Scholberg_____, who signed the foregoing Certificate of Analysis, before me, and after being duly sworn, made oath (1) that he performed the analysis and/or examination the results of which are herein contained, (2) that said analysis and/or examination was performed in a laboratory operated by the Division of Consolidated Laboratory Services of the Commonwealth or authorized by such Division to conduct such analysis and/or examination and (3) that this Certificate of Analysis is true and correct.

Given under my hand this  30TH  day of  OCTOBER  , 19 85

My commission expires____July 23_____, 19 89

ceu

Page 2  of  2

XCLS FS 007AP (REV. 7-74)

18

104

THE COLLEGE OF WILLIAM AND MARY
VIRGINIA INSTITUTE OF MARINE SCIENCE
SCHOOL OF MARINE SCIENCE

May 2, 1986

*Stevens*

*file*

MAY 1986
RECEIVED

Mr. C. Jeffers Schmidt, Jr.
Commonwealth's Attorney
Lancaster County
Lancaster, Virginia  22503-0204

Dear Mr. Schmidt:

I received your letter of April 28th notifying me of the re-scheduling of Commonwealth v. Stevens for July 7-8-9-10, 1986.  Although I am pleased to aid you and the Commonwealth as well as I can, there are two concerns which I feel I must express to you:

1) During my previous testimony, I gave what simply amounted to background information on the Rappahannock River system since I myself have no knowledge of any specific event or direct observation relating to both the place and time in question.  Was this testimony truly of use to you or the court?

2) In a brief "interview" before my last appearance at the Circuit Court, your associate, Lt. Riley, applied what may be the correct term to my testimony in this case.  He called it "eyewash".  I ventured that it was expensive eyewash in view of the distances I travelled and time away from projects at the Institute.

You will understand that I am a professional such as yourself and the season approaching will be a very busy one for me.  I would greatly appreciate your consideration of that fact and ask that you recognize the considerable help you would render me if only one of the four days referred to above should require my actual presence.

Sincerely yours,

John D. Boon, III, Ph.D.
Associate Marine Scientist

JDB,III/cdg

(804) 642-7272

Gloucester Point, Virginia 23062

105

CRANE-SNEAD & ASSOCIATES, INC.
COURT REPORTERS
RICHMOND, VIRGINIA
PHONE 358-4833

OCT 09 1990

1   VIRGINIA:

2          IN THE CIRCUIT COURT OF LANCASTER COUNTY

3

4

5

6   COMMONWEALTH OF VIRGINIA

7   VS

8   CLYDE DUNAWAY

9

10

11

12

13

14          Transcript of the hearing on March 1, 1988 before

15   the Honorable J.M.H. Willis, Judge.

16

17

18

19

20

21

22

23

24

**106**

CRANE-SNEAD & ASSOCIATES, INC.

COURT REPORTERS

RICHMOND, VIRGINIA

PHONE 255-4335

2.

APPEARANCES:

Edward K. Carpenter, Esq.
Goochland, Virginia
counsel for the commonwealth;

James C. Breeden, Esq. and
A. Davis Bugg, Jr., Esq.
Irvington, Virginia
counsel for the defendant;

The defendant, himself.

CRANE-SNEAD & ASSOCIATES, INC.
COURT REPORTERS
RICHMOND, VIRGINIA
PHONE 355-4335

3.

NOTE:  The court reporter having first been duly sworn, the hearing commences, viz:

THE COURT:  Mr. Breeden, are you ready?

MR. BREEDEN:  We are ready to proceed.

THE COURT:  Mr. Carpenter?

MR. CARPENTER:  We are ready, Your Honor.

THE COURT:  I understand there is a plea agreement in this case.  Has that agreement been signed by all of the parties?

MR. CARPENTER:  Yes, Your Honor.

THE COURT:  Mr. Dunaway, is it difficult for you to stand?

THE DEFENDANT:  No.

THE COURT:  Can you stand comfortably?

THE DEFENDANT:  Yes.

NOTE:  At this time the defendant is standing.

THE COURT:  Are you Clyde Dunaway?

THE DEFENDANT:  Yes.

THE COURT:  You are represented by Mr. Breeden and Mr. Bugg who are here with you?

THE DEFENDANT:  Yes, sir.

THE COURT:  Mr. Dunaway, the grand jury has returned an indictment against you charging you

CRANE-SNEAD & ASSOCIATES, INC.
COURT REPORTERS
RICHMOND, VIRGINIA
PHONE 355-4332

4.

punishable by confinement in the state penitentiary for a term up to a maximum of 10 years. Your case was set for trial today before a jury on that charge.

I now have been handed a plea agreement which has the name Clyde Dunaway signed to it. Is that your signature?

THE DEFENDANT:  Yes.

THE COURT:  Did you sign this agreement voluntarily and of your own free will?

THE DEFENDANT:  Yes, sir.

THE COURT:  Did you sign this agreement after conferring with your attorneys and discussing the charge against you with them and having their advice concerning that charge and this plea agreement?

THE DEFENDANT:  Yes, sir.

THE COURT:  Do you understand that with respect to the charge against you you have the right to plead not guilty and submit yourself to trial before a jury of citizens of this community? Do you understand that?

THE DEFENDANT:  Yes, sir.

THE COURT:  Do you understand that you have the right to plead not guilty, but to waive trial by jury and if the commonwealth attorney and the

CRANE-SNEAD & ASSOCIATES, INC.

COURT REPORTERS
RICHMOND, VIRGINIA
PHONE 358-4355

5.

1    a jury?  Do you understand that?

2              THE DEFENDANT:  Yes, sir.

3              THE COURT:  Have you discussed with your

4    attorneys your right to testify or not as you choose?

5              THE DEFENDANT:  Yes, sir.

6              THE COURT:  Have you entered into this

7    plea agreement having in mind all of your rights

8    with respect to your pleas?  Your right to trial by

9    jury and your right to testify or not?

10             THE DEFENDANT:  Yes, sir.

11             THE COURT:  Are you asking me to accept

12   this plea agreement and to dispose of your case in

13   court today?

14             THE DEFENDANT:  Yes, sir.

15             THE COURT:  The plea agreement provides

16   that you will tender, and the commonwealth attorney

17   will accept, a plea of guilty to a reduced charge of

18   obstruction of the administration of justice which

19   is a misdemeanor charge which carries a maximum

20   punishment of 12 months in jail and/or a fine of

21   $1,000.  And that upon your tendering of that plea

22   the commonwealth attorney will recommend a jail

23   sentence of 12 months and a fine of $1,000, but the

24   jail sentence will be suspended on the condition of

CRANE-SNEAD & ASSOCIATES, INC.
COURT REPORTERS
RICHMOND, VIRGINIA
PHONE 358-4355

6.

of your payment of the fine and the costs of this
proceeding within 6 months from this date.  Is that
the agreement you are asking me to accept and to
endorse?

THE DEFENDANT:  Yes, sir.

THE COURT:  Do you understand that by
pleading guilty in accordance with this agreement
you will be admitting you are in truth guilty of
obstruction of justice which will be the amended
charge against you?

THE DEFENDANT:  Yes, sir.

THE COURT:  Do you understand you will
thereby be giving up your right to trial by a jury
and the court?

THE DEFENDANT:  Yes, sir.

THE COURT:  Have you had ample opportunity
to discuss the perjury charge and the plea agreement
with your attorneys, Mr. Breeden and Mr. Bugg, and
received their advice?

THE DEFENDANT:  Yes, sir.

THE COURT:  Are you satisfied with the
services they have rendered you?

THE DEFENDANT:  Yes.

THE COURT:  Have you understood everything

CRANE-SNEAD & ASSOCIATES, INC.
COURT REPORTERS
RICHMOND, VIRGINIA
PHONE .355-4335

7.

1   THE DEFENDANT: Yes, sir.

2   THE COURT:  I will accept the plea agree-

3   ment and dispose of the case in accordance with it.

4   Mr. Carpenter, I would like for you to

5   state for the record the amended charge.

6   MR. CARPENTER:  Your Honor, the amended

7   charge is that the defendant obstructed the adminis-

8   tration of justice on July 9, 1986 in violation of

9   section 18.2-460 of the Code of Virginia.

10   THE COURT:  What is your plea to that?

11   THE DEFENDANT:  Guilty.

12   THE COURT:  You may be seated.

13   NOTE:  At this time the defendant is

14   seated.

15   THE COURT:  Mr. Carpenter, will you state

16   for the record a summary of the facts in support of

17   that charge?

18   MR. CARPENTER:  Your Honor, I was assigned

19   as a special prosecutor by Judge Foster in September

20   1986 to investigate the allegation of perjury that

21   arose in the second trial of Commonwealth vs Emerson

22   Stevens wherein Mr. Stevens was convicted of abduc-

23   tion of Mary Keyser Harding on or about August 2,

24   1985, and murder in the first degree on that date,

CRANE-SNEAD & ASSOCIATES, INC.
COURT REPORTERS
RICHMOND, VIRGINIA
PHONE 355-4336

8.

99 years and one day.

In the course of that investigation, Mr. Dunaway was one of the approximately 60 witnesses that was interviewed. In discussing Mr. Dunaway's testimony with him in that second trial I specifically reviewed with him at page 120 of the July 9, 1986 trial transcript of this second trial. I questioned him about his interest in a $20,000 reward that had been offered for information leading to the arrest and conviction of the person responsible for the abduction and murder of Mary Keyser Harding.

He testified on cross examination in that trial that he had no interest in the reward. He had made no inquiry regarding that reward.

In the course of our interviews with various witnesses and other persons who had information with regard to that second trial, I interviewed Ronald Crockett of the sheriff's department and two of his deputies, Joan McNeal and Judy Boyer. I was advised by Judy that sometime prior to the first trial, after Mr. Stevens' arrest, Clyde Dunaway had expressed to her his belief he was entitled to that reward. Joan McNeal, I expect would testify that

CRANE-SNEAD & ASSOCIATES, INC.
COURT REPORTERS
RICHMOND, VIRGINIA
PHONE 355-4333

9.

one occasion and a second time on April 26, 1986.
The date she recalls, because of the anniversary
of her in-laws. Mr. Dunaway told her he was entitled
to the reward, and contacted a Richmond attorney
about suing the sheriff of Lancaster County in order
to recover that.

In addition, Sheriff Crockett would testify,
I expect from the transcript of each of the inter-
views conducted, that Mr. Dunaway at sometime after
the first trial, within the first several weeks,
asked the sheriff when a decision would be made on
the reward, and the sheriff would testify that he
responded that no such decision could be made until
the conclusion of the second trial that was scheduled
for July 1986.

In addition to that, the chief investigator
in the murder trial, Dave M. Rilee, a special
investigator with the state police, would testify
that Clyde Dunaway contacted him with information
concerning having observed the truck of Emerson
Stevens parked near the home of the victim, Mary
Keyser Harding, on the night their evidence reflected
she was abducted and killed. Mr. Dunaway did
testify he observed the truck parked 150 yards west

CRANE-SNEAD & ASSOCIATES, INC.
COURT REPORTERS
RICHMOND, VIRGINIA
PHONE 355-4335

10.

Investigator Rilee on about September 2, 1985 with that information.

Our evidence would further show on August 29, 1985 the Rappahannock Record, the local newspaper, ran a story and a picture of Mary Keyser Harding on the upper right portion of the front page of that paper. That indicated a reward was being offered, and at that time it was $1,000. The following week, September 5, 1985, a second article was run on approximately the same portion of the front page of that paper indicating the reward had grown and I think it was in excess of $20,000.

I interviewed George Noble, who by stipulation, would testify that he was then president of the Bank of Lancaster in Kilmarnock which was the employer of Mary Keyser Harding. That bank had offered $5,000. The employer of Mrs. Harding's husband, Standard Products, offered another $5,000, and other persons in the community had subscribed pledges in excess of over another $10,000. By August 26, 1985 there was some $20,800 in pledges that had been offered for the arrest and conviction. That information was published in the August 29, 1985 edition of the Rappahannock Record, as I previously

CRANE-SNEAD & ASSOCIATES, INC.
COURT REPORTERS
RICHMOND, VIRGINIA
PHONE 355-4335

11.

Investigator Rilee would testify that in the course of one of the first of several interviews he had with Mr. Clyde Dunaway that the subject of the reward came up. With respect to his testimony, he didn't bring it up, but when the subject did come up his best recollection would be Mr. Dunaway indicated he felt the children of Mrs. Harding — she had a one year old son and another child — were the persons who deserved the reward.

Investigator Rilee, I expect the testimony to show, was concerned immediately proceeding the second trial because Mr. Dunaway was making a number of inquiries concerning the reward. He talked to Mr. Dunaway about that, and Mr. Dunaway indicated at that time that he didn't want the reward. And Mr. Dunaway so testified. However, we also interviewed Lancaster Investigator Boles. He indicated that Mr. Dunaway talked to him shortly after the second trial and that he wanted to know when the reward was going to be determined, the recipient award.

When we interviewed Mr. Dunaway he advised us that he had no interest in the reward until he was asked about it on cross examination by Mr. Parker in that second murder trial, and because he had

CRANE-SNEAD & ASSOCIATES, INC.
COURT REPORTERS
RICHMOND, VIRGINIA
PHONE 355-4335

12.

1   bills were piling up, and his wife was providing the

2   only income to the family, he got to thinking about

3   it, and he thought why not.   I am entitled to it

4   and I could use it.   That's when, apparently, he

5   made the inquiry of Mr. Boles concerning it.

6          Therefore, the full picture is that there

7   were inquiries made by Clyde Dunaway from his

8   initial contact with Investigator Riley, albeit an

9   innocent one, and not reflecting an interest until

10  the last inquiry was made.   So, those five police

11  officers, including the two deputy sheriffs, would

12  show an ongoing interest on the part of Clyde

13  Dunaway for this $20,000 reward.

14         Therefore, in this perjury prosecution

15  the question became, was this testimony which the

16  Commonwealth believes to be false, material to the

17  testimony that was then offered in the second murder

18  trial?   The Commonwealth's position was -- We have

19  case law to support it.   Specifically, Allen vs US,

20  a 1975 Virginia case, which recites that questions

21  of credibility of witnesses are always relevant.

22  In 230 Va. 370 the Supreme Court of Virginia reversed

23  a rape conviction, because the trial court refused

24  to allow cross examination of the rape victim con-

117

CRANE-SNEAD & ASSOCIATES, INC.
COURT REPORTERS
RICHMOND, VIRGINIA
PHONE 355-4336

13.

for that rape and her claim for compensation, and thirdly, the workman's comp case she had filed. The Supreme Court reversed that case and said questions of self interest and motivation are always relevant, therefore, it should have been allowed.

We would take the position that the question about the reward and its motivation, and how that may have impacted on Clyde Dunaway's testimony was a question for that jury to consider, because that was a circumstantial evidence case. No eyewitnesses were offered by the Commonwealth in Commonwealth vs Stevens and there was no confession. There was a steadfast denial on the part of the defendant about the murder. It was in fact a mistrial the first time this case was tried due to a hung jury which could not decide unanimously upon the guilt or innocence of the defendant, Emerson Stevens. Therefore, since it was a circumstantial case every element that would be evaluated by the triar of fact as to the honesty of the various witnesses for both sides became a material link.

In Parker vs Commonwealth the court says such inquiries are always relevant. Therefore,

CRANE-SNEAD & ASSOCIATES, INC.
COURT REPORTERS
RICHMOND, VIRGINIA
PHONE 355-4395

14.

1   prove a legitimate point in issue, then that testi-

2   mony is material. That was the thrust of the

3   Commonwealth's argument.

4   We have had a number of discussions,

5   obviously, which led to this plea agreement. I can

6   assure the court that this agreement is not entered

7   into lightly. We are cognizant of all the pressure

8   that's been brought to bear on this community and

9   the defendant and the family of Mary Harding. How-

10  ever, we also recognize that there was a 1320 page

11  long transcript of that second trial which under

12  Virginia law the defense, under 19.2-222, would

13  require we put into evidence.

14  I expected the defendant to argue the

15  question of materiality should have been taken into

16  consideration in light of all the evidence. We

17  were going to focus on the perjury, whether the

18  testimony of Mr. Dunaway was material, about the

19  false testimony, and about his inducement to testify

20  by virtue of that reward. Nevertheless, there are

21  considerations we must look at.

22  We do recognize Virginia is somewhat of

23  a hybrid in jurisdictions in this country in as far

as the question of materiality is concerned in a

CRANE-SNEAD & ASSOCIATES, INC.
COURT REPORTERS
RICHMOND, VIRGINIA
PHONE 355-4335

15.

jurisdiction materiality in a perjury case is a
question of law for the court.  A minority of the
jurisdictions cited by that treatise indicate that
it's a question for a jury.  Virginia, in its Model
Jury Instructions, has materiality as a jury issue.
I gave long consideration to asking this court to
determine that jury instruction was nothing more
than a suggestion, because the majority of jurisdic-
tions in this country would not let the jury make
that determination whether it was material or not.

Weighing the fact the jury instruction has
been recommended, I think it's a safe rule to use
for our consideration of the trial.  Not being
barred by the Virginia Supreme Court, I felt there
was a strong likelihood the court would adopt the
belief that materiality was a jury issue and, there-
fore, it would be put to 12 citizens of this
community, if 12 citizens could be found in this
community that didn't have some opinion about the
guilt or innocence of Emerson Stevens that might
render them incapable or reaching a fair and impartial
decision in this case.

That represents the facts we have consider-
ed.  I have been advised by counsel for the

CRANE-SNEAD & ASSOCIATES, INC.
COURT REPORTERS
RICHMOND, VIRGINIA
PHONE 325-6335

16.

1   been that he was somewhat confused when he stated

2   that he had not made any inquiry about the reward.

3   With respect to his testimony it would have been that

4   he meant by that he did not ask for it rather than

5   he did not ask about it.  That too is a question that

6   would be greatly debated because of the number of

7   inconsistent statements we would have from the various

8   police officers.

9            That's what we expected the evidence to

10   show.  I think all these facts and considerations

11   justify the court in accepting the plea agreement.

12   Thank you, Your Honor.

13            THE COURT:  Mr. Breeden, is there anything

14   you want to add to that statement?

15            MR. BREEDEN:  Yes, Your Honor.  May it

16   please the court.  The evidence would have shown in

17   this case that Clyde Dunaway has a perfectly clean

18   criminal record.  He is 49 years old and never had

19   any criminal offense in Virginia

20            The evidence would further have shown there

21   were some questions asked him at the second trial of

22   the Emerson Stevens murder and abduction case which

23   dealt with whether he had prior discussions or made

CRANE-SNEAD & ASSOCIATES, INC.
COURT REPORTERS
RICHMOND, VIRGINIA
PHONE 358-4335

17.

technically he did not give correct answers based on the facts as they have been developed. We also believe that the evidence would have shown these answers Mr. Dunaway gave were not willful misstatements of facts. As Your Honor knows one of the elements of perjury in Virginia requires a willful misstatement.

There would have been abundant evidence that Mr. Dunaway, after the first trial and before the second trial, suffered a rather serious heart attack. The day he testified he was in a nervous condition. One witness described him as a nervous wreck. His testimony would have been he was confused about the questions that were asked him.

We would further point out there would have been no claim by the Commonwealth anyway that Mr. Dunaway falsely testified about the merits of the case against Emerson Stevens. That is to say, that he testified in any material way falsely about what he saw the night that Mary Harding disappeared. The Commonwealth would not in any way make a claim of a false statement in that regard.

As far as Joanie McNeal is concerned, her ____ ___ ____ there was a statement made

CRANE-SNEAD & ASSOCIATES, INC.
COURT REPORTERS
RICHMOND, VIRGINIA
PHONE 358-4333

18.

second trial, when Mr. Dunaway was in some way making a claim to the reward. On the other hand, the sheriff of this county's testimony would have been that Mrs. McNeal's testimony regarding Clyde Dunaway's statement with reference to a comment he had made was some three months after the second trial, so there was a rather clear conflict between two of the Commonwealth's witnesses. We would point out that human memory has its frailties. That would have been a common theme in this case.

The evidence would have shown as far as Mr. Dunaway is concerned that he himself never entertained any intention of seeking the reward until after the second trial. He would admit he had a change of heart. This would be consistent with Officer Boles' testimony.

The case boils down to two questions. The first is materiality. The material testimony the defendant would have argued was that he saw Emerson Stevens' truck at Mary Harding's house the night she disappeared, but the evidence would have been abundant from three other witnesses, or some of them, that the truck was there. It would have been proven by other witnesses which would in effect

CRANE-SNEAD & ASSOCIATES, INC.
COURT REPORTERS
RICHMOND, VIRGINIA
PHONE 355-4335

19.

1   material.  There is authority in Virginia that where

2   a witness' statement is not material to the issue

3   then it's not possible to convict him of perjury.

4   It would have been a contested legal question in

5   this case.  Certainly the defendant would have argued

6   out of some 1300 pages of testimony in the second

7   trial that there were some three to five lines in

8   issue.  A minuscule amount compared to the testimony

9   of many other witnesses.  Mr. Dunaway's testimony

10   really centered on whether there was a truck there

11   that night that belonged to Emerson Stevens.

12        There were no questions about the reward

13   asked of Mr. Dunaway in the first trial.  There were

14   in the second trial, yet his testimony on the merits

15   would have been the same.

16        Turning to what condition he was in on the

17   day he testified, the evidence would have been he

18   had suffered a severe heart attack on April 1, 1986

19   between the trials.  As I have indicated before he

20   was a nervous wreck the day he testified.  He would

21   have had a list of medications the jury would have

22   heard about dealing with his heart condition.

23        Mr. Dunaway was confused when he was asked

CRANE-SNEAD & ASSOCIATES, INC.
COURT REPORTERS
RICHMOND, VIRGINIA
PHONE 355-4935

20.

been he took the question to mean had he inquired about the reward for himself? Had he asked for it himself? Had he made a firm application for it?

Trooper Rilee would have said just before Mr. Dunaway went on the stand one day in July 1986 that Trooper Rilee pointed out to him he might be asked this question, and Mr. Dunaway's spontaneous and emphatic remark to Trooper Rilee was he didn't want any part of the reward.

This having been said, and the court knowing on Mr. Dunaway's part it was not a willful misstatement, but an honest confused response in a tense situation at a sensational trial -- plus, I would ask the court to keep in mind Mr. Dunaway was testifying against his first cousin, his mother's nephew.

Taking all of this into consideration, the defendant having fully considered it, it is the defendant's position the plea agreement is one which the court should accept. It is our position as his counsel that justice is being well served by a guilty plea to a misdemeanor. Thank you.

MR. CARPENTER: I would like to add one thing. As I indicated earlier, we believe the

CRANE-SNEAD & ASSOCIATES, INC.
COURT REPORTERS
RICHMOND, VIRGINIA
PHONE 355-4335

21.

whether or not Emerson Stevens killed Mary Harding.
It was not whether or not even if Clyde Dunaway saw
Emerson Stevens' truck at Mary Keyser Harding's
home. The only appropriate inquiry was did the
reward impact on Clyde Dunaway. Was the jury entitled
at the second trial to know that Clyde Dunaway made
a number of inquiries about that reward, and how
would it have deflated his testimony.

I am well aware of what counsel has argued
that this must be judged in light of the total
picture of the evidence as it determined the guilt
or innocence of Emerson Stevens. Counsel alluded
to the fact a number of other people put the defend-
ant's truck there, but I know counsel would agree
there was only one witness in the entire prosecution
who categorically put Emerson Stevens' truck at the
home of Mary Harding that night. That was Clyde
Dunaway. It was from that statement to Investigator
Rilee that Rilee, with that statement and Investigator
Boles, first approached Emerson Stevens to say we
have heard your truck was there that night. Can you
provide us with some information? From that flowed
a number of inconsistent statements by Stevens con-
_____ __ ___ _____ that night or not.

CRANE-SNEAD & ASSOCIATES, INC.

COURT REPORTERS

RICHMOND, VIRGINIA

PHONE 355-4335

22.

1   Stevens and say, Wait a minute, Mr. Stevens. You

2   say what you will, but you can't deny one thing.

3   Your truck was there. The point is, Clyde Dunaway

4   is the witness for the Commonwealth who put that

5   truck there.

6           Christine Pflugradt testified also for the

7   Commonwealth. She saw a light colored short bed

8   pickup in the driveway at approximately the same time

9   frame Mr. Dunaway testified he saw Emerson Stevens'

10  truck.

11          If Mr. Dunaway's testimony had been to

12  reiterate today that which he testified to in the

13  second trial, the Commonwealth was going to call

14  Investigator Wilson who would say when he interviewed

15  Mr. Dunaway on September 5, 1985 after the murder,

16  Mr. Dunaway told him, contrary to the way he testi-

17  fied, when he saw the truck he slowed down. He

18  looked around for his first cousin, Emerson Stevens.

19  He thought he had run out of gas or broken down.

20  He didn't see him and he went on home.

21          Investigator Wilson would say Mr. Dunaway

22  then told him he did not recognize the vehicle when

23  he first went by. On the following Sunday he saw

the vehicle at Farnham Motor Company with the defend-

CRANE-SNEAD & ASSOCIATES, INC.

COURT REPORTERS
RICHMOND, VIRGINIA
PHONE 355-4335

23.

1   conclusion that was the truck he had seen before.

2            Therefore, the Commonwealth's position

3   in this case would have been, had we ventured into

4   what I would characterize a proper area of overall

5   materiality, then it would reflect there was a

6   mountain of evidence against Emerson Stevens. There

7   is no question about that. There was the victim's

8   hair, and on and on. There was a lot of evidence,

9   but Clyde Dunaway was the basis of that mountain.

10            For that reason, for yourself, and for

11   the public, I make that statement. Thank you.

12            THE COURT: Stand up, Mr. Dunaway.

13            NOTE: At this time the defendant is

14   standing.

15            THE COURT: Do you have anything to say

16   before sentence is pronounced upon you?

17            THE DEFENDANT: No, sir.

18            THE COURT: On your plea of guilty and on

19   the statements of the evidence by the commonwealth

20   attorney and by your attorney, it is the judgment

21   of the court that you are guilty of obstructing

22   justice in violation of Code Section 18.2-460, which

23   is the amended charge.

24            You are sentenced to serve 12 months in

128

CRANE-SNEAD & ASSOCIATES, INC.
COURT REPORTERS
RICHMOND, VIRGINIA
PHONE 355-6585

24.

prosecution.  The jail sentence is suspended on the condition that you be of good behavior and violate no criminal law of this commonwealth for a period of 5 years from this date.  The suspension is further conditioned upon your payment of the fine and the costs of this prosecution within 6 months from this date.

You can avoid serving any time on this sentence if you comply with the conditions of suspension, but I want you to understand if at any time during the next 5 years you are convicted any where in the Commonwealth of Virginia of a violation of any criminal law, however small, or if during the time you engage in conduct by the court's opinion is not good behavior, or if you fail to pay the fine and costs within 6 months, expect to be brought back and be sentenced to serve the 12 months in jail. Do you understand that?

THE DEFENDANT:  Yes, sir.

THE COURT:  It is so ordered.  You are discharged from further custody.

MR. CARPENTER:  Thank you, Your Honor.

MR. BREEDEN:  Thank you, Your Honor.

129

CRANE-SNEAD & ASSOCIATES, INC.
COURT REPORTERS
RICHMOND, VIRGINIA
PHONE 358-4335

25.

# CERTIFICATE OF COURT REPORTER

I, Myrtle W. Reid, having been duly sworn, hereby certify that I was the court reporter in the Circuit Court of Lancaster County on March 1, 1988 at the time of the hearing herein.

I further certify that, to the best of my ability, the foregoing transcript is a true and correct record of the hearing.

Given under my hand this the _____ day of October, 1990.

Original Signed

Myrtle W. Reid

STATE OF VIRGINIA

CITY OF RICHMOND

## AFFIDAVIT OF ALFRED C. BROWN

I, Alfred C. Brown, being first duly sworn, make the following statement under penalty of perjury:

1. I currently live at 10134 Garfield Road, Richmond Virginia. I am over 18 years old and competent to make this affidavit.

2. I am a private investigator licensed in the Commonwealth of Virginia specializing in criminal mitigation in capital cases. I am currently serving as the Chief Executive Officer of Insight Investigations, Inc.

3. My regular course of business includes conducting investigations to establish mitigating issues and/or innocence issues in capital cases, performing field investigations, conducting research, establishing clients' social histories and background information, and investigating prosecutorial and juror misconduct issues.

4. I was retained by the law firm of Troutman Sanders LLP in 2004 to conduct an investigation into the Emerson Stevens case. During the course of my investigation, I created memoranda based on the notes I took during my interviews with various witnesses related to the case. I did this as part of my regular course of business.

5. I have attached the relevant memoranda that I created during my investigation regarding the Stevens case to this affidavit.

FURTHER AFFIANT SAYETH NAUGHT.

ALFRED C. BROWN

Signed and sworn before me this 19 day of April, 2016.

NOTARY PUBLIC

131