# ATTACHMENTS

# TO

# ALFRED BROWN AFFIDAVIT



## INSIGHT

### Investigation & Security Services, Inc.

360 West Office Building

7206 Hull Street Road, Suite 206 Richmond, Virginia 23235

www.insight-investigations.com

DCJS Business #11-1215

Telephone: (804) 674-9577

Email:Insight@rcn.com

DCJS School #88-1062

Fax: (804) 674-4994

DATE:      December 30, 2004

FROM:      Alfred C. Brown

TO:        Megan C. Rahman
           Stephen A. Northup

RE:        Commonwealth vs. Emerson Stevens
           Sandra Deel

**Attorney Work Product**

I conducted an interview with Emerson Stevens former wife Ms. Sandra Deel. Sandra has known Emerson Stevens since she was 14 years old. They met in Junior high school and later married.

Ms. Deel states she was married for twelve and one half years to Emerson. There marriage produced three children. At the time of the incident Christopher was 7, Carrie was 9 and Jennifer was 11 years old. She was employed as a nurses aid on the 3 - 11 shift at Westminster Canterbury. Sandra's start date was August 12th and she was employed until October 8, 1985. This was a retirement home for the elderly.

There were several trucks in the area that resemble the one Emerson drove. Emerson was made aware that a person had cleaned the carpets in the Harding home several days before the crime. This person also drove a similar light colored pick up truck. Sandra recalls riding with Emerson on one occasion when they saw this truck and attempted to follow it. They Followed it to a residence but know one would answer the door. She can't recall the address or any other details.

Sandra stated that the same night of the crime she was on her way home when she observed a light colored pick up truck parked in the drive way of the Harding residence. She believes it was about 11:50 p.m. She slowed down almost to a stop thinking it could be her husbands, but then decided to continue home. She remembered the truck was just pulled into the driveway, only to the point that another vehicle could not have pulled in behind it. She remembered the lights being on in the house.

It was around 12:00 midnight when she arrived at her home. Emerson's truck was parked in the yard, she felt it and it was cold. Upon entering her home she found him in bed asleep. She advised Attorney Parker of what she saw that night. He told her not to say anymore about it and that nobody would believe her. She had mentioned it to several people however, now she can't recall who she told. Attorney Parker declined to use the information at trial.

Sandra states that she was a very light sleeper, if Emerson had gotten up that night or earlier that morning before his normal time she would have known. He got up at his normal time and went to work.

Regarding Riley, she said he would ride up and down the road harassing Emerson. He was telling her that she was living with a murderer and why was she protecting him. Riley also told her how one day Emerson was going to kill her too.

Sandra did not recall much about Mary Harding, other than she appeared to be quiet and to herself. Some how she found out how Emerson Harding's father (a.k.a.) E.O. felt that Emerson Harding and Mary had gotten married to quick.



## INSIGHT

### Investigation & Security Services, Inc.

360 West Office Building
7206 Hull Street Road, Suite 206 Richmond, Virginia 23235

www.insight-investigations.com
DCJS Business #11-1215
Telephone: (804) 674-9577

Email:Insight@rcn.com
DCJS School #88-1062
Fax: (804) 674-4994

DATE:      March 14, 2005

FROM:      Alfred C. Brown

TO:        Megan C. Rahman, Esquire
           Stephen A. Northup, Esquire

RE:        **Commonwealth v. Emerson Stevens**
           **Ray Reynolds**

I spoke with Mr. Ray Reynolds concerning the Emerson Stevens case. Mr. Reynolds said he ran the crab house where crabbers would come in to sell their catch for the day. He would weigh the crabs and give them a ticket and pay them at the end of the week. He purchased crabs from Emerson Stevens. Special Agent David Riley came to him asking questions about Emerson Stevens, and his daily catch. Riley questioned Ray about Emerson's catch on the morning of August 23, 1985. At the time, Ray did not see the ticket for Emerson's catch. Ray was subsequently subpoenaed to testify in Emerson Stevens first trial. Prior to testifying he wanted to refresh his memory by looking at the pay records. At this time he located the tickets, he had made a mistake, Emerson Stevens did sell crabs on August 23, 1985.

While at the court, he requested to speak with Riley. He and Riley went into one of the rooms at the court house and he told Riley about his mistake, Stevens did sell crabs on the morning of August 23, 1985.

Ray said Riley became agitated, Riley wanted him to testify to what he had originally told him. Ray told Riley he was not going to do that, he was going to tell the truth. Ray said Riley went off, he started yelling and cussing at him to maintain his original statements. After that, Ray was not called to testify. He did not receive a subpoena in the second trial either. He can't recall if he spoke to the Commonwealth Attorney or not. Neither can he remember if he spoke with Emerson's Attorney Mr. Parker.

Since then, an attorney from Charlottesville contacted him concerning the Stevens case and his experiences with Riley. After discussing his encounter with Riley, this attorney had scheduled depositions. Ray said he did not hear from the attorney anymore.

135



## Investigation & Security Services, Inc.

### 360 West Office Building
### 7206 Hull Street Road, Suite 206  Richmond, Virginia  23235

www.insight-investigations.com
DCJS Business #11-1215
Telephone: (804) 674-9577

Email:Insight@rcn.com
DCJS School #88-1062
Fax: (804) 674-4994

DATE:        February 2, 2005

FROM:       Alfred C. Brown

TO:            Megan C. Rahman, Esquire
                  Stephen A. Northup, Esquire

RE:            **Commonwealth vs. Emerson Stevens**
                  **Interview w/Kevin Davis**

**Attorney Work Product**
**Privilege and Confidential**

I conducted an interview with Mr. Kevin Davis. In 1985 he was a Captain with the Lancaster Sheriffs Department. He had recently completed K-9 training. Mr. Davis states that he was dispatched to the Harding home that day with his dog. When he arrived only the grandmother and the children were there. The scene in his opinion had not been contaminated. He took the dog around the perimeter then he began his search on the back side of the home near the woods. The dog immediately picked up a scent. The dog went over to the flip flop shoe nearest to the kitty litter pan then toward the front of the house where the other flip flop shoe was located. Then the dog took him toward the road (State Route 354). The dog followed a scent along beside the road on the west bound side. This is the same side as the residence. His dog continued almost to the next state road on the left of State Route 354. The distance is approximately two tenths of a mile. At that point the dog lost the scent. According to Mr. Davis, and from his experience if the person being tracked gets into a vehicle the dog will stop. It was his opinion that the person may have gotten into a vehicle.

Mr. Davis theorized that the person who abducted Mrs. Harding grabbed her outside near the kitty litter pan and dragged and carried her around the house toward the road and down beside the road before getting into a vehicle. According to his theory, this person took her quite a distance down the road before entering the vehicle.

Davis said he was moving very fast, the dog was fast therefore he followed the speed of the dog. He recalled drag marks in the dirt, footprints but did not take time to inspect them, or anything else that could have been evidence. Another Officer, Ashby Allen also came to the house. After that he is not sure what was or was not done to secure the scene.

Davis says he was available to assist the department, but he and Special Agent Riley immediately conflicted. Riley gave him an assignment to interview several people and Davis felt Riley should not have been telling him what to do. If he was to be assigned to do interviews it should have come from the sheriff instead of Riley. Apparently, that issue was never cleared up between he and the Sheriff. Therefore, from that point on Davis was somewhat out of the loop during the investigation. He remembers the FBI and other agents with the Virginia State Police being in his office. He was not advised of the daily progress of the investigation.

Davis's personal opinion was they did arrest the right person but doesn't feel that Emerson Stevens is capable of masterminding an abduction, and/or murder, therefore he had to have had some help. His only explanation as to motive, is drunkenness.

He remembers the medical examiner being irritated that Agent McCain had cut the rope off of the body prior to it being received at the examiner's office.

Bruce Boles and Mr. Davis attended the autopsy in Richmond. Mrs. Harding's body had been in the water for several days and the medical examiners cooling system was off, he states that it was extremely difficult to bear.



## Investigation & Security Services, Inc.

360 West Office Building

7206 Hull Street Road, Suite 206  Richmond, Virginia  23235

www.insight-investigations.com
DCJS Business #11-1215
Telephone: (804) 674-9577

Email:Insight@rcn.com
DCJS School #88-1062
Fax: (804) 674-4994

**DATE:**   September 6, 2005

**FROM:**   Alfred C. Brown

**TO:**   Megan Rahman, Esquire
Stephen A. Northup, Esquire

**RE:**   Commonwealth vs. Emerson Stevens
Ann & Louis Dick

**Attorney Work Product**
**Privilege and Confidential**

On September 7, 2005, I conducted a follow up interview with Ann & Louis Dick by telephone.

On September 5, 1985 Mrs. Dick provided an initial interview where she described a white truck coming out State Route 622 intersection  around quarter to five in the morning.  She recalls the male driver being slim and sitting up tall and straight in the seat.  This driver had a plaid type shirt on.  Ann was riding in the back seat of a SUV.  Mr. Hayden and his wife were in the front. Since the incident Mr. Hayden has passed away.

During this period Ann & Louis had a lot of contact with Virginia State Police Agent Riley and Lancaster Investigator Bruce Boles.  Ann would see Riley at different places around the county. Riley would tell Ann various bits and pieces of information, he often played with Ann's mind. Ann recalls a very tall man who identified himself as a FBI agent coming to her home, he showed her photographs of several people and asked questions.  When Ann asked Riley about the FBI's involvement, he told her the FBI was never involved with the case.

Riley was traveling around showing different people the evidence, such as the rope and the chain. At one point Riley told her he was testing the shirt, that he tested the shirt three times and finally found some hairs.

Ann describes several people in the area that were suspicious; there was a white male who worked at the R&K Store,  lived in Richmond County drove a pick up truck,  left the area after the murder.

138

She was also concerned with four or five white males, they all appeared to be under 30 years old, who lived in the rental home near the R&K Store. This house was just to the left as you walk out of the store. There was a blue pick up truck over there that some of them drove.

There was a boy ( a white male with dark hair) at the court house during the trial who said he worked for Riley. This boy said Riley likes him, he was Riley's pet. Riley used him when ever he needed information on cases.

Many people in that area was scared at the time because of what happen to Mary. Others who testified, referenced the time by saying they were going home to watch something on televison Ann feels they lied about that, most of them did not watch that particular TV program.

Ann never understood why Earl Smith came to her home banging on her door, he was screaming she had done a terrible thing, and a lot of people was going to be in trouble. Then Earl just ran away from the house.

Ann also mentioned a man who lived in the back of Harding's residence, this man would dress in camouflage clothing, kept manikins on his porch.

Ann Dick describes Mary Harding as a woman who was held in high esteem to all in the community except for her husband Emerson. It was rumored that Emerson had a girl friend before the death of his wife, Mary.

Louis Dick describes Emerson Stevens as a scavenger, it was Mr. Dicks opinion that Emerson only had the minimum number of crab pots, he purchased just enough gas each morning to operate the boat for the day, he had just enough bait for the crab pots. He made only enough money to eat and get something to drink. Emerson was just getting by. On the level he operated on, he would not have had the desire or the means to commit a crime such as this.

It would have been very easy for most watermen too disposed of the body by putting it either under the bridge or in the channel. This would have allowed the body to go into the sea, and/or never surface. In the area where the body was found, is was a marshy area, most boats could not get into that area. Louis Dick says the chain found on Mary's body was too heavy for any of the waterman on their level, maybe on a dragon rig or a much larger boat a chain like that would be useful.

The Dicks believes the jury was influence by a business man in the areas named George Noble, and he talked to the jury on several occasions. According to their sources, Mr. Noble was a friend of Mary Harding's father, Mr. Keyser.

Ann & Louis was threatened during this period of time. On one occasion their home insurance was canceled, apparently their independent agent named Sandra wrote a letter saying they were the type of people who would burn their home for the insurance money, their policy was subsequently canceled and the home loan was called due. She is a friend of the Harding's

Riley and the commonwealth attorney, Jeffers Schmidt wanted her to lie and she did not want to. Riley and Schmidt had suggested to Ann as to how she should testify. Ann did not follow their script, she was not comfortable leaving certain information out and saying things that she knew was not true. As a result she found herself facing charges of perjury.

After the trials Ann was interviewed at the department of State Police regarding the impending perjury charge. She was aware that the police were recording their interview. Special Prosecutor Edward Carpenter also interviewed them regarding the perjury charges. He also requested the tapes from the Virginia State Police. It seems the Virginia State Police  tapes were not clear, and they were distorted.  The Dicks were represented by Attorney Dennis Donald,  he also went over the statements, attempted to listen to the tapes and according to the Dicks all of their information and statements were consistent.  All charges were dropped.

Their attorney Denny Donald may have additional information on Riley's tactics as well as the county's effort to charge her with perjury.  She thinks Riley was involved with another murder case in Northumberland County where a  Pilot's wife was murder.

PAGE 1 OF 2

## AFFIDAVIT

I volunteer the following information of my own free will for whatever lawful purposes it may serve.

I, Raymond Reynolds, being first duly sworn, do depose and state the following:

I was questioned by police investigators Bruce Bowles and David Riley related to the abduction and murder of Mary Keyser Chapman HOLDING. Emerson Eugene Stevens had been charged with the murder, and a retrial was set for July 1986.

Stevens was in the crabbing business, and I told Bowles and Riley that I remembered Stevens being late getting in with his crabs on the Friday morning after the victim had disappeared. I told them Stevens had gotten in around 12:30PM, when he usually got in around 10:30AM. However, on July 10, 1986, the day I was scheduled to testify, I checked my records and realized that I had been mistaken when I told the investigators that Stevens had been late on that Friday. My records showed that Stevens had actually been late on Thursday, the morning before the evening that the victim had disappeared. The Friday morning after the victim had disappeared, Stevens had been on time and had his normal load of crabs.

Upon discovering my error, I went to court and told Bowles and Riley about my mistake. Riley told me to go ahead and testify and to stick with my original statement. He told me not to change anything. I told Riley that I could not do that because it was not true. Riley became upset. I was later excused and not called to testify.

I certify the above named Ray Reynolds
to be his true signature
3/3/97
Attested by
Notary

1

PAGE 2 OF 2

I have read this statement, and certify that the facts contained herein are true and correct.

X _____
AFFIANT

WITNESSED: _____

STATE OF VIRGINIA
CITY OF _____ to-wit:

The foregoing instrument was subscribed and sworn to before me this __3__ day of
March, 1996/997

_____
Notary Public

My commission expires: 8/31/99

**U.S. Department of Justice**

Federal Bureau of Investigation
*Washington, D.C. 20535*

October 14, 2015

MS. LUCIE HIDLAY
316 KENT ROAD
CHARLOTTESVILLE, VA 22903

FOIPA Request No.: 1337801-000
Subject: HARDING, MARY KEYSER
(08/23/1985-07/12/1986)

Dear Ms. Hidlay:

This is in response to your Freedom of Information Act (FOIA) request.

Records which may have been responsive to your request were destroyed in May 1991. Since this material could not be reviewed, it is not known if it was responsive to your request. Record retention and disposal is carried out under supervision of the National Archives and Records Administration (NARA), Title 44, United States Code, Section 3301 and Title 36, Code of Federal Regulations, Chapter 12, Sub-chapter B, Part 1228. The FBI Records Retention Plan and Disposition Schedules have been approved by the United States District Court for the District of Columbia and are monitored by NARA.

For your information, Congress excluded three discrete categories of law enforcement and national security records from the requirements of the FOIA. See 5 U.S.C. § 552(c) (2006 & Supp. IV (2010). This response is limited to those records that are subject to the requirements of the FOIA. This is a standard notification that is given to all our requesters and should not be taken as an indication that excluded records do, or do not, exist.

For questions regarding our determinations, visit the www.fbi.gov/foia website under "Contact Us." The FOIPA Request number listed above has been assigned to your request. Please use this number in all correspondence concerning your request. Your patience is appreciated.

You may file an appeal by writing to the Director, Office of Information Policy (OIP), U.S. Department of Justice, 1425 New York Ave., NW, Suite 11050, Washington, D.C. 20530-0001, or you may submit an appeal through OIP's eFOIA portal at http://www.justice.gov/oip/efoia-portal.html. Your appeal must be received by OIP within sixty (60) days from the date of this letter in order to be considered timely. The envelope and the letter should be clearly marked "Freedom of Information Appeal." Please cite the FOIPA Request Number in any correspondence to us for proper identification of your request.

Enclosed for your information is a copy of the FBI Fact Sheet and Explanation of Exemptions.

Sincerely,

David M. Hardy
Section Chief,
Record/Information
  Dissemination Section
Records Management Division

Enclosure(s)



# FBI FACT SHEET

- The primary functions of the FBI are national security and law enforcement.

- The FBI does not keep a file on every citizen of the United States.

- The FBI was not established until 1908 and we have very few records prior to the 1920s.

- FBI files generally contain reports of FBI investigations of a wide range of matters, including counterterrorism, counter-intelligence, cyber crime, public corruption, civil rights, organized crime, white collar crime, major thefts, violent crime, and applicants.

- The FBI does not issue clearances or non-clearances for anyone other than its own personnel or persons having access to FBI facilities. Background investigations for security clearances are conducted by many different Government agencies. Persons who received a clearance while in the military or employed with some other government agency should contact that entity. Most government agencies have websites which are accessible on the internet which have their contact information.

- A criminal history summary check or "rap sheet" is NOT the same as an "FBI file." It is a listing of information taken from fingerprint cards and related documents submitted to the FBI in connection with arrests, federal employment, naturalization or military service. The subject of a "rap sheet" may obtain a copy by submitting a written request to FBI, Criminal Justice Information Services (CJIS) Division, Record Request, 1000 Custer Hollow Road, Clarksburg, West Virginia 26306. Along with a specific written request, the individual must submit a new full set of his/her fingerprints in order to locate the record, establish positive identification, and ensure that an individual's records are not disseminated to an unauthorized person. The fingerprint submission must include the subject's name, date and place of birth. There is a required fee of $18 for this service, which must be submitted by money order or certified check made payable to the Treasury of the United States. A credit card payment option is also available. Forms for this option and additional directions may be obtained by accessing the FBI Web site at www.fbi.gov/about-us/cjis/background-checks/background_checks.

- The National Name Check Program (NNCP) conducts a search of the FBI's Universal Index (UNI) to identify any information contained in FBI records that may be associated with an individual and provides the results of that search to a requesting federal, state or local agency. Names are searched in a multitude of combinations and phonetic spellings to ensure all records are located. The NNCP also searches for both "main" and "cross reference" files. A main file is an entry that carries the name corresponding to the subject of a file, while a cross reference is merely a mention of an individual contained in a file. The results from a search of this magnitude can result in several "hits" and "idents" on an individual. In each instance where UNI has identified a name variation or reference, information must be reviewed to determine if it is applicable to the individual in question.

- The Record/Information Dissemination Section (RIDS) searches for records and provides copies of FBI files responsive to Freedom of Information or Privacy Act (FOIPA) requests for information. RIDS provides responsive documents to requesters seeking "reasonably described information." For a FOIPA search, the subject's name, event, activity, or business is searched to determine whether there is an associated investigative file. This is called a "main file search" and differs from the NNCP search.

**FOR GENERAL INFORMATION ABOUT THE FBI, VISIT OUR WEBSITE AT
www.fbi.gov**

1/6/14

## EXPLANATION OF EXEMPTIONS

### SUBSECTIONS OF TITLE 5, UNITED STATES CODE, SECTION 552

(b)(1)    (A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified to such Executive order;

(b)(2)    related solely to the internal personnel rules and practices of an agency;

(b)(3)    specifically exempted from disclosure by statute (other than section 552b of this title), provided that such statute (A) requires that the matters be withheld from the public in such a manner as to leave no discretion on issue, or (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld;

(b)(4)    trade secrets and commercial or financial information obtained from a person and privileged or confidential;

(b)(5)    inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency;

(b)(6)    personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy;

(b)(7)    records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information ( A ) could reasonably be expected to interfere with enforcement proceedings, ( B ) would deprive a person of a right to a fair trial or an impartial adjudication, ( C ) could reasonably be expected to constitute an unwarranted invasion of personal privacy, ( D ) could reasonably be expected to disclose the identity of confidential source, including a State, local, or foreign agency or authority or any private institution which furnished information on a confidential basis, and, in the case of record or information compiled by a criminal law enforcement authority in the course of a criminal investigation, or by an agency conducting a lawful national security intelligence investigation, information furnished by a confidential source, ( E ) would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law, or ( F ) could reasonably be expected to endanger the life or physical safety of any individual;

(b)(8)    contained in or related to examination, operating, or condition reports prepared by, on behalf of, or for the use of an agency responsible for the regulation or supervision of financial institutions; or

(b)(9)    geological and geophysical information and data, including maps, concerning wells.

### SUBSECTIONS OF TITLE 5, UNITED STATES CODE, SECTION 552a

(d)(5)    information compiled in reasonable anticipation of a civil action proceeding;

(j)(2)    material reporting investigative efforts pertaining to the enforcement of criminal law including efforts to prevent, control, or reduce crime or apprehend criminals;

(k)(1)    information which is currently and properly classified pursuant to an Executive order in the interest of the national defense or foreign policy, for example, information involving intelligence sources or methods;

(k)(2)    investigatory material compiled for law enforcement purposes, other than criminal, which did not result in loss of a right, benefit or privilege under Federal programs, or which would identify a source who furnished information pursuant to a promise that his/her identity would be held in confidence;

(k)(3)    material maintained in connection with providing protective services to the President of the United States or any other individual pursuant to the authority of Title 18, United States Code, Section 3056;

(k)(4)    required by statute to be maintained and used solely as statistical records;

(k)(5)    investigatory material compiled solely for the purpose of determining suitability, eligibility, or qualifications for Federal civilian employment or for access to classified information, the disclosure of which would reveal the identity of the person who furnished information pursuant to a promise that his/her identity would be held in confidence;

(k)(6)    testing or examination material used to determine individual qualifications for appointment or promotion in Federal Government service he release of which would compromise the testing or examination process;

(k)(7)    material used to determine potential for promotion in the armed services, the disclosure of which would reveal the identity of the person who furnished the material pursuant to a promise that his/her identity would be held in confidence.

FBI/DOJ

Angelique Ciliberti
2101 Arlington Blvd, Apt 406
Charlottesville, VA 22903

September 25, 2015

Virginia State Police
Public Relations Office
P. O. Box 27472
Richmond, VA 23261-7472

Dear FOIA Officer:

Under the Virginia Freedom of Information Act, §2.2-3704 et seq., I am requesting an opportunity to
inspect or obtain copies of public records. Specifically, I am requesting a report generated by a multi-party
task force that may have included the Virginia State Police, Lancaster County Sherriff's Office,
Kilmarnock Police Department, Virginia State Police Special Agent David M. Riley, and FBI Agents Tom
Carter, Earl Pitts, and Lou Sharron regarding the death of Mary Harding (date of disappearance:
08/22/1985; her body was found 08/29/1985) in Lancaster, Virginia. The report was likely generated
between 08/22/1985 and 07/12/1986.

If there are any fees for searching or copying these records, please inform me if the cost will exceed
$200.00. This information is not being sought for commercial purposes.

The Virginia Freedom of Information Act requires a response to this request be made within five business
days. If access to the records I am requesting will take longer than this amount of time, please contact me
with information about when I might expect copies or the ability to inspect the requested records.

If you deny any or all of this request, please cite each specific exemption you feel justifies the refusal to
release the information and notify me of the appeal procedures available to me under the law.
Thank you for considering my request.

Sincerely,

Angelique Ciliberti
502-648-8618

146



Colonel W. S. (Steve) Flaherty
Superintendent

(804) 674-2000

# COMMONWEALTH of VIRGINIA

### DEPARTMENT OF STATE POLICE

Lt. Col. Robert B. Northern
Deputy Superintendent

P. O. BOX 27472, RICHMOND, VA 23261-7472

October 6, 2015

Angelique Ciliberti
2101 Arlington Boulevard, Apt 406
Charlottesville, Virginia 22903

Re: Freedom of Information Act Request

Dear Ms. Ciliberti:

Your request has been received in the Criminal Justice Information Services Division for response.

As you may be aware, requests for records of the Commonwealth, its agencies and political subdivisions are governed by the *Virginia Freedom of Information Act* (FOIA), §2.2-3700 *et. seq.*

Criminal investigative reports are excluded from dissemination under the Freedom of Information Act by Paragraph (A) (2)(a), Section 2.2-3706, Code of Virginia, as amended. Therefore, the requested records are being withheld because the custodian has exercised his discretion to withhold the records in accordance with Virginia Code Section 2.2-3700 et. seq. It is the policy of the Virginia Department of State Police not to release files or photographs related to criminal investigations.

I trust this information has been of assistance to you.

Sincerely,

Tricia W. Powers, Lieutenant
Criminal Justice Information Services Division
(804) 674-8028

TWP/cm

Angelique Ciliberti
2101 Arlington Blvd, Apt 406
Charlottesville, VA 22903

October 29, 2015

Lancaster County Sheriff's Office
Administration Division
8293 Mary Ball Road
Lancaster, VA 22503

Dear FOIA Officer:

Under the Virginia Freedom of Information Act, §2.2-3704 et seq., I am requesting an opportunity to inspect or obtain copies of public records. Specifically, I am requesting a report generated by a multi-party task force that may have included the Virginia State Police, Lancaster County Sheriff's Office, Kilmarnock Police Department, Virginia State Police Special Agent David M. Riley, FBI Agents Tom Carter, Earl Pitts, and Lou Sharron, and Lancaster Investigator Bruce Boles, regarding the death of Mary Harding (date of disappearance: 08/22/1985; her body was found 08/29/1985) in Lancaster, Virginia. The report was likely generated between 08/22/1985 and 07/12/1986.

If there are any fees for searching or copying these records, please inform me if the cost will exceed $200.00. This information is not being sought for commercial purposes.

The Virginia Freedom of Information Act requires a response to this request be made within five business days. If access to the records I am requesting will take longer than this amount of time, please contact me with information about when I might expect copies or the ability to inspect the requested records.

If you deny any or all of this request, please cite each specific exemption you feel justifies the refusal to release the information and notify me of the appeal procedures available to me under the law. Thank you for considering my request.

Sincerely,

Angelique Ciliberti
Aac4xz@virginia.edu
502-648-8618



RONALD D. CROCKETT, SHERIFF

# OFFICE OF THE SHERIFF

8293 MARY BALL ROAD     LANCASTER, VIRGINIA 22503     PHONE: 804-462-5111     FAX: 804-452-7046

November 4, 2015

Ms. Angelique Ciliberti
2101 Arlington Blvd. Apt. 406
Charlottesville, VA 22903

By U.S. Mail and E-mail to aac4xz@virginia.edu

Re: Freedom of Information Act Request
    Death of Mary Harding

Dear Ms. Ciliberti,

Today I received your October 29 written request for an opportunity to inspect or obtain copies of a report generated by a multi-party task force that may have included the Virginia State Police, this office, Kilmarnock Police Department, Special Agent David M. Riley, FBI Agents Tom Carter, Earl Pitts, and Lou Sharron, and the sheriff's Inv. Bruce Boles, all in regards to the disappearance and death of Mary Harding in August 1985.

Special Agent David M. Riley is known to have retired several years ago from the Virginia State Police. Sheriff's Investigator Bruce Boles died on May 14, 2010. I have no information regarding the status of Agents Carter, Pitts, and Sharron. This office has no authority over the records of the Kilmarnock Police Department. Mrs. Mary Harding was reported missing from her home on the morning of August 23, 1985; her body was recovered on August 29, 1985 in the water off of Riverside Drive in Morattico, Lancaster County. Emerson Eugene Stevens was arrested on October 25, 1985 on a direct indictment by the Lancaster County grand jury, and later convicted of homicide by jury trial.

Pursuant to §2.2-3706 A 2 of the Code of Virginia, 1950 as amended, Sheriff Crockett exercises his discretionary authority not to release the criminal investigative report or portions thereof. The sheriff has maintained this policy since he first took office effective January 1, 1984. Effective January 1, 2016 Sheriff-Elect Patrick McCranie will take office; his discretionary authority policy may be different than that of Sheriff Crockett.

Sincerely,

Capt. Martin R. Shirilla
Chief Deputy

cc: Hon. R. Cunningham, Attorney for the Commonwealth for Lancaster County
    correspondence file

149

Angelique Ciliberti
2101 Arlington Blvd, Apt 406
Charlottesville, VA 22903

November 12, 2015

Kilmarnock Police Department
Mike Bedell
514 N Main St.
Kilmarnock, VA 22482-3828

Dear Mr. Bedell,

Under the Virginia Freedom of Information Act, §2.2-3704 et seq., I am requesting an opportunity to inspect or obtain copies of public records. Specifically, I am requesting a report generated by a multi-party task force that may have included the Virginia State Police, Lancaster County Sherriff's Office, Kilmarnock Police Department, Virginia State Police Special Agent David M. Riley, FBI Agents Tom Carter, Earl Pitts, and Lou Sharron, and Lancaster Investigator Bruce Boles, regarding the death of Mary Harding (date of disappearance: 08/22/1985; her body was found 08/29/1985) in Lancaster, Virginia. The report was likely generated between 08/22/1985 and 07/12/1986.

If there are any fees for searching or copying these records, please inform me if the cost will exceed $200.00. This information is not being sought for commercial purposes.

The Virginia Freedom of Information Act requires a response to this request be made within five business days. If access to the records I am requesting will take longer than this amount of time, please contact me with information about when I might expect copies or the ability to inspect the requested records.

If you deny any or all of this request, please cite each specific exemption you feel justifies the refusal to release the information and notify me of the appeal procedures available to me under the law.
Thank you for considering my request.

Sincerely,

Angelique Ciliberti
Aac4xz@virginia.edu
502-648-8618

Angelique Ciliberti
2101 Arlington Blvd, Apt 406
Charlottesville, VA 22903

April 15, 2016

Virginia State Police
Public Relations Office
P. O. Box 27472
Richmond, VA 23261-7472

Dear FOIA Officer:

Under the Virginia Freedom of Information Act, §2.2-3704 et seq., I am requesting an opportunity to inspect or obtain copies of public records. Specifically, I am requesting a list of the physical evidence stored in connection with the death of Mary Harding (date of disappearance: 08/22/1985; her body was found 08/29/1985 in Lancaster, Virginia).

If there are any fees for searching or copying these records, please inform me if the cost will exceed $200.00.  This information is not being sought for commercial purposes.

The Virginia Freedom of Information Act requires a response to this request be made within five business days.  If access to the records I am requesting will take longer than this amount of time, please contact me with information about when I might expect copies or the ability to inspect the requested records.

If you deny any or all of this request, please cite each specific exemption you feel justifies the refusal to release the information and notify me of the appeal procedures available to me under the law.
Thank you for considering my request.

If you have any questions or require additional information in order to process my request, please do not hesitate to contact me at 502-648-8618 or aac4xz@virginia.edu.


Sincerely,

Angelique Ciliberti
Aac4xz@virginia.edu
502-648-8618

**151**



| Colonel W. S. (Steve) Flaherty<br>Superintendent<br>———<br>(804) 674-2000 | # COMMONWEALTH *of* VIRGINIA<br>### DEPARTMENT OF STATE POLICE | Lt. Col. Robert B. Northern<br>Deputy Superintendent |
| --- | --- | --- |

### P. O. BOX 27472, RICHMOND, VA 23261-7472

April 22, 2016

Angelique Ciliberti
2101 Arlington Boulevard, Apt #406
Charlottesville, Virginia  22903

Re:  Freedom of Information Act Request

Dear Ms. Ciliberti:

Your request has been received in the Criminal Justice Information Services Division for response.

As you may be aware, requests for records of the Commonwealth, its agencies and political subdivisions are governed by the *Virginia Freedom of Information Act* (FOIA), §2.2-3700 *et. seq.*

Criminal investigative reports are excluded from dissemination under the Freedom of Information Act by Paragraph (A) (2)(a), Section 2.2-3706, Code of Virginia, as amended.  Therefore, the requested records are being withheld because the custodian has exercised his discretion to withhold the records in accordance with Virginia Code Section 2.2-3700 et. seq.  It is the policy of the Virginia Department of State Police not to release files or photographs related to criminal investigations.

I trust this information has been of assistance to you.

Sincerely,

Tricia W. Powers, Lieutenant
Criminal Justice Information Services Division
(804) 674-8028

TWP/cm

# *VIRGINIA:*

*In the Court of Appeals of Virginia on* Tuesday *the* 21st *day of* March, 1989.


Emerson Eugene Stevens,                                                                    Appellant,

against          Record No. 1124-86-2
                 Circuit Court Nos. 108-A-1986 and
                                    109-A-1986

Commonwealth of Virginia,                                                                   Appellee.

                                        Upon an appeal from
                                        judgments rendered by the
                                        Circuit Court of Lancaster
                                        County on the 12th day of
                                        September, 1986.

                    Before Judges Barrow, Coleman and Cole

          For reasons stated in writing and filed with the record, the
Court is of opinion that there is no error in the judgments appealed
from.   Accordingly, the judgments are affirmed.   The appellant shall
pay to the Commonwealth of Virginia thirty dollars damages.

               This order shall be certified to the trial court.

                              A Copy,

                              Teste:

                                        David B. Beach, Clerk

                         By:  _____
                                        Deputy Clerk



## Investigation & Security Services, Inc.

### 360 West Office Building
#### 7206 Hull Street Road, Suite 206  Richmond, Virginia 23235

www.insight-investigations.com
DCJS Business #11-1215
Telephone: (804) 674-9577

Email:Insight@rcn.com
DCJS School #88-1062
Fax: (804) 674-4994

DATE:        September 30, 2004

TO:          Megan Rahman, Esquire

FROM:        Alfred C. Brown

RE:          **Commonwealth vs. Emerson Stevens**
             **Interview with Margie Hogge**

**Attorney Work Product**
**Privileged and Confidential**

I conducted an interview with Margie Hogge in regards to the Emerson Stevens case. Margie was married to Emerson Harding for eleven years. She began dating Emerson Harding nine months after the death of his wife, Mary Keyser Harding.

Margie knew Emerson from Lancaster High School. Mary Keyser Harding also attended Lancaster High.

After high school, Margie lived in Northern Virginia about eight years before she returned to Lancaster County where she met Emerson again. Margie's parents lived within two miles of the Harding residence located on State Route 354.

Emerson asked her out and they began to date. Emerson was nice and she became close with his two children. Ray was seven years old and Rachael was about four years old.

Emerson's parents tried to persuade him not to marry her. However, by February of 1988, they were married. They purchased a house together. She told him the only way she would marry him was if he did not fish. For the first years of their marriage, Emerson worked with his father painting.

In November of 1988, Emerson took Ray and Rachael to his parent's house. He did not give Margie much of an explanation as to why he took the kids to his parents. The children never returned. It was later after the divorce that she learned that Emerson took the kids to his parents hoping that it would keep his parents together.

In 1988, Margie had her first child by Emerson, Reva. Reva was nine months old, when they got into a fist fight. Margie and Emerson were not getting along very because of his drinking. In 1991, Margie had a second child, Jake. At this point, she felt she could not leave Emerson.

The following year, Emerson began to fish again. He worked for a company in Reidville called Omega Proteins. He only came home on Friday nights and left back out on Sunday night. While he was home over the weekends, he would be gone most of the day or drunk. He also worked for another company, Zapata Haynie, a fishing boat company.

In 1998, Emerson attended a school in Louisiana to meet the requirements to become a captain of a fishing boat. Emerson still fish in Louisiana. He normally leaves in April and return in November.

In February of 1999, Emerson moved out. He had a weirdness about him, he did not like the police and he doesn't like animals, especially cats, he kicked the cat they had. Emerson had a hunting dog and he knew the dog had died, but he did not tell her and did not remove the dog from the dog house. He left it for her to dispose of. She would be blamed for things that went wrong, he felt it was not up to him to make her happy.

Emerson is 6'4", slim, right-handed white male. He was a smoker, like to smoke Merits and Dorals. Emerson loved to drink beer, his favorite is Old Milwaukee. Emerson was beat by his father as a child. He always blamed his mother for allowing it to happen. Margie has heard Emerson tell his mother that she never protected him as a child. However, as an adult, Emerson idolizes his father. His father placed blame on his wife for everything, just as Emerson had done her.

To Margie's knowledge, Emerson has only been in trouble for a DUI charge and resisting arrest. Emerson drank heavily, he would leave home early in the morning and would not return until early morning the following day. He would wet the bed and/or fall asleep in the bath tub. Margie looked for counseling and found a group for wives with alcoholic husbands. A friend, Sharon Nicolas attended the meetings with her. She also talked to a preacher who supported her through her troubles with Emerson.

Emerson's mother has said to Margie that her son had problems, but she didn't know how to help him.

Margie said Emerson has a temper, but he has the ability to control his behavior in public. Emerson was abusive toward her and the children. Once there was an incident with Reva, she back-talked him while they were out. Emerson did not say anything while out, but when he returned home, he picked Reva up by her neck to his eye level and choked her. Then he banged her head into the wall until she wet her pants. He would pick the kids up by their arms and beat them.

When their relationship was suffering, Emerson would try to get her pregnant.

Emerson could have been depressed, he seemed quiet, didn't talk about the death of Mary. Emerson purchased a headstone for Mary's grave. This stone has his name beside Mary's. He plans to be buried beside his first wife.

Margie had heard rumors of Mary having a hard life with Emerson, she heard they weren't getting along very well. Margie describes Mary as a tough girl, and she was feisty. Mary played baseball and basketball in high school. Margie had heard a rumor through a girlfriend that Mary had gotten married because she was pregnant.

Emerson received about $80,000 dollars from Mary's insurance. Emerson purchased a $75,000 CD and a $5,000 CD. Margie described herself as bipolar and said she was not very good at handling finances. At one point, he paid off the mortgage on their home and she was to save enough money to replace it. She recalled saving about $25,000. Another portion of the money was used for an operation on Reva's ears. Margie did have one of Emerson's checking account registers. A copy is enclosed.

There was a discrepancy in what Emerson told her about Mary's car being paid for. Emerson had originally told her that he paid off Mary's car, but when he attempted to purchase a new truck, the salesman at Chandler Chevrolet said that Mary's car was paid off by insurance taken out by Mary when she purchased the vehicle.

Once Margie was concerned about noises and/or a peeping tom at their house. A neighbor who lived across the street also had concerns about the same thing. Margie became so concerned that she called the police and they agreed to stake out their residence. Emerson came home un-expectantly that night and she told him about the police having the house surrounded in hopes of catching the person. Emerson walked outside and peeped into the window and the police converged on him. She was never clear as to why he did that. His only explanation was, he wanted to see what could be seen through the window.

Margie believes Emerson Harding, "EO" as he is called, first introduced Emerson Stevens' name into the investigation. She was told that he banged his fist on the table and said that Emerson Stevens did this.

Margie also mentioned the Harding's had two baby sitters. One was a lady named Wathley. The other was Robin Stevens daughter.

According to sources, there were allegations of wife swapping between Emerson O. Harding III and his wife and Randolph Williams and his wife Joyce. It was also alleged that Emerson was seeing Joyce. Someone mentioned that he has observed Emerson walking from the residence in the early morning hours.

Two different psychic's were involved in the search for the perpetrator of this crime. The psychic hired by the police department, came up with it was a person who drove a two-tone truck, light and dark blue. Silva Brown, the other psychic, said the person had blonde hair and drove a blue vehicle.

Emerson usually returns in the month of November. Emerson told his daughter he would give her a birthday party, but now he is talking like he may not come back. He said something about going to work in North Carolina.

COMMONWEALTH OF VIRGINIA    )
                           )
CITY OF RICHMOND            )

## <u>DECLARATION OF MARCELLA F. FIERRO</u>

I, Marcella F. Fierro, M.D., hereby declare the following under penalty of perjury:

1.  I am a former Chief Medical Examiner for the Commonwealth of Virginia, in which position I served as for 14 years. Prior to my appointment as Chief Medical Examiner, I served as Deputy Chief Medical Examiner for the Central District for 171/2 years.  I retired from the Office of the Chief Medical Examiner (OCME) on January 1, 2008, after working there for 34years total. After retiring from the OCME, I began working privately as a forensic pathology consultant for local governments, Federal, State, and local law enforcement agencies, and private individuals. I have been qualified as an expert and testified in state and federal courts in Virginia, North Carolina, Maryland, Washington DC, Ohio, Utah, California and others.

2.  I am board certified in Anatomic, Clinical and Forensic Pathology. My duties at the OCME included the examination, and medical investigation of the deaths of  persons who died sudden, unexpected, suspicious, or violent deaths in order to determine the cause and manner of death, and to collect evidence that may be helpful in the death investigation.

3.  In my capacity as a Deputy Chief Medical Examiner for the Commonwealth of Virginia, I performed a post-mortem examination on the body and remains of Mary K. Harding in connection with the investigation of her murder in Lancaster, Virginia in 1985. As part of that examination, I examined six cuts on the right side of her body in order to determine the cause. I wrote a report in 1985 that documented my examination, findings, and opinions. I recovered physical evidence from her body including oral, anal, vaginal swabs and hair exemplars; I also made microscopic slides from some of those swabs, as my report notes.

4.  I was qualified as an expert witness and testified for the Commonwealth in both the February 1986 and July 1986 trials of Emerson Stevens. I have reviewed my testimony from both trials.  In this affidavit, when I refer to my trial testimony, I am referring to the July 1986 trial of Mr. Stevens, which resulted in his conviction of first-degree murder.

5.  During my testimony, I summarized much of the information contained in my report, including my findings regarding the cuts to Mary Harding's body. In assessing the likely source of the cuts, I considered the location, shape, length, and depth of each of the cuts. The cuts ranged in size from four and a quarter to five inches in length and from a half-an-inch to two-and-a-half-inches deep. Four of the cuts were parallel on her torso and a fifth was angulated on her right hip, and there was a cut at the base of her neck.

6. I testified that the wounds were not immediately mortal, but if left untreated, a person could suffer hemorrhages or blood loss sufficient to cause death. I concluded, however, that Ms. Harding died of asphyxia due to the ligature that was around her neck and that her death occurred prior to her body being deposited in the water, due to the fact that there was no water in her lungs.

7. I testified that the cuts on Ms. Harding's body were made with a cutting instrument with one sharp edge and one blunt edge, like a knife or something similar. The Commonwealth's Attorney asked me to examine a knife during my testimony, and I explained that this knife could have inflicted the type of cuts found on Ms. Harding.

8. On cross-examination, the defense showed me a propeller from a work boat and asked me if it could have inflicted the wounds I found on the victim's body. I testified that it was my opinion, to a reasonable degree of medical certainty, that the propeller shown to me could not have caused the cuts found on Ms. Harding's body.

9. Recently the Innocence Project at University of Virginia School of Law, retained me to review my case file, which was made available to me by the OCME. This file included my own reports, reports of the state police, lab reports, and numerous photographs of Ms. Harding's body, as well as photographs of the physical evidence recovered in the case. Some of these photographs were taken by me, and others were taken by the state police.

10. In addition to reviewing the original case file, I also emailed a Medical Examiner listserv and asked them for any photographs they may have in connection with cases involving propeller injuries. I received a number of responses and photographs, which were helpful in re-evaluating this case.

11. After a thorough analysis of the aforementioned materials, it is my conclusion that the wounds on Ms. Harding's body were caused by a propeller rather than a knife, and that these cuts were inflicted post-mortem, as I testified at trial.

12. My revised opinion is based upon reconsideration of the size, location, length, depth, parallel nature, and periodicity of the wounds. The cuts are more consistent with a post-mortem encounter with a propeller for several reasons.  First, the wounds are not in the usual locations of cutting wounds caused by a knife as found in usual stabbing deaths. Additionally, the cuts show periodicity, that is they occur at regular intervals, which would also be inconsistent with usual knife wounds. Also, most knife wounds are not as long as the cuts found on Ms. Harding's body.  Finally, Ms. Harding's body was discovered in shallow water in an area that was heavily trafficked by propeller boats.

13. My new opinion regarding the cause of the cuts on Ms. Harding's body is based on my reevaluation of the case, as well as my additional experience generally and my specific experience with subsequent propeller injury cases. My additional years of experience, and my consultation with other medical examiners regarding cases involving propeller injuries, I now believe that my initial opinion and trial testimony in reference to the cutting injuries was in error.  The periodicity, location, depth, and extent of the wounds

on Ms. Harding's body are more consistent with a propeller and inconsistent with a knife. It has always been my policy that upon discovery of a mistake or error on my part – or on the part of anyone under my charge – I should move as quickly as possible to correct my error and my opinion accordingly. I am submitting this affidavit in an attempt to do so in this case.

The foregoing is true to best of my knowledge, information and belief.

.

_____

MARCELLA F. FIERRO, MD

Signed this __13_____ day of May, 2016.

**City of Lancaster** )
)
**State of Virginia** )

## DECLARATION of LAWRENCE TAFT

I, Lawrence Taft, declare the following under penalty of perjury:

1.   I was the owner of the R & K Store in Lancaster, Virginia when Mary Harding disappeared and was later found murdered.

2.   I was questioned by Detective David Riley about the murder of Mary Harding.  Det. Riley asked me what I knew about Emerson Stevens and Mary Harding, and what my impression was of them.  I told Det. Riley that my impression of Mary Harding was that she was generally bright and happy.  She did not normally hang around the R & K store, but she did occasionally stop in and buy dog food.  I also told Det. Riley that I knew Emerson Stevens, and that I did not think he was capable of harming anyone.

3.   Emerson Stevens purchased gas daily, purchasing only as much gas as he needed to go crabbing each day.

4.   Det. Riley tried repeatedly to get me to say that Emerson Stevens woke me up in the middle of the night that Mary Harding disappeared so that he could buy five gallons of gas. Det. Riley was extremely aggressive and pushy, insisting that I agree with his story even though it was not true.  I was never

woken up in the middle of the night by Emerson Stevens ever, for any reason.   I made it clear to Det. Riley that I was not someone who could be bullied into lying.  I remember this very clearly because I was shocked that a law enforcement officer would behave this way.


*Lawrence Jeff Jane*

LAWRENCE TAFT


Signed this 23rd day of May, 2016.

# VIRGINIA STATE POLICE

*(estuarial scientist).*

Date of Transcription _____ 10/1/85

Dr. JOHN BOONE of the Virginia Institute of Marine Sciences at Gloucester was contacted by the reporting agent regarding currents in the Rappahannock River from off of Towles Point to Mud Creek. He was given a description of the condition of the victim's body and of the weights tied to her.

After consulting with an associate, Dr. JOHN RUSELLI, Dr. BOONE provided the following information with the caveat that <u>at best</u> it was merely informed speculation: *(too many variables).*

1) Between the points described, a <u>semi-buoyant</u> object bouncing along the <u>bottom</u> of the river would move <u>upstream</u>, as the bottom current maintains an upriver <u>net</u> current of averaging 1/10 of a knot per hour. Thus, such an object on the bottom would move upstream about 2½ nautical miles each 24 hours unless obstructed until it began to surface, whereupon it would be acted upon by surface currents.

2) The net movement for surface currents would be downstream.

3) The tide flow taking an object up river on an incoming tide during the period she was missing would have only carried a surface object a maximum of 1½ to 2 nautical miles before reversing its flow.

*- say no real conclusion can be made. use for rebuttal*

Investigation on ___ 9/23/85 ___ at ___ Henrico Co. ___ File # ___ 85-81-0697 ___ 10⁻³

by ___ SA D. M. Riley/ss/A31 ___ Date dictated ___ 9/30/85

This document contains neither recommendations nor conclusions of the Virginia State Police. It is the property of the Virginia State Police and is loaned to your agency; it and its contents are not to be distributed outside your agency.

**JAMES W. PARKER, J.D.**
*"Attorney At Law"*
**112 Grandview Drive**
**Hampton, Virginia 23664-1952**
**(757) 850-8811 – Fax. (757) 850-9189**
**E-mail:** jwpjd@aol.com

August 7, 2001

Ms. Linda R. Pitman
Vice Chairman
Virginia Parole Board
6900 Atmore Drive
Richmond, VA 23226

Re. Emerson Stevens, **#149528**

Dear Ms. Pitman,

I apologize for being slow in following up on my meeting with you on July 27, 2001. The paperwork in this matter is voluminous; containing many hundreds of documents and transcripts. Without any doubt, the violent death of Mary Harding was beyond horrible, but I also believe that the arrest and conviction of Emerson Stevens served only to create further injustice.

The conviction of Mr. Stevens resulted from lies, greed, suggestion, public arousal and, sadly, prosecutorial misconduct; in my view, the greatest of judicial evils. In the sleepy county of Lancaster, the violent death of Mrs. Harding created a virtual frenzy among the community never before seen before or since. Understandingly, police authorities were compelled to quickly find, try, and convict the perpetrator or perpetrators. Jointly involved were county, state, and federal police authorities. A reward of more than $25, 000.00 was promptly posted, and the printed and televised news media had a literal hey day.

An extensive review of trial transcripts, notes, statements, documents, and after discovered evidence reveal, in my humble opinion, an almost total void of credible evidence. There was no provable finding of motive; there were no eyewitnesses placing Mr. Stevens at or near the crime scene; there was an absence of "real" evidence, except that of a single strand of human hair which, upon forensic examination, was thought to be "similar" to that of the victim. Equally important is the fact that there was no confession by the defendant. From the very beginning, Mr. Stevens has remained steadfast in his claim of innocence.

Almost immediate following the disappearance and death of Mrs. Harding, the aforesaid reward was posted for the capture, arrest, and conviction of her assailant. Emerson Stevens was not considered as a suspect until such time as his cousin, Clyde

Dunaway, reported that he had seen the Stevens truck on the highway some distance from the driveway entrance to the victim's home. (It is important to note that only until the reward was posted did Dunaway make his accusatory report to the police. Prior to the posting of the bond, Dunaway had told a state trooper that he had driven past the victim's home the night of the crime, and saw parked on the side of the highway a truck that he did not recognize. That clearly exculpatory information was never provided to Stevens' counsel.) In his post-reward statements, Dunaway stated that he immediately recognized the truck on the side of the road, slowed but never stopped to ascertain whether or not his cousin was in need of assistance. Some eleven days following the posting of the reward, Dunaway telephoned State Investigator David Riley that he had something to tell him, and made an appointment to meet with him. At this meeting, on September 5, 1985, Dunaway told Riley that he had seen Stevens' truck parked on the roadway near the entrance to the Harding home. Prior to the receipt of this information, local and state police, assisted by the FBI, had conducted a fairly extensive investigation regarding the disappearance and death of Mrs. Harding. Vehicles of various colors, and several suspects had been considered.

Upon Dunaway's false report, the entire tenor of the investigation was directed towards Emerson Stevens. Investigation of prior suspects came to a total halt, and was directed fully towards the previously non-considered Emerson Stevens. Until retaining counsel, Stevens fully and totally cooperated with the authorities. He was submitted to many hours of interrogation: At his home, at his boat dock, on the roadway, at local and state police facilities, and on the front porch of the home of the victim which, incidentally, was directly across the road from where she was buried. Without the necessity of search warrants, Stevens allowed his home, his truck, and his boat to be searched for evidence. He allowed body hairs to be removed from all parts of his body for examination. He voluntarily surrendered ropes, chains, and clothing for testing. As well, he submitted himself to lengthy polygraph testing by the state police. Although Stevens was told by the police that he had "failed" the testing, and was interrogated for another two hours, an independent polygraphist found the testing to be "inconclusive, but leaning towards innocence." Obviously, the Commonwealth would not agree to the introduction of the polygraph findings at trial. Lying to "suspects" by the police, we all know, is standard police procedure. Although accepted by the courts as sometimes necessary I, frankly, during my five years as a police officer never found it necessary to stoop to lying to convict criminals. And, during my short police career, I arrested and convicted more than my share of criminals. Throughout his many hours of interrogation, Emerson, as he does today, maintained his innocence.

Post-trial, as I had suspected, I found that Clyde Dunaway had committed perjury during his testimony at trial. At my request, the court appointed a special prosecutor: Eddie Carpenter, Commonwealth's Attorney of Essex County, who spent more than 300 hours investigating my complaints of many suspected improprieties. At trial, on cross-examination, Dunaway steadfastly claimed that he had no interest in the reward money, and had made no inquiries of the police regarding the reward. Upon investigation, Mr. Carpenter discovered that Dunaway had, in deed, contacted many persons regarding the reward; including, in fact, four or five police officers on more than one occasion.

Although the Commonwealth's Attorney of Lancaster County, Jeffery Schmidt, was well aware that Dunaway was giving false testimony, he failed and refused to notify either the court or counsel for Mr. Stevens. Subsequently, Dunaway was indicted for perjury in the Stevens trial. A plea agreement was reached, and on March 1, 1998, Clyde Dunaway pled guilty to the reduced charge of obstructing justice. He was convicted, sentenced to 12 months in jail, and fined $1,000.00 plus costs. His sentence was suspended for 5 years conditioned upon his good behavior and payment of fines and costs within six months. I enclose, for your review, a portion of Dunaway's trial transcript.

A prosecution witness, Ann Dick, because of disturbing discoveries made by her following the first trial, contacted me by telephone and later met with me in person. Mrs. Dick, wife of a retired Maryland State Trooper, reported to the police that on the early morning hours of August 23, 1985, she observed on the highway a pick-up truck traveling with no headlights. She told the police that she believed it was the truck of Emerson Stevens. As well, she told the police that the driver of the truck was *positively not* Emerson Stevens. She was told by both the police and the Commonwealth's Attorney to, at all costs, not mention at trial that Stevens was not driving: "Even if he (counsel for Stevens) turns you upside down and shakes you, don't say it wasn't Stevens." On several occasions, both the police (primarily David Riley) and the Commonwealth's Attorney coached Mrs. Dick on how to testify in order to make it appear that Stevens was the driver of the truck she had seen that morning.

When interviewed by Mr. Carpenter, Mr. Schmidt stated that Mrs. Dick's change of testimony at the second trial was a total surprise to him. Yet, in Schmidt's files, Carpenter found a note, dated days prior to trial, stating that "you need to talk to Dick, we may be losing her." When confronted by Carpenter, Schmidt could do nothing but stutter and could not explain the conflict.

In the Commonwealth's file, Mr. Carpenter told me that he had found what he believed was exculpatory evidence, and which was never turned over to me by Schmidt. As well, he told me that there was sufficient probable cause for him to charge Mr. Schmidt with subornation of perjury, but that it would be a waste of time because a jury in Lancaster County probably would not convict him. Too, Carpenter told me that he discovered evidence in the FBI reports that were, in his opinion, exculpatory. At trial I had made a motion for the FBI reports to be made available to me. But my motion was denied by Judge Foster, who opined that he had read the FBI reports, and did not feel that they contained any exculpatory evidence.

Despite the findings of the special prosecutor; despite the finding of subornation of perjury; despite the fact that exculpatory evidence was never released to the defense; despite the fact that in his closing statement the Commonwealth's Attorney presented evidence to the jury which was *not* presented at trial; despite the fact that a Commonwealth's witness committed perjury; and despite the fact that the judge exhibited bias throughout the entire trial, the case of Emerson Stevens has never been fully reviewed on appeal.

I have submitted several documents for your review, including my initial brief to the Court of Appeals.

The clerk of the circuit court of Lancaster County recently informed me that she had located all of the evidence presented at trial –to include the hair found on the plaid shirt under the seat of the truck. If you think it would be beneficial to have the hair DNA tested I will, at my expense, endeavor to have such testing done. But, I'll be totally honest with you. After all that I've seen happen in the Commonwealth's effort to convict Emerson, at almost any cost, I have a gut feeling that that little old single strand of hair will stand a good chance of being the hair of the victim.

I cannot begin to tell you how appreciative I am of your consideration of Mr. Stevens for parole. Should you feel the need for addition information, or if you wish to further discuss this matter with me, please do not hesitate to call upon me.

I thank you for your courtesy and for your time.

Sincerely,

/S/

James W. Parker



AFFILIATED LAW OFFICES

JAMES W. PARKER, J.D., P.C.
BRIAN D. LYTLE, J.D.
MARTIN K. GRIFFIN, J.D.

PARKER, LYTLE & GRIFFIN

ATTORNEYS AT LAW

1310 TODDS LANE, SUITE B
HAMPTON. VIRGINIA 23666

(804) 838-09(

July 18, 1986

Lt. Gordon L. Rogers
Internal Affairs Unit
Virginia State Police
P. O. Box 27472
Richmond, VA  23261-7472

Re. Special Agent David M. Riley, V.S.P.

Dear Lt. Rogers:

As a member of the Virginia State Bar, and as a third generation former police officer, I am compelled to file a formal complaint concerning the investigation and testimony of Special Agent David M. Riley in the trial of Emerson E. Stevens of Lancaster County, Virginia.  Trials of Mr. Stevens on murder and abduction commenced on February 24, 1986, and, following a mis-trial, again on July 7, 1986.

I would presume you are aware that Mr. Stevens was, in the second trial, convicted and sentenced by the jury to 164 years and one day.  Although his guilt or innocence is not an issue relative to this complaint, I am solidly of the opinion that he was convicted as a result of the unlawful and ethically despicable conduct of Agent Riley in collaboration with Lancaster County Commonwealth's Attorney C. Jeffers Schmidt, Jr.

Testimony at the trial supported my suspicion that Agent Riley committed perjury, suborned perjury, encouraged witnesses to slant or embellish their testimony, coached and intimidated the witnesses, and badgered, threatened, and intimidated the defendant frequently.  It would also appear that Agent Riley made the mistake of focusing his investigation solely on his personal desire to convict the defendant rather than to objectively solve the death of Mary Keyser Harding by the use of accepted methods.  Your investigation should reveal that this case was handled in a sloppy fashion from its inception and that material evidence was improperly handled.

Based upon the information available to me, the misconduct of Agent Riley is sufficient to commence an investigation by your unit and, if founded as I believe it will be, sufficient to mandate his dismissal and the filing of criminal charges.  Special Agent Tom Stanley is familiar with the allegations against Agent Riley, and has already spoken with certain of the witnesses.

2.

Re. Special Agent David M. Riley

Those witnesses include former Maryland State Trooper Louis Dick and his wife, Anne Dick, both of Lancaster County. Basically, it was the testimony of those witnesses that Agent Riley confirmed to them allegations made by the defendant and which Agent Riley denied on the witness stand under oath. Additionally, the Dick's have sworn that Agent Riley encouraged them to slant, embellish, and fabricate testimony. Agent Riley also encouraged the Dick's to with hold evicence which might be favorable to the case of the defendant.

Your investigation should also reveal that witness Christine Phlugradet reported to the police that on the evening of the offense she observed a "small, light blue, light green, or white pick-up truck" in the driveway of the victim, but was persuaded by Agent Riley to testify that she observed a "short-bedded light colored pick-up truck" so as to infer that the vehicle she observed could more likely have been that of the defendant. I believe that this tactic by Agent Riley was utilized on the majority of those witnesses who gave testimony concerning their observation of a pick-up truck.

Additionally, Agent Riley testified under oath that Dr. David Antonio gave information to the police indicating that the defendant "was faking injuries to his wrist in an attempt to defraud the insurance company" and that an operation on the defendant was merely exploratory. Dr. Antonio, testifying under oath, denied making any such statements and was adament that the defendant showed objective symptoms of injury and had suffered a 10-15% loss of use of the affected limb which was in effect at the time of the abduction and murder of the victim.

I also believe you will find that the witness Thomas Stevens originally reported that the defendant's pick-up truck was at the boat dock when he first observed the defendant's boat missing, but was allowed to testify to the contrary by Agent Riley so that Stevens' testimony would conform to other testimony which at the time indicated that the defendant's truck was observed at the opposite end of the county at the same time Stevens claimed it was at the boat dock.

Also, I believe that witness Timothy Brent and potential witness Ray Reynolds of Barrack & Reynolds Seafood will tell you that Agent Riley either put words in their mouths or suggested they not reveal evidence which might be exculpatory to the defendant.

Based upon the seriousness of my allegations, I am of the opinion that Agent Riley should be subjected to a polygraph, and that every witness in this case, including the defendant, should be re-interviewed by an objective member of your unit. I also believe that Agent Riley should be suspended or assigned to a non-investigatory position pending your investigation.

169

3.

Re. Special Agent David M. Riley

   Should you desire to discuss this matter personally I will be happy to meet with you at your convenience.  You should also be advised that I am forwarding a copy of this letter to the Attorney General of Virginia for consideration of possible criminal charges against both Special Agent Riley and Commonwealth Attorney Schmidt.

   The interests of justice and the integrity of the police profession demand that this complaint be promptly and thoroughly investigated in an objective fashion.

   Thanking you for your courtesy and attention to this matter, I am

        Sincerely,

        James W. Parker, J.D.

JWP/jd

cc:  C. Sue Terry, Attorney General
    C. Jeffers Schmidt, Commonwealth Attorney
    Emerson E. Stevens



# COMMONWEALTH of VIRGINIA

C. JEFFERS SCHMIDT, JR.
COMMONWEALTH'S ATTORNEY

OFFICE OF THE
COMMONWEALTH'S ATTORNEY
LANCASTER COUNTY
LANCASTER, VIRGINIA 22503-0204

TELEPHONE
(804) 462-7240

July 3, 1986

Mr. E. O. Harding, IV
Route 2
Lancaster, Virginia 22503

RE: Commonwealth v. E.E. Stevens

Dear Emerson:

I anticipate that I may call you to testify on July 8, 1986. I have already forwarded a copy of the transcript of your earlier testimony. Please review that again.

I would appreciate it if you would consider and let me know what you would say about the following subjects:

1. Please be able to provide an explanation for dating several girls, among them Cindy Hayden and a young lady named Weber. I don't see anything wrong with this, but I would like for you to be able to make a natural explanation without being surprised on the witness stand.

2. Please be able to explain the origin of and disposition of approximately $81,000.00 worth of life insurance. I do not want you to be surprised by a question concerning this at trial. If that money is all in a trust account at the bank in favor of the children, that would be the best way to explain where the money is and what it is being used for.

      3.    Please be able to explain your new "fancy sports car." Again, I  see nothing wrong with having a new car, and I do not want you to appear to be surprised on the witness stand about a question concerning it.

      If there are any other things about your testimony that worry you, please contact me.

                          Sincerely yours,

                          C. Jeffers Schmidt, Jr.

CJSjr/cc

172

# Bank of Lancaster

## Kilmarnock, Virginia

22482

July 7, 1986

Mr. Emerson O. Harding, IV
Route 2, Box 365
Lancaster, Virginia

Dear Emerson,

As requested by your mother, Peggy Harding, I have listed
below funds that we now have on deposit here at the Bank of Lancaster:

```
CD # 5200 - $75,000.00
CD # 5442 - $ 5,000.00
Savings account - $956.79
Christmas Club    $525.00
IRA -             $2034.52
```

2 U.S. Savings Bonds -$1,000.00 each—purchased in name of
Carlton Ray Harding.by you on March 21, 1986.

The following are insurance checks which the bank paid upon Mary's
death:

| | |
|---|---|
| Employee Stock Ownership Plan (ESOP) | $ 1,014.41 |
| Firemans Fund Insurance Company (BanClub) | 5,000.00 |
| Life Insurance Company of Virginia | 46,245.64 |

I trust this information will be helpful to you and if I can
be of any further assistance please do no hesitate to contact me.

Sincerely,

Lucille Christopher

Lucille Christopher

**STATE of VIRGINIA**

## AFFIDAVIT of MARGIE HOGGE

I, Margie Hogge, do aver and swear:

1. After the death of Mary Harding, I began dating Emerson Harding, IV.
   We were married on Feb. 5th, 1988.

2. In the beginning of our marriage, I took care of Rachel and Ray Harding,
   Mary and Emerson's two children. Without explanation, Emerson
   suddenly removed them from our home and moved them into his
   mother and father's house. Many years later, Emerson told me he had
   done this in the hopes that it would keep his parents from splitting up.

3. Emerson rarely talked about Mary or her murder, so it was surprising to
   me when one day, he told me that it was his father, Emerson "E.0."
   Harding who came up with the idea of Emerson Stevens being the person
   who killed Mary. Emerson described how he was sitting at the picnic
   table with his father after Mary was murdered, and his Dad began
   pounding his fist on the picnic table saying "Emerson Stevens! THAT'S
   who did this!"

4. Emerson and I had two children as well, a daughter named Riva, and a
   son named Jake. Neither of the children I have with Emerson Harding
   have anything to do with him now.

5. Emerson Harding had a serious drinking problem which he never
   admitted or got treatment for while I was married to him.   He could
   become quickly and easily enraged and volatile when he was drinking.
   One of the times Emerson came home drunk we got into a fist fight.
   this was sometime around summer of 1989. He was punching me on
   the side of my head with his fist and I was punching him back on the
   side of his face. I am barely 5'3" and he is 6'4". I don't know how
   many times he punched me but at some point my head went numb
   and I walked away because I thought he was going to kill me and
   Riva was in her high chair screaming. I went to stay with my parents
   and my father found Emerson the next day and told him he better
   never lay another hand on me. I went to what is now Bon Secours
   Medical Center in Lively to have the doctor check me out.

**174**

throat and banged her head against her closet door again and again – 8 or 9 times – until he was done with her. He yelled at me, too, and ordered me to stay in the kitchen before he took her into her room and did this to her. Riva was 9 years old when this happened.

7. Sometimes he would drink so much he would wet the bed while he slept. He could get very volatile and angry even when he wasn't drinking.

8. Emerson's mother, Peggy Harding, once admitted to me that she knew something was wrong with her son, but said she didn't know what she could do about it. Peggy Harding was also controlled by her husband, Emerson 0. Harding, III who was always covering up for his son, Emerson Harding, IV. One time, my husband Emerson fell asleep in the bath because he was so drunk, and slept there all night. When Emerson's father learned this, he screamed at me because he said his son could have drowned, and he blamed me for leaving him in the tub.

9. When our marriage was in a particularly bad way, Emerson would try and get me pregnant. I think it was his way of forcing me to stay in the marriage.

10. Emerson would also control me financially. He would refuse to give me money, and I would have to ask my parents for money for necessities for myself and our children. Emerson was also a very jealous man, and he was always suspicious about what I was doing both in our own home, and when I would go out. He would often just drive around in his car or truck.

11. During his marriage to Mary Harding, Emerson Harding worked on a commercial fishing boat that fished menhaden. He also had this job during our marriage, though I tried to insist early on in our marriage that he not work on a commercial fishing boat. The men would go out early Monday morning and not return until Friday night. It was unusual for the boat to come back in in the middle of the week, but it did happen. On weekends, Emerson Harding was mostly drunk and abusive.

12. Emerson Harding never rearranged the furniture in any room of our house that I recall during our entire marriage, from February 1988 to February 1999.

someone creeping around the house, peeping in the windows. A female neighbor thought this might be happening at her house as well, so we called the police and asked them to watch our homes. I told Emerson that we did this, and still he went outside to peer into our windows, and of course the police rushed him.

14. There was a rumor in Lancaster that Mary Harding had been having an affair with a school teacher who lived in Heritage Point, the neighborhood right behind the house Mary and Emerson lived in on Route 354. I have no idea whether there is any truth to that rumor. I do know that before my marriage to Emerson Harding, we were driving through the Heritage Point neighborhood, and Emerson pointed at a house and asked me if I knew that a school teacher used to live in the area.

15. I don't believe that Emerson's parents were in town the week that Mary went missing; it is my recollection that they were on vacation at the Outer Banks in North Carolina. I can't recall now if Emerson told me this, or if I learned it through someone else. Emerson Harding would have been able to stay in his parents' home unnoticed.

Further, Affiant sayeth not.

_Margie W. Hogge_
MARGIE HOGGE

NOTARY PUBLIC

176

PAGE 1 OF 2

## AFFIDAVIT

I volunteer the following information of my own free will for whatever lawful purposes it may serve.

I, Raymond Reynolds, being first duly sworn, do depose and state the following:

I was questioned by police investigators Bruce Bowles and David Riley related to the abduction and murder of Mary Keyser ~~Guzman~~ HARDING. Emerson Eugene Stevens had been charged with the murder, and a retrial was set for July 1986.

Stevens was in the crabbing business, and I told Bowles and Riley that I remembered Stevens being late getting in with his crabs on the Friday morning after the victim had disappeared. I told them Stevens had gotten in around 12:30PM, when he usually got in around 10:30AM. However, on July 10, 1986, the day I was scheduled to testify, I checked my records and realized that I had been mistaken when I told the investigators that Stevens had been late on that Friday. My records showed that Stevens had actually been late on Thursday, the morning before the evening that the victim had disappeared. The Friday morning after the victim had disappeared, Stevens had been on time and had his normal load of crabs.

Upon discovering my error, I went to court and told Bowles and Riley about my mistake. Riley told me to go ahead and testify and to stick with my original statement. He told me not to change anything. I told Riley that I could not do that because it was not true. Riley became upset. I was later excused and not called to testify.

*[signature: N. Reynolds]*

I certify the above named Ray Reynolds
to be his true signature,
3/3/97
*[signature: Alice Day]*
Notary

1

PAGE 2 OF 2

I have read this statement, and certify that the facts contained herein are true and correct.

X _____
AFFIANT

WITNESSED: _____

STATE OF VIRGINIA
CITY OF _____ to-wit:

The foregoing instrument was subscribed and sworn to before me this _3_ day of
March, 1996/1997

_____
Notary Public

My commission expires: 8 31 9 9

## PARKER, LYTLE & GRIFFIN

ATTORNEYS AT LAW

1310 TODDS LANE, SUITE B
HAMPTON, VIRGINIA 23666 .

AFFILIATED LAW OFFICES

(804) 838-0901

JAMES W. PARKER, J.D., P.C.
BRIAN D. LYTLE, J.D.
MARTIN K. GRIFFIN, J.D.

August 12, 1986

Ms. Bertha G. Abbott, Clerk
Lancaster Circuit Court
Lancaster County, VA 22503

Re. Commonwealth of Virginia v. Emmerson E. Stevens

*Copy*

Dear Ms. Abbott:

I would appreciate your kindness in issuing witness sub-
poenas for the following persons to appear before the Circuit Court
in the above matter at 10:00 A.M. on the 27th day of August, 1986,
to give testimony on behalf of the defendant:

Inv. Bruce Boles
Sheriff's Department
Lancaster, VA 22503

Louis Dick
Rt 2, Box 963
Lancaster, VA 22503

Anne Dick
Rt 2, Box 963
Lancaster, VA 22503

Christine Pflugradt
P.O. Box 86
Lively, VA 22507

D. M. Riley, VA State Police
P. O. Box 9108
Richmond, VA 23227

Dr. David R. Antonio, M.D.
Rappahannock Gen. Hospital
Kilmarnock, VA 22482

John H. Hammell, Jr.
P.O. Box 295
Lancaster, VA 22503

Ray Reynolds
% Barracks & Reynolds Seafood
Irvington, VA 22480

Thanking you for your courtesy in this matter, and with
best personal wishes, I am

NOTE: ALSO PLEASE SUBPOENA THE
FOLLOWING PERSONS:

Peter J. Olenick, Principal
Lancaster Immediate School
Lancaster, VA 22503

Linda Cornwell (Mrs. Keith Cornwell)
Lancaster, VA 22503

Angela Cornwell
Lancaster, VA 22503

Sincerely,

James W. Parker, J.D.

*Copy*

*Filed: Aug 12, 86 BGA. Ellis*
*Teste: BGA. Ellis*
*issued 8/13/86*
*-189-*

*Phone Call from Parker's office on Sept 8.86 - approx 8:25 A.M. to re-issue subpoena, as stated above.*

179

C. W. WARTHEN Cᵒ. INC.
LYNCHBURG, VIRGINIA   Form No. 204-C—Subpœn    - Witness

# The Commonwealth of Virginia,

To the _____**Sheriff**_____ of the ____**County**____ of ____**Lancaster**____, Greeting:

WE COMMAND YOU, That you summon ____**Dr. David R. Antonio, M.D. Rappahannock General Hospital**____

____**John H. Hammell, Jr. P.O. Box 295 Lancaster, Va.**____

____**Ray Reynolds c/o Barracks & Reynolds Seafood**____

____**Circuit**____ Court of the ____**County**____ of ____**Lancaster**____,

__**27th**__ day of ____**August**____, 19__**86**__, at __**10:00**__ o'clock

ɔ say in behalf of the ____**Defendant**____, in a certain

Court, before the said Judge, depending and undetermined, between

ntiff, and____

____**Emmerson E. Stevens**____, Defendant____.

*not issued upon request of Comm. Atty.*

WITNESS, ____**Bertha G. Abbott**____, Clerk of our said Court, at the Courthouse, this

____**12th**____ day of ____**August**____, 19__**86**__, and in the ____**211th**____ year of the Commonwealth.

Bertha G. Abbott, Clerk

____*Bertha G. Abbott*____, Clerk.

*-175-*   *Filed - Aug. 12, 1986*
*Teste: Constance Oliver Dep. Clk*

C. W. WARTHEN CO.
LYNCHBURG, VA.    Form No. 802-A—   of Subpoena Duces Tecum

# Commonwealth of Virginia,

_____ County __ **of** __ Lancaster _____, **to-wit:**

*To the Sheriff of said* _____ County of Lancaster _____, *Greeting:*

WE COMMAND YOU, in the name of the Commonwealth of Virginia, that you summon _____

       Barrack & Reynolds Seafood

_____

_____

_____

/in the office of James W. Parker, J.D. 1310 Todds Lane, Suite B
to appear before our xxxxxxxxxxxxxxxxxxxxxxxxxxCourt xxx

Hampton, Virginia, on or before 1st day of _____ July _____, 19 86, at 10:00
at the Courthouse thereof, on the

o'clock __ A. M., to produce before our said Court that certain writing, to-wit: _____

_____

_____ the crabbing ledger book for the month of _____

_____ August, 1985, for inspection, photographing or _____

_____ copying by James W. Parker, J. D., counsel for _____

_____ the defendant _____

_____

_____

_____

_____

and then and there to testify, and the truth to say on behalf of _____ Defendant _____

_____

in a certain matter of controversy in our said Court now pending and undetermined, wherein _____ _____

_____ Commonwealth _____, is plaintiff and

_____ Emerson E. Stevens _____, a defendant.

And have then there this writ and make return how you have executed the same.

WITNESS, _____ Bertha G. Abbott _____ Clerk of our said Court, at the Courthouse, this

_____ 16th day of _____ June _____, 19 86, and in the _____ 210th _____ year of the Commonwealth.

     2ear : 6/24/86
     Quile : P2R      Bertha G. Abbott, Clerk

            By: _Roberta N. Lewis_   Deputy
                                        Clerk.

**181**

**CITY OF LANCASTER** )
)
)
**STATE of VIRGINIA** )

## AFFIDAVIT of KEITH HOGGE

I, Keith Hogge, do aver and swear:

1. I am a retired law enforcement officer within the Town of Kilmarnock and Lancaster Sheriff's Office, where I worked for over 30 years. I was rehired by the newly elected Sheriff Patrick McCrainie in February of 2016. One of my duties has been to re-investigate the death of Mary Harding. To that end, I have reviewed both the court file, the Commonwealth's Attorney's file and the police file. There are many aspects of this case that cause me grave doubt that Emerson Stephens was responsible for Mary Harding's abduction and murder.

2. I am married to Margie Hogge, who was previously married to Emerson Harding. Initially, I did not share my wife's belief that her ex-husband Emerson Harding – and not Emerson Stevens – was responsible for the death of Mary Harding. Over time, though, and through continued investigation, I have grave doubts about Emerson Steven's guilt.

3. When I was first married to Margie, we lived in the house that she had shared with Emerson Harding.

4. One day, I was cleaning up the garage at that house, and I found two items buried under many other items. One was a grave marker with Mary K. Harding's name on it, with her date of birth and date of death. The other was a portion of anchor chain that used to belong to Emerson Harding, IV, who owned his own small fishing boat.

5. I showed the photo of the chain that was attached to Mary Harding's body to Warner George, who worked in the boat yard as yard boss after fishing commercial shipping boats for many years. I did not tell Warner George anything about the case, or tell him why I was asking; I just showed him a picture of the chain and asked him what it was. He told me that this was a

182

photo of a purse boat chain, the type of chain that is used to raise and lower the purse boats on a commercial fishing ship. There are two purse boats on the commercial fishing ship that Emerson Harding worked on. The two purse boats are each lowered into the water from the opposite sides of the ship to encircle and net the schools of menhaden.

6. I attempted to review the actual records about the travels of The Atlantic that week, and about who was actually working on the ship. I was looking at the records at the office of the shipping company in (2006), and when I began taking notes, the woman in charge snatched the notes away from me and said she should not have let me see them. I have since been told by Diane Haydon, a relative of Peggy Harding, that the records for the month of August 1985 – after the week of August 18, 1985, are missing.

7. Furthermore, Emerson Harding was only working a laborer on the ship – he was not a captain and he had no leadership role. Laborers on a ship could change from week to week. The idea that Emerson Harding's absence – particularly if it was only for a short time – would be noticed is not credible.

8. In addition, Emerson Harding's parents were not in town when Mary disappeared. If Emerson in fact came home the night before, but stayed in town in an effort to catch her with someone else the next evening, he had a place (his parents' house) to wait without fear of being seen.

9. Belle Isle used to be a popular place for people to go drink and party after dark, and Emerson Harding was known as one of the people you could often find there at night. It is relevant, then, that Mary Harding's body was found just off the shore of Belle Isle park, in water that you could simply wade into, weighted down with a cinderblock and a chain from a purse boat. And since we now know that Dr. Boone's trial testimony – that Mary's weighted body could have traveled 10 miles upstream in 4 days – was in fact a lie, it is far more likely that Mary's body was deposited where it was later found.

10. I have reviewed several Virginia State Police reports documenting several different interviews with Emerson Harding, and there are several striking facts. Emerson Harding never mentioned Emerson Stevens at all during his first interview. However, by the time the state police conduct the second interview (one week later?), Harding had come up with numerous reasons

to suspect Emerson Stevens. Riley never asked him why he had come to suspect Emerson Stevens, or why he never mentioned these "facts" during the first interview.

11. Emerson Harding relayed to VSP SA David Riley that the family could not get any information from Mary Harding's children, and the police reports suggest that SA Riley simply accepted this conclusion. While 1-year old Rachel would obviously not be helpful, 4 year old Ray might well have been. By his father's own admission, Ray did not sleep in his own bed the night his mother was abducted; he had slept in his mother's bed. Emerson Harding told Riley that the children were normally in bed by 9:00 pm. But Burtonsville Davis, who worked at the R & K Market the night Mary disappeared said that when she drove by Emerson and Mary's house after she got off work that night at around 10:30 pm, she saw Ray standing in the sliding glass doorway looking outside, and the lights were on in the house. When a family member called the next morning, Ray answered the phone and told her that he couldn't find his mother. Clearly, Ray was capable of relaying relevant information.

12. What Ray Harding saw and heard that night has always been relevant to me. If Emerson Harding was waiting in the woods behind the house, he would certainly wait until he thought his children were asleep. But if he guessed wrong about Ray being asleep, and Ray later reported to his family that he heard his mother say the name "Emerson" the night before, there was ample reason for Emerson Harding to say the children couldn't be helpful to law enforcement AND to point the finger at the only other Emerson they knew.

13. There are police reports that document the fact that Emerson Stevens was out searching for Mary Harding, along with many other concerned citizens.

14. Emerson Harding also told VSP SA David Riley several "facts" about Emerson Stevens that SA Riley did not substantiate. One is that Emerson Stevens knew Emerson Harding's work schedule, and therefore, would know when he was not home. First, there was no evidence that Emerson Stevens had such information. Second, if Emerson Stevens knew that Emerson Harding worked on a commercial fishing boat, he knew what every other person in town knew about someone who worked on a commercial

fishing boat: they are usually gone all week long.

15. Emerson Harding also told SA Riley that Emerson Stevens had made a phone call to Mary and Emerson's home within the last year. Although SA Riley did obtain the phone records for the day that Mary disappeared, there is nothing in the Commonwealth's files to show that Riley attempted to verify Emerson Steven's phone call to the house.

16. Emerson Harding also told SA David Riley a story about how Emerson Stevens made a crude comment about Mary Harding not long before her murder. According to Harding's story, this comment was made in the presence of other fishermen who Harding named. Riley made no apparent effort to verify this story by interviewing these men.

17. SA Riley apparently did little or nothing to corroborate Emerson Harding's "alibi." Emerson Harding was allegedly working on a commercial fishing boat the night his wife was abducted and murdered, although he had come home the night before for just for a few hours, which was unusual. In the brief time that he was home, Harding believed he heard a "peeping tom" in the woods next to the side of the house where the couple's bedroom was located. Harding rearranged the furniture in their bedroom, so that the bed was visible to anyone who might climb a tree outside their window, and took down the curtains in the bedroom. Obviously this behavior seems a bit odd, if Harding had truly been concerned about someone peeping into the windows, as the new bedroom arrangement made it much easier to see Mary Harding (or anyone else in the bed).

18. Emerson Harding received $80,000 in life insurance proceeds on a policy Mary had taken out that year. Harding began dating other women soon after Mary's murder, a fact for which the Commonwealth's Attorney C. Jeffers Schmidt encouraged Harding to have a good explanation to provide the jury. Harding used at least some of the life insurance money to buy a sports car, another fact the Schmidt encouraged Harding to be prepared to explain. Schmidt also suggested to Harding that it might be a good idea to put the remaining money in the bank in savings bonds for his children's college.

19. It is also noteworthy that most of the individuals who claimed to have seen Emerson Stevens' truck near Mary Harding's house the night she

disappeared did not say this initially.  They mostly made this claim after Emerson Stevens had become SA Riley's target AND after the reward money was pledged.  (for example, Thomas Stevens, Esther Stevens, Anne Dick, Louis Dick, Judy Boyer, etc.)

Further, Affiant sayeth not.

KEITH HOGGE

NOTARY PUBLIC

LYNN B. MOUBRAY
COMMONWEALTH
REG. NO. 157242
EXPIRES 02-28-20
OF VIRGINIA
NOTARY PUBLIC

**VIRGINIA: IN THE CIRCUIT COURT OF THE COUNTY OF LANCASTER**

| | | |
|---|---|---|
| **EMERSON EUGENE STEVENS,** | ) | |
| **Petitioner,** | ) | |
| | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **No. CL16000095-00** |
| | ) | |
| **EDDIE L. PEARSON, WARDEN,** | ) | |
| **Greensville Correctional Center,** | ) | |
| **Respondent.** | ) | |

# <u>SUPPLEMENTAL APPENDIX</u>

### TO

### AMENDED PETITION FOR WRIT OF HABEAS CORPUS

**Appendix pages 187-253**

AX 7-414
EXP:bad

1

The following information was exchanged during a joint meeting between Special Agent (SA) EARL E. PITTS, FEDERAL BUREAU OF INVESTIGATION (FBI), D.M. RILEY, VIRGINIA STATE POLICE (VSP), Bureau of Criminal Investigation (BCI), and RONALD D. CROCKETT, Sheriff, Lancaster County, Virginia (VA):

The rope and cinder block used to weigh down the body of MARY KEYSER HARDING, is rigged in a manner similar to the rigging used to weigh down gill nets. Gill netting is a method used by LANCASTER COUNTY WATERMEN to catch small fish as they travel in schools up and down the Rappahannock River. The rigs consist of a series of weights and corks which provide stability in buoyancy to the net. Occasionally the weight is provided by securing a cinder block and rope to the edges of the net. This is commonly referred to as a "poor man's gill net."

Gill netting is always done at night, and is a "one shot," method of fishing, meaning that once the nets are pulled, they have to be reset somewhere else. In almost all instances, a small skiff is used to retrieve and dump the nets.

Sheriff CROCKETT advised that his office will contact seafood buyers in the area to determine who has been gill net fishing in the area, and he will also check with the FISH AND GAME COMMISSION to determine who holds licenses to set gill nets in Lancaster County.

Because of the tidal action and currents of the Rappahannock River, it is currently estimated that the body of MARY KEYSER HARDING was dumped within 500 to 600 yards of where it was eventually located.

The chain found on the body of MARY KEYSER HARDING is similar to the chain used for paton-tonging. Occasionally, fishermen also use chains to weigh down the bottom of a gill net.

VSP-BCI has developed information that RICHARD DAWSON and JULIUS ASHBURN are currently rigging a boat for paton-tonging. The boat is moored in the Mattradico (Phonetic) Point area of Lancaster County.

The following points of information were noted regarding RICHARD DAWSON's possible connection with the offense:

H0291

AX 7-414
EAP:bad

2

1.  DAWSON is a suspect in the killing of his wife,
    which occurred approximately three weeks prior to
    instant offense.

2.  DAWSON's deceased wife, MARY, answered MARY
    HARDING's advertisement for a baby-sitter, and was
    turned down.

3.  DAWSON regularly stays with JULIUS ASHBURN, placing
    him in the vicinity of the HARDING residence.

4.  JULIUS ASHBURN is an associate of EMMERSON HARDING,
    the victim's husband.

5.  ASHBURN is associated with a small white pickup
    truck.

6.  RICHARD DAWSON has access to MARGARET FALCONER's
    (Phonetic) pickup truck.

7.  DAWSON and ASHBURN "partied" the week of the
    abduction near the victim's residence.

8.  DAWSON and ASHBURN are rigging a boat in the
    Mattradico (Phonetic) Point area.

9.  Witnesses have stated that DAWSON has been "hunting
    for women" for sex after his wife's death.

The following points of information regarding EMMERSON
STEVENS' possible tie-in to instant offense were discussed by
SA PITTS, FBI; SA RILEY, VSP-BCI; and Sheriff CROCKETT, LANCASTER
COUNTY, VIRGINIA SHERIFF'S DEPARTMENT, during a joint meeting on
September 6, 1985.

1.  STEVENS' pickup truck was seen parked on the
    highway near the victim's house on the evening of
    the offense.

2.  STEVENS is a known Peeping Tom.

3.  STEVENS has been to the victim's residence on past
    occasions.

H0292

189

AX 7-414
EAP:bad

3

4. STEVENS' boat was gone from the dock where it is regularly moored on the morning of August 23, 1985, at 3:00 A.M. At that time, it was out of sight and sound of the dock.

5. STEVENS' boat was observed returning to the dock at approximately 6:00 A.M., August 23, 1985.

6. STEVENS' routine, which is almost ironclad, is that he is a dawn to noon fisherman.

7. STEVENS was observed returning from the dock in his pickup truck at approximately 6:40 A.M., August 23, 1985.

8. STEVENS lied about his known whereabouts on August 22-23, 1985, when interviewed by Agents of VSP-VCI.

   A. EARL SMITH, a close personal associate of both EMMERSON STEVENS and RICHARD DAWSON, and a possible accomplice to instant offense, also lied about his whereabouts and the whereabouts of STEVENS and DAWSON.

9. STEVENS' pickup truck was seen on Whitehall Road at approximately 9:30 P.M., August 22, 1985. It was noted that the victim's mother-in-law lives on Whitehall Road, and that the victim had visited her mother-in-law during the evening of August 22, 1985.

H0293

85-136 - Harding Case

On the evening of September 4, 1985, Sheriff Crockett assigned me
to the investigation of the Abduction and Murder of Mary Harding.

On the morning of September 5th, I met with Special Agent Dave
Riley of the Virginia State Police at the Sheriff's Office to initiate
a joint investigation of the Harding case.  Riley and I proceeded to
the residence of Emerson E. Stevens in the Ottoman area and asked the
subject to follow us to an area better suited for an interview.  While
enroute toward Mollusk on Rt. 354, we decided to conduct the interview
at the Harding residence which we knew to be vacant at the time.
Stevens drove his white Dodge pickup truck to the Harding house where
we exited our vehicles and proceeded to the front deck where the
interview began.  Questioning followed a general course as to Stevens'
knowledge of Mary Harding's disappearance and his relationship to the
victim and her husband, Emerson Harding.  Stevens exhibited defensive
behavior during the interview stating that his truck couldn't have
been seen at or near the Harding residence on the night of her dis-
appearance because he was at home, his truck was in the driveway and
the keys were in his pocket.  He stated, "I was at home that night;
you can ask my children".  Stevens explained that he had been at his
neighbors house, (Kendrick Walker), with his children until approx.
9:30 - 10:00 p.m. on the night of August 22nd.  Upon leaving Walker's
house Stevens said that he took his children back home where they
all went to sleep in the same bed.  Stevens challenged us to check
with Kendrick Walker also to verify his story.  During the entire
interview Stevens continued to move either his legs or his hands and
was obviously experiencing anxiety.  His voice cracked a couple of
times while speaking, further displaying his anxiousness.  When asked
if his truck or boat could have been used by someone else with or
without his knowledge, he responded that he knew for sure that nobody
could have used either.  He explained that his truck was at home all
night and the keys were in his pocket.  And as for his boat, he knew
that it hadn't been used on the night of August 22nd because on the
morning of August 23rd when he went to the boat to begin his crabbing,
the engine was cold and it was full of gas because he checked.  After
a brief interview of approx. 15 to 20 minutes, Stevens became upset
with the line of questioning and started toward his truck, where he
made some closing statements to the effect that we were looking in
the wrong direction, and then drove off.

On the night of September 5, numerous State Police Special Agents
and uniform officers joined the Sheriff's Department in a special
checking detail at various locations in the upper end of the County
along Rt. 354, soliciting information from motorists regarding the
abduction and murder of Mary Harding.  The checking detail was the
product of State Police supervisors in Richmond and though manpower
and effort was strong, the project yielded minimal information.

On September 6 I met Agents Riley, McCann, and Robertson at the
Sheriff's Office to organize an evidence search of Emerson Stevens'
truck and boat.  While the agents proceeded to Bertrand to begin
the search I remained at the office to obtain hair samples and
fingerprints from Stevens.  Upon obtaining said samples I turned

H0099

**191**

-2-

same over to Agent Riley and then we proceeded to the search area.
Upon my arrival in Bertrand where Stevens' boat was docked, Agent
Robertson asked me to obtain underarm hair from Stevens because he
thought that a hair he had just located was an underarm hair.  I
then went to Stevens' house and obtained the additional hair samples
and spoke briefly with Stevens' wife, Sandra.  I asked her if she
had worked at Westminster Canterbury on the night of August 22, 1985,
to which she replied that she had worked the 3 to 11 p.m. shift and
had gotten off work at approximately 11:30 p.m.  Sandra said that
she had arrived at home that night a little after midnight and
that her husband was in bed at the time.  I asked her if she had
slept well that night and if she remembered waking up during the
night.  She indicated that she had slept sound and hadn't awoke
during the night.  I asked if her husband had left for work prior
to her awakening and she said that he had.  Sandra also volunteered
that she had called Emerson at home from her job at Westminster
Canterbury at approx. 8:30 p.m. the night of August 22nd and that
he was at home at that time because she talked with him.

Following my conversation with Sandra, I went back to the Bertrand
dock and joined Agents McCann and Robertson with the evidence search
already in progress.  Numerous items were located and seized during
this search and the subsequent search of Stevens' truck conducted
by Agent Robertson and myself, the details of which were recorded
by Agents McCann and Robertson as they ultimately submitted said
evidence to the Forensic Laboratory in Richmond.

On September 8 I took State Trooper H. J. Boles with me to the
Ottoman/Bertrand area where we conducted several interviews including
Earl Smith and Tommy Stevens.  Little was obtained from Smith as he
was intoxicated at the time.  Tommy Stevens related having seen
Emerson Stevens' work boat returning to the Bertrand dock at approx.
4:15 a.m. on the morning of the 23rd of August.  Tommy, a waterman,
said that when he left the Bertrand dock at approx. 3:00 a.m.,
Emerson Stevens' boat was gone out of sight and sound and later
while on the water he saw the boat returning to the dock.  This
stood out in Tommy's mind because Emerson normally isn't on the
water until 6:30 or 7:00 a.m.

On Monday, September 9, Trooper Boles and myself interviewed the
following employees at the Bank of Lancaster who were friends and
co-workers of Mary Harding.  Donna Holt, Diane Luttrell, Marion Brown,
Joanne Winstead, Jody Hudson, and Ester Stevens.  Interview sheets
attached.

Later the same day Trooper Boles, Sheriff Crockett and myself inter-
viewed Calvin and Salina Lewis of Ottoman who conveyed concern
regarding their nephew, Kevin Lewis, approx. 25 yoa.  Mrs. Lewis
particularly was concerned because she felt that Keven was capable
of having committed the Harding murder.  She went on to explain
past instances in which Keven was suspected of making strange phone
calls to her and other occasions where she recalls Kevin acting very
strangely to the point that she felt very uncomfortable in his
presence and actually feared him at times.

H0100

-3-

Leaving the Lewis residence we proceeded to the beach nearby and walked down the beach past several cottages to a cottage normally inhabited by a Jeff Holden, W/M, approx. 30 yoa.  It had come to the Sheriff's attention that Holden had been working on the water up until Mary's disappearance when he suddenly ceased working and hadn't been seen in the area since.  We surveyed the area around the cottage noting that it was accessable only by foot or by boat but not by car.  Subsequent research of Jeff Holden by Special Agent Hicks with the State Police eliminated him as a possible suspect.

On September 14th, Virginia Game Warden Bob Mathers met me at the Sheriff's Office towing one of the available boston whalers in order that we made survey by water the area where the body of Mary Harding was found.  Leaving from the Simonson boat launch in Richmond County we proceeded to the shore of Belle Isle where I took several photographs and measured the water depth along the shore line.  The water depth varied up to approx. 5 feet or more in the general area where the body was found, supporting the theory that the body may have drifted to that location.

At 9:15 a.m. on September 15, after several previous attempts, I finally contacted the victim's sister, Helen Webb, by phone at her residence in Richmond.  Helen advised that at approx. 9:00 p.m. on the night of August 22 she received a phone call from her sister, Mary, who was happy and looking forward to spending the coming week-end with her as the beginning of a weeks vacation.  Helen said that the conversation was normal in content and lasted approx. 15 minutes.

For the remainder of the day (Sept. 15), Trooper Boles and myself talked with numerous citizens in the upper end of the County along Rt. 354, particularly in reference to the chain and cinderblock used as weights on Mary's body.  Interviews included Tommy Stevens, Wayne Reynolds, Bubba Wilmer, Earl Smith, and Junior Barrack.  I provided polaroid photos of the block and chain to each party which provided little information except request to view the actual objects for possible identification.  In addition to these inter-views I also stopped by the residence of E. O. Harding to talk with the victim's husband, Emerson, who now stays with his parents.  We talked with Emerson Harding for about an hour, during which time he informed me that his 4 year old son was experiencing nightmares but refused to talk about it on each occasion.  Upon Emerson's request, I explained further details regarding the condition of Mary's body as per Medical Examiners statements at the autopsy.  Emerson advised that Emerson Stevens was a suspect in his own mind because he had been acting different since Mary's death.  On one occasion Emerson explained that several friends, including Emerson Stevens, were talk-ing with him shortly after Mary's body was found.  Each person offered their condolences and shook his hand except Emerson Stevens who just remained silent and looked at the ground.  Harding also advised that he was returning to work in the morning.

H0101

-4-

On September 17, Agent Riley and myself continued interviews in the
Ottoman-Millenbeck area beginning with Mike Callis at Callis Seafood
in Millenbeck.  Only general conversation with Callis ensued yielding
nothing of consequence for report purposes.  Upon leaving Callis
Seafood we proceeded to the end of Rt. 682 (Millenbeck Rd.) where
we located Charles Hayden, a local waterman.  As a matter of note:
Tommy Stevens had informed us on an earlier occasion that Hayden
had told him that he had driven by the Harding house on Thursday
night, August 22 at approx. 10:00 p.m. and had seen a light colored
pickup truck in the driveway.  Hayden reportedly had borrowed Paul
Beirs' truck from Heritage Point that evening to carry some crabs
to the White Stone Fire Department and upon returning home saw a
truck at the Harding house.  Stevens also said that he mentioned to
Hyaden a few days later that he should talk to the police about what
he had seen to which Hayden responded that he couldn't remember if
he had seen anything or not.  Upon our recounting this story to
Hayden during this interview on 9/17/85, he said that he didn't know
anything that could help us.

State Police Special  Agent Bill Hicks joined us in the afternoon of
the September 17 to conduct further interviews.  We talked with Ben
Bartlett, William David Adkins, Wayland Stevens, and Michael Dunaway
at two separate locations along and near the end of Rt. 625 (White
Hall Rd.) in Ottoman.  Nothing of consequence from either party.

We then talked with a Cathy Keyser, W/F, approx. 27 yoa, at her resi-
dence in Millenbeck.  On information obtained during our investigation
we thought it possible that Emerson Stevens may have made advances
toward Keyser and also other local females in the past.  The brief
interview with Keyser seemed awkward for her due to the subject of
discussion and the presence of two young children in close proximity
who gazed on from an open window in the house.  Keyser didn't openly
deny nor did she confirm that Stevens had made advances toward her in
the past.

On Sept. 18, Agent Riley and myself again travelled the County con-
ducting interviews.  We located Gilliam Hayden, Hampton Lewis, and
Wayne Reynolds, all residence of the Ottoman area, as they were pick-
ing corn on Waverly Avenue in Kilmarnock.  Gilliam Hayden said that
he and his wife had driven by the Harding residence a week or two prior
to the abduction and saw Emerson Stevens' pickup truck parked approx.
200' on the Mollusk side of the driveway at around 9:00 - 9:30 p.m.
There was nobody around the vehicle, no lights on, and vehicle was
facing Mollusk.  Reynolds inquired as to the possibility of viewing
the chain and I advised him that the chain was still at the Lab but
that I would arrange for him to look at the chain upon its return.

Later the same day at approx. 3:12 p.m., we talked with Kendrick
Walker at his home in Foster's Village, next door to Emerson Stevens.
Walker said that Emerson and his children were at his house on the
evening of August 22nd.  They were eating crabs and later watched TV
until Emerson took his children home at around 10:00 p.m.  Kendrick

H0102

**194**

-5-

said that he remembers that he took off on the night of August 22nd and that he was confused when he told us during our first interview that he had worked that night.

On the morning of Sept. 19, I contacted Lancaster Dispatcher Judy Boyer by phone regarding a note she had left on my box concerning Emerson Stevens' truck.  Boyer advised that she had seen Emerson's truck parked on the Mollusk side of the Harding house facing Mollusk at approx. 9:30 p.m. on August 16, 1985, when she was coming home from work.

I also contacted the Northern Virginia FBI office in reference to a psychological profile and entering this case file information into the new VICAP (violent criminal apprehension program) system.  Agent Hein will provide the necessary information and forms.

Agent Riley and myself then went to Rappahannock-Westminster Canterbury and obtained a photocopy of Sandra Stevens' work schedule from when she began work in early August to early September.

Note:  Kendrick Walker is set for a polygraph at 1:00 p.m. tomorrow, September 20, 1985.

Results of Walker's polygraph as reported by Agent Riley on Sept. 23rd: Walker can't remember what time Stevens left his house on the night of August 22nd but that it could have been as early as 8:00 - 8:30 p.m. and he really doesn't know if Stevens remained at home.  Also, Walker said that Emerson had stated recently that he sure would like some of Mary Harding and that it wasn't doing Emerson Harding any good cause he was out on the boat all of the time.

Sept. 24 - Emerson Stevens and wife set up for polygraph tomorrow at 9:00 a.m.  Emerson agreed to take the polygraph as long as I was not present and Sandra said that she would take it after her husband, if necessary.

The polygraph on Emerson Stevens begain at approx. 10:00 a.m. on the 25th.  I was present but stayed out of sight from Emerson and Sandra. Emerson failed the polygraph on two charts having a strong reaction on both charts to the question, "Did you yourself cause the death of Mary Harding".  During subsequent interrogation by the examiner and Agent Riley, Emerson said that he was parked on the side of the road between the Harding residence and Heritage Pt. at approx. 9:30 p.m. on the night of August 22nd when Mary disappeared.  He maintained that his children were with him and that he had stopped to take a leak.  He also said that he had just left his own house and following that brief stop he proceeded to his brother-in-law's house (Bradley Dawson) in Lively where they watched TV, talked for a while and then went back home.  Making that admission at the door of the examining room, he then said that he wanted to go home and walked out, where-upon he and Sandra were transported home.

Agents Hicks and Riley and myself proceeded back to Lancaster County to locate Bradley Dawson and his wife, Delores.  The couple were not

H0103

-6-

at home, but later that evening, Riley and Hicks did make contact. Bradley and Delores remembered the night of August 22nd clearly for varied reasons and stated that Emerson did not come to the house at any time that night.

On Sept. 30 I went to the Forensic Lab in Richmond and talked with Mary Jane Burton, the head of serology.  Mary Jane advised that none of the submitted stains were blood thus far and that none of the hair samples had matched the known hair of Mary Harding's so far.  I also talked with medical examiner, Marcella Fiero, regarding the final report on the Harding autopsy.  Fiero indicated that the final report was not ready but we discussed the case for a while as she was very interested in details to date.

On October 2nd I talked with Elmer Miller, Forensic Geologist at the Northern Virginia Lab, in reference to a green paint-like substance that was on the chain retrieved from the victim's body.  Miller advised that the substance was not paint but was some type of resinous compound like fiberglass maybe.  It was described as a pigmented, translucent material but not wholly identifiable as any particular known substance by name-brand, etc.  Miller said that he was finished with the chain and would send it back to the Richmond Lab.

On October 3rd, Agent Riley and myself talked with various people in the Ottoman area including a Burton Davis who is employed at the R & K Country Store.  Davis said that about a couple months ago Emerson Stevens had pulled a real estate agent out of a mud hole with his pickup truck.  The real estate man was stuck in a driveway leading to a farm just past Hartswell Church on Rt.354 and Davis thought that Earl Smith and/or Earnest Talley may have been with Stevens when he pulled the car out.  Davis said that he was telling us this because he thought that we may be interested in the chain or rope that was used on that occasion.

Later that day we spoke with Timmy Brent, a former co-worker with Emerson Stevens.  Brent said that he used to work on the water with Emerson a few seasons back, then worked elsewhere for a while and was now working with him again.  Stevens had just recently asked Brent to help him and Brent accepted.  We inquired as to the type of rope and chain that Emerson had and during the conversation learned that Emerson had a knife very similar to one that Brent had and that Emerson kept the knife in a leather sheath on the dash of his truck. Brent said that his knife was made by Sears and was very similar to Emerson's which was called a Wildcat Skinner.

On the morning of October 8, I met Agent Riley at W. R. Pittman's air strip on Rt. 653 where a State Police helicopter picked us up to take some aerial photographs of the upper end of the county. Riley also informed me that the hair recovered from a shirt in Emerson Stevens' truck was reported by the lab to be similar in all characteristics to the known hair of Mary Harding.

H0104

-7-

On October 9, Agents Riley, Robertson and myself talked with Earnest Talley and Earl Smith who looked at the chain recovered from the body and said that it looked just like the one that Emerson Stevens used to have in the back of his truck. Smith and Talley both recalled the day that they pulled the car out with Emerson's truck. Smith said that he recalled taking a chain from the back of Emerson's truck and hooking it underneath the real estate agent's car, but upon realizing that Emerson couldn't get close enough without getting stuck himself, he put the chain back in the truck and got a long piece of rope which finally allowed length enough to reach Emerson's truck. The real estate agent bought them a case of beer at the Village Center market in Ottoman and then left. This all occurred during a heavy rain storm.

The three of us then travelled the county showing the chain to the following people: Bubba Wilmer, Junior Barrack, Wayne Reynolds, Tommy Stevens, Randolph Williams, Burton Davis, Lawrence Taft, and also at Humphreys Railway and Greenvale Creek Marina. No identifications made.

On October 10, Riley and I presented the basic case information to the Commonwealth's Attorney for his consideration as to going before the Grand Jury for indictments on October 25. We also talked with E. O. Harding, Randolph Williams, and Tommy Stevens, at length this evening, encouraging them to let us handle the situation.

There are a few matters of note that I should include at this point. The first is that on October 8, Earl Smith and Earnest Talley told Riley and I that Emerson Stevens used to have a knife in a sheath on the dash of his truck but its no longer there. Earl Smith said that he used that knife to cut the tow rope from the real estate agent's car and that Emerson never wore the knife; it just stayed on the dash all of the time, at least up until that incident. The second matter of note involves a brief conversation between Riley and Emerson Stevens which occurred around that same time frame. Riley and I found Emerson at his father's house one day and upon our noticing that the knife and sheath was not on the dash of his truck, Riley asked Emerson about the knife. Emerson became quite upset, denying that he ever had a knife like that on the dash of his truck. When Riley first confronted Emerson about the knife both of his hands began shaking so badly that he put his hands in his pockets. Another matter of note is that Timmy Brent had located his knife upon my request and turned it over to Riley and myself. Earl Smith and Earnest Talley later viewed that knife and said that it looked exactly like Emerson's except the handle wasn't quite that thick as they recalled. On that same subject, Riley had obtained a Wildcat Skinner from a company in New York, only the name had been changed to Pro Hunter. That knife looks exactly like Timmy's knife except the handle is a little thinner. Another matter of interest was something that Emerson Stevens told Timmy Brent around late September or early October. Brent said that Emerson and Sandra had come by his girlfriend's (Sandra Walker) apartment one evening. During conversation, Emerson said that we didn't find his knife during our search of his truck because his father had taken the knife and thrown it overboard. I spoke with Emerson's father, Howard, about that statement a few days later and he denied any knowledge of it. Howard said that he didn't know why Emerson would say such a thing.

H0105

-8-

Returning now to the chronological investigatory process, on October 17th, in a continuing effort to locate the mentioned real estate agent, I received some information from the proprietor of the Village Center, a Mr. Hen, to the effect that the fellow I was looking for was a "tax man" of some sort. I contacted an employee of the Commissioner of Revenue's Office and was advised that a Pat Quinn had done some tax assessments in Lancaster some time back and that he worked for Windgate Appraisals in Roanoke, Va. A subsequent conversation with Jeff Schmidt provided an address and phone number. I contacted Patrick Quinn by phone at his home in Fredericksburg, Va. (703) 786-8698. He said that a man named Stevens had pulled him out in a white pickup truck. Quinn recalled a couple other fellows being with Stevens and remembered them using a rope, but could not remember seeing a chain. Quinn returned a call to the Sheriff's Office the next day and left a message for me to call him. I contacted Quinn by phone again on October 19. He said that the date he had gotten stuck was August 8, 1985, at around 4:00 - 5:00 p.m. Quinn also stated that he had asked the other man (Mr. Windgate) who was riding with him on that day, about the incident and neither could remember the attempted use of the chain but Quinn said that it was certainly possible because he was distracted due to the heavy rain and really wasn't watching the actions of the three men. Please note the following pertinent information:

Patrick Quinn                          Windgate Appraisal Services
828 Stansbury Dr.                      P.O. Box 6014
Fredericksburg, Va. 22401              Roanoke, Va.
(703) 786-8698

Property owned by:   Adele S. Failmezger
                     3502 Cobb Dr.
                     Fairfax, Va. 22030
                     273-3203

On October 25 the results of this investigation were presented to the Grand Jury which produced two indictments charging Emerson Stevens with the abduction and murder of Mary Harding. Agent Riley and myself proceeded to the Ottoman area where we eventually located Emerson at his residence where he was taken into custody. I read Emerson the miranda warnings from a card provided by Riley. Riley began talking to Emerson and upon making reference to "all of the people we had talked with", Emerson shouted, "they're all a bunch of lying mother fuckers". Emerson didn't wish to make further conversation and was processed shortly thereafter at the Lancaster Jail and incarcerated on a $200,000.00/$400,000.00 bond.

At this point, I should also note that as a result of my delayed involvement in this investigation, I remain somewhat at a loss for certain facts presently exclusive to other agents, officers, and agencies the bulk of which would further enhance those items contained herein. Agent Riley's report should provide some of these details particularly regarding Emerson Stevens' past reputation for making advances toward females, including family members, in

H0106

-9-

addition to at least one prior peeping tom incident in which he was
caught and confessed to.

It is also a subject of course that this supplemental report is a
condensed summary and does not include many interviews, conversations,
and days of general research into the solution of this cime.

H0107

**199**

COMMONWEALTH OF VIRGINIA
DEPARTMENT OF HEALTH
**OFFICE OF THE CHIEF MEDICAL EXAMINER**
CENTRAL DISTRICT
9 NORTH 14TH STREET
RICHMOND, VIRGINIA 23219
(PHONE (804) 786-3174

☒ Resident
☐ Non-resident

## REPORT OF INVESTIGATION BY MEDICAL EXAMINER

DECEDENT **Mary** (First name)  **Keyser** (Middle name)  **Harding** (Last name)   AGE: **24**   RACE: **W**   SEX: **F**

ADDRESS **Rt. 2**  **Lancaster** (Number and Street)   (M) W S D   OCCUPATION: **Bookkeeper**

**Lancaster** (City or County)   (Zip Code)   SSN   EMPLOYER **Bank of Lancaster**

TYPE OF DEATH: (Check one only)
Sudden in apparent good health — Suspicious — Violent or Unnatural **X**
Unattended by physician — Unusual — Means  weapon
In prison, jail, or police custody

| | Last Seen Alive | Injury or Illness | Death | Medical Examiner Notified | View of Body | Police Notified | If Motor Vehicle Accident Check One Of The Following |
|---|---|---|---|---|---|---|---|
| DATE | 8-22-85 | 8-22-85 | 8-23-85 | 8-27-85 | 8-27-85 | 8-23-85 / 8-27-85 | DRIVER |
| TIME | 10 pm | | 3 am ? | 4:30 pm | 5:45 pm | | PASSENGER / PEDESTRIAN |

NOTIFICATION BY **Sheriffs Office**   OFFICIAL TITLE
Address **Lancaster**

| | LOCATION | CITY OR COUNTY | TYPE OF PREMISES (E.G., HIGHWAY, ETC.) |
|---|---|---|---|
| INJURY OR ONSET OF ILLNESS | Ottoman | Lancaster | Home & Neighborhood |
| DEATH | Ottoman | Lancaster | |
| VIEWING OF BODY BY MEDICAL EXAMINER | Morattico | Lancaster | Dock |

DESCRIPTION OF BODY: Clothed ☐ Unclothed ☒ Partly Clothed ☐
Hair Color ___ Beard ___ Mustache ___
Pupils: R ___ L ___ Eyes ___ Color ___
Body Heat ___ Scars, Tattoos, etc ___

FATAL WOUNDS (GUNSHOT, STAB, ETC.)

CAUSE OF DEATH:

MANNER OF DEATH: (Check one only)
Accident ☐ Suicide ☐ Homicide ☒ Natural ☐ Undetermined ☐ Pending ☐

AUTOPSY: Yes ☒ No ☐
AUTHORIZED BY Medical Examiner
Pathologist Dr. M.F.Fierro
Autopsy No. 369/85

I hereby declare that after receiving notice of the death described herein I took charge of the body and made inquiries regarding the cause and manner of death in accordance with §32.1-283, Code of Virginia; and that the information contained herein regarding such death is correct to the best of my knowledge and belief.

Date **8/29/85**   City or County of Appointment **Lancaster**

Signature of Medical Examiner
Name of Medical Examiner (Type or Print) **A. B. Gravatt, M.D.**

CME Form No. 1 Revised 3/80

H0180

200

C106951



COMMONWEALTH OF VIRGINIA
DEPARTMENT OF HEALTH
OFFICE OF THE CHIEF MEDICAL EXAMINER

CENTRAL DISTRICT
9 NORTH 14TH STREET
RICHMOND, VIRGINIA 23219
PHONE: (804) 786-3174

REPORT OF AUTOPSY

Autopsy No. 369-85
Date/Day 8/28/85
Time 9 AM

THIS BODY IS NOT READY FOR REPORT.
A FINAL REPORT WILL BE SENT AFTER
THE REVIEW OF THE MICROSCOPE, AND
OTHER TESTS ........ ....

**DECEDENT** Mary Keyser Harding

| First | Middle | Last |

Autopsy Authorized by: Dr. Gravatt - Lancaster Co.

Body Identified by: Comparison of antemortem and postmortem dental records by Dr. Kaugers, DDS

Persons Present at Autopsy: Dr. Ross R. Smith
S. Dennison   J.K. Davis, Cpt.-LSD
B.A. Boles-LSD

Rigor: Complete _____ jaw _____ neck _____ arms _____ legs _____ passed X
Livor color: Indeterminate _____ distribution: _____

Age 20's Race W Sex F Length 60" Weight 74 Eyes Indet. Pupils: R _____ L _____
Hair Medium length brown hair Mustache – Beard – Body Heat Ambient
strands present on vertex; pubic hairs brown

Clothing, Personal Effects, External wounds, scars, tattoos, other identifying features:
The body is received in a sealed grey metal casket sealed with phillip's head screws
   and is inside a zippered black plastic pouch.
External examination: White female bloated with skin slippage; hand skin is absent
   except for skin and fingernail of left ring finger under golden band on left ring finger.
   Ring is inscribed 10K €3 pattern; no inscription. Red-pink nail polish on left great toe;
   skin stocking present  Right sole shows pink spots measuring from 1/8 to ¼". For
   remainder of external examination and injuries see body diagrams.
Radiographs negative for missiles and foreign bodies.
PATHOLOGICAL DIAGNOSES:
Six cutting wounds; right hip, right flank, and right base of neck:
   - Wounds measure 4½, 5, 4-3/4, 4-3/8, 4-3/4" in length and vary from ½" to 2½" deep.
   - Margins are clean and without hack marks.
   - Irregular cutting wound right lower midback 7/8" x 1", L-shaped.
   - All wounds cut skin, are devoid of bridging in the base with the flank wounds cutting
     back muscles.
Ligature marks of neck, circumferential measuring ½" to 2-3/4":
   - No deep injury to neck.
Contusion left anterior tibia.
Subcutaneous discoloration anteromedial thighs (section submitted).
Black pattern marks posterior right calf, anterior right tibia and right axilla.
Stellate black mark right medial buttock.
Rust mark posterior right leg and medial aspect right leg.
No defense injuries of hands or forearms.
Marine animal soft tissue artifact of eyes, mouth, right knee.

Cause of Death: Pending Cutting wounds of right lower neck, right flank and
   right buttock (see separate sheet for individual tracks)

Provisional Report 8/28/85
Final Report _____

The facts stated herein are true and correct to the best of my knowledge and belief.

8/28/85
Date Signed

OCME – Richmond
Place of Autopsy

Signature of Pathologist
M.F. Fierro, M.D.
9 N. 14th Street
Richmond, VA  23219

Page 1 of 3

CME FORM NO. 10 REVISED 4/84

H0181

## GROSS DESCRIPTION

| | |
|---|---|
| **SKIN:** | Venous vascular mottling, slippage of epidermis, no other holes. |
| **PLEURA:** | 50 ml of bloody effusate bilaterally in each pleural cavity. No holes in parietal pleura. Right apex underlying cut No. 1 shows no hole. |
| **PERITONEUM:** | No hemoperitoneum. Dry. |
| **PERICARDIUM:** | Intact. Gas formation. |
| **HEART:** | 140 gms. Right heart is not dilated. Coronary arteries are within normal limits. Myocardium is soft and flabby but free of gross scars. Valves within normal limits. |
| **AORTA:** | No atherosclerosis; yellow tan with none to very slight trace hemolytic staining. |
| **NECK ORGANS:** | The tongue, posterior pharynx, hyoid, anterior and lateral strap muscles, esophagus and trachea are free of injury. No subcutaneous hemorrhages. |
| **LUNGS:** | Left: 210 gms. Right: 320 gms. Airways are pink, red and dry. Bulk. Parenchyma is pale, pink purple and on cut section free of gross lesions. No aqueous emphysema. Minimal purple softening and discoloration. Tracheo-bronchial tree is free of any debris. |
| **LYMPH NODES:** | Within normal limits. |
| **LIVER:** | 710 gms. Tan brown with gas formation, dry; no congestion. |
| **GALLBLADDER:** | Gas formation of the wall, the lining is within normal limits and shows residual amber orange sticky bile. No stones. |
| **SPLEEN:** | 120 gms. Purple. Soft. |
| **PANCREAS:** | Moderately autolyzed; otherwise within normal limits. |
| **ADRENALS:** | Autolyzed; orange yellow. |
| **GI TRACT:** | The esophagus contains damp food in the esophagus which is otherwise dry. |
| **STOMACH:** | Contains 100 ml of thick, non-watery lightly digested food contents with green peas, carrot slivers, bean husks, tomato, and possibly onion within the stomach. The gastric mucosa is tan and pale and within normal limits. The small and large bowel show gas formation but are otherwise within normal limits. Appendix is present. |
| **KIDNEYS:** | Right: 85 gms. Two old healed irregular depressed scars of the upper and lower pole on the right and a single depressed scar on the lower pole of the left kidney. |
| **BLADDER:** | Dilated with gas formation of the wall and devoid of urine. No injury. |
| **GENITALIA:** | The right labia is ragged and shows marked slippage of skin. No discrete injuries identified. The vaginal vault is clean and damp. No watery secretions. The cervix is transverse and within normal limits. The uterus is non-pregnant and lined by thin tan endometrium. The ovaries and tubes are present and within normal limits. |
| **BRAIN & MENINGES:** | The brain is liquified within a gray intact dura which is devoid of epidural, subdural or subarachnoid staining. Upon opening, the liquified brain shows no areas of localized staining. |
| **SKULL:** | No lacerations, abrasions or bruises of scalp. Petrous ridge of left temporal bone is wedged and is devoid of temporal bone hemorrhage. |
| **RIBS & VERTEBRAE:** | Ribs are within normal limits. No fractures. Vertebra: The cervical spine is opened and is free of injury. The cut of the right lateral neck, No. 1, has left a slightly irregular nick, less than 1/16" of the lateral aspect of a right cervical vertebra without any injury to vessels. The carotid, jugular, subclavian, brachycephalic and axillary arteries/veins are intact. |
| **PELVIS:** | No fractures. |
| **EXTREMITIES:** | No defense injuries; no epidermis remaining except for skin retained on the left ring finger held in place by the ring. |

| OTHER LABORATORY PROCEDURES: | TOXICOLOGY ☒ | BACTERIOLOGY | | DENTAL CHART ☒ | X—RAY ☒ | | FINGER—PRINTS ☒ |
|---|---|---|---|---|---|---|---|
| | PHOTOGRAPHY ☒ | SEROLOGY ☒ | | FORENSIC SCIENCE ☒ | | | PALMS |

**DISPOSITION OF EVIDENCE**

| TYPE (Clothing, Bullets, Etc.) | NAME OF RECIPIENT | ADDRESS | OFFICIAL TITLE | DATE |
|---|---|---|---|---|
| Hair: Plucked exemplars of head and pubis, residual head and pubis hair, hair adherent to midback, rusty material behind right knee, left ring finger skin for trace evidence under nail, material recovered from left ear, pleural effusate for blood grouping and bone for blood grouping, oral, anal and vaginal swabs and smears for sperm and acid phosphatase. | | | | |
| Ring | B.A. Boles-LSD | | | |

MEDICAL ATTENTION AND HOSPITAL OR INSTITUTIONAL CARE:

| NAME OF PHYSICIAN OR INSTITUTION | ADDRESS | DIAGNOSIS | DATE |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

CIRCUMSTANCES OF DEATH:

| | NAME | Offical Title or Relationship to Decedent | ADDRESS |
|---|---|---|---|
| FOUND DEAD BY | William Parks | | Morattico |
| LAST SEEN ALIVE BY | Talked to sister on phone | 10 pm on | 8-22-85 |
| WITNESSES TO INJURY OR ILL-NESS AND DEATH | | | |
| | | | |
| | | | |

NARRATIVE SUMMARY OF CIRCUMSTANCES SURROUNDING DEATH:

    Mary abducted from home on night of August 22, 1985.  Found in Rappahannock river close to shore in about 2 1/2 feet of water approximately 1/2 mile down river from Seafood plant in Morattico.  Body in state of decomposition, bloated.

    Heavy rope tied tight around neck - was looped around neck 4 times. Rope tied to large cinderblock - heavy chain tied to the rope and end of chain tied around right leg just above knee.( Rope and chain removed by Crime Lab personnel).

    Multiple trauma on back, shoulders hips, probably after death due to scraping back and forth due to rough water, waves in river, probably striking cinderblock and other materials in water.

    Cause of death - strangulation - homicide

Toxicology sent:   Yes ☐   No ☒
Blood ☐
Urine ☐
Other_____ ☐

DECEDENT_____

H0183

203

Page 3 of 3
Mary Keyser Harding
CME 369-85
8/28/85

Multiple cutting wounds, six:

1. Cutting wound curvilinear right upper shoulder at base of neck 4-3/4" long, $2\frac{1}{2}$" deep, $8\frac{1}{2}$" from top of head. Margins laterally are clean and void of bridging. The posteromedial end is blunt; the anterior superior shoulder end is sharp.
 - No major vessels, spinal cord or vertebral injury.

2. Right posterior back, horizontal 4" long, $\frac{1}{2}$" deep, 1" gaping, $19\frac{1}{2}$" from top of head, cut transects skin, soft tissue and into fat.

3. Subjacent to #2, right back, 4-3/4" long, $\frac{1}{2}$" deep, $20\frac{1}{2}$" from top of head, wound penetrates skin and subcutaneous fat.

4. Subjacent, roughly horizontal to Nos. 2 and 3, 4-3/4" long, 3/4" deep with blunt lateral margin gaping 3/4", 21" from top of head, wound severs skin, soft tissue and muscle.

5. Subjacent to Nos. 2,3, and 4, roughly horizontal, 5" long, 1" deep, with a blunt medial and sharp lateral margin, $22\frac{1}{2}$" from top of head, wound penetrates into subcutaneous fat.

6. Oblique of the right upper lateral buttock, $4\frac{1}{4}$" long with a 3" segment penetrating $\frac{1}{2}$" deep into dermal fat, 26" from top of head.

7. Irregular cut roughly L-shaped medial to wound No. 6 with 7/8" and 1" arms.

M.F. Fierro, M.D.
9 North 14th Street
Richmond, VA  23219

H0184

SP110 8-15-79

# VIRGINIA STATE POLICE

10/7/85

Date of Transcription _____

On 9/30/85, TIMOTHY ROBERT BRENT, P. O. Box 376, Kilmarnock, VA, telephone number 435-6569, was interviewed at his residence. According to TIMOTHY BRENT, he has known the suspect, EMERSON STEVENS, for approximately five years. BRENT advised that he met STEVENS through his girlfriend, SANDRA JEAN WALKER, niece of EMERSON STEVENS. BRENT advised that he has known his girlfriend for five years and has visited the suspect at the suspect's residence on numerous occasions. BRENT further advised that the suspect, STEVENS, has visited his residence on a number of occasions, which includes approximately one to two times a month. BRENT said that on one occasion, he and Miss WALKER resided in the White Stone area in a one story frame dwelling located near the intersection of State Route 646 and State Route 647. BRENT said that he and his girlfriend, SANDRA WALKER, split up sometime in August, however BRENT was unable to provide the particular date.

According to BRENT, he has worked with STEVENS on a number of occasions and most recently worked with STEVENS on his fishing boat up until early July. BRENT said that he cannot recall the exact time in July when he stopped working with STEVENS, but said that it was approximately two to three days after STEVENS hurt his hand on a mechanical wench on the fishing boat. BRENT said after he stopped working with STEVENS, another individual, EARL SMITH, worked with STEVENS in the Gwens Island area. According to BRENT, after he stopped working with STEVENS, he never saw him again until he was approached by STEVENS on 9/30/85 when STEVENS asked him to start oystering with him. BRENT said that he intended on fishing with STEVENS because he does not believe that STEVENS was involved in the abduction and murder of Miss MARY HARDING. BRENT said that he had talked with STEVENS regarding his contact with the police authorities and advised that STEVENS advised that the police were accusing him of the incident. According to BRENT, STEVENS would not commit such a vicious crime and BRENT is convinced that the reason that STEVENS was suspected of the offense was because of communication from Mr. TOMMY STEVENS. According to BRENT, TOMMY STEVENS had told police authorities that he had seen EMERSON STEVENS' boat or truck at the Burtrane area.

According to BRENT, he knew the victim and had attended school with the victim's husband. BRENT further advised that he knew where the victim lived, but had little or no information about the crime.

According to BRENT, he did not know where the body had been recovered in the Lancaster area. BRENT states that STEVENS is not a violent individual and he has never seen STEVENS with a knife. BRENT said that STEVENS might attempt

| | | | | |
|---|---|---|---|---|
| Investigation on | 9/30/85 | at Lancaster Co. | File # | 85-81-0697 |
| by | SA B. L. Robertson/ss/A61 | | Date dictated | 10/3/85 |

This document contains neither recommendations nor conclusions of the Virginia State Police. It is the property of the Virginia State Police and is loaned to your agency; it and its contents are not to be distributed outside your agency.

H0738

2
85-81-0697

to flirt with an individual female, however STEVENS would never force or hurt anyone.

BRENT was asked where he was on the evening of 8/22/85. According to BRENT, he did not know where he was on that evening, but he is certain that he was not with EMERSON STEVENS. BRENT said that he is uncertain if during that period of time, that he was living with his girlfriend, SANDRA WALKER, or if he was living at his residence on Route 647, near Route 646. BRENT said that after he and his girlfriend split up, that he lived at the residence near White Stone for approximately one week. After that time, BRENT said that he moved in with his mother, VIRGINIA BRENT, who resides on Whaley Avenue in Kilmarnock, VA.

BRENT was asked if he knew if STEVENS ever utilized anyone else's boat. According to BRENT, he did not know if STEVENS ever utilized anyone else's boat, but said that on one occasion, STEVENS did keep his boat near LEWIS CALLEY'S dock.

H0739

SP110 8-15-79

# VIRGINIA STATE POLICE

Date of Transcription ___9/12/85/sa/6___

EARL STEVE SMITH came to the Richmond Office, Bureau of
Criminal Investigation on 9/11/85 at the request of Special
Agent D. M. RILEY for the purpose of a polygraph examination.

The purpose of the polygraph examination was to determine
if SMITH had abducted and killed MARY HARDING or if he
knew who had.

After having SMITH execute a Polygraph Agreement Form
and sign a Rights Waiver Form, which was witnessed by
SA RILEY and me, SMITH denied that he abducted and killed
MARY HARDING or knew who did.

I conducted an examination in which the following relevant
questions were asked:

1. Do you know for sure who caused MARY HARDING's death?
   Reply:  No.

2. Did you cause MARY HARDING's death?  Reply:  No.

3. Before MARY HARDING was discovered missing, did you
   know she was dead?  Reply:  No.

Upon examination of the two charts run in this test, I
concluded that SMITH was deceptive when he answered question #3
in that manner.

I was unable to come to a conclusion of truthfulness or
deception on questions #1 and #2.

SMITH was advised of the test results and he admitted
that he had not been completely truthful.  He made the
following admissions:

1. That he knowingly lied in his first statement to
   police.

---

Investigation on ___9/11/85___ at ___Richmond, VA___ File # ___85-81-0697___

by ___SA L. W. Barden___ Date dictated ___9/11/85___

This document contains neither recommendations nor conclusions of the Virginia State Police. It is the property of the Virginia State Police and is
loaned to your agency; it and its contents are not to be distributed outside your agency.

H0659

85-81-0697
2

2. He was picked up by EMERSON STEVENS at 8:30 p.m.
   or 9:00 p.m. on 8/22/85 and rode around drinking
   beer. He was taken home by STEVENS at 10:00 p.m.

3. He heard STEVENS tell another waterman to tell crab
   buyer that he would be late bringing crabs in to
   sell.

4. On 8/22/85, after STEVENS picked him up, STEVENS
   was talking about what a nice looking woman MARY
   HARDING was.

5. On 8/23/85 when he was picked up by STEVENS to go
   crabbing, STEVENS asked him not to say anything about
   riding around on the evening of 8/22/85.

SA RILEY was advised of the test results and admissions.

SMITH arrived at the Richmond Office at 8:55 a.m.  The
pretest interview began at 9:47 a.m.  The last chart was
completed at 11:17 a.m.  He left the Richmond Office at
1:44 p.m.

H0660

SP110 8-15-79

## VIRGINIA STATE POLICE

Date of Transcription _____ 10/2/85/sa/49

EARL STEVE SMITH of Millenbeck (lives in an abandoned
bus - no phone) was interviewed by the reporting agent
and SA W. C. HICKS at 1700 hrs.  He provided the following
information:

SMITH has recently worked as a helper to EMERSON STEVENS
crabbing in the vicinity of Towles Point.  He had to be
asked specifically if he was acquainted with and worked
with STEVENS before he acknowledged this.

He stated that he rode around drinking beer with EMERSON
STEVENS and ERNEST TALLEY on the afternoon of Thursday,
8/22/85, in STEVENS' white pickup truck.  He alleged that
STEVENS took him home late in the afternoon and he went
to bed early.  STEVENS picked him up the next morning
(Friday, 8/23/85) to go crabbing at the usual time of
5:30 - 6:00 a.m.

SMITH denied any knowledge of the disappearance and murder
of MARY HARDING.

---

Investigation on ____ 9/5/85 ____ at ____ Lancaster Co. ____ File # ___ 85-81-0697 ___ -117

by _____ SA D. M. Riley _____ Date dictated ____ 9/27/85 ____

This document contains neither recommendations nor conclusions of the Virginia State Police.  It is the property of the Virginia State Police and is
loaned to your agency; it and its contents are not to be distributed outside your agency.

H0721

SP110 8-15-79

# VIRGINIA STATE POLICE

9/23/85

Date of Transcription _____

THOMAS E. STEVENS, Route 2, Box 539, Lancaster, VA, telephone 462-5507,
a waterman, was interviewed at his boat docked at the eastern tip of
Route 354 in Bertrand.  STEVENS revealed the following information:

He is a professional waterman.  In the summer when he is crabbing, he arrives
daily at his boat at approximately 3:00 a.m.  On the morning of 8/23/85,
he arrived at the dock at the usual time.  He was surprised to find that
EMERSON STEVENS' work boat, "Miss Sandra," was not at the dock and had
apparently left sometime before he arrived that morning.  He cannot recollect
specifically whether or not EMERSON'S white Dodge pickup was at the dock
or not at the time.

At approximately 4:00 a.m., while he was working his crab pots off shore,
THOMAS STEVENS saw the "Miss Sandra" heading towards the dock.  He could not
say who was on board.  The "Miss Sandra" is not equipped with lights.  He
has never seen EMERSON STEVENS' boat leave the dock previously to work the
water before sunrise.

| | | | | |
|---|---|---|---|---|
| Investigation on __9/4/85__ | at | Lancaster Co. | File # | 85-81-0697 |
| by _____ SA D. M. Riley/ss AB77 | | | Date dictated | 9/23/85 |

This document contains neither recommendations nor conclusions of the Virginia State Police.  It is the property of the Virginia State Police and is
loaned to your agency; it and its contents are not to be distributed outside your agency.

H0680

4

AX 7-414
EEP:pad

CROCKETT advised that another individual, RICHARD
DAWSON, was seen riding with a second unknown person in a light
colored truck in the vicinity of the victim's residence during
the evening of August 22, 1985. CROCKETT advised that DAWSON has
a history of violence toward women, and is currently a suspect in
the death of his wife, MARY, which occurred approximately three
weeks prior to instant matter. DAWSON is described as a white
male, approximately 31 years of age, who is currently staying
with JULIUS ASHBURN (PH) and JOE CHARNOCK (PH) in a house trailer
near the intersection of Routes 354 and 201. CROCKETT noted that
the house trailer is located in the same general vicinity as the
victim's residence.

A witness advised the LANCASTER COUNTY SHERIFF'S
DEPARTMENT that at approximately 9:30 P.M., August 22, 1985, she
observed a small white-colored "luv" type pickup truck parked
midway up the victim's driveway.

CROCKETT advised that a neighborhood investigation has
revealed that dogs had been heard barking around 10:00 P.M.,
during the nights immediately prior to the abduction. One person
in the neighborhood has stated that she thought she heard someone
crying or yelling late at night during the evening of
August 22-23, 1985.

CROCKETT could provide no additional information at this
time.

Physical observation by SAs CARTER, PITTS, and SCIARONE,
reveal that the victim's residence is a single family dwelling,
located on Route 354, north of the Community of Ottoman. The
area is heavily wooded, and the victim's nearest neighbors are
approximately one quarter of a mile away. It was also noted that
Route 354 is the major North/South road on the western side of
Lancaster County.

H0261

85-81-0695
2

HARDING stated that his wife, MARY, had publicized an add for a babysitter and that RICHARD DAWSON'S wife, MARY DAWSON, had answered the add and pleaded with her to let her have the job.  His wife, MARY, did not give her the job because of the poor reputation that the DAWSON'S enjoyed.  MARY HARDING had told her that she would call her back, but never did.

HARDING stated that BILL PARKS of Ditchley said that JOE CHARNOCK from Tangier, JULIUS ASHBURN, and RICHARD DAWSON were at a party on White Hall Road approximately 2 weeks previous to this interview, before the disappearance of MARY HARDING.

HARDING stated he heard that ESTHER STEVENS had said that EMERSON STEVENS went out very early Friday and then left again to go back down to the dock to go crabbing.

HARDING stated that EMERSON STEVENS has a very fast boat with a new high powered engine.  He stated EMERSON STEVENS is a very sneaky individual who talks a great deal about women, including the fact that he told HARDING about a year ago that he would like to have a sexual relationship with his niece.

FD-302 (Rev. 3-8-77)

FEDERAL BUREAU OF INVESTIGATION

Date of Transcription
9/18/85

1

JOSEPH PARKER CHARNOCK, was interviewed at his residence, a house trailer near the intersection of Routes 354, and 201, by Special Agent (SA) EARL E. PITTS, FEDERAL BUREAU OF INVESTIGATION, and D.M. RILEY, VIRGINIA STATE POLICE (VSP), Bureau of Criminal Investigation. After being advised of the identity of the interviewing Agents and the nature of the interview, CHARNOCK provided the following information:

CHARNOCK advised that he is acquainted with RICHARD DAWSON, and has known him for about three years. He stated that he has seen DAWSON "right much" since DAWSON's wife died approximately three weeks prior to the interview. He also advised that DAWSON helped him move to the trailer in which he now resides after his (CHARNOCK's) girl friend threw him out of their house at Lancaster Shores. CHARNOCK explained that he and his girl friend, LORRAINE Last Name Unknown, broke up on a Thursday night, either August 15, 1985, or August 22, 1985, and that she threw him out of the house. CHARNOCK then went to his boat, where RICHARD DAWSON met him and helped him carry his personal items to JULIUS ASHBURN's trailer.

CHARNOCK stated that RICHARD DAWSON has stayed the evening at the trailer on a few occasions since that incident. He also advised that DAWSON occasionally picks him up and takes him to the "Chinese Store," (indicating the GULF Service Station and Convenience Store on Route 354, near Ottoman), to buy beer. CHARNOCK explained that both he and DAWSON drink OLD MILWAUKEE beer, and that they drink several cans of beer together on week nights. CHARNOCK advised that he has not seen DAWSON since last Friday night, (August 23, 1985).

CHARNOCK advised that he owned a skiff which was tied up by LEWIS KELLISES' OYSTER HOUSE, but he sold the skiff a couple of weeks ago. CHARNOCK mentioned that RICHARD DAWSON had been interested in buying the skiff, and had put a down payment on it. However, after paying the down payment, DAWSON's wife died, and

---

Interviewed on 8/30/85   at Lancaster County,   File # Alexandria 7-414
                               Virginia

By SA EARL E. PITTS/bad                          Date Dictated 9/6/85

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

H0267

FD-302a(Rev. 11-15-83)

AX 7-414

Continuation of
FD-302 of CHARNOCK                    On 8/30/85    Page 2


DAWSON stated he needed the money for funeral expenses. CHARNOCK
then sold the skiff to a third party. CHARNOCK advised that the
skiff was equipped with a 33 horsepower EVENRUDE outboard motor.

When asked again, CHARNOCK advised that the last time he
had seen RICHARD DAWSON was when he (DAWSON) had brought his
(CHARNOCK's) clothes to the trailer.

CHARNOCK stated that it has been "a couple of years"
since he and DAWSON have ran around regularly. He advised that he
and DAWSON used to get together frequently to drink beer, "party,"
et cetera. He advised that a couple of weeks ago, he did go with
RICHARD DAWSON and JULIUS ASHBURN and a female named SARAH to
CHARLES DAWSON's bus (indicating the bus in which CHARLES DAWSON
resides at Windmill Point). CHARNOCK stated that he thinks that
was the same night that RICHARD DAWSON's wife died.

CHARNOCK advised that he knows KEITH WILMER, and that he
has been on the dock where WILMER's boat is kept. CHARNOCK stated
that he does not know WILMER well, and is unable to provide any
information regarding him.

CHARNOCK advised that he is sure that RICHARD DAWSON was
at JULIUS ASHBURN's trailer last Friday night, (August 23, 1985).
He advised that he came there alone, and that the three of them,
DAWSON, ASHBURN, and CHARNOCK, sat around the living room watching
a movie on television. CHARNOCK advised that DAWSON talked a
great deal about being accused of shooting his wife, and stated to
CHARNOCK and ASHBURN that he did not do it.

CHARNOCK advised that he was with RICHARD DAWSON on the
night an incident occurred in Newport News, leading to a rape
charge against DAWSON. He further advised that he was questioned
by police regarding the incident. He cannot recall a specific
date, but he remembers that he, DAWSON, and a "young boy" whose
name he cannot recall, were in a bar shooting pool in Newport
News. DAWSON won a trophy for shooting pool, and the three of
them met a girl who accompanied them to the apartment of a friend.
When they arrived at the apartment, the friend was leaving, and
"loaned" them the apartment for the evening. DAWSON then sent
CHARNOCK and the "young boy" out to pick up a pizza. CHARNOCK
advised that it was early in the morning, and they had a difficult
time finding a pizza parlor open. When they returned to the
apartment, he noticed that the female just sat in the living room
holding her head down, and did not say anything. CHARNOCK advised

H0268

FD-302a(Rev. 11-15-83)

AX 7-414

Continuation of
FD-302 of CHARNOCK                          On 8/30/85     Page 3

that he is not sure when this occurred, but believes that it was a
couple of years ago.

CHARNOCK advised that at the time of the above mentioned
incident, he was living on a working boat.  He advised that he
would stay with RICHARD DAWSON on weekends, and admitted staying
with DAWSON in Lancaster County within the past year.

CHARNOCK advised that he owns a boat which is moored in
Lancaster County.  He advised that the boat is in good running
condition, but that it needs a new starter.

CHARNOCK advised that he found out about "the girl,"
(referring to MARY KEYSER HARDING) the day after the offense
occurred, stating "the day after RICHARD DAWSON was here."
CHARNOCK advised that he "didn't even know of the girl."

The following information was obtained through
observation and interview:

| | |
|---|---|
| Name: | JOSEPH PARKER CHARNOCK |
| Race: | White |
| Sex: | Male |
| Height: | Six feet |
| Weight: | 159 pounds |
| Hair: | Brown, balding |
| Eyes: | Brown |
| Date of Birth: | April 26, 1954 |
| Place of Birth: | Tangier Island, Virginia |
| Social Security Account Number: | 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 |
| Occupation: | Waterman |

215

H0269

FD-302a(Rev. 11-15-83)

AX 7-414

Continuation of
FD-302 of CHARNOCK                    On 8/30/85    Page 4


     Criminal History:    Admits several arrests for
                             driving while intoxicated, leading
                             to the loss of his Operator's
                             License as a habitual offender.
                             Also admits several assaults on his
                             wife.

     Miscellaneous:    Tattoo of a storm cloud, with a
                             lightening bolt on the right
                             shoulder.  Advised that he drinks
                             OLD MILWAUKEE beer.

H0270

8/28/85   at  Kilmarnock, VA    re: AX 7-414
by SA Earl E. Pitts              9/3/85

Brenda Wilmer was interviewed at her place of business, the Bank of Lancaster. After being advised of the identity of the interviewing agent and the purpose of the interview, Wilmer provided the following information:

Wilmer advises that her resident address is General Delivery, Regina, VA. 22540. She has been employed by the Bank of Lancaster for 13 years. Prior to her employment at the Bank, she was a high school student. She presently works in data processing, and he duties put her in daily contact with Mary Keyser Harding.

Wilmer has never recieved any unusual telephone calls or what she would consider unusual visits, either at the Bank or at her residence. She advises that that the only unusual occurances she is aware of in the community is a prowler at he residence in 7/85, and a breaking and entry in the neighborhood last winter. She advises that the LANCASTER county Sheriffs Department (LSD) was notified of the prowler; and the LSD arrested a Black male who was

H0167

Ax 7-414

— 2 —

on probation for the breaking and entering.

Wilmer advises that on the morning of 8/22/85, she awoke sometime between 6:30 Am and 7:00 a.m. She explains that her husband was not home at the time she awoke because he regularly leaves for work around 1:30 Am. She further explains that her husband, Keith, is a waterman.

After doing the routine household chores, B. Wilmer departed for work, and arrived at the Bank of Lancaster at approximately 8:30 Am. She took her lunch break at 12:30 p.m. She advises that she often has lunch with Mary Harding and other women who work at the Bank; however, on 8/22 Mary Harding had lunch with her son, Roy, who stays at a day care center near the Golden Eagle Golf Course. Wilmer returned from lunch at 1:30 pm.

Wilmer can not recall any unusual occurances at work during the morning or evening. She, Mary Harding, and the other women at the Bank left at their normal time of 4:30 pm. Wilmer went directly home to fix supper for the family. Supper was eaten at approximatly 6:15 p.m., with Brenda Wilmer, Keith Wilmer, their 12 year old son Todd, and six year old daughter (i.e. the entire family) there for the meal.

H0168

218

AX 7-414                          — 3 —

After supper, B. Wilmer went to the garden to tend to the butterbeans. Her husband and son went to bed. B. Wilmer worked in the garden until approximatly 8:15 p.m. She then watched television or did housework, not being sure which she did on that particular evening.

At approximatity 11:00 pm. B. Wilmer went to bed. The entire family slept until 1:00 a.m. (8/23/85), when Keith and Todd awoke to prepare for another day of working on the water. Keith and Todd Wilmer left for work at approximatity 1:30 Am.

B. Wilmer slept until 6:30 am or 7:00 am, awoke, and followed the routine of the previous day. When Mary Harding did not come to work at the regular time of 8:30 Am., the co-works began to feel uneasy. At 8:55 a.m. they learned she was missing.

B. Wilmer volunteered the information that her husband, Keith, learned of Mary Harding's disappearance at 4:00 p.m. (8/25/85). He had finished his day on the water, and had gone to kitmarm Kilmarnock to buy bait. While in Kilmarnock, he brought his check from the sale of fish to the Bank for B. Wilmer to deposit. While K. Wilmer was in the Bank, B. Wilmer told him of Harding's disappearance.

Wilmer was unable to provide any additional information at this time.

H0169

**219**

SP110 8-15-79

# VIRGINIA STATE POLICE

9/16/85/dt/1D19
Date of Transcription

LINWOOD HUGH SMITH, also known as DUKEY, of Rt. 2, Box 303, Lancaster, Virginia, was interviewed at the scene of the recovery of the body at RCV Seafood on Route 622.  The following information was obtained:

Former Sheriff, GARLAND FORRESTER told the family of MARY KEYSER HARDING that KEITH WILMER was close to being tied to the ROGERS murders in 1976. SMITH had heard hearsay that WILMER had offered W. T. BROWN'S ex-wife $200 to go into the woods and have sex with him several years ago.  He also heard that he raped his sister-in-law, JANET PITTMAN.  WILMER'S wife, BRENDA, worked in the same bank with the victim, MARY HARDING.

WILMER'S boat is the "Miss Brenda", and it is tied in Mud Creek.  WILMER worked with EMERSON HARDING, the husband of the victim, oyster tonging this past winter.  Three years ago, WILMER was caught in a wench and he heard that EMERSON HARDING accidentally hit the throttle instead of the brake which caused WILMER to be hospitalized.

SMITH had also heard that a subject named EMERSON STEVENS might possibly have been involved.  He had heard that STEVENS' boat was missing from Bertrand early Friday morning when it was discovered the victim was missing from her home.  SMITH said that he had obtained information that WILMER might be involved from a subject named RICKY REYNOLDS who is somehow related to the HARDING family.

| | | | |
|---|---|---|---|
| Investigation on | 8/27/85 | at Lancaster Co. | File # 85-81-0697 |
| by | Special Agent D. M. Riley | | Date dictated 9/10/85 |

This document contains neither recommendations nor conclusions of the Virginia State Police. It is the property of the Virginia State Police and is loaned to your agency; it and its contents are not to be distributed outside your agency.

H0642

SP110 8-15-79

# VIRGINIA STATE POLICE

9/16/85/dt/1D17

Date of Transcription _____

The reporting agent was conducting an air surveillance on subject PETER
REMINGTON when a radio message was received to the effect that the body had
possibly been found in the Rappahannock River.  The location was given as
approximately 50 to 100 feet off of Bell Isle Marsh in the vicinity of
Morattico.  The reporting agent flew over the scene and located the body in
the river, apparently tied to something in the location stated.  The exact
location was immediately south of Mud Creek, approximately 50 to 100 feet
off of Bell Isle Marsh.  The body was floating face down and appeared to be
nude and tethered to a rope or some other object.  SHERIFF RONALD CROCKETT
and members of the rescue squad were anchored in a boat approximately 50
feet from the floating body, awaiting a recovery team.  The reporting agent
kept the body spotted from the air and directed ground units to the nearest
ground location to the body in an attempt to recover it from the ground.
When ground units arrived to the closest ground location to the body, it was
ascertained that it was impossible to recover it from the ground.  It was
also apparent that the body would have had to have been dumped from the
river itself.  The reporting agent landed at W. R. Pittman's Air Strip,
approximately 2 miles from the body's location and proceeded to RCV Seafood,
which is located on the Morattico Point end of Route 622, the nearest
improved State highway to the body.  DR. A. B. GRAVATT, Medical Examiner,
had already gone to the body by boat with members of the rescue squad and at
approximately 1630 hours the body was returned to the dock at RCV Seafood in
a plastic bag.  Special Agent L. E. McCANN had been notified and was already
on the scene with the crime scene van and he has made a separate report on
the condition of the body and the recovery of the rope, chain, and
cinderblock which was weighting the body to the location where it was found.

It was learned from SHERIFF R. D. CROCKETT at the scene at RCV Seafood that
a subject by the name BILL PARKS and his young son who live at the end of
Route 622 near RCV Seafood had spotted the body while searching for
driftwood off of Bell Isle Marsh at approximately 1530 hours that same
afternoon and had come back and reported it.

On the dock at RCV Seafood, DR. GRAVATT indicated that the body was that of
a young white female, identity unknown at that time.  The cause of death was
also unknown at that time.

| | | | |
|---|---|---|---|
| Investigation on _____8/27/85_____ | at ___Lancaster Co.___ | File # ___85-81-069 7 | |
| by _____Special Agent D. M. Riley_____ | | Date dictated ___9/10/85 | |

This document contains neither recommendations nor conclusions of the Virginia State Police.  It is the property of the Virginia State Police and is
loaned to your agency; it and its contents are not to be distributed outside your agency.

H0641

Re-intv.                    8/28

Doris Gill

3 yrs. — Keith Witmer

Brenda - wife

followed — Friday night, after
they married from S.
of Lancaster (after 7 p.m.)
blinking lights. He stopped
at Walter Mitchells Srv.
Sta. (pretty sure of Id)

(Marysha) Came to cottage on river.
Ask about place for hunter
Set a white in yard after
talkg. Followed from
field to Lit water (may
have been 2ⁿᵈ person in
vech.

← ————→
Phone calls   more freg

H0131

then
One will offer call to
S.D.

Lucy Lumpkin, Investor,
co. emp., getting assn
of some time, phone
line cut.

(whisper) voice

"Will you meet me tonight"

Sometimes profit-collect
premises no voice

Actual language but not
vulgar

(Also bo - recently stated
making phone calls)

H0132

—2—

Gill (II)

Alan is a watchman

Keith jel. of Blade
Death her

H0133

R.D., J.C., young boy
Girl, loaned apt., 2 to
pizza, couldn't find
got back, I head down,
never said anything
couple of yrs ago.

Staying w/ on boat. Would
stay w/ R.D. on weekends
Has stayed w/ Richard in
LANCASTER CO.

Goes to Chinese Store
for beer. Has been
take by Richard.

Boat runs good, but needs
new starter

Didn't even know of girl.

H0134

225

$\frac{E/g}{P/ts}$

Re-intv

Brenda Witmer —
  Connie Smith
    wife of Garraett Smith

  live in Centennia

  refered by Margret Brown.

Gail Caudle — ran pre-school
which Ray attended
    Peach color house , near
Golden Egl. Golf course

(Note) Mary had lunch
w/ Ray the day the crime
occured , see previous
info. w/ Brenda Witmer).

H0135

SP110 8-15-79

## VIRGINIA STATE POLICE

9/16/85/dt/1D22

Date of Transcription

Lancaster County Sheriff's Department Dispatcher GLORIA REVERE was interviewed at the Sheriff's Department by the reporting agent.  She stated that several years ago, she worked at Haywood Marina and that KEITH WILMER was a regular patron of that Marina.  Approximately 5 years ago, WILMER called her on the telephone, trying to be anonymous.  She recognized his voice immediately.  He told her that she looked very good to him and that he wanted to meet her somewhere, in the woods possibly, so that they could have sex.  When she confronted him as to his identity, he stated his name was ALAN VanLANDINGHAM.  MRS. REVERE stated she knew specifically that the caller was, in fact, KEITH WILMER.

MRS. REVERE also said that she believes that WILMER has also made anonymous calls to DORIS GILL, another employee who worked with MARY KEYSER HARDING at the Bank of Lancaster.

MRS. REVERE also heard that there was gossip three or four years ago to the effect that WILMER used to follow girls from the Bank of Lancaster when they left work in the afternoons.

She also heard that a subject named MERIDITH HAYDEN, who lives on Route 627 off Route 354, telephone 462-5421, had had a fight several years ago with WILMER over a statement that WILMER had said regarding HAYDEN'S daughters.

Investigation on ___8/28/85___ at ___Lancaster Co.___ File # ___85-81-0697___

by ___Special Agent D. M. Riley___ Date dictated ___9/10/85___

This document contains neither recommendations nor conclusions of the Virginia State Police.  It is the property of the Virginia State Police and is loaned to your agency; it and its contents are not to be distributed outside your agency.

H0644

AX 7-414
EEP:jl
1

The following information was exchanged on August 28, 1985, during a joint meeting between the FBI; VSP-BCI; and the LANCASTER COUNTY (VA) S.O regarding KEITH WILMER:

1. History of obscene telephone calls (documented).

2. History of attempted abductions.

3. His wife works at the same bank, in the same area, as the victim.

4. Known wife beater.

5. Owns and operates a small, light, red "S" body pick-up truck.

6. His boat is docked near where the victim's body was found.

7. His travel from his residence to his boat takes him within four miles of the victim's residence.

8. One to two years ago, he worked an entire season with the victim's husband.

9. He sustained a foot injury which hospitalized him when his foot became caught in a wench. EMMERSON HARDING accidently hit the power throttle rather than the brake, aggrevating the injury.

10. He is a waterman, associated with ropes, chains and seamen's knots.

11. He is a suspected "peeping Tom".

12. According to rumor, he attempted to rape his sister-in-law.

13. He offered BETTY BROWN $200 to "go into the woods" with him.

H0265

228

AX 7-414
2

14. He is timid around men, but aggressive around women.

15. He has a short, powerful build; physically capable of completing the offense.

16. The victim attended a wedding reception at his house.

17. He did not attend the search (as far as is known).

18. He works on a boat by himself.

H0266

229

EMERSON  STEVENS

KNEW  WHAT  EM.  WAS DOING - KNOWS SCHED.
AND  KNEW  E.O.  WAS IN  NAES HEAD.
HIS  WIFE  WAS NOT AT FUNERAL.

HAD  ACE  BANDAGE  ON LAST  WEEK -
HAD  CAST ON  HAND  FRIDAY.

REAL  NERVOUS  WHEN  EM.  TALKED TO
HIM  AFTER  FUNERAL.  TALKED TO  HIM
AT  CIVIC  CENTER. -  EM.  WENT  UP TO
HIM.


EITHER  IN  MARSHES  OR  WOODS -
THERE  BARRELLS -  & CRAB  BARRELLS -
WERE  FULL  OF  GILL  NETS -  ON  LEFT
GOING  INTO  MORATICO -  LAND  BELONGS
KIETH  WILMAR'S  FATHERS

H0382

**230**

SP110 8-15-79

# VIRGINIA STATE POLICE

Date of Transcription 10/2/85/sa/47

The reporting agent visited the following residences in the area of the crime:

1. AVIS DOTSON, Rt. 2, Box 318, (Rt. 354), Lancaster, VA, telephone (804) 462-5587. This residence also houses LILLIAN DOTSON, NORMA VAN LANDINGHAM, and ELLA WEBSTER. No useful information was obtained.

2. MAETTA ROBINSON, Rt. 2, Box 325, (Rt. 625), Lancaster, VA., telephone 462-7721. Mrs. ROBINSON works at Lancaster Sheriff's Office. She frequently sees EMERSON HARDING in his white truck on Rt. 625 apparently going to and from the residence of his brother, WELLFORD STEVENS, who lives at the end of the road. WELLFORD STEVENS told her she should have the Sheriff check out KEITH WILMER. He told her this the same day the victim's body was recovered. WELLFORD said that he knew that MARY was scared of WILMER; that she worked with WILMER's wife; that WILMER followed MARY from work one night and sought refuge at the home of THOMAS STEVENS. WELLFORD thought WILMER's boat and pickup truck should be examined for clues. (Note: This is the original source that gave WILMER's name to the Sheriff who provided it to the reporting agent - EMERSON STEVENS was at the scene of the body's recovery.)

3. ULYSESS CARTER, Rt. 2, Box 340, (S.R.625), Lancaster, VA, phone #(804) 462-7825, could provide no information.

4. MARION VESSELL, Rt. 2, Box 335 (S.R. 625) Lancaster, VA, phone #462-7464, could provide no information.

5. Mr. and Mrs. KENDALL JENKINS, Rt. 2, Box 355, (S.R. 625), Lancaster, VA, phone #462-5535, could provide no information.

Investigation on 9/5/85 at Lancaster Co., VA File # 85-81-0697

by SA D. M. Riley Date dictated 9/26/85

This document contains neither recommendations nor conclusions of the Virginia State Police. It is the property of the Virginia State Police and is loaned to your agency; it and its contents are not to be distributed outside your agency.

H0719

85-81-0697
<u>2</u>

6. GEORGE THOMAS, Rt. 2, Box 355, (SR 625), Lancaster, VA, phone #462-7827.  They heard that HAMPTON LEWIS, who cuts grass at the cemetary, had seen a light colored pickup go by the cemetary several times during the day the victim disappeared.

7. THOMAS FIDLER, Rt. 2, Box 367 (SR 625), Lancaster, VA, phone #462-5827, drove by the victim's residence on Friday morning 8/28/85 at 6:00 a.m. with his wife enroute to Baltimore and saw that the house was lit up.

8. JOHN R. McCARTY, Rt. 689, phone #462-7177, could provide no information.

9. ROLAND COURTNEY, Rt. 689, phone #462-5659, could provide no information.

10. BROADUS THOMAS, Rt. 689, no phone, could provide no information.

11. VERNARD SANFORD, Rt. 689, could provide no information.

H0720

(21)

Fredericksburg, Va. - (703-786-8698).
He said that a man named Stevens had
pulled him out in a white pickup truck.
Quinn recalled a couple other fellows being
with Stevens and remembered them using a
rope, but could not remember seeing
a chain. Quinn returned a call to the
Sheriff's Office the next day and left
a message for me to call him. I contacted
Quinn by phone again on Oct. 19. He said
that the date he had gotten stuck
was Aug. 8, 1985 at around 4:00 - 5:00 pm.
Quinn also stated that he had asked the other
man (Mr. Windgate), who was riding with him
on that day, about the incident and neither
could remember the attempted use of
the chain but Quinn said that it was certainly
possible because he was distracted
due to the heavy rain and really wasn't watching
the actions of the three men. Please note the
following pertinent information:

Patrick Quinn                          Windgate Appraisal Services
828 Stansbury Dr.                      P.O. Box 6014
Fredericksburg, Va. 22401              Roanoke, Va.
703-786-8698



cont.

H0030

233

4

AX 7-414
EEP:pad

CROCKETT advised that another individual, RICHARD DAWSON, was seen riding with a second unknown person in a light colored truck in the vicinity of the victim's residence during the evening of August 22, 1985.  CROCKETT advised that DAWSON has a history of violence toward women, and is currently a suspect in the death of his wife, MARY, which occurred approximately three weeks prior to instant matter.  DAWSON is described as a white male, approximately 31 years of age, who is currently staying with JULIUS ASHBURN (PH) and JOE CHARNOCK (PH) in a house trailer near the intersection of Routes 354 and 201.  CROCKETT noted that the house trailer is located in the same general vicinity as the victim's residence.

A witness advised the LANCASTER COUNTY SHERIFF'S DEPARTMENT that at approximately 9:30 P.M., August 22, 1985, she observed a small white-colored "luv" type pickup truck parked midway up the victim's driveway.

CROCKETT advised that a neighborhood investigation has revealed that dogs had been heard barking around 10:00 P.M., during the nights immediately prior to the abduction.  One person in the neighborhood has stated that she thought she heard someone crying or yelling late at night during the evening of August 22-23, 1985.

CROCKETT could provide no additional information at this time.

Physical observation by SAs CARTER, PITTS, and SCIARONE, reveal that the victim's residence is a single family dwelling, located on Route 354, north of the Community of Ottoman.  The area is heavily wooded, and the victim's nearest neighbors are approximately one quarter of a mile away.  It was also noted that Route 354 is the major North/South road on the western side of Lancaster County.

H0261

234

SP110 8-15-79

# VIRGINIA STATE POLICE

Date of Transcription _____ 9/23/85

ANNE B. DICK and her husband, LOUIS DICK, were interviewed simultaneously by
the reporting agent at their home at Route 2, Box 963, Lancaster, VA,
telephone number 804-462-7675.  The interviewed revealed the following:

Mr. DICK is a retired Maryland State Trooper.  For extra income, he fishes
some crab pots in the Rappahannock River.

On the morning of 8/23/85, at approximately 4:55 a.m., Mrs. DICK was accompanying
J. W. HAYDEN and his wife, MARIE HAYDEN, to Richmond International Airport and
was on Route 354 headed west.  As they passed Route 622 on their left, which
leads to Marracticco, she observed EMERSON STEVENS' white Dodge pickup truck
on Route 622 approach the stop sign on 354 and stop.  There were no lights on
the STEVENS' vehicle.  She could observe a single occupant operating the truck
and the lights from her vehicle flooded the cab of his truck allowing her
to see that the operator was wearing a plaid shirt.  She did not observe
the operator's face.  The white pickup truck turned right onto Route 354.

On the morning of 8/23/85, sometime after sun up, LOUIS DICK was fishing his
crab pots when his boat was approached by EMERSON STEVENS' boat, the "Miss Sandra."
STEVENS and EARL SMITH were aboard.  EMERSON STEVENS asked DICK to tell their
crab buyer, Barrack-Reynolds Seafood, that they would be late that day to sell
their catch because STEVENS had a doctor's appointment for his injured hand
which he had hurt several weeks previously.  DICK noticed that STEVENS was
not wearing his hand brace, nor had he seen him wearing it much while crabbing
at that time anyway.

Mr. DICK said that STEVENS had only had his pots in the water for a few days
when he spoke with him on 8/23/85.  DICK noticed that STEVENS took up his crab
pots on Monday, 8/26/85, and gave up his crabbing venture.  He has apparently
not worked a job since.

| | | | |
|---|---|---|---|
| Investigation on __ 9/5/85 | at __ Lancaster Co. | File # __ | 85-81-0697 |
| by __ SA D. M. Riley/ss/B80 | | Date dictated __ | 9/20/85 |

This document contains neither recommendations nor conclusions of the Virginia State Police.  It is the property of the Virginia State Police and is
loaned to your agency; it and its contents are not to be distributed outside your agency.

H0691