

# COMMONWEALTH of VIRGINIA

OFFICE OF THE
COMMONWEALTH'S ATTORNEY
LANCASTER COUNTY
LANCASTER, VIRGINIA 22503-0204

C. JEFFERS SCHMIDT, JR.
COMMONWEALTH'S ATTORNEY

TELEPHONE
(804) 462-7240

July 3, 1986

DELIVERED BY HAND

S.A. David M. Riley
Virginia State Police
Bureau of Criminal Investigation
P. O. Box 9108
Richmond, Virginia 23227

RE: Commonwealth v. E.E. Stevens

Dear Dave:

Attached is a list of some things I would like for you to consider at the outset of the trial. At this point I have decided to call the police and technical witnesses first. I would like to call in this order: McCann, Fierro, Riley, Boles, Robertson, Scholberg, then the lay witnesses.

Looks like we are able to prove that on August 23 Stevens came in at about 9:00 a.m., went to his father's house with Earl where he was seen by the public health nurse, left Earl, later picked up Earl and went back out on the boat, and was seen at the crab house at 12:30 to 1:00 p.m.

Emerson Harding may be an issue. There is the question of $81,000.00 life insurance proceeds. There is the question of a fancy new sports car. There is a question of dating Cindy Hayden and Jerry Weber's daughter.

June Deal Stevens, Mrs. Malachi Stevens, telephone 798-5557, (probably Ashland area), used to live in the house next to Kendrick. She is able to testify that Emerson Stevens left the children a lot while Sandra was working. I have not been able to get in touch with her, but I have heard she is willing to come and testify. She would be useful in rebuttal. Malachi is Tommy Stevens' brother.

H0228

Hampton Lewis and Tracy Lewis may be called by the defense to testify that they cut the grass at the Corrotoman cemetery on August 22.  They may also testify that they have a white truck that is often parked up there while the grass is being cut.  Clyde Dunaway is very familiar with this truck and is able to distinguish it from that of Emerson Stevens.

I am not sure about Meredith Hayden.  He told E.O. Harding that Emerson Stevens is a "prone liar."  He was also supposedly on a fish boat the whole time.  He knows that Emerson Stevens peeps and steals.

Cathy Keyser, Mrs. George William Keyser, is evidently going to testify that she saw Emerson Stevens throw his knife overboard in June.

Lucille Akers, sister of the defendant, is reputed to have said that Howard Stevens threw the knife overboard.

Edward Hayden has been called for an unknown reason. He is a neighbor in Foster's Village, and supposedly knows that the defendant peeps and steals.

Bruce Boles is able to contribute the following: He did search the truck with Robbie and actually picked up the sheath and returned it because there was no knife in it. That was on September 6.

On September 5 Boles was with you during the interview of defendant.  You did most of the talking.  The defendant followed the two of you up to the Harding house because it was a neutral location. The entire interview took 10 to 15 minutes total.  There was some small talk and one or two general questions inquiring whether Emerson saw anything near the house when his truck was up there.  Then the defendant broke into his "litany" after you indicated he was hiding something.  You pressed him for a few minutes longer. On the way out Bruce asked him whether his truck was the same color.  He was always free to go.

On October 3 you and Boles went to Howard's house and saw defendant carrying in groceries.  Bruce will say he asked "we want to know what happened to the Wildcat Skinner knife." This had a "hell" of a reaction on Stevens, and Bruce will say he acted like he had a "nervous breakdown."

- 2 -

H0229

On the day of arrest on October 25, after you and Boles picked up defendant, Boles read right from your Miranda card.   Defendant stated that everyone was lying. When asked about the chain and knife, he said he never had either.   This is Boles' recollection.

I have not been able to get C.E. Saunders or Meade Ransome to admit they saw the defendant in person near his truck or the victim's residence.

I wonder if Dr. Antonio sent the defendant to another doctor for consultation on Friday, August 23.

I am worried about "losing" Ann Dick as a witness.

cc:  B.A. Boles, Investigator

H0230

VIRGINIA STATE POLICE

Date of Transcription _____ 10/7/85/sa/28

EMERSON OTHA HARDING, husband of the victim, was interviewed
by the reporting agent.  He revealed the following information:

His wife, MARY CATHERINE KEYSER (HARDING) was born 9/30/60
and graduated from Lancaster County High School in 1978.
He graduated in 1979.  MARY grew up in the vicinity of
Weems in Lancaster County.  After High School, she went
to North Carolina Weslyen College for approximately six
months.  Following this, she took some classes at Rappahannock
Community College in Glenns, VA.  Shortly before their
marriage in 1979, she had been working part-time at the
Bank of Lancaster in Kilmarnock.  Following their marriage,
she worked full time at the bank.

HARDING impregnated his wife prior to their marriage while
he was still in high school.  They married for this reason
and subsequently MARY miscarried.  They miscarried another
pregnancy and then had their son and three years later,
their daughter.

They had experienced some marital difficulties in the
past due to his own immaturity in drinking and "hanging
out with the boys", but he had put aside those activities
and they had lately been a very close couple.

Financially, they were doing well with approximately a
$30,000 plus joint net income annually and less then $12,000
per year in fixed expenses.  They had a savings account
of approximately $1,650.00.

They lived in the home from where MARY was abducted for
approximately 20 months previous.  They rented the house
from VALEEN and JOE ROBINSON of Kilmarnock, a middle-aged
couple.

EMERSON works for Standard Products on a fish boat and
was at sea on Thursday night, 8/22/85.  His fishboat made
a special trip to bring him home on 8/23/85 when it was
known that MARY was missing.  JACKIE BARRACK and THOMAS
WILLIAMS met him at the dock.

Investigation on _____ 8/25/85 _____ at _____ Lancaster Co. _____ File # _____ 85-81-0697

by _____ SA D. M. Riley _____ Date dictated _____ 9/30/85

This document contains neither recommendations nor conclusions of the Virginia State Police. It is the property of the Virginia State Police and is
loaned to your agency; it and its contents are not to be distributed outside your agency.

H0730

239

85-81-0697
2

To his knowledge he knew of no one who harbored a grudge against he or MARY.

Their closest friends in the area were STEVE and KAREN LEWIS, and RICKY and PAULA WILLIAMS.

Since 5/19/85, he has only been home on weekends.  He normally goes out in the boat on late Sunday nights, returning early Friday evenings.

On Wednesday night, 8/21/85, he came home un-expectedly at about 9:00 p.m.  He and MARY moved some furniture in the bedroom, made love in the bedroom, and he left around midnight to go back to the fishing vessel.

He learned from the family that his wife had last talked to her sister, HELEN, in Richmond at approximately 9:30 p.m. on 8/22/85 and apparently there were no signs of anything being wrong.  He believes MARY would have initiated the phone call.

He learned that his aunt, MARY BRENT, and his cousin, NORMAN WILLIAMS were the first to arrive at his home to find out that MARY was gone on the morning of 8/23/85.

MARY kept the cat litter pan in the bathroom and was in the habit of dumping it every night or every other night.

The afternoon of the day she later disappeared he learned that MARY had: left work at the Bank of Lancaster; picked up their 4 year old son at the day school in Irvington; picked up their year old daughter at her mother's home in Weems; traveled to her grandmother's home on Whitehall Road next to his parents and had dinner with the children; stopped by R & K Store and picked up dogfood; and went home with the children.

HARDING had no ideas as to who could have taken MARY. He did say there was a strange group of young individuals, blacks and whites mixed, whom he suspected of being involved in drugs, that hung out at a trailer every evening.  The trailer is located on Rt. 354 near its intersection with Whitehall Road (Rt. 625).  He said among the people who hung around that location were: The ATCHISON brothers, MICKEY COATES, BURT JONES, BEN BARTLETT, PATRICK JENKINS, and ROGER CARTER.

H0731

**240**

VIRGINIA STATE POLICE

9/11/85/dt/1D5

Date of Transcription _____

EMERSON O. HARDING was interviewed telephonically. He revealed the
following information:

HARDING knows a subject named EMERSON STEVENS, who owns a white, short bed,
full size Dodge pickup truck and a 32 foot wooden work boat named the "Miss
Sandra" which is tied up at the end of State Route 354, which is where
HARDING used to keep his boat. He believes that STEVENS has previously been
caught looking into the windows of RANDOLPH WILLIAMS' house to view
WILLIAMS' wife, JOYCE. He also recalls that STEVENS made a nasty remark one
time a year or so ago while they were close to each other tonging for
oysters in the Rappahannock River. STEVENS had said with regard to the fact
that they were over a deep spot known as Mary's Hole that, "You should know
all about Mary's hole." STEVENS was apparently referring to HARDING'S wife,
MARY. HARDING also said he had heard that STEVENS had only had his crab
pots out for a few days when MARY disappeared and had taken them up almost
immediately after her disappearance. HARDING also stated that EMERSON
STEVENS has visited his residence on several occasions and has been there
when his wife, MARY, was home. He also stated he had heard that he had just
come off of probation on a charge of having tried to steal a depth finder on
a boat tied up near his.

HARDING also stated he had heard that STEVENS had been drinking very hard in
the past several weeks and had become very much of a loner. STEVENS is now
reportedly hanging around with two low life individuals named ERNEST TALLEY
and EARL SMITH. They are both drunks. HARDING stated that EARL SMITH had
been to his residence this past spring with a black male named BURT JONES.
SMITH had tried to borrow money and HARDING had turned him down. SMITH did
not seem to be upset about having been turned down on the money.

HARDING said that STEVENS is known to ride around at night in his white
truck. He also noticed that STEVENS was at the civic center after the
funeral of his wife, MARY, but STEVENS seemed to be very shakey and he could
not recall having seen him at the funeral itself. STEVENS came to the house
during the time that MARY was missing while many other friends and family
members were there, but did not come into the house himself. He instead
sent EARL SMITH into the house to pick up a beer. HARDING said that
STEVENS' name has seemed to come up a lot among his friends and relatives as
being a possible suspect because of his previous behavior. HARDING said
that STEVENS knows his work schedule very well and when he would have been
away from home.

---

Investigation on ___8/30/85___ at ___Lancaster Co.___ File # ___85-81-0697___

by ___Special Agent D. M. Riley___ Date dictated ___9/10/85___

This document contains neither recommendations nor conclusions of the Virginia State Police. It is the property of the Virginia State Police and is
loaned to your agency; it and its contents are not to be distributed outside your agency.

H0631

85-81-0695
2

HARDING stated that his wife, MARY, had publicized an add for a babysitter and that RICHARD DAWSON'S wife, MARY DAWSON, had answered the add and pleaded with her to let her have the job. His wife, MARY, did not give her the job because of the poor reputation that the DAWSON'S enjoyed. MARY HARDING had told her that she would call her back, but never did.

HARDING stated that BILL PARKS of Ditchley said that JOE CHARNOCK from Tangier, JULIUS ASHBURN, and RICHARD DAWSON were at a party on White Hall Road approximately 2 weeks previous to this interview, before the disappearance of MARY HARDING.

HARDING stated he heard that ESTHER STEVENS had said that EMERSON STEVENS went out very early Friday and then left again to go back down to the dock to go crabbing.

HARDING stated that EMERSON STEVENS has a very fast boat with a new high powered engine. He stated EMERSON STEVENS is a very sneaky individual who talks a great deal about women, including the fact that he told HARDING about a year ago that he would like to have a sexual relationship with his niece.

H0632

SP110 8-16-79

# VIRGINIA STATE POLICE

9/11/85/dt/1D10
Date of Transcription _____

RICHARD MELVIN DAWSON of Route 1, Box 293, Weems, Virginia, telephone number (804) 438-6901, was interviewed at the residence of his brother, PAUL DAWSON in Weems, Virginia. Also present at the time of the interview was F.B.I. Agent TOM CARTER from Fredericksburg. The following information was obtained from DAWSON:

DAWSON'S wife, MARY DAWSON, who committed suicide, was buried on the 31st of July. On the night of August 22, 1985, DAWSON had been to the home of his brother, PAUL, where the interview took place, with his two children, LINDSEY and JOE, ages 8 and 9 respectively. He stayed there until late in the evening when he took his children home where he stayed with them the remainder of the night. After he got home he called his ex-wife who lives in Royersford, Pennsylvania. He could not recall the telephone number but the area code was 215 and the first three digits were 948.

DAWSON stated he works as a construction framer in the town of Warsaw.

DAWSON stated he knew EMERSON HARDING, but not his wife, MARY.

DAWSON expressed concern that a subject by the name of PEGGY LOU ROBINSON was supposedly spreading gossip in the Lancaster area. Her daughter was the 8 year old child supposedly raped by his brother, CHARLES DAWSON, who is now a fugitive for this offense.

During the interview, DAWSON was extremely obnoxious and belligerent and tried to overwhelm the conversation with his arrogance. At the time, he was drinking a can of Old Milwaukee beer.

DAWSON was asked about the possibility of his taking a polygraph with regard to the MARY HARDING disappearance. DAWSON at first said that he would, but finally stated that the only way he would take a polygraph was to have it brought to his home.

---

Investigation on ___8/25/85___ at ___Lancaster Co.___ File # ___85-81-0697___

by ___Special Agent D. M. Riley___ Date dictated ___9/10/85___

This document contains neither recommendations nor conclusions of the Virginia State Police. It is the property of the Virginia State Police and is loaned to your agency; it and its contents are not to be distributed outside your agency.

H0635

SP110 8-15-79

## VIRGINIA STATE POLICE

9/11/85/dt/1D1

Date of Transcription

JULIUS LEE ASHBURN, P. O. Box 43, Lancaster, Virginia, telephone
(804) 462-7760, was interviewed at his residence at 10:40 a.m. by the
reporting agent. The following information was obtained:

ASHBURN, until the last couple of months, had been working on a snapper boat
with a subject named JAMES KELLY of Ditchley when he was injured and since
then has been out of work. On Thursday night, the 22nd or Friday night the
23rd of August, RICHARD DAWSON had been to his home. DAWSON had brought his
two children, since the death of his wife MARY, to the ASHBURN'S residence
so that ASHBURN'S wife, SARAH, could look after them. They looked after the
children for approximately 2 weeks after the death of DAWSON'S wife. On the
Thursday or Friday night previously described, DAWSON'S cousin or brother,
BRADLEY DAWSON, had been to ASHBURN'S residence looking for RICHARD DAWSON.
When he found that RICHARD was not there, he left. RICHARD showed up later
and when told that BRADLEY was looking for him, made a phone call and spoke
with BRADLEY, apparently concerning his brother CHARLES DAWSON who was then
a fugitive.

ASHBURN stated that a subject named JOE CHARNOCK from Tangier Island had
been staying with him since approximately the time that MARY HARDING
disappeared. He stated that CHARNOCK had a 26 foot inboard boat and had had
it for about a month. (The Virginia boat registration number of this boat
is VA6926H.) ASHBURN said this boat is docked at RCV Seafood at the end of
Morraticco Point. ASHBURN stated that CHARNOCK is like a brother to him and
that he works in the crabbing business out of Piney Island Seafood with
another Tangier Island man named ROGER PARKS. (Note: PARKS has a light
blue Ford pickup truck, Virginia license CRP-357 and owns the boat "Cindy
Marie, which is tied up at Piney Island Seafood off of Route 622 on
Morraticco Point.)

ASHBURN indicated that JOE CHARNOCK had lived with a girl by the name of
LORAINE (last name unknown), a resident of Lancaster Shores. (Note: When
shown LORAINE'S residence, I found a small house in Lancaster Shores with
the name BALDWIN on the mailbox and a gray Grenada automobile bearing
Virginia license HJV-376 in the yard.) ASHBURN indicated that CHARNOCK had
been living with him until the last couple of weeks because CHARNOCK'S ex-
wife had come down to the area and had caused CHARNOCK and his girlfriend,
LORAINE, to break up.

| | | | |
|---|---|---|---|
| Investigation on 8/30/85 | at Lancaster Co. | File # | 85-81-0695 |
| by Special Agent D. M. Riley | | Date dictated | 9/10/85 |

This document contains neither recommendations nor conclusions of the Virginia State Police. It is the property of the Virginia State Police and is
loaned to your agency; it and its contents are not to be distributed outside your agency.

H0627

85-81-0695
2

JULIUS ASHBURN denied that there had been any small white pickup trucks in his yard for the past several weeks, in spite of the fact that the reporting agent saw one on the Sunday previous to the interview. When pressed, ASHBURN stated that the only vehicle he could think of that might meet that description would be a small white truck belonging to a DAVID SMITH, who might have been there to visit his brother who lives in the house in front of him.

ASHBURN stated that he and RICHARD DAWSON had been planning to fix up ASHBURN'S work boat for oyster tonging this fall. ASHBURN accompanied the reporting agent to the location where his boat is tied up on a creek at the end of Route 620 on the same road on which lives BRADLEY DAWSON. The boat was not in running condition.

ASHBURN stated he had lived in the area of Weems and had known the DAWSON family for many, many years and had only lived in his present location for the last 13 months.

H0628

**245**

FD-302a(Rev. 11-15-83)

AX 7-414

Continuation of
FD-302 of HOLT                          On 8/24/85    Page 2

     HOLT stated that the HARDINGs reside in a house owned by
JOE and VAL ROBINSON (Phonetic).  HOLT is aware that a couple
of months ago, a note was left on the door regarding VAL being
three months behind in the mortgage payments to the FEDERAL
HOUSING ADMINISTRATION.  After finding the note, MARY HARDING
brought the payments up to date.

     HOLT stated that MARY HARDING did not like to stay in
the house alone.  She advised that HARDING never mentioned any
specific reasons why she did not like to stay there alone, such as
unusual telephone calls, strange visits, et cetera.  HOLT stated
that she felt it was just a general uneasiness about living in an
isolated area with her husband away from home several nights a
week.

     HOLT advised that the HARDING family has "a lot of
casual acquaintances," and that they are often visited by other
family members.  HOLT noted that a number of members of the
HARDING family live in the vicinity around Ottoman, and that
EMMERSON HARDING, MARY HARDING's husband, is acquainted with a
number of the watermen in the area.

     HOLT has no knowledge of MARY HARDING every being
bothered by anyone at work.

     HOLT stated that she believes that EMMERSON HARDING is
the "only boyfriend MARY ever had."  She stated that MARY HARDING
may have dated other boys while she was in high school, but
EMMERSON is the only one she was ever serious about.  HOLT also
noted that MARY HARDING grew up in the Weems, VA area.

     HOLT stated that when the HARDINGs went out for an
evening alone, the children were usually kept by close relatives.
HOLT noted that it was unusual for the HARDINGs to go out
without the children, and that their primary social activity was
boating, fishing, and picnicking on the weekends.

     HOLT stated that to the best of her knowledge, all
repairs around the house were done by MARY's father.  She is not
aware of any other repairmen ever visiting the HARDING household.

     HOLT advised that EMMERSON HARDING was an independent
waterman at one time.  He now works for STANDARD PRODUCTS on HENRY
DIXON's boat during the summer, and "oysters" in the winter.  She
stated that EMMERSON HARDING is very generous with others, and
that he knows a lot of people.  She adds that most of the people
he knows are other watermen, and that it is usually a casual

H0298

FD-302a(Rev. 11-15-83)

AX 7-414

Continuation of
FD-302 of HOLT                          On 8/24/85     Page 3

    acquaintance.  She adds that he is shy, and does not meet new
people well.  HOLT also stated that EMMERSON has a problem dealing
with money, and that he may have gone bankrupt in his previous
business.

    HOLT advised that MARY HARDING went to th R & K COUNTRY
STORE (RKCS) often.  She recalls that MARY had commented that
there were always men, particularly watermen, "hanging around"
there.  HOLT is not aware of HARDING ever feeling threatened by
any of the men at the RKCS.

    HOLT also recalls one incident regarding RICHARD DAWSON
which occurred just a few weeks prior to instant interview.  HOLT
explained that DAWSON's wife, MARY, recently committed suicide.
Prior to her death, MARY DAWSON was in the bank regarding her
checking account being out of balance.  HOLT was helping DAWSON by
explaining to her the need to do addition and subtraction on the
check ledger.  Later that day, RICHARD DAWSON came into the bank in
an agitated mood.  He began arguing, and stating that his checking
account could not be overdrawn or out of balance.  He became so
agitated that HOLT had to call an officer of the bank to deal with
him.  HOLT stated that she mentioned this incident because she and
MARY HARDING share the same cubicle.  She explained that her
(HOLT's) desk is in the back of the cubicle, and MARY HARDING's
desk is in the front of the cubicle.  This means that during the
argument, RICHARD DAWSON would have seen MARY HARDING's nameplate,
and may have mistaken HOLT for HARDING.

    HOLT could provide no additional information at this
time.

H0299

P.O.B. 537,

H&R Printing, White Stone

4 yrs
both work in CIF (central info files)
① Baby-sitter (kept by m-I-L)
   Advertised in paper (disappr. by yrslf)
② H wanted to move out of house, money
   problem.

Didn't like to stay there alone.
no specific reasons, never mentioned
phone calls, ect.

lot of casual acq.
visited often by family

No knowledge of being bothered at work

H only boyfriend
she came from Weems.

Children, usually kept by family when coup.
went out.

Joe & Val Robinson own house, couple of months
ago, notes re Val being 3 months behind
in pmts (FHA).

Mary's father did repairs in house

248

H0170

Did you notice any change in Mary's
personality or attitude toward her work
or her friends in the few weeks just
prior to her abduction?

Did she mention anything that was bothering
her? (ex) Trouble sleeping, Any problems at home,
etc.

Did Mary have any problems with any customers?
Any mention of a customer making comments
about her ——— good looking, etc. Did any
customers continually ask for Mary to wait
on them.

H0219

Do you Know Richard Dawson? Are you aware of any disturbance or problem that occurred at the Bank regarding a loan or other banking process involving Richard Dawson that Mary was also associated with.

Did Mary work on Thursday Aug. 22, 1985? Did she mention any plans for that night.

Did Mary ever say that she thought someone was around her house at night — someone was watching her or that she had heard noises at night.

H0220

2

AX 7-414
EEP:pad

is to leave Sunday night for Reedville, VA, where his boat, THE
ATLANTIC SURF, is docked.  During the course of the week he
returns home Wednesday nights, leaves the following morning, and
returns Friday night and remains through Sunday night.  At the
time the disappearance was discovered, EMMERSON HARDING was
employed at his regular duties as Mate on the fishing boat, and
the boat had to return to Reedville, due to a family emergency.
CROCKETT advised that it has been established that the husband
was at sea all day Thursday, and that the victim can be placed in
the residence as late as 9:30 P.M., August 22, 1985, therefore,
EMMERSON HARDING is not considered as a suspect in his wife's
disappearance.

        CROCKETT advised that EMMERSON HARDING has been
interviewed, and that the only unusual occurrence he can recall
from the previous Wednesday night (August 21, 1985) is that he
observed an automobile (no further description) drive slowly past
the residence.  CROCKETT advised that at 9:30 P.M., August 22,
1985, the victim ended a telephone call to her sister in
Richmond, VA.  Interview of the sister indicated that the victim
did not say anything that would indicate anyone other than family
members were in the victim's residence during the time of the
telephone conversation.  CROCKETT also advised that a search
around the residence revealed a cat litter box in the backyard.
He noted that the box appears to have been dropped, and that cat
litter had spilled out to either side of the box.  Approximately
ten feet from where the box was located, impressions in the
ground indicate that a struggle took place.  One of the victim's
"flip-flop" sandals was located near the disturbed earth.
CROCKETT also noted that several broken twigs and branches were
found along the path leading from the cat litter box to the
driveway in front of the residence.  Along the path a second
"flip-flop" sandal was found with the toe guide torn from the
shoe.  CROCKETT advised that a tracking dog, handled by Deputy
Sheriff KENNETH DAVIS, LANCASTER COUNTY SHERIFF'S DEPARTMENT,
followed a "scent trail" identical to the path previously
described.

**251**

H0259

To __L-1__

Date __08/29/85__   Time __2238__

## WHILE YOU WERE OUT

M __Bruce Walker__

of _____

Phone __462-7633__

Area Code        Number        Extension

| TELEPHONED | | PLEASE CALL | |
| CALLED TO SEE YOU | | WILL CALL AGAIN | |
| WANTS TO SEE YOU | | URGENT | |
| RETURNED YOUR CALL | | | |

Message __Can contact him after__
__Funeral Tomorrow if need to.__
__Advised that Last Thursday__
__he went to Richmond. Around__
__9:30 when he was returning__
__home, he past Road that__

Operator



AMPAD
EFFICIENCY®

23-000  50 SHT. PAD
23-001  250 SHT. DISPENSER BOX

**252**      H0365

There was a Dark Green car, either Chev or Pontiac. Looked like a 67-69 Impala - It was sitting on the road that leads to Dorsey's house with lights shining on 354. Mr Walker advised it was just sitting there. He said it slipped his mind because of search & everything. And then everyone told him that a Lt Pickup was involved in the incident, so he never thought any more about it until now.

253

H0366



# COMMONWEALTH of VIRGINIA

### DEPARTMENT OF STATE POLICE

September 16, 1985

TO:     File

FROM:   SA D. M. Riley

SUBJECT: 85-81-0697
         William Keith Wilmer, Suspect

SHERIFF R. D. CROCKETT informed me at the scene of the body's recovery that he had received an anonymous call regarding another possible suspect since the body had been found in the river.  The man's name was KEITH WILMER. WILMER has a record of making obscene phone calls, of beating his wife, and of chasing women.  WILMER'S wife works at the bank where the victim worked and WILMER drives a light red clean looking late model pickup truck which might fit the description of that seen by CHRISTINE PFLUGRADT on the night of 8/22/85.  WILMER lives in the area of Regina and although Regina is not close to the victim's home, nor where the body was found, he does keep his boat in Mud Creek which is the same creek at the mouth of which the body was found.  WILMER is known to have his crab pots located between the mouth of Mud Creek and the area of Tappahannock in the Rappahannock River.  He is known to leave very early in the morning.  He would have access to the items tied around the victim's body and would also have a history of attempts to sexually exploit women.

DMR/dt/1d18

H0658

```
 1        VIRGINIA:   IN THE CIRCUIT COURT OF THE COUNTY OF

 2                            LANCASTER

 3

 4    EMERSON EUGENE STEVENS, #1150546

 5                   Petitioner

 6      vs.                                Record No:

 7    EDDIE L. PEARSON, WARDEN,            CL16000095-00

 8    GREENSVILLE CORRECTIONAL CENTER,

 9                   Respondent.

10

11

12

13

14        BEFORE:    THE HONORABLE R. MICHAEL MCKENNEY

15               Judge of the Circuit Court

16

17

18

19                    December 1, 2017

20                     11:00 a.m.

21                                          COPY

22

23

24

25        Reported by:   Jody A. Holbrook, CCR
```

```
 1
 2      APPEARANCES:
 3          JENNIFER L. GIVENS
 4          Assistant Professor of Law, General Faculty
 5          Legal Director, the Innocence Project of UVA
 6          School of Law.
 7          and
 8          DEIRDRE M. ENRIGHT
 9          The Innocence Project at UVA School of Law
10          Charlottesville, Virginia
11
12          LAW OFFICES OF TROUTMAN SANDERS
13          By:  STEPHEN A. NORTHUP, ESQ.
14              Richmond, Virginia
15          On Behalf of the Petitioner
16
17
18          OFFICE OF THE ATTORNEY GENERAL
19          By:  ALICE T. ARMSTRONG, ESQ.
20              Senior Assistant Attorney General
21              Director of Actual Innocence and Capital
22              Litigation Unit
23              Richmond, Virginia
24              attorney, of counsel for Respondent
25
```

```
 1              THE COURT:  What I have just done, is the
 2     transcript from our September 8 hearing, the
 3     original and a copy, were both delivered to my
 4     chambers and I had failed to bring the original
 5     here to provide to the Clerk.  So, I have today
 6     provided the original of our September 8 hearing to
 7     the Clerk.  I apologize for not getting it here
 8     earlier.  Reading it, it was the copy, but not
 9     realizing, putting things together was the
10     original.
11         Today the Court addresses the matter of
12     Emerson Eugene Stevens versus Adriane L. Bennett,
13     Chair of the Virginia Parole Board.
14         Before the Court states its ruling, I want to
15     thank all counsel involved in this.  You all know
16     so much more about *habeas corpus* than I would
17     possibly ever be able to know.  Neither as a
18     defense attorney or as prosecutor did I deal with
19     issues involving *habeas* for reasons I may state
20     through this; but I have learned a great deal.  The
21     work that has been done, both by the petitioner and
22     by the respondent, has been a tremendous help in
23     guiding the court to its resolution today.
24         These are great challenges for this or any
25     court to face and were it not for the benefit of
```

1   the work of very skilled counsel, this work would
2   be virtually impossible for the court to properly
3   assess.  So, I thank counsel for their diligent
4   efforts in this regard.

5        The matter today is before the court on an
6   amended petition for a writ of *habeas corpus* filed
7   by Mr. Stevens alleging that he was illegally
8   detained pursuant to Virginia Code Section 8.01-654
9   and the following sections alleging that his
10  detention is without lawful authority and he is
11  requesting relief pursuant to Virginia Code Section
12  8.01-654(A).

13       Mr. Stevens was convicted of first degree
14  murder and abduction with intent to defile on July
15  13, 1986, in the Lancaster County Circuit Court by
16  a jury impaneled from Essex County.

17       The jury fixed his sentence at 99 years and
18  one day imprisonment for the murder charge and 65
19  years on the abduction charge.  A final judgment
20  and sentencing order was entered in the case on
21  September 12, 1986.

22       Mr. Stevens had initially been tried February
23  24 through the 27, 1986, but with a jury from
24  Westmoreland County.  That jury was unable to reach
25  an unanimous verdict and a mistrial was declared.

```
 1          The convictions occurred on the re-trial of
 2     the case with a jury from Essex.
 3          The charge arises from the murder of Mary
 4     Harding, a 24-year old mother of two children and
 5     the wife of a Lancaster County resident, who was
 6     determined to be missing from her home on August
 7     23rd, 1985.  Ms. Harding's body was discovered in a
 8     tributary of the Rappahannock River.  The body was
 9     weighed down with a chain and cinder block and a
10     rope was wrapped around the victim's neck.
11     Multiple slash marks were observed on the victim's
12     back and buttocks.
13          The medical examiner's report entered at the
14     time determined the cause of death to be
15     asphyxiation.  A time of death was determined by
16     the medical examiner based upon the contents of the
17     victim's stomach of undigested food, which appeared
18     to have been the remnants of a dinner eaten several
19     hours before the murder.
20          The medical examiner would testify that the
21     cuts on the victim's back were caused by a knife of
22     a certain type.  The Commonwealth produced evidence
23     at trial that Mr. Stevens owned a similar knife.
24     Mr. Stevens had made conflicting statements about
25     the knife, ultimately admitting that his father had
```

1   discarded the knife prior to being interviewed by
2   the police.
3       The petition for *habeas corpus* focuses on a
4   number of issues involving testimony by witnesses
5   and failure on the part of the Commonwealth to
6   disclose exculpatory information as required under
7   *Brady versus Maryland*, 373 U.S. 83, a 1963 case,
8   and issues of ineffective assistance of counsel.
9       *Habeas Corpus* is a writ employed to bring a
10  person before a court, most frequently to insure
11  that the party's imprisonment or detention is not
12  illegal.  Our history of *habeas corpus* arises from
13  the *Habeas Corpus* Act of 1679, which secured to
14  English subjects speedy relief from all unlawful
15  imprisonments.  This English statutory right made
16  its way to be included in the constitutional
17  guarantee of personal liberty, which may not be
18  suspended by acts of the Legislature, pursuant to
19  Article 1, Section 9 of the Constitution of the
20  United States by pursuing Abraham Lincoln's
21  legislative provisions.  In Virginia, *habeas corpus*
22  is governed by statute.
23      Pursuant to that statute, jurisdiction for
24  *habeas corpus* petitions lie originally, but not
25  exclusively, with the Supreme Court of Virginia.

1    If a petition is filed and is not filed in the

2    Supreme Court, it must be filed with the court of

3    original jurisdiction which entered the original

4    judgment of conviction.

5        Accordingly, this court does have jurisdiction

6    over Mr. Stevens' petition for writ of *habeas*

7    *corpus*.

8        In assessing the claims requested by

9    Mr. Stevens, it is important that the court review

10   the procedural history of the case.  Following

11   sentencing on September 12, 1986, Mr. Stevens

12   appealed this matter to the Court of Appeals of

13   Virginia.  That Court affirmed Mr. Stevens'

14   conviction in a published opinion *Stevens v.*

15   *Commonwealth*, 8 Va. App. 117, 379 S.E.2d 469, 1989

16   case.  That opinion was released on March 21, 1989.

17   The Court of Appeals denied Stevens' petition for

18   rehearing *en banc* on May 17, 1989.  The Supreme

19   Court of Virginia denied further appeal by Order

20   dated November 2nd, 1989.

21       The initial petition for writ of *habeas corpus*

22   was filed in the Circuit Court of Lancaster County

23   on December 10, 1990.  Many issues similar to those

24   raised today were raised in the initial petition,

25   including allegations about the Commonwealth

```
1   improperly failing to provide requested exculpatory
2   evidence, at that time addressing scientific
3   reports, and an allegation that the Commonwealth
4   had knowingly presented perjured testimony of Clyde
5   Dunaway.
6        The initial petition for habeas corpus was
7   denied by this court.  It was denied a motion to
8   reconsider the denial of relief concerning
9   Dunaway's perjured testimony on July 9, 1991.  An
10  appeal was noted from the Court's judgement to the
11  Supreme Court of Virginia, but the appeal was
12  dismissed on a finding that the petition for appeal
13  had been not timely filed by Order of the Supreme
14  Court on October 23, 1991.
15       Mr. Stevens sought Federal habeas corpus
16  relief in the United States District Court for the
17  Eastern District of Virginia, Richmond division.
18  That Court denied relief by Order of November 20,
19  1992.   In reading the memorandum opinion from the
20  United States District Court for the Eastern
21  District, the Court found that Mr. Stevens had
22  committed a procedural default in his appeal of his
23  State habeas corpus petition, not raising issues of
24  Dunaway's perjury or failure to disclose
25  exculpatory information regarding interviews with
```

1  Dunaway.

2      This Court ultimately entered an Order

3  authorizing DNA testing of available evidence on

4  November 20, 2012, on Mr. Stevens' motion for

5  mitochondrial DNA testing of hair.  The submitted

6  material was determined not appropriate for

7  testing.

8      The initial petition in this matter was filed

9  on October 4, 2016.

10      On October 21, 2016, the Court granted an

11  unopposed motion to file an amended pleading.

12      On December 19, 2016, Mr. Stevens filed an

13  amended petition for writ of *habeas corpus*.  The

14  amended petition raises five claims for relief.

15      One: The Commonwealth knowingly used the false

16  testimony of Clyde Dunaway; and counsel was

17  ineffective for failing to raise this due process

18  violation on direct appeal.

19      Two:  The Commonwealth knowingly used the

20  false testimony of Dr. Boon.

21      Three:  The Commonwealth knowingly used the

22  false testimony of Earl Smith or failed to satisfy

23  its obligation under *Brady v. Maryland* to disclose

24  Smith's prior statements.

25      Four:  The Commonwealth violated *Brady* by

1   failing to disclose exculpatory evidence.

2       Five:   Trial counsel was ineffective for

3   failing to present the testimony of Ray Reynolds.

4       In response to the amended petition, a motion

5   to dismiss was filed on behalf of the respondent.

6   At that time it was Eddie L. Pearson, Warden of the

7   Greensville Correctional Center.  Subsequently,

8   Mr. Stevens was granted parole and at the last

9   hearing on September 8th, the party respondent was

10  substituted to reflect the Sheriff of the Virginia

11  Parole Board.  The Court allowed additional

12  responsive pleadings to the motions, including a

13  reply in opposition to the Warden's motion to

14  dismiss on March 14, and a Warden's response in

15  support of a motion to dismiss on April 17, 2017.

16      The Court would note that the reply opposition

17  brief was allowed over the objection of the

18  Commonwealth.

19      The motion to dismiss was argued in this court

20  on September 8, 2017.

21      The Court will now attempt to assess the

22  claims for relief.

23      Claim Number One.  The Commonwealth knowingly

24  presented Clyde Dunaway's false testimony at both

25  trials and counsel failed to raise the issue on

1    appeal.

2         Clyde Dunaway testified that he saw

3    Mr. Stevens' truck parked a short distance from the

4    victim's house on the night of her murder.  When

5    confronted at trial about attempts to receive a

6    reward for compensation for his testimony, Dunaway

7    denied having made such inquiries.  Point in fact,

8    Dunaway had made at least five inquiries from law

9    enforcement officers, including two deputy

10   sheriffs, about receiving a reward for his

11   cooperation.  There was a $20,000.00 reward that

12   was noticed at the time.  Dunaway had made numerous

13   inquiries about receiving all or a portion of that

14   for his cooperative testimony.  The Commonwealth

15   did not endeavor to correct Dunaway's false

16   statements.

17        Following the trial, a special prosecutor was

18   appointed to investigate perjury allegations

19   arising from the trial.  Dunaway ultimately pled

20   guilty to a misdemeanor charge of obstruction of

21   justice to resolve a criminal matter charged as

22   perjury on March 1st, 1998.  The Court would note

23   Mr. Stevens was also charged with perjury, which is

24   another rather unusual feature in this case.

25        Throughout the history of this case and the

1    amended petition and the responsive filings made by
2    Mr. Stevens, he has asserted his actual innocence.
3    The Court notes that Mr. Stevens has always
4    maintained innocence to the allegations of these
5    matters.   Here the Court makes reference to actual
6    innocence as a legal assertion made on Mr. Stevens'
7    behalf.

8        In making this argument, Mr. Stevens relies
9    upon *Schlup versus Delo*.  And Counsel, I will ruin
10   these various names undoubtedly that I refer to and
11   I will work with Ms. Holbrook to see that they are
12   correct in the transcript; but if you-all will bear
13   with my poor pronunciations of names foreign to a
14   lawyer now.  The *Schlup* decision was reported by
15   the U.S. Supreme Court, 513 U.S. 298 (1995) and it
16   stands for the proposition that actual innocence
17   may serve as an excuse to procedural bars.

18       And the *McQuiggin v. Perkins* case, and I note
19   in Mr. Stevens' footnote that it was the "iggin"
20   that you couldn't find and then played around and
21   the "Q" was correct, but the "g" was not.  That is
22   reported at 569 U.S. 383 (2013).  Their report said
23   "actual innocence, proved, serves as a gateway
24   through which a petitioner may pass whether the
25   impediment is a procedural bar, as it was in *Schlup*

1   and *House*, or, as in this case, expiration of the

2   statute of limitations."  Here, the U.S. Supreme

3   Court was addressing it, the *habeas corpus*

4   petition, which was filed under the Federal *habeas*

5   *corpus* statute.  Like Virginia's *habeas corpus*

6   statute, in play at the time, a one-year statute of

7   limitations.

8       The Supreme Court went on to caution "that

9   tenable actual innocence gateway pleas are rare: A

10  petition does not meet the threshold requirement

11  unless he persuades the District Court that in

12  light of the new evidence, no juror, acting

13  reasonably, would have voted to find him guilty

14  beyond a reasonable doubt".

15      Mr. Stevens concedes that the Virginia Supreme

16  Court has not adopted the gateway standard of

17  actual innocence and cites two Circuit Court cases

18  with a proposition that the *Schlup-McQuiggin*

19  standard has been applied by Circuit Court in their

20  request that this court apply it in this case as

21  well.

22      In *Redy v. Wright*, 60 Va. Circuit Court 18,

23  (2002) case, in which Judge Weckstein considered

24  whether Redy had presented evidence of actual

25  innocence in light of new evidence to show that it

1    would be more likely than not that no reasonable

2    juror would vote to convict, the Court found that

3    only by meeting his burden on his actual innocence

4    claim can he evade the bar of the statute of

5    limitation and any other procedural bars, and have

6    his other constitutional claims, his competency-

7    related claims, considered by the Court.

8    Ultimately the court found that *Redy* had not

9    carried the burden.

10        Mr. Stevens also cites *Neal v. Commonwealth's*

11   *Attorney in Roanoke*, 60 Va. Circuit Court 440.

12   This was a 2003 case.  This is not a *habeas* case,

13   rather it is a motion for new scientific

14   investigation and retention of biological evidence.

15   The Court did not find this case to be instructive

16   in this particular matter.  And I would note that

17   Judge Weckstein is a significantly better Judge

18   than I could ever pretend to be.  His decision in

19   *Redy* was well thought out and quite well-measured.

20        The Court would note that subsequent to both

21   of these Circuit Court decisions, the Virginia

22   Supreme Court in *Teleguz v. Commonwealth*, 279 Va. 1

23   (2010) held that the petitioner's claim was quote

24   "barred because of assertions of actual innocence

25   are outside the scope of *habeas corpus* review,

1   which concerns only the legality of the

2   petitioner's detention".

3       In considering the request to adopt the

4   gateway approach, the Court was mindful that

5   pursuant to Virginia Code Section 19.2-327.11, the

6   Virginia General Assembly has created a process

7   through the writ of actual innocence by which a

8   defendant may establish their innocence upon clear

9   and convincing evidence that no rational trier of

10  fact could have found sufficient evidence beyond a

11  reasonable doubt as to one or more of the elements

12  of which the petitioner was convicted.

13      While this Court is not unsympathetic to the

14  circumstance this ruling may place on Mr. Stevens,

15  it doesn't believe it is appropriate for the Court

16  to ignore the statutory limitations nor to expand

17  existing law.  This Court views its responsibility

18  as zealously guarding existing law and not making

19  it.

20      Accordingly, the Court believes the holding in

21  *Teleguz* is a proper statement of Virginia law.  The

22  Court declines to apply the broader actual

23  innocence review approach requested by Mr. Stevens.

24  The Court frames this, in future direct appeals the

25  issue may be structured in a way that the Virginia

1    Supreme Court may have an opportunity to directly

2    address it, rather than addressing this as some

3    tangental issue.  The Court thinks that it is

4    important that it be available to be addressed.  I

5    note there are serious issues which have been

6    raised, which were the standard to review the issue

7    of actual innocence as a gateway to make the

8    analysis.  The Court's reading may be different.

9         This case presents a number of, what the Court

10   can only describe as, unusual circumstances.  The

11   medical examiner has changed her conclusions

12   regarding the cut marks found on the body.

13   Initially concluding that they were the result of a

14   knife, which was a very large focus, if you read

15   the transcript, a very large focus of testimony of

16   a number of the witnesses of the Commonwealth.  The

17   issue about the knife and its disposition can only

18   be read as being adverse because of the statements

19   Mr. Stevens made and representations about the

20   disposition of the knife.  The medical examiner has

21   now concluded, upon review, that the slashes are

22   consistent with a motor boat propeller.

23        Additionally, there is an entire body of

24   scientific evidence that has developed, calling

25   into question the reliability of hair evidence

1   which was presented central to the case made by the

2   Commonwealth.  To a very large extent, petitioner's

3   counsel had provided significant evidence to

4   confirm that by the standards being currently

5   employed by the Federal Bureau of Investigation,

6   the testimony of the expert at trial, fell within

7   what the Court would refer to as just areas of

8   improper testimony and conclusion regarding that

9   evidence.

10         There are issues that were raised, and I would

11   just say to counsel, I know that is significant to

12   counsel for the petitioner, that this FBI report

13   was found, and some other documents, in a box that

14   was in the Sheriff's Office.  There's a suggestion

15   that there was some kind of improper conduct that

16   requires some further scrutiny.  I suggest that the

17   disposition of that box, the information at the

18   Sheriff's Office, has more to do with the changes

19   which have occurred since Mr. Stevens original

20   trial.  We are now on the second Commonwealth's

21   attorney since Mr. Schmidt. We are on the second

22   Sheriff.  First Sheriff, I guess, since Sheriff

23   Crockett retired.  We are in an all-new building.

24   Everything in many ways is different.  I am not

25   sure that the location of the box by Deputy Hogge

```
 1   of the Sheriff's Office is anything other than a
 2   function of those changes and not some negative
 3   attempt or intent to conceal, hide information.   I
 4   would suggest that if you were to hide information,
 5   the Sheriff's Office may not necessarily be the
 6   correct place to do that, considering various
 7   changes in administrations.   These raise serious
 8   concerns.   However, not applying that standard,
 9   places these issues outside of the Court's
10   analysis.
11        As to Claim 1, the Court finds that the
12   subsequent claim regarding Dunaway's alleged
13   perjured testimony was available during the
14   pendency of his direct appeal.   The Court further
15   notes that the issue was raised by the petitioner
16   in his writ of habeas corpus filed on April 17,
17   1992, in the Eastern District of Virginia and the
18   cite is at Page 4, Paragraph C3, in which
19   Mr. Stevens' petition states "Failure to provide
20   evidence that a material witness for the
21   Commonwealth committed perjury, which such witness,
22   Clyde Dunaway, was convicted of in a proceeding
23   following the trial of Emerson Stevens, at which
24   trial, the Commonwealth emphasized the importance
25   of the testimony of Dunaway".   Therefor, as to the
```

1   substantive portion of Claim 1, the Court grants
2   the motion to dismiss as barred under Virginia Code
3   Section 8.01-654 (B)(2) as untimely.
4       The Court further finds that the ineffective
5   assistance of counsel claim is untimely as well.
6       Mr. Stevens is well aware of the issues raised
7   by appellate counsel on November 2nd, 1989.
8   Accordingly, Claim Number 1, assertion of
9   ineffective assistance of counsel is dismissed
10  pursuant to the motion.
11      In doing so, however, the Court has analyzed
12  whether the actions of appellate counsel were
13  ineffective for not raising a claim under *Napue v.*
14  *Illinois*, 360 U.S. 264, which stands for the
15  proposition that a prosecutor's failure to correct
16  knowingly false testimony was a due process
17  violation under the Fourteenth Amendment of the
18  U.S. Constitution.  The substance of the complaint
19  is that appellate counsel for Mr. Stevens did not
20  supplement or amend his pending brief on direct
21  appeal to the Virginia Court of Appeals while the
22  matter was pending, even though Dunaway's case
23  concluded with his conviction almost a year before
24  the direct appeal was concluded.
25      To succeed on a claim of ineffective

1    assistance of counsel, Mr. Stevens must show that

2    his attorney's performance was both deficient and

3    that he was prejudiced as a result set out in

4    *Strickland v. Washington*, 466 U.S. 668 (1984).  Set

5    out in *Jerman v. The Director of the Department of*

6    *Corrections*, 267 Va. 432 (2004) Virginia Supreme

7    Court case:  "Jerman must first prove that his

8    counsel's performance was deficient, meaning that

9    counsel made errors so serious that counsel was not

10   functioning as the counsel guaranteed the defendant

11   by the Sixth Amendment".  He must next show that

12   "the deficient performance prejudiced the defense";

13   that is to say, that "counsel's errors are so

14   serious as to deprive the defendant of a fair

15   trial".  Unless he can establish both prongs of the

16   two-part test, his claims of ineffective assistance

17   of counsel will fail.  Quote from *Jerman* at Page

18   438 of the Supreme Court records.

19        Reviewing the record, it is clear that

20   appellate counsel undertook efforts to raise the

21   *Napue* claim on appeal.  By letter dated April 30th,

22   1987, from James W. Parker, the appellate counsel,

23   to Cynthia L. McCoy, then Deputy Clerk of the Court

24   of Appeals of Virginia, counsel requested to

25   continue a scheduled oral argument so that he might

supplement the record with information obtained
from the special prosecutor.

Counsel requested this Court to allow an
opportunity to supplement the record with a hearing
on June 4, 1987, even requesting that testimony be
taken from the special prosecutor.  This Court
found that it was without jurisdiction to grant the
relief and the motion was denied.

On appeal to the Supreme Court, appellate
counsel in its motion for *writ of certiorari* again
attempts to supplement the record with information
of Dunaway's conviction and information obtained
from the Commonwealth's attorney's file through the
special prosecutor.  As indicated earlier,
appellate counsel raised the issue during the
initial *habeas* review in Federal Court.

The review of the ineffective assistance claim
under Claim 1, the Court having dismissed the
substantive claim for timeliness and ineffective
assistance of counsel claim of timeliness, would
note that we find no bearing setting aside the
timeliness issue, on the claim of ineffective
assistance as to these issues.

As to Claim II, the Commonwealth knowingly
presented false testimony from Dr. Boon.  The Court

1    has struggled with the issues associated with this

2    claim, perhaps more than any other.  In part,

3    because the claim is based upon the FBI report,

4    which the Court, in doing the work I use to do, I

5    would have known it as a 302, which is called an

6    FBI report.  In reviewing that, we noted recovered

7    for Mr. Stevens by his counsel, received from a

8    member of the Lancaster County Sheriff's Department

9    on October 4, 2016.  The FBI report is undated, was

10   prepared by Special Agent named Earl Pitts, but

11   there is no date on it.  It is clearly prior to the

12   date of Mr. Stevens' arrest and includes the

13   following statement: "Because of the tidal action

14   and currents of the Rappahannock River, it is

15   currently estimated that the body of Mary Keyser

16   Harding was dumped within 500 to 600 yards of where

17   it was eventually located".  There is no

18   explanation in the report for that conclusion, nor

19   are there any accompanying documents upon which

20   that conclusion is based.

21        This statement contained in the 302 or FBI

22   report by Special Agent Pitts of the FBI is raised

23   as an issue by appending a letter dated May 2nd,

24   1986, from John D. Boon, the III, PhD. to C.

25   Jeffers Schmidt, Jr., Commonwealth's attorney,

1    Lancaster County.  It is presumed by the Court, it

2    is not clearly stated, but presumed by the Court

3    that this letter was recovered by Mr. Stevens'

4    counsel during a permissive review of the

5    Commonwealth's file allowed by Robert Cunningham,

6    then the Commonwealth's attorney of Lancaster

7    County, prior to filing the initial petition for

8    the *writ of habeas corpus*, as the Court understood,

9    which occurred more than a year prior to the filing

10   of the current amended or before the current

11   petition for *writ of habeas corpus*.

12       The Court has also read the transcript of the

13   testimony of Dr. Boon.  Doctor Boon's appearance

14   was as an expert witness, a doctor associated with

15   the Virginia Institute of Marine Science, to

16   testify about tidal currents in the Rappahannock

17   River basin.  He was asked to render an opinion on

18   a question of whether a body weighed as indicated

19   would have been able to travel from a location

20   given by the Commonwealth to the location in which

21   the body was recovered.

22       Without additional information to determine

23   how Special Agent Pitts drew the conclusion about

24   the location of the body's entry in the

25   Rappahannock River system, the Court concluded its

```
 1    values in impeaching or confronting an expert
 2    witness would be severely limited.
 3         Further, the Court reads Dr. Boon's May 2nd,
 4    1986 letter not as some admission that his prior
 5    testimony was false, but rather his sense that his
 6    testimony was of limited value in a murder case.
 7    It is what this Court views as, I will use the term
 8    I use to describe it, you see it with jurors and
 9    witnesses, it's an offering, any, any excuse to get
10    out of coming to court or to be excused from jury
11    duty, people take.  He writes this letter that says
12    my work is valuable, I don't want to come to court
13    for four days and I don't think my testimony is
14    very important.  In doing that, he makes reference
15    to a statement made by Virginia State Police
16    Investigator David Riley, who termed his testimony
17    as "eye wash".  I was asked by Mr. Stevens' counsel
18    what I thought "eye wash" meant.  I didn't give the
19    right answer because I didn't know what "eye wash"
20    meant.  I never heard that phrase before.  It was
21    introduced in this letter and included in this.  It
22    is informally defined as insincere talk or
23    nonsense.  This characterization by Riley seems
24    more of an insult to the integrity of Dr. Boon's
25    expert, professional testimony than it does to its
```

1  truthfulness.   The court notes that there is some

2  irony in Investigator Riley whose tactics are very

3  much a part of Mr. Stevens actual innocence

4  associates, being pointed to as being the person

5  who could define the truth in the content of any

6  testimony.

7      The Court doesn't believe that the evidence

8  suggests that the Commonwealth knowingly presented

9  false testimony.  The evidence suggests that the

10  Commonwealth had available through its expert

11  testimony a conclusion that the hypothetical

12  presented was possible based upon an understanding

13  of tidal currents in the Rappahannock River

14  system.  As is true with much of expert testimony,

15  it may have been subject to significant challenge.

16  It may have been rebutted by conflicting expert

17  testimony.  But the Court finds no merit in Claim

18  II and does not find evidence of a *Napue* violation.

19  Accordingly, the motion to dismiss as to Claim II

20  is granted.

21      As to Claim III, the Commonwealth knowingly

22  presented false testimony from Earl Smith.

23  Mr. Stevens argues that the Commonwealth presented

24  the evidence of Earl Steve Smith, knowing his

25  testimony to be false.  In the alternative, they

1    argue that the Commonwealth violated *Brady* by not
2    disclosing Smith's prior statements to law
3    enforcement.  At trial, Smith testified as to two
4    issues of significance.  One involved an incident
5    where another vehicle was towed from a ditch by
6    Mr. Stevens with the assistance of Mr. Smith and
7    others.  Although two other witnesses testified
8    that the incident occurred on August 8, 1985,
9    Mr. Smith was not asked by the Commonwealth the
10   date of the incident.  The trial transcript at Page
11   196 indicates that Mr. Schmidt, the Commonwealth's
12   attorney, asked "Do you recall a time during the
13   rain when you saw a car stuck in a ditch?".  It was
14   not a question of the date.  Could only have made
15   reference to the date adopted from the testimony of
16   earlier witnesses.  The Court notes that none of
17   the witnesses interviews, other than through the
18   FBI reports noted in the supplemental appendix to
19   the amended petition for writ of *habeas corpus,*
20   address the towing incident at all.
21         The second issue involves the time at which
22   Smith was picked up by Mr. Stevens on the morning
23   following the murder.  Smith testified that he was
24   picked up late in the morning.  An interview of
25   Smith conducted by Special Agent Riley on September

1    5, 1985, includes the statement, Smith: Stevens

2    picked him up the next morning, Friday, August

3    23rd, 1985, to go crabbing at the usual time, 5:30

4    to 6:00 a.m..

5        Upon cross-examination, Smith conceded that he

6    could have been mistaken about Stevens arrival on

7    August 23rd.  Smith testified in ways that would

8    have been consistent with Mr. Stevens' testimony,

9    stating upon arrival at Stevens' boat on Friday

10   morning, he didn't see anything unusual about the

11   boat or Stevens.  The boat was like we put it in

12   the slip the day before.  The boat didn't look to

13   me like it had been touched.  Everything was in

14   place like we put it.  It was where we left it.  He

15   further stated that Stevens didn't appear nervous

16   or fidgety.  The testimony begins in the transcript

17   on Page 211.

18        This question about a late pick up was one

19   that was clarified through the testimony that

20   Mr. Stevens the day prior had a doctor's

21   appointment with Dr. David Antonio.  Doctor

22   Antonio's records confirmed the appointment on the

23   earlier date and indeed, Mr. Stevens' testimony and

24   conceded ultimately by Mr. Smith, was the day

25   before Mr. Stevens had started his day late in

1     order to accommodate the doctor's appointment.

2         In reading Mr. Smith's testimony, the court

3     does not believe that Mr. Stevens has demonstrated

4     that the testimony was false or that the

5     Commonwealth knew that it was false.  The confusion

6     about the date Mr. Stevens was late was corrected

7     upon cross-examination.

8         As to the disclosure of the interviews of

9     Stevens, most of the issues in Claim IV address

10    *Brady* materials.  This is an appropriate time for

11    the court to address the standard that the court is

12    to apply in analyzing alleged violation of *Brady*

13    for failure to turn over materials.  The Supreme

14    Court has held that the suppression by the

15    prosecution of evidence favorable to an accused

16    upon request violates due process where the

17    evidence is material either to guilt or punishment,

18    irrespective of the good faith or bad faith of the

19    prosecution.  Set out at Page 87 of the *Brady*

20    decision.

21         The elements of a *Brady* violation are that the

22    evidence is favorable to the accused, suppressed by

23    the prosecution and material.  The Supreme Court in

24    1985 extended *Brady* to encompass impeachment

25    evidence, as well as evidence which may be

1    favorable to the case in chief.  The failure to

2    disclose favorable evidence constitutes

3    suppression, even if it is known only to the

4    police.

5         Evidence is material if it could reasonably be

6    taken to put the whole case in such a different

7    light as to undermine confidence in the verdict.

8    Materiality is satisfied if there is a reasonable

9    probability that had the evidence been disclosed,

10   the result of the proceedings would have been

11   different.   Applying that standard to Smith's

12   statements, including the statement of Smith

13   contained within the FBI report, the Court finds

14   the evidence would not have or the information

15   would not have aided impeachment with regard to the

16   time of the pick up the day following the murder,

17   since cross-examination accomplished Smith

18   conceding that he could have been mistaken as to

19   the date of the late pick up.

20        As to Smith's statement contained in the FBI

21   report about the presence of a knife on Stevens'

22   dashboard, by this analysis, this would not change

23   the results of the proceeding since Stevens made

24   admissions to owning the knife of a kind in

25   question.

1     Accordingly, the Court grants the motion to

2  dismiss as to Claim III.

3     The Court would note that many of the claims

4  here arise from information contained in the

5  aforementioned FBI Report 302.  At trial, in

6  response to Mr. Stevens' assertions that the FBI

7  report could possibly contain exculpatory evidence,

8  the Commonwealth's attorney submitted the report

9  for the Court to review.  The Court reviewed the

10 report.  Following review of the FBI report, the

11 Court ruled that it did not contain exculpatory

12 evidence and ordered the material filed.  Upon the

13 Court's ruling, the Commonwealth was not obligated

14 to provide the report.  Further, the trial court

15 noted, excuse me, trial counsel noted at the

16 sentencing hearing, the Court decided that in its

17 opinion there was no exculpatory evidence in that

18 summary, and I certainly accept that.  No objection

19 was made to the Court's ruling.  No action was

20 undertaken to preserve the issue of the Court's

21 determination of exculpatory or materiality, and

22 therefore, claims as to the violation of the rule

23 of *Brady* do not apply to the FBI report.

24 Speculation on how other courts may have received

25 and handled this report are immaterial.  Reality

1   is, the Commonwealth is absolved from disclosure by

2   the Court's ruling, which was not objected to.

3   Mr. Stevens may not now raise it as a basis for his

4   *habeas* request.

5   We note that Claim IV,(2) relies almost

6   entirely on the FBI report, as do portions of each

7   of the contents of Claim IV.

8   As to Claim IV, Subsection 1, the Court finds

9   no *Brady* violation for the failure to turn over the

10  statement of Thomas E. Stevens.  Stevens indicates

11  that Mr. Stevens' boat was not equipped with

12  lights.  However, in the same paragraph of an

13  interview with Special Agent Riley on September 4,

14  1985, he indicated that he saw Mr. Stevens at

15  approximately 4:00 a.m. on August 23rd, 1985.  The

16  Court does not find the material at a reasonable

17  probability would change the result of the

18  proceedings and thereby the court finds the

19  material in Stevens' statement to be immaterial.

20  Claim IV (3).  Again, an analysis of the

21  testimony of Mr. Brent and Mr. Brent's statement to

22  Special Agent Robertson that Stevens is not a

23  violent individual and that he had never seen

24  Stevens with a knife may have been used to impeach

25  Brent's testimony; however, Mr. Stevens had made an

1    admission of owning a knife similar to the knife in
2    question and acknowledged having made a false
3    representation about the disposition of the knife.
4    In light of Mr. Stevens' admission, the court does
5    not find the contents of Brent's statement, even if
6    disclosed and developed by reasonably competent
7    counsel, would undermine the confidence in the
8    verdict nor would have resulted in the proceedings
9    having a different result.
10        Claim IV, (4).  The contents of all of the
11   requests in this portion of Claim IV rest upon the
12   release of the FBI report this Court had previously
13   deemed at the time of trial not to contain
14   exculpatory evidence and not released by the court
15   at the time of trial.
16        Claim IV, (6).  The statement of Patrick Quinn
17   involving his remembrance of a chain in
18   Mr. Stevens' truck when Stevens and others   helped
19   pull Quinn's vehicle from the ditch.  When
20   initially interviewed, Quinn said he didn't
21   remember it, but at the trial he said he wasn't
22   sure whether there was a chain.  Quinn conceded
23   that a chain may have been used initially in an
24   attempt to tow his truck from the ditch.  He said
25   he was distracted by the level of water and was

1    concerned that Mr. Stevens' truck would wind up in
2    the water, the ditch.  When asked about the chain,
3    Mr. Stevens at trial did not recall having a chain
4    that day, but he didn't deny having a chain that
5    day.  The witness who described his remembrance as
6    "honestly can't say" is not likely to have been
7    impeached in a manner which would have resulted in
8    a different verdict.  The Court finds that this
9    matter is also not material and grants the motion
10   to dismiss as to this claim.
11        Claim IV, (7).  Issues regarding the testimony
12   of Ann Dick have been raised in direct appeal and
13   were again addressed in the *habeas* proceedings
14   previously filed.  This portion of the claim is
15   barred under Virginia Code Section 8.01-654(B)(2).
16        Claim IV, (8).  Mr. Stevens suggests that the
17   letter from the Commonwealth's attorney Mr. Schmidt
18   to Special Agent Riley is an example of the
19   prosecutor coaching the witness.  The Court doesn't
20   view this as coaching in any way, but rather as the
21   prosecutor reviewing his case and concerns with the
22   investigator with whom he has, obviously, worked
23   closely through a trial and in preparation of
24   retrial.  The Court does not deem the contents of
25   the letter nor the nature of the communication to

1   be exculpatory or in any manner  suggestive of

2   coaching.  To the extent that the statements

3   reflect concerns of Mr. Schmidt, it would have been

4   the Commonwealth's work product and not subject to

5   disclosure, had he not chosen to include them in a

6   letter.  Also note, that he sent a letter

7   expressing the same concerns about the testimony of

8   the victim's husband, Mr. Harding, to Mr. Harding.

9   Questions about dating, questions about the

10  disposition of insurance funds, question about

11  buying a fancy car.  But these, again, are not, as

12  the Court sees them, suggestions of coaching.

13  These are concerns, and, to the extent that you

14  deem them, the letter to Mr. Harding forewarned him

15  of issues that may be there.  The Court would note

16  in the letter to Investigator Riley, there is a

17  person identified who had not been interviewed by

18  the Commonwealth.  Mr. Schmidt's letter suggests

19  that Mr. Riley, Investigator Riley, should speak

20  with that person as a potential witness.

21  Mr. Schmidt had deemed information that they may be

22  available to provide information involving

23  Mr. Stevens' conduct.

24       Claim IV, (9).  The Court finds that the

25  statements of Emerson Harding, husband of the

1    victim, do contain some inconsistencies from his

2    trial testimony, particularly a distinction between

3    hearing a strange noise on the night before the

4    murder and observing a slow moving vehicle on the

5    night prior to the murder and the dating of a crude

6    comment made by Mr. Stevens about Ms. Harding,

7    whether that was a year prior to the murder or two

8    weeks before.  The Court doesn't believe that the

9    availability of the information and the attempted

10   impeachment of Mr. Harding with the information

11   would have resulted in a different verdict.

12       This is cumulative of the FBI report and a

13   number of the other documents which have been

14   submitted by both sides in this proceeding and

15   issues of disclosure or nondisclosure.

16       It is this Court's position in reviewing

17   discovery, personal involvement in doing this, that

18   the government should release as much information

19   as it possibly can in every case which doesn't

20   place in danger a witness or another defendant. I

21   strongly believe that the government should adhere

22   to the highest standards of disclosure to insure

23   that the system of justice works properly and to

24   avoid trial by surprise.  Many prosecutors disagree

25   with this idea.  Fortunately, today, the

1   prosecutors with whom I work regularly exceed the

2   expected standards.  Many of the questions in this

3   case, in fact, most of what has been raised in the

4   petition for *habeas corpus* would not have arisen

5   had there been a full and complete disclosure of

6   information.

7        Having said that, applying the standard as the

8   Court understands it, the various subparts of Claim

9   IV raise questions as to whether the availability

10  of all of the information of the investigations and

11  identified suspects would have provided adequate

12  impeachment information and exculpatory evidence to

13  produce a different result.  It is suggested by the

14  petitioner that had he had the information about

15  other potential suspects, they would have produced

16  evidence about each of those suspects to raise

17  potential reasonable doubt as to the defendant's

18  guilt.  The Court concludes, however, it would not

19  have resulted in a different conclusion because the

20  identification of the suspects would also come with

21  credible evidence which creates an alibi for each

22  of them.  When initially reading the FBI report,

23  Richard Dawson seems to be a very strong candidate,

24  a suspect in this matter.  However, there is alibi

25  evidence that he gave that he had a long distance

1   telephone call, which was confirmed by law

2   enforcement at a time consistent with the murder.

3       Emerson Harding was working offshore as

4   confirmed by his employer, Standard Products, at

5   the time.

6       Keith Wilmer had his wife's testimony that he

7   was at his residence from 6:15 until he left at

8   1:30 a.m. to go crabbing.

9       Mr. Stevens could have inserted any name as a

10  possible suspect.  They would have to come with

11  credible evidence that would have been produced as

12  to the alibi of each of them.

13      The Court notes that among the suspects

14  referred to in the FBI report is Emerson Stevens.

15  The Court is also mindful that Mr. Stevens produced

16  alibi witnesses.  The Commonwealth raises in their

17  motion to dismiss the presence of those alibi

18  witnesses and the Court believes that it is

19  appropriate.

20      The jury did not accept the alibi evidence

21  presented and made a finding of guilty, indicating

22  they did not find the alibi testimony credible.

23      Accordingly, the Court grants the motion to

24  dismiss as to the various claims and the claim in

25  its entirety as stated in whole under Claim IV,

1    through their petition for writ of *habeas corpus*.

2        Claim V.  Trial counsel unreasonably failed to

3    present testimony from Ray Reynolds.  Mr. Reynolds

4    was a buyer for a local crab house which

5    Mr. Stevens sold his catch.  Statements from Alfred

6    C. Brown of Investigation Security Services, Inc.,

7    which is a part of the appendix filed by the

8    petitioner, it is dated March 14, 2005, indicating

9    at that time his interview of Reynolds.  At least

10   since that time, Mr. Stevens has had the benefit of

11   Reynolds insight, even though most of that

12   interview addresses Special Agent Riley's handling

13   of Reynolds and his handling of this portion of the

14   investigation.

15       We note at trial, Special Agent Riley

16   testified that the records of Barrack & Reynolds

17   Crab House, Mr. Stevens sold the same amount of

18   crabs the entire week, including August 23rd.  It

19   is in the transcript at Page 184.  Further, the

20   purchase logs covering August 16 through August 29

21   were introduced as Respondent's Exhibit T were

22   available for inspection by the jury.  The Court

23   finds that the claim was not pursued timely.

24   Further we find that no merit to the claim that

25   trial counsel was ineffective in not calling

1   Reynolds to testify, since the evidence designed to
2   show that Mr. Stevens had worked a normal day on
3   the day following the murder was available through
4   other sources as were the actual purchase records,
5   which were introduced to the jury.

6       The Court finds that the claim failed for
7   timeliness and the motion to dismiss is granted as
8   to this claim as well.

9       In ruling today, the Court does not dismiss
10  the serious questions that have been raised through
11  the petition for *habeas corpus*.  Further inquiry
12  would be appropriate, but the relief through *habeas
13  corpus*, taking into account the procedural bars
14  under the statute, the standards by which the Court
15  must review it are limited.

16      The challenge for the court is to constrain
17  its curiosity about issues beyond the scope of
18  *habeas* and properly limit its action in this way.

19      In total, the Court grants the motion to
20  dismiss the petition for *habeas corpus*.  We ask the
21  Attorney General to prepare an order reflecting
22  today's ruling.  We would note the objection of
23  Mr. Stevens and his counsel to today's ruling.

24      We will order a copy of the transcript of
25  today's ruling be prepared and filed with the

1     court, and will order that the Commonwealth bear

2     the burden of the cost of the transcript.

3         That is the Order of the Court.

4         Thank you.

5         (The proceedings were concluded at 11:48 a.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1
2                    REPORTER'S CERTIFICATE
3
4          I, having been sworn, do hereby certify
5    that the foregoing is a true and correct transcript
6    of my shorthand notes taken in this matter to the
7    best of my ability.
8          Given this 26th day of December, 2017.
9
10
11          _____
12          Jody A. Holbrook, CCR
13
14
15
16
17
18
19
20
21
22
23
24
25

VIRGINIA:

## IN THE CIRCUIT COURT OF LANCASTER COUNTY

EMERSON EUGENE STEVENS, #1150546,
      Petitioner,

   v.                                 Record No. CL16000095-00

ADRIANNE L. BENNETT,
CHAIR OF THE VIRGINIA PAROLE BOARD,
      Respondent.

### FINAL ORDER

This matter came before the Court on Petition for Writ of Habeas Corpus, the Respondent's Motion to Dismiss, the Petitioner's reply, and the Respondent's Response, which was filed with leave of the Court. The Court has carefully considered the pleadings and exhibits, controlling legal authorities and the record in of the trial proceedings in the cases of <u>Commonwealth v. Emerson Eugene Stevens</u>, Record Nos. Case Nos. 108A-1986 and 109A-1986, which are hereby made a part of the record in this case.

In addition, the Court heard argument on the habeas corpus petition and the motion to dismiss on September 8, 2017. For the reasons set forth on the record at a hearing conducted on December 1, 2017, the Court grants the motion to dismiss as to all claims. A transcript of the Court's ruling on December 1, 2017, has been filed and is incorporated herein by reference.

It is, therefore, **ORDERED** that the petition for a writ of habeas corpus is dismissed. The petitioner's objections are noted for the record.

The Clerk is directed to forward a certified copy of this Order to Jennifer L. Givens, counsel for the petitioner, and to Alice T. Armstrong, Senior Assistant Attorney General, counsel

for the respondent.

Entered this 7th day of February, 2018.

R. Michael McKenney
Judge

We ask for this:

ALICE T. ARMSTRONG
Senior Assistant Attorney General
Virginia State Bar No. 45149
OFFICE OF THE ATTORNEY GENERAL
202 North Ninth Street
Richmond, Virginia 23219
(804) 786-5315 (phone)
(804) 786-1108 (fax)
aarmstrong@oag.state.va.us

Seen and objected:

JENNIFER L. GIVENS
The Innocence Project
University of Virginia School of Law
580 Massie Road
Charlottesville, Virginia  22903
(434) 924-2912
jlg2ac@virginia.edu

A TRUE COPY
TESTE:
DIANE H. MUMFORD, CLERK
BY _____ D.C.
LANCASTER COUNTY CIRCUIT COURT

CERTIFIED COPY MAILED COUNSEL LISTED  02/07/2018

## VIRGINIA:

*In the Supreme Court of Virginia held at the Supreme Court Building in the City of Richmond on Tuesday the 18th day of September, 2018.*

Emerson Eugene Stevens,                                                          Appellant,

against          Record No. 180596
                 Circuit Court No. CL16000095-00

Adrianne Bennett, Chair,
Virginia Parole Board,                                                          Appellee.

From the Circuit Court of Lancaster County

Upon review of the record in this case and consideration of the argument submitted in support of and in opposition to the granting of an appeal, the Court is of the opinion there is no reversible error in the judgment complained of. Accordingly, the Court refuses the petition for appeal.

A Copy,

Teste:

Patricia L. Harrington, Clerk

By:          *SSrℓ*

Deputy Clerk

**298**

# VIRGINIA:

### *In the Supreme Court of Virginia held at the Supreme Court Building in the City of Richmond on Tuesday the 20th day of November, 2018.*

Emerson Eugene Stevens,                                                                          Appellant,

against         Record No. 180596
                Circuit Court No. CL16000095-00

Adrianne Bennett, Chair,
 Virginia Parole Board,                                                                          Appellee.

Upon a Petition for Rehearing


On consideration of the petition of the appellant to set aside the judgment

rendered herein on the 18th day of September, 2018 and grant a rehearing thereof, the prayer of

the said petition is denied.



A Copy,

Teste:

Patricia L. Harrington, Clerk

By:

Deputy Clerk


**299**

# A Murder on the Rappahannock River

A little over 30 years ago, a Northern Neck fisherman named Emerson Stevens went to prison for the brutal slaying of a homecoming queen and mother of two. Now, a reexamination of the case by a hard-charging UVA lawyer has turned up troubling questions. Did police have the wrong man?

WRITTEN BY MARISA M. KASHINO     | PHOTOGRAPHED BY GREG KAHN | PUBLISHED

ON **JUNE 27, 2019**

| TWEET | | SHARE |

## Part One

The sun was just beginning to fade when David Riley pulled up to the little house off Route 354. The Virginia State Police detective got out of his unmarked Ford Fairmont and took in the setting of the mystery that had brought him here—a low-slung home shrouded in trees and underbrush. Across the street, a cemetery.

It was Friday, August 23, 1985, and earlier that day, the local sheriff's office in Lancaster County had gotten a disturbing call: Mary Keyser Harding was missing.

A 24-year-old mother of two, Mary was a bookkeeper at the local bank. She also shouldered the weekday parenting while her husband, a commercial fisherman, was out to sea. She hadn't dropped her kids off at the sitters' that morning, so the children's great-grandmother went by the house. Mary's four-year-old son, Ray, answered the door. "Momma is gone," he said.

Ray and his one-year-old sister were in the house alone. The little boy's chicken dinner from the night before sat on the table. A dusting of Comet lay unrinsed in the bathroom sink. The TV was on.

By the time Detective Riley arrived, Mary's husband, Emerson Harding, had returned to shore. Her panicked family and friends had been in and out of the house for hours. In rural Lancaster County, population 10,000, word traveled faster than the mayflies. But now Lancaster's sprawling topography felt daunting. A patchwork of corn and soybean fields, interrupted only by thick bands of scrub pines and maples, blanketed the area. Beyond all that was the water, where most of the men in town made a living. Some fished from big corporate ships on the Chesapeake Bay. Others crabbed and oystered on the Rappahannock River, their bounty destined for dinner plates in Washington, 115 miles away.

The trade set a predictable rhythm for life on the peninsula. Though their husbands were gone much of the time, few wives worried about being alone. Crime was limited mostly to thefts and other petty offenses. The disappearance of a young mother was like a boulder plummeting into a still pond.

Pretty and blue-eyed, Mary had been homecoming queen of Lancaster High, class of 1978. Despite her five-foot-two, 100-pound frame, she also dominated on the basketball and softball teams. She was the fifth of the nine Keyser kids. Her father was an appliance repairman. Her mother worked as a waitress and mail carrier until she was gravely injured in a car accident. After that, Mary became the stand-in mom to her four younger brothers—checking homework, cooking dinner, and pushing them, in her playful way, to explore their curiosities. Once, four-year-old John asked about pepper—could it really make you sneeze? "Let's find out," said Mary, grinning.

> PRETTY AND BLUE-EYED, MARY HAD BEEN HOMECOMING QUEEN OF LANCASTER HIGH.

She and Emerson started dating in high school. He was a year behind her, more than six feet tall and as quiet as she was outgoing. After graduation, Mary enrolled at North Carolina Wesleyan on a softball scholarship. But college didn't take, and the couple missed each other. Mary got pregnant and moved back home to start her life as a wife and mother.

Anyone who knew her couldn't fathom that she'd ever abandon her kids. As Detective Riley made his way around the Hardings' property, he didn't think that was possible, either.

Outside by the back door, he saw a litter box, its contents splattered across the dirt, as if Mary had been startled, then dropped it while taking it outside. Nearby, he found one of her white flip-flops. The other one was out front by the driveway. To Riley, the conclusion was obvious: Someone had taken her.

**Over the weekend, search parties fanned out**. They moved through the woods around the cemetery and stomped through the late-summer cornstalks, tying ribbons around trees to signal where they'd checked. She could be out in the water, everyone knew that. But they tried to imagine finding her on land, maybe injured or kidnapped but alive.



Police found Mary's flip-flops in separate places in the yard. Photograph courtesy of the Innocence Project at UVA School of Law.

When two days of scouring turned up nothing, the mood around town darkened. Lancaster was a place where the local convenience store would let you run up a tab of $400 or $500, where kids ran free until sundown, when their parents would whistle for them to come home. Now neighbors were sizing one another up.

Riley was doing the same. The 37-year-old detective was a second-generation law-enforcement officer known for his swagger. He'd been with the state police nearly 15 years, several of which he'd spent investigating major crimes such as murders and rapes. It was a level of experience the Lancaster cops lacked—experience that now seemed essential.

By August 27, four days after Mary vanished, Riley had brought in a Cessna to aid the search. That afternoon, he was up in the airplane when its radio spit out an alert: A body had been found in the Rappahannock, just off the coast of a marshy area called Belle Isle.

"We flew as low as we could," Riley remembers. There it was, floating face down in water so shallow he could see straight to the river bottom.

"The body was badly decomposed," says Riley. "Extremely bloated, probably double the normal size."

The woman was naked. She had slashes on her back. And whoever had disposed of her had gone to brutal lengths to weigh her down. A rope around her neck was tied to a large cinder block. A heavy chain was secured to the rope, too, its other end wrapped around her right leg. Riley recognized the equipment—you'd find it on the boat of many watermen.

Soon the medical examiner confirmed what everyone already knew. Mary—she was in the water after all.

**With a killer on the loose, rumors bloomed like dark bruises**. Some people said a Satanic cult had murdered Mary. Others guessed it was a summer vacationer who'd already left town. Either option was easier to stomach than the idea that the murderer was one of their own.

"Everybody was just so scared and, you know, 'Who's going to be next?' " says Karen Lewis, one of Mary's best friends. "Of course, that's what people were thinking—'It could have been anybody.' "

People bought dogs, installed floodlights, added to their gun collections. Some sent their children away to stay with relatives. A psychic came to town to help investigate, and the Bank of Lancaster, Mary's employer, along with other donors, pooled $20,000 in reward money for information about the crime.



Mary's killer used a chain and a cinder block to submerge her body in the river. Photographs courtesy of the Innocence Project at UVA School of Law.

The case was so out of character for Lancaster that multiple law-enforcement agencies teamed up to work it. The FBI dispatched a trio of agents to assist, and local police cracked open their files on potential people of interest. But there was no mistaking who was in charge: David Riley and the Virginia State Police.

Riley prided himself on his command of details—his recall of just the right scrap of evidence when a new turn in a case suddenly made it relevant. "An aggressive agent but very competent," remembers Louis Sciarrone, one of the FBI agents sent to Lancaster.

Unsurprisingly to anyone who knew the town, one name that Riley and the other law officers heard early and often was Dawson.

Richard and Charles Dawson were well-known hell-raisers. Each had a history of resisting arrest and was considered armed and dangerous by the Lancaster cops, according to a law-enforcement summary of local police files. "I was down there one day and Richard's on top of the chicken house and the dad's yelling, 'Get down from there!' " says Keith Hogge, a lifelong Lancaster resident who was then an animal-control officer. "The dad went and got the shotgun. He shot [his son] right in the butt."



# OUR LITTLE MARY

Left us August 23, 1985.
We love and still miss you.

The Family





Mary's son, Ray, was home alone with his 1-year-old sister when the family discovered Mary was missing. Top photograph courtesy of the Innocence Project at UVA School of Law; bottom courtesy of Mary Harding's friends and family.

But lately, suspicions about the brothers had become more sinister. At the time of Mary's disappearance, according to investigative notes from her case, Richard was a suspect in the killing of his wife. (He was never charged in her death.) Charles was on the run after being accused of raping an eight-year-old girl. (He was convicted in 1986.)

Riley went to talk to Richard, but the brother didn't have anything to offer. He slugged from a can of Old Milwaukee as he told the detective he'd been with his kids the whole night Mary had been taken. As for his brother Charles, he said he hadn't seen him in weeks.

Another person Riley considered was a waterman named Keith Wilmer. He was the husband of one of Mary's coworkers, with a record of making obscene phone calls, according to investigative notes. But when he allowed police to search his house, boat, and truck, they didn't turn up anything useful. Wilmer also took a polygraph. It came back inconclusive.

Riley spoke to Mary's husband, too. Emerson Harding told him the couple had had some difficulty early in their marriage because of his immaturity—drinking too much, hanging out with the boys. But lately, he said, the relationship had been solid. Riley didn't consider Harding a suspect anyway. He'd learned early on that Harding had been out to sea, working, on the night in question. When his ship got word Mary was missing, it made an emergency trip back to shore to drop him off.

**As Riley tracked down leads, he posted up at the R&K Country Inn**, **the convenience store where watermen gassed up their boats and cashed their checks**. It wasn't long before he began to zero in on one fisherman in particular. The man was an independent operator that Mary's husband had singled out, and one who happened to share his first name: Emerson Stevens.

Like his father and brothers, Stevens was a crabber and oysterman—had been since quitting school after the ninth grade. He worked a 32-foot wooden boat named for his wife, the *Miss Sandra*. People knew him as a typical waterman: simple, liked his Old Milwaukee. "What you saw is what you got," says Lawrence Taft, owner of the R&K.

SOME PEOPLE SAID IT WAS A SATANIC CULT. OTHERS GUESSED
IT WAS A SUMMER VACATIONER WHO'D ALREADY LEFT TOWN.

Stevens wasn't a friend of the Hardings' per se, but he lived nearby and had been to their home. Harding told Riley that the waterman was around during the search parties as well as after Mary's funeral, and seemed shaky after the service. According to a police report, Harding described him to Riley as a loner and a drinker who talked a lot about women.

He recalled an incident from a year or so before, when he and Stevens both happened to be oystering in a deep spot of the Rappahannock called Mary's Hole: "You should know all about Mary's Hole," Harding remembered Stevens saying, according to the report.

Because Mary was found naked, Riley assumed her killer had sexually assaulted her. Still, he thought, Stevens's alleged comments didn't make him a murderer: *Men talk like that*. But the detective did pick up an interesting tidbit in Harding's description of Stevens: The waterman drove a white Dodge pickup. And earlier, the police had gotten a call from a tipster who said she'd driven by the Hardings' the night Mary was abducted and noticed a truck in the driveway. She couldn't identify the make or model but said it was light-colored.

A few days after Riley's conversation with Harding, the detective heard from a second witness, Clyde Dunaway, who said he, too, had driven by Mary's that night and seen a pickup. Dunaway described it as white with a short bed. In fact, Dunaway said he knew exactly whom it belonged to: his cousin Emerson Stevens.

Dunaway wasn't the only kin turning on the waterman. Down at the boat dock, another cousin, Thomas Stevens, told Riley he had been on the water about 4 am on August 23 and was surprised to see the *Miss Sandra* heading back toward shore. Stevens, he said, wasn't typically out so early. Thomas's wife, Esther, told Riley she'd also noticed something unusual that morning: Stevens's white Dodge speeding away from the dock at about 6:40.

Then Riley heard a chilling story from a neighbor of Stevens's named Joyce Williams. A couple years earlier, she told him, she'd been walking from her bathroom to her bedroom, unclothed, when she caught Stevens with his face pressed against her window, staring right at her.

**The detective found Stevens at home the next day and told him to follow him to the Harding house**. They sat on Mary's front deck, across the street from the Corrottoman Cemetery, where she'd recently been buried.

Stevens was 32 at the time, with close-set brown eyes, shaggy hair, and a light bulb of a nose. "Tell me why you were parked on the side of the road," the detective remembers instructing as he pointed out where Stevens's truck had allegedly been spotted the night Mary died. Stevens insisted he'd been home the whole time. He said that he was at a neighbor's house with his kids, eating crabs and watching TV, that they went home around 9:30, and that his wife returned from her shift at a retirement home a while later. "Go and check my alibi," Stevens urged.

Riley wasn't convinced. He ordered a search of both the truck and Stevens's boat. After eight hours, a pair of state police officers had evidence to send to the crime lab for analysis: a strand of hair that had been clinging to a plaid shirt inside the pickup.



Waterman Emerson Stevens and his wife Sandra. Stevens didn't know Mary but had fished in the past with her husband. Photograph courtesy of Emerson Stevens.

Back at Mary's house, where he returned to reexamine the scene, Riley noticed a dogwood tree with scuffing around the trunk, as if someone had climbed it. He scaled it himself and found that it gave him a direct line of sight into Mary's bedroom—at night, with the lights on, he thought, someone would have a clear view inside.

Within a week, the detective had his suspect at headquarters, hooked up to a polygraph. Stevens blew it. "There's only two reasons you failed this test," Riley recalls telling him. "Either because you killed Mary Harding or you're guilty of something else related to it."

When Stevens continued to deny any involvement, Riley says he offered him an out—"You were probably there that night doing something innocent"—and suddenly Stevens changed his story. He hadn't actually gone straight home after the crab dinner at his neighbors', he said. Rather, he'd taken his kids on a drive to visit his sister. On the way there, they were near Mary's house, Stevens said, when he pulled over to urinate on the side of the road.

It wasn't a confession, but it was a huge break. Riley had gotten his suspect to place himself at the scene of the crime.

A week later, one of Stevens's fishing buddies seemed to fill in another hole in the case. He told the detective that Stevens used to keep a Wildcat Skinner, a type of folding knife, in a leather sheath on his dash. It had a long blade—good for cutting through rope or fishing line—and Stevens's friend said he hadn't seen it since Mary's disappearance. Riley thought he may have finally found the explanation for those slashes in Mary's back.

That afternoon, he pulled up to Stevens's parents' house as his suspect was carrying groceries inside, and cornered him. "Emerson," he says he asked, "where's your Wildcat Skinner knife?"

Riley saw Stevens start to tremble. The waterman backed away till he hit the fence, then raised a shaking, pointed finger. "Get outta here!" Riley remembers him yelling.

Before long, the detective got forensics on Stevens to back up his growing suspicions. The hair analysis on the strand from the waterman's Dodge came back from the state crime lab. It was a match to Mary.

On Halloween, a little more than two months after her death, the Rappahannock Record reported the news from its front page: Emerson Stevens had been arrested for the abduction and murder of Mary Keyser Harding.

**At Stevens's trial the following February, Lancaster County prosecutor C. Jeffers Schmidt Jr. laid out his and Riley's grisly theory of the case**. Stevens, he told the jurors, was a stealthy predator who had stalked Mary for weeks, sneaking into her yard and peeping at her from the perfect hiding spot: the dogwood tree outside her bedroom window.



The Harding house. Photographs courtesy of the Innocence Project at UVA School of Law.

"When he saw her the night that he killed her—those little blue shorts and that little white T-shirt—that really set him off," Schmidt said. "She was going through the house. She had Comet in the [sink] and in the toilet, and she was cleaning up. . . . She brought the cat-litter box out. . . . When she got around the corner of her house, right around that corner where this dogwood is, she saw somebody back there. She saw this man back there. Surprise. . . .

"He grabbed her. . . . One of her flip-flops came off over here while she was fighting to get away from him. . . . He throws her in the back of the truck, and what does he do with her? He panicked. I don't know whether he meant to go over there and kill her, but he meant to go over there and look in her window. You can infer that his motive was to go over there and rape her. . . .

"He had the [rope] . . . . He had the knife . . . . Finally his mind started clicking . . . . He wrapped it around her neck. He said, 'Well, I know what I can do with her body. I can give her to the crabs . . . .' He said, 'Well, if I put the chain on her and if I put the [cinder] block on her, and if I take this knife and I slice her body open to draw the blood and throw her over, there is not going to be anything left in two or three days.' "

Lancaster was riveted by the trial. Every day, curious residents streamed through the white-columned entrance of the 1800s courthouse to watch the drama unfold. They watched as Schmidt got the medical examiner to stipulate that a knife like Stevens's Wildcat Skinner—still nowhere to be found—was capable of making the wounds to Mary's back. And they watched as he called one of the nation's top experts in forensic hair analysis to the stand to describe how the strand found in Stevens's pickup contained "a unique pattern" that matched it to Mary.

Then came all those cousins of the defendant—Thomas and Esther Stevens first, and later Clyde Dunaway testifying he was certain he'd seen Stevens's truck parked by the Harding house the night Mary died. "I slowed to about 30 or 35 miles an hour," Dunaway told the jury. "It was just across the road."

On the third day of the proceeding, jurors got to hear Stevens's side of the case. Four people who said they'd had dinner with Stevens at his neighbor's that night took the stand and backed up his alibi. His 11-year-old daughter, Jennifer, who was also there, testified about heading home with him about 9:30 pm, watching a few minutes of TV, and then going to bed around 10 or 10:30, after her father had turned in. Stevens's wife told the jury he was in bed asleep when she returned from work at five past midnight.

Stevens also took the stand himself and tried to explain away the new story he'd told after failing his polygraph—about taking his kids to his sister's and stopping to pee near Mary's. He said he'd made it all up to get Detective Riley off his back. "I was tired," Stevens said, "and I wanted to go home."

But in the end, the case was mostly circumstantial, not much of a lock for either side. Indeed, when the jurors returned after seven hours of deliberating, there was no verdict. Instead, they announced, they were hung.

**For a fleeting moment, Stevens and his wife allowed themselves to hope the prosecution might drop the case**. Before getting entangled in this mess, they'd led unexceptional lives—teenage sweethearts who'd married young and made a modest home on the same dirt road as Stevens's parents. Stevens, who had no history of violence, not only maintained he wasn't a murderer or a peeping Tom—he said he hardly even knew Mary. He might recognize her at the grocery store, sure, but he claimed he'd never really talked to her.

It didn't matter. After the second trial opened on July 8, 1986, Stevens's own father inadvertently helped the prosecution frame its case against his son. The new testimony centered on the missing knife. During the first trial, Stevens had said he knew what had happened to his Wildcat Skinner: He'd dropped it overboard while fishing. But now his father, Howard, told the jury the story was bogus. Howard said he was the person who'd made the Wildcat Skinner disappear—and that Stevens well knew he'd done it. "I throwed

it in the woods," Howard said. "I got rid of it because he was hassled so bad."

"HE SAID, 'WELL, I KNOW WHAT I CAN DO WITH HER BODY. I CAN GIVE HER TO THE CRABS.'"



Stevens's boat, the *Miss Sandra*, named for his wife. Photograph courtesy of the Innocence Project at UVA School of Law.

Stevens was caught. He tried to explain why he'd lied. "Well, I didn't—I just didn't want somebody to think I was the one that killed the girl and used that knife," he stammered when he took the stand.

Schmidt pressed Stevens on all his fabrications. "You admit to us you lied about going up to your sister's and taking a piss on the side of the road?"

"Yes, I told that," said Stevens.

"You have a hard time with times, don't you?" Schmidt asked when Stevens tripped over seemingly simple questions about his alibi.

"Yes, I do. I'm not a smart person," he said.

This time, when the jurors came back, the courtroom erupted in cheering and wailing. Outside, someone rang the cast-iron bell planted on the lawn, signaling that a verdict had come down. Emerson Stevens, the jury said, was guilty. They recommended to the judge that he go to prison for 164 years.

**Stevens and his wife had brought their three kids to court that day, thinking it might help jurors see him as a family man**. Instead, they watched police handcuff their dad and march him out of the courtroom. Hearing the verdict, Stevens says, was a shock: "I knew I was innocent of the crime. How could they have convicted me on that little bit of evidence?"

In the fall of 1986, he was sent to the Powhatan prison northwest of Richmond. Alone in his cell, he would turn the second trial over in his mind. His circular bumbling and lies had hurt him, that was true. But as weeks turned to months and then years, he focused again and again on aspects of the case that he thought should have swayed jurors. Such as what happened when a Lancaster resident named Anne Dick took the stand. At the first trial, Dick testified about driving on Route 354 in the predawn hours the morning Mary went missing and seeing Stevens's Dodge pass without its lights on. She said she couldn't make out the driver's face, but whoever it was had on a plaid shirt.

At the second trial, however, she gave a new version of events. She said she didn't actually know whose truck she'd seen, and she was certain the driver wasn't Stevens.

Then why, Stevens's lawyer asked her, didn't she tell the first jury that?

"Because Detective Riley told me not to," Dick replied.

ONE OF THE NATION'S TOP EXPERTS IN HAIR ANALYSIS DESCRIBED HOW THE HAIR FOUND IN STEVENS'S TRUCK WAS A MATCH TO MARY.

It was an astonishing admission, and for a moment Stevens felt a surge of relief. "I thought they was going to declare another mistrial," he says. But the proceeding forged ahead.

Another inconsistency between the two trials was more subtle. It involved Belle Isle, the location where Mary's body surfaced.

Stevens kept his boat a good ten miles downstream from Belle Isle. If he had dumped her all the way up there, it would have meant a long nighttime journey upriver to ditch a body in shallow water along an exposed shoreline, when the wide-open waters of the Chesapeake were just as close. Not only that, but Stevens's boat wasn't rigged for the dark. How did that make sense?

During the first trial, Schmidt had called Dr. John Boon, from the Virginia Institute of Marine Science, to explain how Stevens could have dumped the body near his dock, only for the Rappahannock's currents to carry it ten miles upriver—even in its weighted-down state.

But at the second trial, Boon didn't show up. Instead, his prior testimony was simply read aloud to the jury, and Schmidt never explained why the scientist wasn't there.

These weren't just the obsessions of a man languishing in prison. After the trial, Stevens's lawyer, James Parker, had filed a formal complaint against Riley with the Virginia State Police. "I am solidly of the opinion that [Stevens] was convicted as a result of the unlawful and ethically despicable conduct of Agent Riley in collaboration with Lancaster County Commonwealth's Attorney C. Jeffers Schmidt Jr.," Parker wrote in the complaint, adding, "Your investigation should reveal that this case was handled in a sloppy fashion from its inception."



After the trial, there was a stunning turn of events with the star witness for the prosecution, who said he'd seen Stevens's truck by Mary's the night of her murder. Photograph courtesy of the Innocence Project at UVA School of Law.

Parker also asked the court to appoint a special prosecutor to probe possible improprieties in the case. The commonwealth's attorney from another county was tapped for the job, and his conclusions were devastating. The special prosecutor found that Clyde Dunaway— Stevens's cousin and the only person who claimed to have seen his truck at Mary's at the time of her abduction—called in the tip to Riley a full nine days after Mary went missing, and only after news of the reward was published. It turned out the money had come up in one of Dunaway's first interviews with the detective; from there, Dunaway proceeded to ask four more police officers about it, telling one that he'd contacted an attorney to help him sue for it. Yet at Stevens's second trial, Dunaway testified under oath that he'd never inquired about the $20,000.

Dunaway, the closest person the state had had to an eyewitness against Stevens, was charged with obstruction of justice. In 1988, he pleaded guilty to the offense.

The revelations were not enough, though, as Parker worked to appeal Stevens's case. Maybe mistakes got made in a small town eager for closure. But the lawyer failed to persuade the courts to overturn Stevens's conviction.

**After he went to prison, Stevens told Sandra to divorce him**. His ordeal had already cost his family so much. The couple had sold their house to cover his legal bills and had uprooted their children to a new school, where they hoped they wouldn't get bullied so badly. Stevens says he told Sandra, " 'You just go ahead with your life and move on.' "

At first, Sandra continued to visit him with the children, but eventually she remarried. When the kids got older, they visited Stevens on their own. Then they had children and started bringing them along, too. Sandra and the kids say they never doubted Stevens—that their testimony about being with him that night was the truth. The rest of Lancaster, meanwhile, mainly moved on.

At night, Stevens dreamed of the wide-open Rappahannock. He sketched pictures of boats and water and tuned in to fishing shows on PBS whenever he could. He wrote to his family constantly, sent them cards for every holiday—even the minor ones, like St. Patrick's Day— and saved all year to mail $100 to each of his three kids for Christmas.

He stayed out of trouble, got his GED, and worked in the prison shop building furniture for motor-vehicle departments, schools, and other state facilities. His good behavior earned him some small comforts, such as a cell without a roommate.

Over the years, he wrote to lawyers around Virginia, asking if they'd look at his case. At one point, he wrote to the governor. He never heard back.

**One spring afternoon in 2002, 16 years after his conviction, Stevens was watching the local news when a story about another murder case came on**.

He listened as a CBS reporter in Richmond talked about Beverly Monroe, a 65-year-old woman who a decade earlier had been found guilty of killing her boyfriend. The details of Monroe's case could hardly have been more different from Stevens's: She was a chemist whose art-collector beau was named Roger de la Burde, a supposed French count who lived on a 220-acre horse-country estate by the James River. Even so, Stevens felt encouraged when the reporter said Monroe had just been released because a federal judge had thrown out her conviction. The broadcast cut to footage of her walking out of jail, smiling widely, her daughter by her side.

A few weeks later, Stevens still hadn't shaken the image when he got hold of a *Richmond Times-Dispatch*. He spotted an article about Monroe, and a name in the third paragraph jumped out: David Riley.

"That's the same rascal that got me," Stevens says he thought.

Riley had been the lead investigator in Burde's death in 1992. The medical examiner had initially ruled it a suicide: Burde, whose royal lineage had been called into question and who was under FBI investigation, had been found with his own revolver by his hand. But Riley had become convinced of foul play. He'd learned of a compelling motive, too: Another woman was pregnant with Burde's child.

Monroe, though, had insisted she knew all about the affair and that she and Burde were working things out. She had a grocery-store receipt that she said proved she'd left Burde's mansion after dinner on the night he died. Riley, she alleged in court papers, subjected her to lengthy, confusing interrogations, to make her doubt her own memory and convince her of a totally new version of events: "That she must have fallen asleep in the den after she and Burde had dinner and awakened to the sound of Burde shooting himself . . . gone into shock, suppressed any memory of the tragic incident, and then left and gone to the grocery store."

Monroe had had a climactic confrontation with Riley, one detailed in court papers, in which she alleges the detective told her that if she just admitted to killing Burde, she would only be charged with second-degree murder. When Monroe still refused to confess, Riley reverted to his scenario in which she had simply been asleep in the mansion when Burde shot himself. He wrote it down and asked Monroe to sign it. She did, but only, she alleges, because she was "under extreme duress from Riley's threats." The document, which looked like proof Monroe had initially lied about being present at Burde's death, was critical to the prosecution.

In the *Times-Dispatch* story that Stevens read in prison, Monroe said Riley had "bombarded" her. To Stevens, her account felt eerily familiar: Riley pressing him over and over again to say he'd been at Mary's that night, how he'd finally broken down after his polygraph and made up the story about stopping there to pee. "That's the same way Riley did me," Stevens says he thought.

"You could tell him something, and he would come back to you and say, 'I don't care what you say. It's like this,' " Stevens says of the detective.


### "I KNEW I WAS INNOCENT. HOW COULD THEY HAVE CONVICTED ME ON THAT LITTLE BIT OF EVIDENCE?"


Sure enough, when Monroe's lawyers convinced the federal court to revisit her conviction, the judge found that "substantially tainted evidence and testimony" had been allowed into her trial. The judge stopped short of calling Riley's methods unlawful but nonetheless had scathing words for the police work: "The Court finds that the tactics engaged in by Riley were deceitful, manipulative, and inappropriate."

During all his years in prison, Stevens had tried to stay positive—ending Christmas letters to his kids with "Maybe next year, we'll be together" and, when they visited, making plans for "when I get out of here."

For so long, it was mostly just talk. Now that he knew about Monroe, though, everything felt different.

## Part Two



The cemetery where Mary was buried, across the street from her home.

**One autumn morning in 2009, 23 years after Emerson Stevens went to prison for murdering Mary Keyser Harding, a lawyer named Deirdre Enright answered her phone, eager to learn more about him.**

Enright—then 49, with red hair, freckles, and a weakness for four-letter words—had spent most of her career defending death-row inmates. She was now the founder of the Innocence Project at the University of Virginia School of Law, working to overturn wrongful convictions. The case of Beverly Monroe—the horse-country woman falsely convicted of killing her phony-French-count boyfriend—was well known in Enright's crowd. She'd heard that Monroe's lawyer, Stephen Northup, had been working with Stevens. The fact that both investigations had been led by the same detective—David Riley of the Virginia State Police—piqued her interest.

On the phone with Northup, Enright asked him why she should take Stevens's case. "He said, 'I want to give him hope,' " Enright says of the conversation. "I was like, 'Uh, I don't do the hope business. If it's a dead end, I'm not taking it.' "

Enright had hundreds of other potential clients to consider, but she let Northup explain. He was a partner at the national law firm Troutman Sanders who had taken Stevens's case pro bono six years earlier, after Stevens read about Monroe and wrote to him. With the help of a private investigator, Northup had slowly chipped away at the matter, but he hadn't found enough to take a shot at freeing Stevens. Enright thought there was a chance an attorney in her position could make better progress. "Law-firm lawyers," she says, "can't go out and beat the bushes themselves."

She says Northup told her how the FBI had sent agents to Lancaster back in 1985 to work alongside the local authorities but that the feds' report was mysteriously missing. Northup also told her about Anne Dick, the Lancaster woman who initially testified that she'd seen Stevens's truck the morning Mary was discovered missing but then changed her story at the second trial, saying she was certain Stevens was not the person she'd seen. When asked why she didn't tell the first jury that, Dick said, "Because Detective Riley told me not to." A detective with a solid case, Enright thought, doesn't waste time pressuring people to manipulate the facts.

Enright went digging through Northup's files on Stevens and found an old affidavit from a merchant named Ray Reynolds, who ran the crabhouse where Stevens used to sell his catch: He said he'd initially told Riley that Stevens had arrived at an unusual time that

morning—but later checked his records and realized he'd confused it with another day. Reynolds said Riley "told me to go ahead and testify and to stick with my original statement." Reynolds refused and was never called to the stand. Were there others, Enright wondered, waiting to tell their own stories about Riley?

Enright also learned about Stevens's cousin Clyde Dunaway, the star prosecution witness who'd been the only person claiming to have seen Stevens's truck at Mary's at the time of her murder. On the stand, Dunaway had testified he'd never inquired about the $20,000 reward for information about the crime. But after the guilty verdict, an investigation determined that Dunaway had, in fact, repeatedly asked about the money. For his false testimony, Dunaway pleaded guilty in 1988 to obstructing justice in Stevens's case. "It was another huge red flag," Enright says.

And there was that missing FBI report that Northup had mentioned. Reading the trial transcripts, Enright noticed that Stevens's trial lawyer had pressed the judge for access to it —but been denied after the prosecutor objected. Had the feds reached a different conclusion than Riley? What might she find in that report if she could get her hands on it?



UVA lawyer Deirdre Enright (left) has picked apart the case for a decade. Her law partner Jennifer Givens (right) joined the fight more recently.

Enright tracked down Stevens's trial lawyer, by then sick with a brain tumor, to get his take. She says he told her that Stevens had been railroaded: "He's like, 'This was a disaster.'"

So in June 2010, Enright went to meet Stevens. He told her about the prison shop where he worked on furniture, and he explained how to build a chair. She stayed until the guards shut down visiting hours. "The whole 'look him in the eye and know he's innocent'—all those things to me are distractions," says Enright. Still, she had to admit she liked him.

**It was the beginning, Enright knew, of an arduous process—piecing together new theories of a decades-old crime and trying to show that investigators had gotten it wrong could prove impossible**. Even so, she felt there was enough evidence to justify her own investigation into what happened on August 22, 1985.

One of the first matters Enright wanted to look into was Mary's husband, Emerson Harding. She'd noticed that during Stevens's trial, his lawyer had asked questions that seemed designed to make the jury wonder if the husband had played some role in the murder. By the time of the second trial, Harding had been seen around town with other women. He had collected more than $80,000 in life-insurance money, and he was driving a new sports car. To Stevens's trial lawyer, Harding didn't necessarily look like a grieving spouse.



Mary and Emerson Harding were high-school sweethearts. Photograph courtesy of Mary Harding's family and friends.

Enright went to see Harding's second wife, a woman named Margie Hogge. The two had wed after Mary's death, then divorced in 1999. In the dimly lit living room that she once shared with Harding, Hogge gave Enright a harrowing account of her former marriage. According to a sworn affidavit, she said Harding "could become quickly and easily enraged and volatile when he was drinking." She described an incident when he came home drunk in the summer of 1989: "He was punching me on the side of my head . . . . I thought he was going to kill me."

She continued: "One time, he got so mad at our [nine-year-old] daughter, Riva, he picked her up by her throat and banged her head against her closet door again and again—eight or nine times—until he was done with her." (Hogge never filed police reports documenting the alleged abuse, and Harding was never charged. Harding could not be reached directly; through Mary's sister, he declined to comment.)

After leaving Hogge's house, Enright felt troubled that investigators didn't seem to have scrutinized Harding. His activities in the days before Mary's murder especially bothered her. Harding was typically out to sea all week, but at Stevens's trials, he testified that he had made an unusual, midweek trip home on Wednesday night, the evening before Mary was killed. He said he was back on his ship the following night, but Enright hadn't found anything to convince her of his story. None of Harding's shipmates had taken the stand, and she didn't have a manifest from the boat. She wondered if Harding had ever gotten back on it at all.

**Not everyone in Lancaster was willing to help Enright**. When she knocked on the door of a retired sheriff's deputy, she says, he berated her and cornered her on his porch. "There was a time when that would have menaced me," says Enright. "Now I'm old and I don't give a rat's ass."

C. Jeffers Schmidt Jr., the Commonwealth's Attorney who had prosecuted Stevens and was still in office nearly three decades later, was more polite but no more forthcoming. Enright says he declined to let her crack open his files on the case (which Schmidt denies). The old FBI report was a sticking point, too. The court record indicated it was under seal at the courthouse, yet Enright couldn't get anyone to produce it.

So she drilled down on the key piece of evidence she did have access to: the hair found in Stevens's truck, which supposedly came from Mary. It had been the only physical evidence connecting Stevens to the crime. But forensic science had advanced dramatically since the trial. Microscopic hair comparison—the technique used to match the hair to Mary—had come under scrutiny and, in fact, would soon be proven unreliable. (By 2015, 74 people would be exonerated by DNA in cases in which microscopic hair comparison had been a factor.)

Enright wanted to put the strand through DNA testing—a process that hadn't existed in 1985. It would require a judge's permission, which Schmidt might object to. So her team began making a case, finding old jurors who said they would support the testing. One said she didn't believe she could have convicted Stevens without the hair.

BY THE TIME OF STEVENS'S SECOND TRIAL, MARY'S WIDOWER HAD BEEN SEEN AROUND TOWN WITH OTHER WOMEN.

As it turned out, though, Schmidt never got the chance to weigh in on the test. While Enright and her then law partner, Matthew Engle, were working up their pleading, Lancaster voters were preparing to go to the polls—and when Election Day came, Schmidt lost his eighth race for Commonwealth's Attorney in a stunning upset. All of a sudden, Lancaster had a prosecutor with no professional investment in the case of Mary Harding.

Schmidt's defeat set off a dizzying sequence of events that rocked the small town. Within weeks of the election, the incoming Commonwealth's Attorney was accusing Schmidt of purging files and of forcing his staff to sign nondisclosure agreements. The saga went on

for months, with Virginia's attorney general eventually having Schmidt arrested for allegedly destroying public records. (The charge was later dismissed.)

The upheaval was a boon for the Innocence Project: Schmidt's successor gave Enright and her staff access to the old files on Emerson Stevens.

One day in 2013, after Schmidt left office, Engle was in town leafing through the paperwork when he made a startling find: a letter to Schmidt from the marine scientist John Boon. Boon was the tidal expert who had testified at Stevens's first trial about how Mary's body could float ten miles upstream, but—for reasons that were never disclosed—he hadn't appeared at the second trial, the one in which Stevens was convicted. In that proceeding, a transcript of his prior testimony had instead been read aloud. The letter seemed to explain why Boon hadn't shown up himself. "Was this testimony truly of use to you or the court?" Boon had written to Schmidt before the start of the second trial. "In a brief 'interview' before my last appearance at the Circuit Court, your associate, Lt. Riley, applied what may be the correct term to my testimony in this case. He called it 'eyewash.' "

Engle looked up the word. It meant "nonsense," according to the dictionary. Or, as Engle puts it, "bullshit."

When Enright saw the letter, she was floored. The lawyers say they thought its meaning was obvious: Riley had never believed in one of the key parts of his case against Stevens.

Yet it appeared that Schmidt had not disclosed any of this to Stevens's trial lawyer. Says Engle: "That was absolutely clear evidence of prosecutorial misconduct."

**If Enright and her team were going to help Stevens, they would have to do it without an assist from modern science**. In November 2013, nearly a year after they sent the hair to a lab in Lorton for DNA analysis, Engle opened an e-mail with the results. "It was crushing," he says.



The only piece of physical evidence tied to Stevens was a hair that police found in his truck and that was matched to Mary through forensic analysis. But after his trial, the science around hair analysis changed dramatically.

The lab had been unable to reach a conclusion about whom the hair had come from, meaning it could have been Mary's or Stevens's or anybody's. "I really thought at that point that we had lost our opportunity to win the case," says Engle.

The pace slowed for a while as Enright and her team juggled other clients, but in the fall of 2015, Enright got a new reason to feel hopeful. Sheriff Ronnie Crockett—who'd won his first election two years before Mary's murder—was retiring his badge and starting a second act as a real-estate agent. For the first time since Mary died, in other words, neither of Lancaster's top law-enforcement officials had played a role in putting Stevens behind bars. "People got less and less protective of the case," says Enright.

By this point, she'd been grinding away for five years: She had Anne Dick and Ray Reynolds, both of whom alleged Riley had asked them to stick with stories they said weren't true. She had Clyde Dunaway, the witness who'd pleaded guilty to obstructing justice. She had the "eyewash" letter. Now she decided to turn her attention to another major piece of evidence she'd had her doubts about: the Wildcat Skinner, the knife Riley had used to connect Stevens to the gashes on Mary's back.

Those cuts had always seemed strange to Enright. They were almost uniform in length. And because the killer had strangled Mary, why bother with a knife at all? Enright didn't buy the gory explanation proffered in court—in which the prosecutor suggested the killer had sliced open his victim to entice crabs to eat away the evidence.

Enright called Marcella Fierro, the medical examiner who'd performed Mary's autopsy. Fierro had testified that Stevens's Wildcat Skinner could have made the cuts. Enright wanted to know if she would stand by her original assessment.

THE HAIR FOUND IN STEVENS'S TRUCK WAS THE ONLY
PHYSICAL EVIDENCE AGAINST HIM, BUT THE SCIENCE HAD
COME UNDER SCRUTINY.

Fierro, who had risen to chief medical examiner for the entire Commonwealth before retiring, agreed to take another look. She reviewed her old reports and numerous photos of Mary floating in the Rappahannock. She e-mailed a listserv of other coroners to test out a different theory, asking if anyone had photos that might back it up. The responses filled her in-box.

By the time she got on a second call with Enright, Fierro had reached a new conclusion. The cuts on Mary, she said, most likely came from a boat propeller—postmortem. Not from the Wildcat Skinner. Not from any knife at all.

**In March 2016, Enright was back in Lancaster, looking onto a vast soybean field from Lawrence Taft's living room**. She'd shown up unannounced, but when she explained why she was there, Taft and his wife were happy to invite her in.

Taft had owned the R&K store, the waterman hangout where Riley had poked around during his investigation. Enright had seen an old report that indicated Taft had been interviewed by Riley back in 1985. Plus, she knew Mary had stopped at the R&K the night she was killed. Enright thought Taft might remember something useful.



The R&K, now closed, was like a town square in the '80s: Watermen gassed up their boats in the morning and stopped by for beer at the end of the workday. Mary ran an errand at the store on her way home on the last night of her life.

It turned out he did. One day, Taft said, Riley showed up at the store "looking serious," wanting to discuss Emerson Stevens. The waterman was a frequent customer, dropping in several times a day to gas up his boat or buy beer. Taft told Riley he didn't think Stevens was capable of harming anyone. Then, he said, Riley changed tactics. As Taft detailed in a sworn statement for Enright, "Detective Riley tried repeatedly to get me to say that Emerson Stevens woke me up in the middle of the night that Mary Harding disappeared so that he could buy five gallons of gas. Detective Riley was extremely aggressive and pushy, insisting that I agree with his story even though it was not true. I was never woken up in the middle of the night by Emerson Stevens ever, for any reason."

Taft told Enright he had made it plain to Riley "that I was not someone who could be bullied into lying. I remember this very clearly," Taft said, "because I was shocked that a law-enforcement officer would behave this way."

Enright found Taft's matter-of-fact account totally believable. "I loved him," she says, "because he was just like, 'Riley was a bully. His thing just didn't work on me.' "

**With Taft's story in hand, Enright and her new law partner, Jennifer Givens, felt they finally had enough to file a petition asking the court to throw out Stevens's conviction—even without the still-missing FBI report**.

Then, the very day after submitting their pleading, Enright's cell phone rang. It was a deputy for Patrick McCranie, Lancaster's new sheriff. Almost immediately after he'd taken office, Enright had dropped in to see McCranie. "She wanted to know if we knew where the [FBI] file was," McCranie says. "I was like, 'I have no clue.' Heck, I don't even know where to file things at."

Now Enright could hardly believe what McCranie's deputy was calling to tell her: They'd found a box of evidence in storage. The FBI report was inside. Would she like to come see it?

When Enright and a couple of her students arrived at the courthouse, they could immediately tell that the new sheriff's decision to hand over the documents was controversial. "Literally, we were escorted, from the minute we got out of the car, by two guards," remembers Enright. "They were saying, 'There's some people here who are pretty angry about this.' "

As she'd hoped, the box was full of revelations.

First, a joint filing from the FBI, Riley, and the Lancaster sheriff divulged a new theory about where the authorities believed Mary's body had been ditched—and it was nowhere near Stevens's dock, a direct contradiction to the narrative floated in court. The officers estimated that Mary's killer had left her "within 500 to 600 yards of where [she] was eventually located." Second, the documents showed that two of the men Riley and the FBI were initially interested in each kept boats near where the remains were found.

One of them, Keith Wilmer, was the husband of one of Mary's colleagues at the Bank of Lancaster, the waterman whose polygraph had been inconclusive. Investigators noted in the files that they had heard concerning stories about him from two women in town. A bank employee said Wilmer had made obscene telephone calls and aggressive, sexual advances toward her and once followed her home after dark, according to the FBI report. A woman who worked as a dispatcher for the sheriff's department told police that Wilmer had also called her, tried unsuccessfully to disguise his voice, and told her he wanted to have sex with her in the woods. (Other than to emphasize that he was cleared in Mary's case, Wilmer declined to comment.)

> "I WAS NOT SOMEONE WHO COULD BE BULLIED INTO LYING. I WAS SHOCKED THAT A LAW-ENFORCEMENT OFFICER WOULD BEHAVE THIS WAY."

The other, Richard Dawson, had had his share of run-ins with the law. His own wife had died just weeks before Mary, and the FBI's paperwork stated he had been staying with a friend in a trailer up the street from the Harding house: The two men "partied" the week of the abduction near the victim's residence, it said, and Dawson "was seen riding with a second unknown person in a light colored truck in the vicinity of the victim's residence" the night Mary was killed.

Dawson had also had troubles at Mary's bank. Investigators noted that he'd gotten into an altercation with one of Mary's colleagues over his wife's account. Mary and her coworker had shared a cubicle that had Mary's nameplate on the front. The colleague had told the FBI she worried Dawson may have mistaken her for Mary during their argument.

The materials continued: "Witnesses have stated that Dawson has been 'hunting for women' for sex after his wife's death."

There was more. In an interview Riley did with Mary's husband, Harding mentioned that Dawson's late wife had responded to an ad Mary had placed seeking a babysitter. She had pleaded for the job, but Mary had turned her down because of the family's reputation.

Despite all this information, there's no indication Riley ever gave Dawson a polygraph. (Dawson died in 2009.)

When Enright finished examining the write-ups on the men, she could see nothing to explain why they hadn't been pursued harder. Both had stronger connections to Mary, and both kept boats near where her body was found. Yet Riley had zeroed in on her client. Why?

"They were troublesome, and Emerson is easy," Enright concludes. "Emerson's going to be pushed around and be terrified."

**The box also contained records on the Lancaster resident Enright had always wanted to know more about: Emerson Harding**.

In all the years Enright had pored over Stevens's case, she'd never been sure how closely Riley had looked at Mary's husband. She'd also never seen a ship manifest that she felt proved Harding was out to sea on the night of the murder.

In the box, Enright found the captain's daily fishing report as well as an attendance record from Harding's ship. According to the documents, the vessel was anchored in the Chesapeake for the night by 8 pm on August 22. Mary was still alive then—she had spoken to her sister on the phone just after 9 pm. The materials listed Harding as present on the

boat. They were never shown in court, but Riley must have come across them during his investigation and perhaps used them to help rule out Harding as a suspect. After all, they backed up his alibi.

Other paperwork in the box, however, raised a new, thornier set of questions.

Riley's reports showed he had interviewed Harding three times. It was during the third conversation, a week after Mary turned up dead, that Harding suggested Riley check out Emerson Stevens. This was the conversation in which Harding described Stevens's crude comment about the area of the Rappahannock called Mary's Hole, when Stevens allegedly said Harding "should know all about" the place. Harding repeated the story on the stand at both trials.

Yet as Enright read Riley's reports, she noticed a discrepancy: Under oath at the trials, Harding said the conversation had happened two Sundays before Mary was killed. But according to Riley's paperwork, Harding said he'd heard Stevens make the comment a year or so before.

There was another discrepancy. On the witness stand, Harding said that when his ship had made that unusual midweek stop home Wednesday night, the night before Mary's murder, he'd gone out to feed the dog and "heard something on the side of the house in the woods . . . . I walked in the woods and shined the flashlight. It was something moving around."

The comments were teed up by Schmidt, the prosecutor, seemingly to insinuate that Mary's stalker might have been outside that night, too. Riley's summaries of his conversations with Harding, however, didn't mention anything about the strange noise. That was odd, Enright thought. Why would Mary's husband leave such a crucial detail out of his conversations with police?



Mary Harding's grave at Corrottoman Cemetery.

To Enright, it looked as if Harding had embellished significant parts of his story for the jury. As far as she could tell, the prosecution hadn't disclosed either of these discrepancies to Stevens's defense—a clear violation, in her opinion.

To Enright, the most concerning document that related to Mary's husband was a letter she had never seen. It was written by Schmidt before the second trial. In it, he raised concerns about Emerson Harding's activities after Mary's death—anticipating how Stevens's trial lawyer would try to cast doubt about Harding in the minds of the jury. "Emerson Harding may be an issue," the prosecutor wrote. "There is the question of $81,000.00 [in] life insurance proceeds. There is the question of a fancy new sports car. There is a question of dating Cindy Hayden and Jerry Weber's daughter." The person to whom Schmidt was pointing out these concerns? David Riley.

Enright thought the letter showed that Riley and Schmidt had doubted Mary's husband after all and that they should have looked into him further.

Armed with the new information, Enright and Givens filed an amended petition laying out how they believed Stevens had been wronged. Schmidt, they said, had knowingly presented false testimony and repeatedly failed to turn over crucial information to the defense. (Schmidt's response to me: "Inaccurate.")

"While any one of these pieces of evidence could have altered the outcome, there can be no doubt that, when considered cumulatively, this undisclosed evidence would have resulted in a not-guilty verdict," Enright and Givens wrote in their filing. "Mr. Stevens's conviction," the lawyers asserted, "was engineered by an irresponsible prosecutor and an unscrupulous detective anxious to close a high profile case that shocked a small Virginia community."

**I ring David Riley's doorbell on a sweltering August afternoon**. The 70-year-old who answers is plump around the middle, with a wispy, white comb-over and very striking eyes—as crystal-blue as a Siberian husky's.

At first, he says he doesn't want to talk, but eventually he invites me into his Northern Neck home, leans back in his leather recliner, and unspools the story of the case in intricate detail.

Before I can ask why he homed in on Emerson Stevens, he starts in on the dogwood tree outside the Harding house—the tree where the prosecutor said Stevens had been hiding and spying on Mary the night of her murder. Riley describes how he decided to climb it after noticing scuff marks on the trunk and hearing Stevens's neighbor accuse the waterman of peeping on her. "Even old and fat like I am now," Riley tells me, "I could still climb it."

Then he recounts his first interview with Stevens, when he took Stevens to Mary's front deck. "I said, 'Tell me why you were parked on the side of the road.'" When Stevens denied having been there, Riley tells me, he offered a suggestion. "I said, 'You probably had to relieve yourself'—I didn't use those words, because men don't use those words—but I said, 'You probably stopped to relieve yourself on the side of the road.' He didn't take the bait."

**"WE WERE ESCORTED FROM THE CAR BY TWO GUARDS. THEY WERE SAYING, 'THERE'S SOME PEOPLE HERE WHO ARE PRETTY ANGRY ABOUT THIS.'"**

This was new to me. The case documents and trial transcripts—even Stevens himself—had made it sound as if Stevens came up with that story on his own after failing his polygraph. But here was Riley saying he'd fed it to him weeks earlier.

After Stevens blew the lie detector, Riley continues, "I said, 'There's only two reasons you failed this test: either because you killed Mary Harding or you're guilty of something else related to it.' I said, 'You were probably there that night doing something innocent'—and he bit."

Out came the story about stopping to pee, when Stevens finally put himself at the scene of the crime.

"He already had that in his mind as an out," says Riley. "I used the same tactics in the Emerson Stevens case as I did with Beverly Monroe. . . . If you can't get a direct confession, you just try to get them to talk. They'll say things against their own interest as a way to wiggle out. The whole thing is to keep people talking and steer them in the direction you want them to go."

I ask Riley about the witnesses who allege he pressured them.

People such as Ray Reynolds, the crabhouse manager who said Riley had gotten upset with him when Reynolds realized he had confused crucial dates, and thus couldn't testify that Stevens had shown up late with his catch on the day after the murder. "[Riley] was pissed," Reynolds had told me. "Oh, my God, yeah. He said, 'Man, we gotta stick with the story. Just tell 'em what you told me before.' "

Riley tells me he remembers getting frustrated with Reynolds, but he denies telling him to stick to his original story. (Under cross-examination on the witness stand, Riley had confirmed that he saw Reynolds's crabhouse log and that it showed that Stevens had followed his normal routine the day after the murder.) Riley says Anne Dick—the woman who testified at the second trial that Riley had instructed her to say she saw Stevens's truck —changed her story as retaliation against town law enforcement in a squabble over her dog. (Schmidt had offered the same reasoning at trial.)

As for pressuring R&K owner Lawrence Taft to say Stevens wanted to buy gas in the middle of the night, Riley says: "That, my dear, is an absolute lie."

I ask Riley why Stevens, who had no history of violence, stood out to him above other men in town, such as Richard Dawson.

"The famous Dawson brothers. They were nasty people, but they weren't rapists. . . . This is not the Dawson M.O.," says Riley. I was surprised by his assessment, considering Richard's brother Charles was convicted of raping an eight-year-old girl and, in their petition to free Stevens, the Innocence Project had referenced an old rape allegation against Richard. But Riley went on. "I have literally been in a frozen pigsty on their property wrestling a Dawson brother," he says. The man—Riley can't remember which Dawson—had abducted a woman. "I was there to get her."

"But you don't think he raped her?" I ask, astonished.

"I'm sure he had sex with her," Riley says, "but I'm not sure he raped her."

The logic is baffling. He has just described going out to the Dawsons' to rescue a woman but then dismissed the possibility that Richard Dawson could have abducted and raped Mary. Meanwhile, he pursued Stevens, who had no known violent M.O. Why dismiss Dawson but not Stevens? Riley was ready with his answer, his theory of the entire sordid case.

"Stevens didn't have a violent past, but he had a sexual interest in women beyond the normal," he tells me. "An escalating peeping Tom."

Riley stands by his investigation. "There's no such thing as a perfect case," he says. "There's cases I'd do differently. I can't think of anything I would have done differently in this."

Riley knows about the Innocence Project's inquiry. He sounds embittered about the way their findings portray him.

"I'm always the villain," he says.

**Enright's first try at getting Stevens's conviction overturned didn't work**.

In its motion to dismiss the Innocence Project's petition, the Virginia attorney general's office had picked apart Stevens's claims as meritless, untimely, or both. The state asserted that Stevens couldn't claim that Schmidt had committed prosecutorial misconduct by withholding the FBI report during the July 1986 trial, because the judge at that time had ruled that Schmidt wasn't obligated to turn it over.

When it was put into context, the state argued that John Boon's "eyewash" letter was "a request from a 'professional' who preferred not to sacrifice four business days but was nevertheless willing to testify" at the second trial.






Lawyers from Stevens's UVA team celebrated his release with him and his family. He can't return to Lancaster, however, and is still fighting to clear his name. Photographs courtesy of the Innocence Project at UVA School of Law.

The state wrote that Stevens's trial lawyer had already raised the discrepancies in Emerson Harding's testimony during his failed appeal of Stevens's guilty verdict decades ago. Thus, they were now an invalid claim.

346

As for Richard Dawson and Keith Wilmer, the state asserted the men had been ruled out by the police's investigation.

On December 1, 2017, Lancaster County circuit judge Michael McKinney sided with the Commonwealth.

Enright and Givens appealed in Virginia's Supreme Court, which in November 2018 denied them a hearing. With the state courts exhausted, their next step is to file Stevens's case in federal court.

The one person who sits in the gallery at every hearing is Beverly Monroe. She and Stevens became pen pals after her lawyer took him on as a client. She began mailing him photos of the Chesapeake Bay and scenes she captured on walks, such as a shot she took of a bald eagle. "One of the ways of surviving is to get your mind out of that pit—to project your mind outside," she explains.

Monroe is 81 now and lives in Williamsburg. From time to time, she speaks with law students and others about her ordeal. She married her neighbor, a 94-year-old man from across the street. Last fall, they drove four hours to watch a ten-minute courtroom oral argument on Stevens's behalf. Monroe does it, she says, because someone must bear witness to the way the justice system is treating Stevens: "It's important in a way you can't describe—that simply to be there is better than not to be there."

But even as his case plods through the court system, Stevens has already gotten something of a happy ending. When he came up for parole in the spring of 2017, a slew of people showed up to advocate for his release. Enright and Givens were there and laid out the evidence they'd gathered. Stephen Northup, Monroe's lawyer, emphasized Stevens's flawless record in prison. Carrie Odom, Stevens's daughter, remembers how their 45 minutes of allotted time ballooned to two hours. "We told them how our dad got ripped from us and everything fell apart," she says.

The parole board let Stevens walk out of Greensville Correctional on May 19, 2017—31 years after he went to prison. He's not allowed to return to Lancaster, where some of his siblings still reside and his parents are buried.

Which may be just as well for Mary's family and many in town. McCranie, the sheriff, says he was hounded by Emerson Harding for handing over the FBI report to Enright— something McCranie views as the neutral obligation of a public official. Taft, of the old R&K store, says he's nervous about even talking to a reporter. "We live in a very small community," he tells me. "I can't go running my mouth about this."

In truth, opinions are all over the place. Mary's older sister, Helen Webb, says she's certain the right man went to jail. "All they're doing is opening up old wounds over and over and over again," she says of the Innocence Project. She laughs at Enright's suggestion in court papers that her brother-in-law should have been a suspect. Harding and Mary, she says, had been planning their future and saving to buy a house. "My sisters and myself, we're not shrinking violets. We're strong, opinionated women, and Emerson was okay with that," says Webb. "He is not abusive. I have known him since he was in high school. He and his family, that's just not who they are."

Mary's brother John Keyser studied criminology because of his sister's murder. He, too, says he believes Mary was happily married. He wishes the Innocence Project's investigation wasn't still dragging on but says he was fine with them revisiting her case: "I would hate to find out that we did not have the right person. I'm 90 percent sure that it's [Stevens]. Or 95 percent sure. But you just—you can never know. You can't be 100 percent."


"THERE'S NO SUCH THING AS A PERFECT CASE. THERE'S CASES
I'D DO DIFFERENTLY. I CAN'T THINK OF ANYTHING I WOULD
HAVE DONE DIFFERENTLY IN THIS."

Mary's best friend from high school, Marjorie Holt, meanwhile, says she never got any comfort from Stevens's conviction: "I felt like they pinned it on someone just to make it go away. From day one, I didn't feel he was the right guy."

She'd rather talk about Mary, though, than why the case went awry. "She had a spark—a spirit. She just was one of those people who could talk to anybody," Holt says. "I was shy and kind of bullied. She definitely saved me in high school." Before graduation, Mary gave her a gift. Feeling the weight of it, Holt was embarrassed, thinking there was no way Mary could afford whatever was in the box. It turned out Mary had cleaned up some old bricks from her yard. "She says, 'These are four bricks to help you build the rest of your life.' " Holt chokes up. "She was a deep soul."

**For Stevens, now 65, rebuilding his own life has involved a person he never expected: Sandra, the ex-wife who divorced him while he was in prison but who never doubted his innocence.**

After falling out of touch for decades, she and Stevens reconnected in 2015 while grieving the sudden death of their eldest daughter, Jennifer. "She always wanted us to be back together," says Sandra, whose second marriage didn't work out. "She told me that all the time." Sandra invited Stevens to live with her in her house near the North Carolina border. "I felt like I was getting to know him all over again," she says. "We're older now. We're not kids." They started as roommates but are officially back together.

Stevens is polite and plainspoken, his once shaggy brown hair neatly combed and graying. At his and Sandra's house far into the country, he says that even though he's out of prison, it's still important to keep fighting to clear his name: "I know I'm innocent of the crime, and I don't want that on me. I want to be able to go where I want to go—I can't even go to see my mother and father's graves."



Stevens and his ex-wife Sandra reunited after he was released on parole.

Yet this place feels like home now, too. He introduces me to Candy, the hound mix he and Sandra adopted. She sleeps in bed with them every night. He tells me about the job he got with a local company that makes tents for weddings and other outdoor celebrations. His boss, Kreig O'Bryant, says Stevens is his most dependable employee: "We gave him a key two years ago."

Out front, Stevens shows me the purple rosebush he and Sandra planted in memory of their daughter Jennifer, and the broken-down speedboat that a friend gave him. It's nothing like the 32-foot *Miss Sandra*, but it may yet get him back on the water. He has already reupholstered the seats with leftover vinyl from the tent shop, and he's saving for a new motor.

"Hopefully," he says, "one of these days I can take it fishing."

*This article appears in the June and July 2019 issues of* Washingtonian.