**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

| | |
|---|---|
| **EMERSON EUGENE STEVENS,** | ) |
| **Petitioner** | ) |
| | ) |
| **v.** | ) |
| | ) |
| **ADRIANNE BENETT,** | ) |
| **Chair, Virginia Parole Board,** | ) |
| **Respondent.** | ) |

<u>**AMENDED PETITION FOR WRIT OF HABEAS CORPUS**</u>

Jennifer L. Givens
VSB #42269
The Innocence Project
University of Virginia School of Law
580 Massie Road
Charlottesville, VA 22903
434-924-2912

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

JURISDICTION AND VENUE ........................................................................ 3

PROCEDURAL HISTORY ............................................................................... 4

STANDARD OF REVIEW ............................................................................... 6

THIS COURT IS PERMITTED TO REVIEW THE INSTANT PETITION AND THE
CLAIMS CONTAINED THEREIN BECAUSE MR. STEVENS SATISFIES THE
REQUIREMENTS OF § 2244(b)(2)(B) .......................................................... 9

   1. Earl Smith Testified Falsely (Claim II). ................................................ 10

   2. Dr. Boon Testified Falsely (Claim I). .................................................. 10

   3. The Facts Underlying the Brady Claim (Claim III) Support Mr. Stevens' Innocence.
      ........................................................................................................ 15

   4. "The Evidence as a Whole" ................................................................. 16

      i. Clyde Dunaway Testified Falsely. ..................................................... 16

      ii. The Commonwealth's Only Forensic Evidence Against Mr. Stevens Has Been
         Debunked. ...................................................................................... 18

      iii. The Medical Examiner Has Since Retracted Her Testimony and Conceded That
          the Wounds Were Caused by a Boat Propeller. ............................... 20

      iv. VSP Special Agent David Riley Employed Coercive Tactics to Produce Mr.
          Stevens' Conviction, Ignoring Other Suspects. ............................... 24

      v. Taken Together, Mr. Stevens' Alibi Witnesses Confirm That He Could Not Have
         Committed the Murder. ................................................................... 33

APPLICABLE LAW ......................................................................................... 36

CLAIMS FOR RELIEF .................................................................................... 39

   CLAIM I.   THE COMMONWEALTH KNOWINGLY PRESENTED FALSE
               TESTIMONY FROM DR. BOON AND SUPPRESSED EVIDENCE
               SHOWING THAT IT WAS FALSE. ................................................ 39

                          The State Court's Adjudication Was Unreasonable Under §
                          2254(d) ........................................................................................ 41

   CLAIM II.   THE COMMONWEALTH KNOWINGLY PRESENTED FALSE
               TESTIMONY FROM EARL SMITH. ............................................. 46

i

**The State Court's Adjudication Was Unreasonable Under §
2254(d)** .................................................................................................. 46

**CLAIM III.    THE COMMONWEALTH FAILED TO DISCLOSE EXCULPATORY
EVIDENCE IN VIOLATION OF BRADY V. MARYLAND.** ................... 50

**The State Court's Adjudication Was Unreasonable Under §
2254(d)** .................................................................................................. 57

**CONCLUSION** .................................................................................................... 64

**PRAYER FOR RELIEF** .................................................................................... 65

**VERIFICATION**……………………………………………………………..66

**CERTIFICATION OF SERVICE**……………………………………………..67

# TABLE OF AUTHORITIES

## CASES

*Arnold v. McNeil*,
  622 F. Supp. 2d 1294 (M.D. Fla. Mar. 31, 2009) .................................................... 45

*Batson v. Kentucky*,
  476 U.S. 79 (1986)................................................................................................... 7

*Boone v. Paderick*,
  541 F.2d 447 (4th Cir. 1976) ........................................................................ 37, 38, 48

*Brady v. Maryland*,
  373 U.S. 83 (1963) ........................................................................................... passim

*Brown v. Borg*,
  951 F.2d 1011 (9th Cir. 1991) ................................................................................ 48

*Chavis v. State of N.C.*,
  637 F.2d 213 (4th Cir. 1980) ............................................................................ 45, 49

*Crivens v. Roth*,
  172 F.3d 991 (7th Cir. 1999) .................................................................................. 45

*DeMarco v. United States*,
  928 F.2d 1074 (11th Cir. 1991) ............................................................................. 48

*Elmore v. Ozmint*,
  661 F.3d 783 (4th Cir. 2011) ................................................................................. 38

*Giglio v. United States*,
  405 U.S. 150 (1972)........................................................................................ passim

*Hayes v. Brown*,
  399 F.3d 972 (9th Cir. 2005) ................................................................................. 44

*Jamison v. Collins*,
  291 F.3d 380 (6th Cir. 2002) ................................................................................. 43

*Jenkins v. Artuz*,
  294 F.3d 284 (2d Cir. 2002).................................................................................... 48

*Juniper v. Zook*,
  876 F.3d 551 (4th Cir. 2017) ................................................................................. 37

*Kyles v. Whitley*,
  514 U.S. 419 (1995)........................................................................................ passim

*Lewis v. Connecticut Com'r of Correction*,
  790 F.3d 109 (2d Cir. 2015).................................................................................... 49

*Lovitt v. Warden*,
  266 Va. 216, 585 S.E.2d 801 ................................................................................. 63

*McCambridge v. Hall*,
  303 F.3d 24 (1st Cir. 2002)...................................................................................... 8

*Miller v. Pate*,
  386 U.S. 1 (1967)................................................................................................... 48

*Miller-El v. Dretke*,
  545 U.S. 231 (2005)................................................................................................. 8

*Monroe v. Angelone*,
  2002 U.S. Dist. LEXIS 26310 (E.D. Va. 2002),

*aff'd*, *Monroe v. Angelone*, 323 F.3d 286 (2003)............................................................ passim

*Muhammad v. Kelly*,
575 F.3d 359 (4th Cir. 2009) ....................................................................................... 50

*Napue v. Illinois*
360 U.S. 264 (1959)............................................................................................. passim

*Owens v. Balt. City State's Attys. Office*,
767 F.3d 379, 397 (4th Cir. 2014) ......................................................................... 47, 62

*Panetti v. Quarterman*,
551 U.S. 930, 953 (2007)............................................................................................... 8

*Quinn v. Hayes*,
234 F.3d 837 (4th Cir. 2000), *cert. denied*, 532 U.S. 1024 (2001)............................... 8

*Schlup v. Delo*,
513 U.S. 298 (1995)................................................................................................. 5, 36

*Spicer v. Roxbury Correctional Institute*,
194 F.3d 547 (4th Cir. 1999) ....................................................................................... 45

*State v. Hamblin*,
239 P.3d 300 (Utah Ct. App. 2010) ............................................................................. 50

*Strickler v. Greene*,
527 U.S. 263 (1999)............................................................................................... 36, 44

*U.S. v. MacDonald*,
641 F.3d 596 (4th Cir. 2011) ....................................................................................... 10

*U.S. v. White*,
238 F.3d 537 (4th Cir. 2001) ....................................................................................... 38

*United States v. Acosta*,
357 F.Supp.2d 1228 (D. Nev. 2005)............................................................................ 50

*United States v. Agurs*,
427 U.S. 97 (1976)....................................................................................................... 37

*United States v. Bagley*,
473 U.S. 667 (1985)......................................................................................... 36, 38, 44

*United States v. Cargill*,
17 F. App'x 214 (4th Cir. 2001) ................................................................................... 37

*United States v. Sanfilippo*,
564 F.2d 176 (5th Cir. 1977) ....................................................................................... 48

*United States v. Snell*,
899 F.Supp. 17 (D. Mass. 1995) ................................................................................. 50

*United States v. Spagnoulo*,
960 F.2d 990 (11th Cir. 1992) ..................................................................................... 44

*United States v. Sutton*,
542 F.2d 1239 (4th Cir. 1976) ................................................................................ 44, 49

*Walker v. Kelly*,
589 F.3d 127 (4th Cir. 2009) ....................................................................................... 44

*Wearry v. Cain*,
136 S. Ct. 1002 (2016)................................................................................................. 17

*Weeks v. Angelone*,
176 F.3d 249 (4th Cir. 1999) ....................................................................................... 60

*White v. Helling*,
   194 F.3d 937 (8th Cir. 1999) ........................................................................ 62
*Wiggins v. Smith*,
   539 U.S. 510 (2003) ................................................................................. 6, 8
*Williams (Terry) v. Taylor*,
   529 U.S. 362 (2000) ................................................................................. 7, 63
*Winston v. Pearson*,
   683 F.3d 489 (4th Cir. 2012) ............................................................... passim
*Wolfe v. Clarke*,
   691 F.3d 410 (4th Cir. 2012) ........................................................................ 64

## STATUTES

28 U.S.C. § 2244 ................................................................................... passim
28 U.S.C. § 2254 ................................................................................... passim
Antiterrorism and Effective Death Penalty Act ("AEDPA") ............................ 6, 8, 60

## OTHER AUTHORITIES

Marisa M. Kashino, *A Murder on the Rappahannock River*, WASHINGTONIAN, June 27, 2019,
   *available at* https://www.washingtonian.com/2019/06/27/murder-on-the-rappahannock-river-
   emerson-stevens-mary-harding-innocence-project/). .................................. 28, 29, 54
MERRIAM-WEBSTER, http://www.merriam-webster.com/dictionary/eyewash (last visited May 21,
   2019) ..................................................................................................... 15
MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/nonsense (last visited July
   24, 2019). ............................................................................................... 42
National Academy of Science, *Strengthening Forensic Science in the United States: A Path
   Forward* ("NAS report") (2009) ..................................................................... 18
Ralph Blumenthal, *A Virginia Tale of Love and Death, Suspicions and Doubt*, N.Y. TIMES, Feb.
   22, 2000, *available at* http://www.nytimes.com/2000/02/22/us/a-virginia-tale-of-love-and-
   death-suspicions-and-doubt.html?pagewanted=all ........................................... 25
Spencer H. Hsu, *FBI Admits Flaws in Hair Analysis Over Decades*, WASH. POST, Apr. 18, 2015,
   *available at* https://www.washingtonpost.com/local/crime/fbi-overstated-forensic-hair-
   matches-in-nearly-all-criminal-trials-for-decades/2015/04/18/39c8d8c6-e515-11e4-b510-
   962fcfabc310_story.html?utm_term=.6c6c7a44bc29 ........................................ 18
Spencer S. Hsu, *Convicted Defendants Left Uninformed of Forensic Flaws Found by Justice
   Department*, WASH. POST, April 16, 2012 ....................................................... 19
Standard 3-3.11, *Disclosure of Evidence by the Prosecutor*, ABA ........................ 50
THE MARINER'S MUSEUM,
   http://www.marinersmuseum.org/sites/micro/cbhf/waterman/wat010.html (last visited May 21,
   2019) ..................................................................................................... 14

Emerson Eugene Stevens, an innocent man previously in the custody of the Virginia

Department of Corrections and under the supervision of the Virginia Parole Board, petitions this

Court to grant a Writ of Habeas Corpus.[1]

## INTRODUCTION

Early on the morning of August 23, 1985, the eastern shore county of Lancaster, Virginia,

discovered that 24-year-old Mary Harding, the mother of two young children and the wife of a

local waterman, had disappeared from her home.  A relative called Mary's home and her 4-year-

old son, Ray Harding, answered and said that he could not find his mother.  For four days and

nights, the residents of Lancaster searched for the missing woman in teams alongside multi-

jurisdictional task forces of the FBI, the Virginia State Police, and local law enforcement agents.

Finally, on August 28, 1985, Mary's naked body was inadvertently discovered by William Parks

and his grandson, who were searching in shallow water for driftwood just off the coast of Belle

Isle Park.  Still more shocking, there was a rope wrapped around Mary's neck, affixed to a chain

that was attached to a large, heavy cinderblock.  She was floating face down in the

Rappahannock River, and there were multiple slash marks on her back and buttock.

The Medical Examiner would determine that the cause of Mary's death was asphyxiation,

and that because there was no fluid in her lungs, drowning was not the cause of death.  By using

the not fully digested contents of Mary's stomach, which still contained the remnants of the

---

[1] Each claim, sub claim, paragraph, or amendment incorporates by reference every other claim, sub claim, paragraph, and amendment, as if fully alleged therein.  All allegations of error and prejudice are bases for relief in their own right, but also support relief based on the totality of circumstances.  The Appendix to this Petition is designated by "App." followed by a page number. "Tr." refers to the transcript of the second trial, which took place from July 8th to July 12th, 1986.  All evidence, including documents in the Appendix and any supplements or amendments, is offered as evidence to the extent admissible.  If not directly admissible, this evidence nonetheless constitutes an offer of proof that must be considered in support of an evidentiary hearing.

dinner she ate hours before she was murdered, the Medical Examiner was also able to approximate the time of her death – within 2-3 hours of a meal she ate between approximately 6:30 and 7:30 pm.

Initially, law enforcement had no suspect.  During his own initial interview with Virginia State Police, even Mary's husband, Emerson Harding IV, could not offer the name of anyone with a motive to harm his wife.  Within a week, however, Emerson Harding would suddenly and inexplicably commit to the theory that Emerson Stevens had murdered Mary, for reasons that were never vetted or verified by law enforcement.

Emerson Harding escaped the scrutiny of law enforcement, even after it was learned that he had made an unusual mid-week visit home the night before Mary was abducted and murdered, and despite the fact that Emerson Harding's behavior was otherwise suspicious both before and after his wife's murder.

Soon, the Federal Bureau of Investigation ("FBI") would withdraw from the task force, but only after writing a report detailing the information they had uncovered during their investigation, including a list of suspects.[2]  The newly elected Commonwealth's Attorney, C. Jeffers Schmidt, was facing his first serious homicide case.  Police officer Bruce Boles, who was selected by the newly-elected Sheriff Crockett to be the lead local investigator for Mary Harding's abduction and homicide, had also never investigated a serious felony, much less a homicide.

Into this wide wake of inexperience stepped Virginia State Police Special Agent David M. Riley.  This was long before the Eastern District of Virginia, in a decision upheld by this

---

[2] Petitioner had been unable to locate this FBI report, despite decades of repeated searches and multiple requests. The report, or a portion thereof, was finally located in a box of materials finally disclosed to Mr. Stevens' counsel in October of 2016.

Court, would castigate him by name, describing in detail the improper techniques and aggressive style that Riley had employed to secure the wrongful conviction of Beverly Monroe.[3]  Riley's conduct in this case was even more egregious than his conduct in Monroe's case.  He demonstrated undeniable tunnel vision, focusing on Mr. Stevens to the exclusion of several other more viable suspects.  In order to make his case, he specifically asked several witnesses to alter their testimony to exclude information that was exculpatory as to Emerson Stevens, with varying results.  He blatantly suggested information to witnesses that they themselves had not offered—again, with varying results.  Riley berated uncooperative witnesses and dangled the prospect of reward money before others.  Riley followed Emerson Stevens constantly, threatening him with the death penalty.[4]  Riley quickly latched on to Mr. Stevens as the culprit, and simply ignored countless signs that he was focused on the wrong man.

## JURISDICTION AND VENUE

Mr. Stevens hereby seeks relief pursuant to 28 U.S.C. § 2254 because, at the time he initially filed his petition, he was being held under the supervision of the Virginia Parole Board in violation of the Constitution or laws of the United States pursuant to the judgment of a State Court.  While Mr. Stevens was discharged from parole on March 27, 2020, this Court retains jurisdiction in the case because Mr. Stevens was under supervision/in custody when he filed his Motion for Authorization in the Fourth Circuit on August 2, 2019, and when he filed his initial/prophylactic habeas corpus petition in this Court on September 30, 2019 (Case No.

---

[3] *Monroe v. Angelone*, 2002 U.S. Dist. LEXIS 26310 (E.D. Va. 2002), *aff'd*, *Monroe v. Angelone*, 323 F.3d 286 (2003).

[4]  Upon information and belief, even the local law enforcement officer, Bruce Boles, who was assigned to work the case with Riley, revealed to post-conviction counsel that he later wished that he had not been so young and inexperienced at the time they partnered on this case, as he later came to understand that Riley's incredibly aggressive tactics were unprofessional and unethical.

3:19cv00714).  *See Nakell v. Attorney Gen. of N. Carolina*, 15 F.3d 319, 323 (4th Cir. 1994)

("Because Nakell was in custody when he filed his petition, federal jurisdiction attached and is

not affected by his subsequent release."); *Brooks v. North Carolina Dep't of Correction*, 984

F.Supp. 940 (E.D.N.C. Sept. 25, 1997) (citing *Maleng v. Cook*, 490 U.S. 488, 490 (1989) ("[a]

habeas petitioner must be in custody '*at the time his petition is filed*,' or the court is without

jurisdiction to hear his petition.") (emphasis added).

Venue lies in the United States District Court for the Eastern District of Virginia, the

judicial district in which Mr. Stevens was convicted and was subject to supervision.  28 U.S.C. §

2241(d) (2006).

## PROCEDURAL HISTORY

In July 1986, Mr. Stevens was tried and convicted of first-degree murder and abduction

with intent to defile in Lancaster County.  He was sentenced to 99 years and one day

imprisonment for the murder charge and 65 years for the abduction charge.  Mr. Stevens had

previously been tried in February 1986; that trial ended in a mistrial when the jury could not

reach a verdict.

Mr. Stevens' direct appeals were concluded on November 2, 1989.  He filed an initial

state habeas petition on December 10, 1990, which was dismissed without an evidentiary hearing

by the Circuit Court of Lancaster County on July 9, 1991.  Mr. Stevens filed a Petition for

Appeal to the Virginia Supreme Court, which was denied on October 23, 1991.  He filed his first

federal petition for a writ of habeas corpus, *pro se*, and it was denied on November 20, 1992.

In 2016, Mr. Stevens filed a successive state habeas corpus petition based on multiple

constitutional errors committed during his trial.  On October 4, 2016, Mr. Stevens filed the initial

state habeas petition in this matter.  Shortly after this filing, Mr. Stevens' counsel was informed

that a box of materials generated and/or kept by the Commonwealth recently had been located and was available for review in the Lancaster courthouse. These materials – for which Mr. Stevens' counsels had been searching for decades – included numerous documents supportive of Mr. Stevens' innocence and inconsistent with the Commonwealth's case against Mr. Stevens. On December 19, 2016, Mr. Stevens filed an amended petition based on this new evidence.

In his successive state habeas petition, Mr. Stevens set forth evidence of his innocence, which he argued entitled him to present his successive claims under the United States Supreme Court's reasoning in *Schlup v. Delo*, 513 U.S. 298 (1995). He made it clear to the circuit court, however, that he was *not* seeking relief based on his evidence of innocence, but instead was offering that evidence to excuse the application of any procedural bars.

The circuit court denied Mr. Stevens' habeas corpus petition during an in-court proceeding on December 1, 2017.[5] At the proceeding, the state circuit court refused to consider the full merits of several of Mr. Stevens' constitutional claims or his evidence of actual innocence, applying Virginia law and declining "to apply the broader actual innocence review approach requested by Mr. Stevens."[6] The court asked counsel for Respondent to draft an Order denying the petition, which was entered on February 7, 2018.[7]

Mr. Stevens appealed to the Supreme Court of Virginia. He petitioned that court to reverse the circuit court's dismissal of the claims contained in his habeas corpus petition and vacate his convictions or, alternatively, remand his case to the circuit court with instructions to consider the merits of all of his constitutional claims and/or to grant an evidentiary hearing. The

---

[5] 2254 Petition for Writ of Habeas Corpus Appendix (hereinafter "App.") 255-95.
[6] App. 269 (12/1/17 Tr. at 15).
[7] App. 296-97.

appeal was denied on September 18, 2018.[8]  The petition for rehearing was denied on November 20, 2018.[9]

The instant petition marks the second federal habeas petition filed by Mr. Stevens.  The United States Court of Appeals for the Fourth Circuit has granted authorization to Mr. Stevens to file the instant petition.[10] This Court is permitted to consider the petition and claims here because the "factual predicate for the claim could not have been discovered previously through the exercise of due diligence; and the facts underlying the claim(s), if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense."  28 U.S.C. § 2244(b)(i)-(ii).  Each of the claims raised in the instant petition is based on the evidence disclosed to Mr. Stevens in October 2016; these are claims that were timely raised in state habeas proceedings and are therefore ripe for, and entitled to, consideration by this Court (in light of Mr. Stevens' overwhelming evidence of innocence).  *See* 28 U.S.C. § 2244(b).

**STANDARD OF REVIEW**

28 U.S.C. § 2254(d), as amended by the Antiterrorism and Effective Death Penalty Act ("AEDPA") imposes limitations on this Court's ability to grant relief – only, however, on claims that were actually "adjudicated on the merits in State court proceedings."  *See, e.g. Wiggins v. Smith*, 539 U.S. 510, 534 (2003) ("[O]ur review is not circumscribed by a state court conclusion

---

[8] App. 298.
[9] App. 299.
[10] The petition filed in this Court on May 18, 2020 was the same petition authorized by the Fourth Circuit.  The only substantive changes included in this Amended Petition reflect the fact that Mr. Stevens was discharged from parole and that the Fourth Circuit authorized the filing of this second petition because Mr. Stevens satisfied the requirements of 28 U.S.C. 2244(b).

with respect to prejudice, as neither of the state courts below reached this prong of the *Strickland* analysis.").  Whether a claim was adjudicated on the merits in the below state court proceedings is an issue that must be decided by this Court.

Where § 2254(d) applies, the statute imposes no restriction on this Court's ability to grant relief on a claim decided on the merits in state court if the below standard is met:

> (d)   An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1)   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)   resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

§§ 2254(d)(1)-(2).

In *Williams (Terry) v. Taylor*, 529 U.S. 362, 399 (2000), a majority of the Court defined the terms in 2254(d)(1).

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decision but unreasonably applies that principle to the facts of the prisoner's case. . . .  [T]he phrase "clearly established Federal law, as determined by the Supreme Court of the United States" . . . refers to the holdings, as opposed to the dicta, of this Court's decisions as of the time of the relevant state-court decision.

*Terry Williams*, 529 U.S. at 412-13 (opinion of the Court by O'Connor, J).

To assess claims under § 2254(d)(2), courts apply the well-established test of reasonableness.  In *Miller-El v. Dretke*, 545 U.S. 231 (2005), for example, the Court reviewed the state court's reasons for denying an alleged violation of *Batson v. Kentucky*, 476 U.S. 79

(1986), and the evidence before the state court at the time of its decision.  It then granted habeas relief, having determined that the state court's decision was based on an unreasonable determination of the facts.  *Id.*

The *Terry Williams* Court also noted that "unreasonable . . . is a common term in the legal world and, accordingly, federal judges are familiar with its meaning."  529 U.S. at 410. Thus, the term "unreasonable" is no more demanding in the context of a § 2254 habeas petition than in any other context.  Furthermore, although some "increment of incorrectness" beyond mere error is required, the "increment need not necessarily be great"—it "must be great enough to make the decision unreasonable in the independent and objective judgment of the federal court."  *McCambridge v. Hall*, 303 F.3d 24, 36 (1st Cir. 2002) (en banc).  A state court decision may be based on an "unreasonable determination" of the facts under § 2254(d)(2) if factual bases for the decision are not supported by sufficient evidence, or are contradicted by other evidence in the record.  *See, e.g., Wiggins*, 539 U.S. at 528-29.  Federal habeas review is not, in sum, a "rubber stamp" process; "in the context of federal habeas, deference does not imply abandonment or abdication of judicial review."  *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

In *Panetti v. Quarterman*, the Court further clarified that the "AEDPA does not 'require state and federal courts to wait for some nearly identical factual pattern before a legal rule must be applied."  551 U.S. 930, 953 (2007) (quoting *Carey v. Musladin*, 549 U.S. 70, 81 (2006) (Kennedy, J., concurring)). The AEDPA does not "prohibit a federal court from finding an application of a principle unreasonable when it involves a set of facts 'different from those of the case in which the principle was announced.'"  *Id.* (internal citations omitted).  Furthermore, "[f]or the 'clearly established' prong to apply, the relevant Supreme Court precedent need not be directly on point, but must provide a 'governing legal principle' and articulate specific

8

considerations for the lower court to follow when applying the precedent." *Quinn v. Hayes*, 234

F.3d 837, 844 (4th Cir. 2000), *cert. denied*, 532 U.S. 1024 (2001).

**THIS COURT IS PERMITTED TO REVIEW
THE INSTANT PETITION AND THE CLAIMS CONTAINED THEREIN
<u>BECAUSE MR. STEVENS SATISFIES THE REQUIREMENTS OF § 2244(b)(2)(B)</u>**

At set forth in his Motion for Authorization filed in the Circuit Court, as well as above,

Mr. Stevens could not have presented the claims herein in his first federal habeas petition, as the

claims are based on the information first disclosed to Mr. Stevens' counsel in October of 2016.

This information was in the exclusive possession of the Commonwealth for 30-31 years prior to

the October 2016 disclosure.  Hence, the factual bases of the instant claims were not available to

Mr. Stevens at the time he filed his initial federal habeas petition.

In addition to establishing that the factual predicate of the claims herein could not have

been presented in the initial federal habeas petition, Mr. Stevens must demonstrate that had the

facts underlying the instant claims been available at trial, no reasonable factfinder would have

found him guilty.  28 U.S.C. § 2244(b)(2)(B)(ii).  Mr. Stevens satisfies these requirements.  The

facts underlying the claims herein establish that the Commonwealth knowingly presented false

testimony regarding (1) the location where Mrs. Harding's body was dumped in the water (via

the testimony of Dr. Boon); and (2) Mr. Stevens' whereabouts during the relevant timeframe (via

the testimony of Earl Smith).  Additionally, the facts establish that the Commonwealth failed to

disclose valuable impeachment evidence, as well as exculpatory and material evidence regarding

alternate suspects.  These underlying facts served as the basis of the Commonwealth's theory of

the crime and its case against Mr. Stevens.  But for the presentation of this false testimony and

the suppression of exculpatory evidence, Mr. Stevens would not have been convicted of Mrs.

Harding's murder.  This is undeniably clear when viewed in light of the "evidence as a whole,"

9

which now includes significant new facts supporting Mr. Stevens' innocence.  *See U.S. v. MacDonald*, 641 F.3d 596 (4th Cir. 2011) ("[T]he 'evidence as a whole' is exactly that:  all the evidence put before the court at the time of its § 2244(b)(2)(B)(ii) . . . evaluation.").  The Commonwealth of Virginia's tenuous case against him has been completely eviscerated.

**1.   Earl Smith Testified Falsely (Claim II).**

First, the Commonwealth presented false testimony from witness Earl Smith, who testified that Mr. Stevens was late to work on the morning after Mary Harding was abducted, implying that Mr. Stevens' ordinary schedule was interrupted because he had killed the victim and was disposing of her body during the early morning hours of Friday, August 23, 1985.  Earl Smith testified that during a week in August 1985, he was helping Mr. Stevens pull crab pots because Mr. Stevens "had a bad arm at the time."[11]  Smith stated that while Mr. Stevens normally picked him up around 6 a.m. to pull crab pots, Mr. Stevens picked him up late—at 7 a.m.—on Friday, August 23, 1985, the morning after Mrs. Harding disappeared.[12]

This testimony was false.  A few weeks after his initial statement, Smith had disclosed to Detective Riley that Mr. Stevens had in fact picked Smith up the morning of August 23, 1985 at "*the usual time of 5:30-6:00 a.m.*"[13]  The truth, as the Commonwealth had been made aware, was that there was nothing unusual or suspicious about Mr. Stevens' timing or behavior on Friday morning.

**2.   Dr. Boon Testified Falsely (Claim I).**

Second, Dr. John Boon, a marine scientist, testified during the first trial about how/why Mary Harding's weighted corpse had moved ten miles upstream in four days—an explanation

---

[11] 7/10/86 Tr. at 202.
[12] *Id*. at 203.
[13] App. 209 (emphasis added).

10

that was absolutely critical to the Commonwealth's theory of the crime.  Before the second trial, however, Dr. Boon reminded the prosecutor in writing that his testimony was "eyewash" (nonsense) as Detective Riley had described it before the first trial, and Dr. Boon did not testify a second time.  The Commonwealth nonetheless read his testimony into evidence – thus precluding cross-examination – all the while knowing that investigators had concluded early on in their investigation that the victim's body "was dumped within 500 to 600 yards of where it was eventually located."[14]

Mrs. Harding was killed on the evening of August 22, 1985.[15]  Five days later, on August 27th, her body was found along the shoreline of the Rappahannock River in the town of Morattico, attached to a chain, rope, and cinderblock.[16]  Mr. Stevens' boat was docked on the Rappahannock River at Towles Point in the early hours of August 23rd, a ten-mile distance from where Mrs. Harding's body was discovered.[17]  The Commonwealth theorized that, on the morning of August 23rd, after murdering Mrs. Harding, Mr. Stevens took his boat (which was not equipped with any lights) out a short distance and deposited Mrs. Harding's body into the Rappahannock River.  In order to support the Commonwealth's theory of the crime, the Commonwealth needed to explain to the jury how Mrs. Harding's body could travel the ten-mile distance from where the Commonwealth had speculated that Mr. Stevens had dumped the body, to the location it was found ten miles upstream in the Rappahannock River.  This of course, all while weighed down by a chain, rope, and cinderblock, in just four days.  To accomplish this, the

---

[14] App. 188.
[15] 7/8/86 Tr. at 8.
[16] *Id*. at 22; 7/12/86 Tr. at 26.
[17] 7/9/86 Tr. at 262; 7/11/86 Tr. at 173.

Commonwealth procured the expert testimony of Dr. John D. Boon, Associate Marine Scientist at the College of William and Mary, Virginia Institute of Marine Science.[18]

Dr. Boon testified at Mr. Stevens' first trial, which ended in a hung jury.  After Dr. Boon indicated in writing his reluctance to testify at the second trial, the Commonwealth elected instead to read his testimony from the first trial into evidence at the second trial without revealing to the defense that the "expert" and Detective Riley thought the testimony was nonsense.[19]  This testimony was key in linking together the chain of events proposed by the Commonwealth, particularly the testimony presented by Commonwealth witnesses Esther and Thomas Stevens.

Dr. Boon testified that it was possible for Mrs. Harding's body to travel ten miles upstream towards Morattico in the Rappahannock River in four days:

> Q:    Based upon your opinion can you conclude how and in what direction and what distance a non-buoyant object would travel from the Towles Point area in a four-day period?
>
> A:    In approximately four days…it would travel a distance of about 10 nautical miles.[20]

Dr. Boon supported this conclusion with information he gathered from charts and tables of the Rappahannock River[21] as well as studies he claimed to have personally conducted on the river: "Have you ever been on the river and conducted studies on it yourself personally?  'Yes sir.'"[22] According to Dr. Boon, there was no movement in the Towles Point region of the river at 12:00 a.m. on August 23rd, and shortly thereafter the water began moving upstream in the direction of

---

[18] 7/9/86 Tr. at 256-70.
[19] *Id.*
[20] *Id.* at 267.
[21] *Id.* at 259.
[22] *Id.* at 262.

Morattico.[23]   At 2:53 a.m., the water flow reached its maximum intensity, and the tide flow switched directions every twelve hours—a phenomenon caused by the fact that this region of the river is an "estuary" and is subject to mixing of fresh and salt water.[24]   As a result of these water conditions, Dr. Boon explained, the body would have traveled one mile upstream every ten hours.[25]

During its closing argument, the Commonwealth emphasized to the jury that Dr. Boon was an "honest expert" who said "it is entirely possible that [Mrs. Harding's] body can travel 10 miles up the river in four days."[26]   The Commonwealth knew, however, that this was not, in fact, possible.  In the recently disclosed FBI report, investigators concluded that "[b]ecause of the tidal action and currents of the Rappahannock River, it is currently estimated that the body of Mary Keyser Harding was dumped within *500 to 600* yards of where it was eventually located."[27]

Decades later, while reviewing the Lancaster Commonwealth Attorney's file, post-conviction counsel discovered a letter dated May 2, 1986—two months before Mr. Stevens' second trial—that was also withheld from defense counsel at trial.  The letter from Dr. Boon to Commonwealth's Attorney Jeffers Schmidt.  In it, Dr. Boon reminds Schmidt that his "honest" testimony was in fact a lie crafted by the Commonwealth.[28]   Schmidt had written to Dr. Boon, requesting his expert testimony at Mr. Stevens' second trial.[29]   In response, Dr. Boon expressed

---

[23] *Id*. at 260.
[24] *Id*. at 260, 263.
[25] *Id*. at 261.
[26] 7/12/86 Tr. at 67.
[27] App. 188 (emphasis added).
[28] During a review of the Commonwealth's file in 2013, Matthew Engle (former Legal Director of the Innocence Project Clinic) recorded the contents of this letter.
[29] App. 105.

his concerns about testifying at the second trial:  "Although I am pleased to aid you and the

Commonwealth as well as I can, there are two concerns which I feel I must express to you."[30]

Dr. Boon then reveals his first concern:

> During my previous testimony, I gave what simply amounted to background information
> of the Rappahannock River system since I myself have no knowledge of any specific
> event or direct observation relating to both the place and time in question. Was this
> testimony truly of use to you or the court?[31]

Dr. Boon's second concern is even more alarming:  "In a brief 'interview' before my last

appearance at the Circuit Court, your associate, Lt. Riley, applied what may be the correct term

to my testimony in this case.  He called it 'eyewash.'"[32]  Dr. Boon conceded that his testimony at

the first trial was false, and the Commonwealth knew it.

Dr. Boon's letter to the Commonwealth's Attorney, when coupled with the FBI's

conclusion that the victim's body was dumped close to where Mrs. Harding was found,

completely undermines his testimony.  It reveals how desperately the Commonwealth was trying

to cobble together a case against Emerson Stevens.[33]  Dr. Boon admits to having no direct

knowledge of the Rappahannock River system with respect to the place and time Mrs. Harding

---

[30] *Id.*

[31] *Id.*

[32] *Id.*

[33] The Commonwealth's theory is made even more improbable by the fact that commercial
fishermen in the Rappahannock River frequently use pound nets to fish, and it is unlikely Mrs.
Harding's body could travel a ten-mile distance under water without getting caught in one of
these nets.  A pound net consists of a large net strung between wooden stakes that are pushed
into the bottom of a bay and spaced apart to form a line running across the tide.  THE MARINER'S
MUSEUM, http://www.marinersmuseum.org/sites/micro/cbhf/waterman/wat010.html (last visited
May 21, 2019).  Pound nets trap "anything that moves through them."  *Id.*  Fishermen set up
these nets in the middle of March and do not remove them until November, which means they
were being used at the time of Mrs. Harding's murder in August.  *Id.*  Fishermen such as Thomas
Stevens, who docked his boat directly across from Emerson Stevens' boat in Towles Point, have
spotlights on their boats in order to spot pound nets and crabbing pots in the water when fishing
before dawn, which suggests that pound nets were a frequent occurrence in the area at the time of
Mary Harding's murder.

was allegedly murdered, despite his testimony at trial that he had personally been to the river and conducted studies on it himself.[34]  He even expresses his disbelief that the testimony was "truly of use to [Schmidt] or the court."[35]  Furthermore, he agrees that his prior testimony was "eyewash," which is a slang term used to describe "misleading or deceptive statements, actions, or procedures."[36]  Finally, he reveals that Detective Riley, the lead investigator on the case and a key witness for the Commonwealth, knew that the testimony was "eyewash;"  indeed, Riley was the one who used that term.

### 3. The Facts Underlying the *Brady* Claim (Claim III) Support Mr. Stevens' Innocence.

Third, the facts underlying the *Brady v. Maryland* claim support Mr. Stevens' innocence claim.  Documents that should have been disclosed to Mr. Stevens' trial counsel under *Brady* reveal that law enforcement had identified multiple alternate suspects, including Richard Dawson and Keith Wilmer, both of whom were more likely suspects that Mr. Stevens.  Dawson, the documents reveal, had multiple potential motives for harming Mary Harding, as well as the opportunity to have done so.  Wilmer had been accused of sexually inappropriate behavior toward other women on multiple occasions.

The documents also include evidence that sheds light on, and could have shifted juror perception of, multiple witnesses.  Also, evidence that was not turned over to the defense could have been used to rehabilitate the credibility of witness Ann Dick, who testified favorably at the second trial, but was attacked by the Commonwealth.  There was additional evidence that could have been used to impeach crucial Commonwealth witnesses Emerson Harding and David Riley.

---

[34] 7/9/86 Tr. at 262.
[35] App. 105.
[36] MERRIAM-WEBSTER, http://www.merriam-webster.com/dictionary/eyewash (last visited May 21, 2019).

The undisclosed *Brady* evidence reveals the paucity of the Commonwealth's case.

**4. "The Evidence as a Whole"**

The facts underlying the claims in the instant petition, "when viewed in light of the evidence as a whole, . . . establish by clear and convincing evidence that no reasonable factfinder would have found [Mr. Stevens] guilty."  28 U.S.C. § 2244(b)(2)(B)(ii).  The "evidence as a whole" in this case includes additional significant evidence of Mr. Stevens' innocence and the undeniable weakness of the Commonwealth's case.  The other available evidence of innocence includes the following:

> **i.   Clyde Dunaway Testified Falsely.**

Alleged eyewitness Clyde Dunaway, who placed Mr. Stevens' car outside of the victim's house at a relevant time, was later prosecuted and convicted of obstruction of justice for his false testimony against Emerson Stevens.[37]

Clyde Dunaway testified that he saw Mr. Stevens' truck parked 250 yards west of Mrs. Harding's house on the night of her murder, and that he reported it to Detective Riley.[38]  On cross-examination, Dunaway denied having made inquiries about the $20,000 reward that had been offered for information relating to Mrs. Harding's disappearance:

> Q:     Have you ever talked to Riley about the reward money?
>
> A:     No, sir.
>
> Q:     If Riley told someone you were asking about the reward money, that would be untrue?
>
> A:     Yes.
>
> Q:     Have you ever inquired of anyone about the reward money?

---

[37] App. 112-17.
[38] 7/9/86 Tr. at 103, 120.

A:      No, sir.[39]

In March 1988, after an appointed prosecutor conducted an investigation into his alleged perjury at Mr. Stevens' trial, Dunaway pled guilty to obstruction of justice in order to avoid being tried on the more serious offense of perjury for giving false testimony.[40]  The investigation also revealed that several law enforcement officers were aware of Dunaway's multiple inquiries concerning the reward money.  Dunaway told Judy Boyer, Sheriff Crockett's deputy, that he believed he was entitled to the monetary reward.[41]  After the first trial, Dunaway asked Sheriff Crockett when a decision would be made about the reward, and Crockett told him that no decision would be made until after the second trial.[42]

Detective Riley expressed concerns immediately preceding the second trial that Dunaway had made a number of inquiries concerning the reward.[43]  Shortly after the second trial, Dunaway contacted Lancaster Investigator Bruce Boles, indicating that he wanted to know when the recipient of the reward would be determined.[44]  None of this information had been provided to Emerson Stevens' defense counsel pre-trial.[45]

The Commonwealth knew about these inquiries but did nothing to correct the false testimony from Dunaway.  Thus, jurors wrongly believed that Dunaway lacked motivation to provide testimony helpful to the Commonwealth and were unable to accurately assess this important witness's credibility.  *See, e.g.*, *Wearry v. Cain*, 136 S. Ct. 1002, 1004-06 (2016)

---

[39] *Id*. at 120.
[40] App. 111-12.
[41] App. 113.
[42] App. 114.
[43] App. 116.
[44] *Id*.
[45] In fact, the Commonwealth never provided trial counsel with any information about the disbursement of the reward money. Post-conviction counsel has attempted, via a FOIA request, to determine who received the reward money, but has been unsuccessful thus far.

(prosecution violated *Brady* by withholding witness's pretrial efforts to secure benefit in exchange for testifying).

> ii.   **The Commonwealth's Only Forensic Evidence Against Mr. Stevens Has Been Debunked.**

The only physical evidence connecting Mr. Stevens to the crime was a single hair found on a shirt in his truck that allegedly belonged to Mrs. Harding.  The Commonwealth presented testimony from an "expert" who examined this hair under a microscope and connected the hair to Mrs. Harding.[46]  In the past several years, however, the FBI has reexamined all hair microscopy cases and concluded that microscopic hair comparison is scientifically unreliable and cannot serve as a basis upon which to convict a defendant.[47]  It is now widely accepted that microscopic hair comparison is not scientifically valid.[48]  The FBI and Department of Justice (DOJ) case review demonstrated that only very limited conclusions could be appropriately drawn from microscopic hair comparison analysis.[49]  Without the hair, there is now no reliable physical evidence connecting Mr. Stevens to Mrs. Harding's death.[50]

---

[46] 7/9/86 Trial Tr. at 97.

[47] App. 5-9 (14?).

[48] *See* National Academy of Science, *Strengthening Forensic Science in the United States: A Path Forward* ("NAS report") (2009) (concluding that microscopic hair comparison in criminal investigation is not reliable); Spencer H. Hsu, *FBI Admits Flaws in Hair Analysis Over Decades*, WASH. POST, Apr. 18, 2015, *available at* https://www.washingtonpost.com/local/crime/fbi-overstated-forensic-hair-matches-in-nearly-all-criminal-trials-for-decades/2015/04/18/39c8d8c6-e515-11e4-b510-962fcfabc310_story.html?utm_term=.6c6c7a44bc29**Error! Bookmark not defined.**.

[49] App. 5-8.

[50] As part of the post-conviction investigation of this case, Mr. Stevens attempted to have this hair tested using mitochondrial DNA testing.  Unfortunately, the hair (which had been snipped into four tiny pieces by Scholberg for microscopic "analysis") was too old to generate any DNA testing results.

The Commonwealth called Myron Scholberg,[51] a former FBI hair and fiber analyst, forensic consultant, and part-time employee of the Commonwealth's Northern Virginia Crime Lab in Merrifield, Virginia, to testify about a hair taken from a shirt found under the seat of Mr. Stevens' truck.  At trial, Scholberg compared hairs from the shirt with hair known to have come from Mrs. Harding, and testified that both samples were "microscopically alike in all identifiable characteristics."[52]

In summation, the Commonwealth's Attorney argued that "[Myron Scholberg] said look, I am honest, I am intellectually honest with you.  [While] it's a possibility it's not her hair, it is unlikely in the populace there will be two peoples' hair I cannot tell the difference in with my great experience."[53]  The jurors relied on the Commonwealth's Attorney's claim that the hair was from Mrs. Harding to convict Mr. Stevens.  One juror, James Robertson, stated in his affidavit that he recalled the Commonwealth's Attorney presenting evidence that the hair the detectives found on Mr. Stevens' shirt came from Mrs. Harding.[54]  Another juror, June Baird, stated in her affidavit,

> I . . . remember that the detectives found a hair on a shirt that belonged to Emerson Stevens.  There was an expert who had analyzed the hair with a microscope and who testified about the hair at trial.  The prosecutor told us this hair belonged to the victim.  This hair was the only direct evidence that I remember from the trial, and it was certainly the most important piece of evidence to me.  Without the hair, I don't believe I could have found Emerson Stevens guilty.[55]

---

[51] Several other cases in which Scholberg gave testimony based on unreliable microscopic hair analysis have been subject to review.  Kirk Odom has been exonerated.  *See* Spencer S. Hsu, *Convicted Defendants Left Uninformed of Forensic Flaws Found by Justice Department*, WASH. POST, April 16, 2012.  In the case of Darnell Phillips, Mr. Scholberg identified a hair as that of a "negroid."  Subsequent testing showed that the hair not only did not belong to Mr. Phillips, but belonged to someone with a Caucasian mother.

[52] 7/9/86 Tr. at 97.

[53] 7/12/86 Tr. at 52.

[54] App. 1.

[55] App. 2.

Additionally, juror Margaret Rennolds stated in her affidavit that she remembers the evidence about Mrs. Harding's hair on Mr. Stevens' shirt, and that the Commonwealth's Attorney argued that Mr. Stevens had this hair on his shirt because he killed Mrs. Harding.[56]

The single hair that the Commonwealth claimed belonged to Mrs. Harding was the only forensic link in this entire case. Thus, the Commonwealth heavily relied on microscopic hair comparison testimony that contained the very errors the FBI and DOJ review has identified, and the testimony was provided by a former FBI examiner.[57] During his closing argument, the Commonwealth's Attorney doubled down on upon Scholberg's statements and conclusions, repeatedly stating that the hair recovered from the flannel shirt definitively belonged to Mr. Stevens and Mrs. Harding.[58]

> **iii.    The Medical Examiner Has Since Retracted Her Testimony and Conceded That the Wounds Were Caused by a Boat Propeller.**

---

[56] App. 4.

[57] Although Myron Scholberg was a part-time employee of the Commonwealth at the time he performed his analysis, he had previously been employed by the FBI for twenty-one years, eighteen of which were spent in the hair and fiber unit. App. 80. His area of expertise, pursuant to the training he received and time he spent as part of the FBI's hair and fiber unit, was precisely the type of side-by-side microscopic hair comparison found to be problematic in the DOJ review. Mr. Stevens' case involved Type 1 Error (the examiner stated or implied that the evidentiary hair could be associated with a specific individual to the exclusion of others), Type 2 Error (the examiner assigned to the positive association a statistical weight or probability, or provided a likelihood, that the questioned hair originated form a particular source; or an opinion as to the likelihood or rareness of the positive association that could lead the jury to believe that valid statistical weight can be assigned to a microscopic hair association), and Type 3 Error (the examiner cites the number of cases of hair analyses worked on in the lab and the number of samples from different individuals that could not be distinguished from one another as predictive value to bolster the conclusion that a hair belongs to a specific individual) statements.

[58] "Two of the defendant's hairs and one of the victim's hairs found on the defendant's shirts." 7/12/86 Tr. at 19. "Her hair was on his shirt. He, of course, couldn't deny it was his shirt because it had his hair on it." *Id.* at 20. "[Special Agent Robertson] did find the defendant's hair on his own shirt and the victim's hair on the defendant's shirt. He also confirmed, when asked if the hairs were the same as they had been confirmed by the expert, to be the same hairs of the victim and defendant." *Id.* at 50.

Next, the Commonwealth concocted a theory that a knife that Mr. Stevens might have once owned had caused the wounds on the victim's back.[59]  In support of this theory, the Commonwealth presented testimony from former Chief Medical Examiner Marcella Fierro.[60]  However, Dr. Fierro has since reviewed the case and has signed a sworn affidavit and concluded that the cuts on Mrs. Harding's back are consistent with a post-mortem encounter with a boat propeller, rather than a knife.[61]  Thus, another alleged connection between Mr. Stevens and the crime has been eliminated.

Mrs. Harding, when discovered, had distinct, parallel cuts on her body.[62]  The cuts ranged in size from four-and-a-quarter to five inches in length, and from half-an-inch to two-and-a-half inches deep.[63]  Four of the cuts were parallel on her torso, and a fifth was angulated on her right hip.[64]  Dr. Fierro was qualified as an expert witness and testified for the Commonwealth in Mr. Stevens' trial.[65]  She concluded that the trauma was "due to a cutting instrument and not to postmortem artifact"[66] and that "a cutting instrument [had] to cause this kind of injury."[67]  The

---

[59] Dr. Fierro concluded that asphyxia and cutting wounds were the cause of Mrs. Harding's death.  Her conclusion was a late addition to the autopsy findings and report of Dr. Gravatt, the local Medical Examiner.  Dr. Fierro signed off on Dr. Gravatt's report on September 9, 1985. App. 200.  Dr. Gravatt concluded that the wounds on the victim's back were likely caused after death by scraping material in the water.  App. 203.  The cause of death was strangulation.  *Id.*  It was not until after Dr. Fierro consulted with law enforcement on September 30, 1985 (after they had decided that Mr. Stevens was their primes suspect and that he had been tied to a knife) that she concluded that the wounds on Mrs. Harding's back were likely caused by a cutting instrument (not postmortem artifact) (App. 86), and she altered the cause of death to "asphyxia and cutting wounds."  App. 90.
[60] 7/8/86 Tr. at 82; App. 86-87.
[61] App. 158-60.
[62] 7/8/86 Tr. at 80.
[63] *Id*.
[64] *Id*.
[65] App. 158.
[66] App. 86.
[67] 7/8/86 Tr. at 80.

Commonwealth then asked Dr. Fierro to examine a knife, and she concluded this "knife would have been able to inflict the kind of injuries that [Mrs. Harding] had."[68]

Dr. Fierro's testimony regarding the knife was critical to the Commonwealth's case, as it provided a connection between the wounds inflicted on Mrs. Harding and a knife similar to one owned by Mr. Stevens. The Commonwealth's theory at trial was that Mr. Stevens owned a knife that could have caused the cuts on Mrs. Harding's body. The Commonwealth presented testimony from Timothy Brent, who owned the knife (a Wildcat Skinner knife) presented at trial and examined by Dr. Fierro, and Brent claimed that Mr. Stevens owned a similar knife.[69]

Special Agent Robertson, a crime scene technician for the State Police who searched and photographed Mr. Stevens' vehicle, testified that Mr. Stevens had a knife sheath on the dashboard of his vehicle.[70] After the Commonwealth showed Robertson a brochure advertisement for a Wildcat Skinner knife, Robertson testified that the knife sheath on the dashboard of Mr. Stevens' vehicle was of the type that could have contained a Wildcat Skinner.[71] Dr. Fierro concluded that the Wildcat Skinner knife could be the cause of the injuries[72] and Robertson testified that the Wildcat Skinner was similar to the knife sheath found in Mr. Stevens' vehicle.[73]

---

[68] *Id*. at 83.

[69] 7/10/86 Tr. at 159.

[70] 7/9/86 Tr. at 62. Curiously, Special Agent Robertson neglected to recover the knife case during the search (or any time thereafter). When questioned about this failure, Robertson stated that, "I should have taken the case. We could have it today, and we could compare it. It was just hot, and I forgot to take it…" 7/9/86 Tr. at 88.

[71] 7/9/86 Tr. at 62.

[72] 7/8/86 Tr. at 81.

[73] 7/9/86 Tr. at 63.

Ernest Lee Talley also testified that the Wildcat Skinner knife examined by Dr. Fierro was the same type of knife owned by Mr. Stevens.[74]  Additionally, Earl Smith testified that Mr. Stevens had a knife that was kept on the dashboard of his vehicle and that Mr. Smith had seen Mr. Stevens with the knife on August 8th and before, but he never saw Mr. Stevens with it after Mrs. Harding disappeared.[75]

During his opening statement, the Commonwealth's attorney emphasized that the jury would see evidence of "slash marks" on Mrs. Harding's body and that the jury would hear testimony from the medical examiner about what caused those "slash marks" on Mrs. Harding's body.[76]  On cross-examination, the defense showed a boat propeller to Dr. Fierro and asked whether it could have inflicted the wounds on Mrs. Harding's body.  Dr. Fierro testified that it was her opinion, to a reasonable degree of medical certainty, that the propeller shown to her could not have caused the cuts found on Mrs. Harding's body.[77]  The Commonwealth closed its case by arguing that Mr. Stevens "slashed her body to drain the blood to draw the crabs so they would do their work."[78]  Testimony regarding these wounds and Mr. Stevens' possession of a knife capable of causing them was a critical part of the Commonwealth's case against Mr. Stevens.

Dr. Fierro's recent re-examination of this case has caused her to change her opinion and eliminates yet another important piece of the Commonwealth's case.[79]  Dr. Fierro has now concluded that a propeller did indeed cause the wounds on Mrs. Harding's body, just as Mr.

---

[74] 7/10/86 Tr. at 179-80.
[75] *Id*. at 207.
[76] 7/8/86 Tr. at 15.
[77] App. 159.
[78] 7/12/86 Tr. at 14.
[79] App. 158-60.

Stevens' attorney had hypothesized.[80]  Dr. Fierro's revised opinion is based on her reevaluation

of the case, and her subsequent and specific experience with propeller injury cases.[81]  Upon

reconsideration of the evidence, Dr. Fierro concluded that:

> The cuts are more consistent with a post-mortem encounter with a propeller for several
> reasons.  First, the wounds are not in the location of the knife wounds found in usual
> stabbing deaths.  Additionally, the cuts occur at regular intervals, which would also be
> inconsistent with usual knife wounds.  Also, most knife wounds are not as deep or as long
> as the cuts found on Ms. Harding's body.  Finally, Ms. Harding's body was discovered in
> shallow water in an area that was heavily trafficked by propeller boats.[82]

Dr. Fierro's corrected opinion undermines the Commonwealth's theory of the case and

the testimony it used to connect Mr. Stevens to the murder of Mrs. Harding.  Had the jurors

known the true cause of Mrs. Harding's injuries (and thus avoided exposure to the sensational

and gruesome closing by the Commonwealth about draining blood to draw crabs) it is more

likely than not that no reasonable juror would have voted to convict Mr. Stevens since there was

no physical evidence linking him to the murder.

### iv.  VSP Special Agent David Riley Employed Coercive Tactics to Produce Mr. Stevens' Conviction, Ignoring Other Suspects.

The investigation into Mrs. Harding's death was led by an overzealous detective, who

employed aggressive and coercive tactics designed to obtain a conviction with no regard for

accuracy or truth.  Virginia State Police Special Agent David Riley played a significant role in

securing the wrongful conviction of Mr. Stevens.  During his long career as a detective for the

Virginia State Police, Detective Riley's interrogation tactics came under suspicion numerous

times and were the basis of allegations of improper conduct during his investigations.  Detective

Riley was found to have acted improperly in the notable case of Beverly Anne Monroe, a woman

---

[80] App. 159.
[81] *Id*.
[82] *Id*.

convicted of murdering her long-time companion in 1992.[83]  Years later the United States

District Court for the Eastern District of Virginia granted Monroe's petition for writ of habeas

corpus and admonished Detective Riley for his inappropriate conduct during the investigation.[84]

This Court affirmed.

Detective Riley used the same tactics that this Court described as "manipulative"

interrogation tactics to compel a witness and potential witnesses to provide support for his theory

that Mr. Stevens murdered Mrs. Harding.[85]  With undeniable tunnel vision, Riley focused on Mr.

Stevens to the exclusion of several other viable suspects.  In addition to badgering, harassing and

threatening Mr. Stevens for weeks, Riley specifically asked several witnesses to alter their

testimony to exclude information that was exculpatory as to Emerson Stevens, with varying

results.[86]  Riley berated uncooperative witnesses and dangled the prospect of reward money

before others.

First, after zeroing in on Mr. Stevens as the lead suspect in Mrs. Harding's murder,[87]

Detective Riley repeatedly ignored evidence implicating alternate suspects, including the

---

[83] *See* Ralph Blumenthal, *A Virginia Tale of Love and Death, Suspicions and Doubt*, N.Y. TIMES, Feb. 22, 2000, *available at* http://www.nytimes.com/2000/02/22/us/a-virginia-tale-of-love-and-death-suspicions-and-doubt.html?pagewanted=all ("Beverly Anne Monroe…is a victim of a miscarriage of justice stemming from admissions coerced by Mr. Riley.").

[84] *See Monroe v. Angelone*, 2002 U.S. Dist. LEXIS 26310, at *84 (E.D. Va. 2002) ("The Court finds that the tactics engaged in by Detective Riley were deceitful, manipulative, and inappropriate."); *109 (Riley ignored statements that did not fit his theory of the case…"); *47 ("Riley was 'sympathetic' and he was also deceptive.").

[85] *Id.* at 84 (describing Detective Riley's tactics as "deceitful, manipulative, and inappropriate.").

[86] App. 131, 135, 138-40, 141-42.

[87] Detective Riley's focus on Mr. Stevens as a suspect was initially based on Clyde Dunaway's statement that he had seen Mr. Stevens' truck outside Mrs. Harding's house on the night she disappeared. 2/24/86 Tr. at 182; 7/8/86 Tr. at 134.  As previously discussed, Dunaway lacked credibility and was motivated by his interest in the reward money, which Riley knew for a fact.

victim's husband.[88]  For example, Detective Riley failed to follow up on a lead provided by scent

dogs during the early stages of the search for Mrs. Harding, and information about this lead was

---

[88] Riley neglected to consider Emerson Harding, despite evidence that should have cast suspicion on Harding.  For one, Harding took out a life insurance policy shortly before Mary disappeared and ultimately received more than $80,000 from the insurance company.  App. 131, 156. Harding bought a sports car and began dating other women soon after Mary's death.  App. 185 (Affidavit of Keith Hogge, Lancaster Sheriff's Office).  He engaged in other suspicious behavior. At trial, Harding testified that he moved the bedroom furniture around the night before his wife disappeared.  7/10/86 Tr. at 147-149.  *See also* App. 185.  Harding reportedly believed he heard a "peeping tom" outside his house and then moved their bed in front of a window and took the curtains down.  App. 185.  ("Obviously this behavior seems a bit odd, if Harding had truly been concerned about someone peeping into their windows, as the new bedroom arrangement made it much easier to see Mary Harding or anyone else in the bed.")

    Also, Riley simply accepted Emerson Harding's contention that the family was unable to obtain any helpful information from Ray Harding, Emerson and Mary's son. Riley apparently made no attempt to speak to Ray Harding, despite the fact that Ray was up much later than normal that night and may very well have heard or seen something relevant.  App. 184.  Ray was able to convey information to Virginia Walker, a family member who called Friday morning to check on Mary Harding's whereabouts, but no attempts were made by Riley to collect additional information from Ray.  Riley's tunnel vision similarly prevented him from corroborating Emerson Harding's alibi.  Harding was allegedly working on *The Atlantic*, a commercial fishing boat that stayed out on the water from Monday-Friday, "although he had come home the night before for just [] a few hours, which was unusual."  App. 185.  While it appears that Emerson Harding was paid for working the week of August 18, 1985, the boat manifest is missing, (App. 183); thus, no one has been able to confirm that Harding was actually on the boat when his wife was abducted.

    Additionally, according to Harding's second wife, Margie Hogge, Harding was an abusive husband and father, who drank heavily and had a criminal record.  App. 131, 155, 174-175.  Ms. Hogge stated that Emerson Harding would "become quickly and easily enraged and volatile when he was drinking.  One time he got so mad at our daughter, Riva, he picked her up by her throat and banged her head against her closet door again and again—8 or 9 times—until he was done with her."  App. 174-5.  Harding also beat Ms. Hogge, even punching her in the head repeatedly until her "head went numb" and she had to seek medical care.  App. 174. Apparently Harding's mother recognized that "something was wrong with her son," but was unsure what to do about it.  App 175.  Ms. Hogge also said that there were indications that Mary Harding was "having a hard life with Emerson."  App. 156.  There was a rumor that Mary Harding was having an affair with a local schoolteacher who lived behind their house.  App. 176.

    Even the Commonwealth found Harding's behavior suspicious, as evidenced by a letter from Commonwealth's Attorney Schmidt sent to Harding prior to the second trial.  In that letter, Mr. Schmidt asked Harding to be prepared to explain "dating several girls" since his wife's death, as well as the "origin of and disposition of approximately $81,000.00 worth of life insurance" and his "new fancy sports car."  App. 171-2.  In fact, Mr. Schmidt suggested that Harding put the insurance money "in a trust account at the bank in favor of the children, that

26

not presented at trial.[89]  Although Detective Riley testified that he looked into other potential suspects who lived in the area, there is no indication that he subjected them to anything more than fleeting consideration.[90]  Riley appears to have subjectively accepted other potential suspects' alibis while simultaneously rejecting the many alibi witnesses who verified Emerson Stevens' innocence.

In contrast, the FBI participated in the investigation and prepared a report that contained the identities of several other viable suspects, including Keith Wilmer and Richard Dawson.  In a recent article in *Washingtonian*,[91] Riley explained that as to the "famous Dawson brothers" – "[t]hey were nasty people, but they weren't rapists."[92] Charles Dawson, however, had been convicted of raping an 8-year old girl.  Also, Riley had himself gone to the Dawsons' property in search of an abducted woman:  "I was there to get her."  When asked whether he thought the woman had been raped, Riley responded, "I'm sure he had sex with her, but I'm not sure he raped her."[93]  Still, Riley considered Emerson Stevens – who had no criminal record – the better suspect:  "Stevens didn't have a violent past, but he had a sexual interest in women beyond the normal.  An escalating peeping Tom."[94]

---

would be the best way to explain where the money is and what it is being used for."  App. 171. Harding did so just four days later.  App. 173.
    Finally, there is another connection between Emerson Harding and the crime.  The chain used to weigh down Mary Harding's body is a "purse boat chain, the type of chain that is used to raise and lower the purse boats on a commercial fishing ship.  There are two purse boats on the commercial fishing ship that Emerson Harding worked on.  App. 183.
[89] App. 131, 136-37.
[90] 2/24/86 Tr. at 159; 7/8/86 Tr. at 190-91.
[91] App. 344 (Marisa M. Kashino, *A Murder on the Rappahannock River*, WASHINGTONIAN, June 27, 2019, *available at* https://www.washingtonian.com/2019/06/27/murder-on-the-rappahannock-river-emerson-stevens-mary-harding-innocence-project/).
[92] *Id.*
[93] *Id.*
[94] *Id.* at 345

Detective Riley received information from Clyde Dunaway that Dunaway had allegedly seen Mr. Stevens' truck outside of the Hardings' house the night Mary disappeared.[95]  The following day, Riley and Boles interrogated Emerson Stevens on Mrs. Harding's front porch. Boles and Riley offered conflicting testimony about whether or not Mr. Stevens was considered a suspect at that time, but it is clear that he was being treated as one and that he was not advised of his rights.[96]  Although Riley had no reason to doubt Mr. Stevens' alibi at the time, Riley badgered him, asking him the same questions "over and over" and accusing him of lying.[97]

In his interrogation of Mr. Stevens on September 25, 1985, which lasted somewhere between two and four hours, Detective Riley repeatedly badgered Mr. Stevens about his alibi and eventually lied to him, saying that he already had conclusive evidence that Mr. Stevens was guilty.[98]  Detective Riley then directly threatened Mr. Stevens, saying he was not going to release him from questioning until Mr. Stevens told Detective Riley why his truck was seen outside the Harding house on the day of the murder.  Mr. Stevens—who was by then mentally and physically exhausted from this lengthy interrogation—fabricated an innocuous explanation to fit Detective Riley's alleged conclusive evidence of his guilt.  Mr. Stevens said he had pulled over on the side of the road to relieve himself.[99]

For the first time ever, Detective Riley proudly admitted to journalist Marisa Kashino, for the June 2019 issue of *Washingtonian*, that he had successfully planted in Emerson Stevens'

---

[95] 7/8/86 Tr. at 136.
[96] 2/24/86 Tr. at 133 (Riley testifying that Mr. Stevens was not a suspect at the time); 7/8/86 Tr. at 162 (Riley testifying that Mr. Stevens was a suspect at the time); 7/8/86 Tr. at 228 (Boles testifying that Mr. Stevens was not a suspect at the time); 2/26/86 Tr. at 184 (Mr. Stevens testifying that he was not advised of his rights by Riley and Boles at the time of the first interview).
[97] 2/26/86 Tr. at 183.
[98] 2/26/86 Tr. at 199; 7/11/86 Tr. at 194.
[99] *Id*.

mind an innocent explanation for why Mr. Stevens might have been near the crime scene.[100]  As Riley describes it:  I said, "Tell me why you were parked on the side of the road."  . . . "I said, 'You probably stopped to relieve yourself' – I didn't use those words, because men don't use those words – but I said, 'You probably stopped to relieve yourself on the side of the road.'  He didn't take the bait."  But after Riley told him that he had failed a polygraph, Riley gave Emerson an ultimatum.  Per Riley, "I said, 'There's only two reasons you failed this test: either because you killed Mary Harding or you're guilty of something else related to it.'  I said, 'You were probably there that night doing something innocent' – and he bit."  Emerson Stevens said he had probably stopped to urinate, for the first time putting himself at the scene of the crime.  Says Riley:  "He already had that in his mind as an out."

In the magazine article, Riley admitted to having used "the same tactics in the Emerson Stevens case as I did with Beverly Monroe. . . . If you can't get a direct confession, you just try to get them to talk.  They'll say things against their own interest as a way to wiggle out.  The whole thing is to keep people talking and steer them in the direction you want."[101]

Mr. Stevens was stopped by police and questioned by Riley seven to eight times in the weeks before he was arrested.[102]  During these interactions, Riley constantly accused Mr. Stevens of lying and of murdering Mrs. Harding.[103]  Mr. Stevens saw the police in his neighborhood "just about every day"—sometimes just riding by his house, and other times

---

[100] App. 343 (Marisa M. Kashino, *A Murder on the Rappahannock River*, WASHINGTONIAN, June 27, 2019, *available at* https://www.washingtonian.com/2019/06/27/murder-on-the-rappahannock-river-emerson-stevens-mary-harding-innocence-project/).

[101] *Id.*; *see Monroe v. Angelone*, 2002 U.S. Dist. LEXIS 26310, at 84 (E.D. Va. 2002) (describing Detective Riley's tactics as "deceitful, manipulative, and inappropriate.").

[102] 7/11/86 Tr. at 193; 7/8/86 Tr. at 199 (Riley testifying that he questioned Mr. Stevens "several" times before the arrest); 7/8/86 Tr. at 225 (Boles testifying that they interviewed Mr. Stevens "probably six or eight times" total).

[103] *Id.*

talking to his wife, father, or other friends and family members.[104]  Mr. Stevens and his wife felt

that he was being harassed by Detective Riley and the police.[105]

Riley attempted to coerce and manipulate testimony from several other witnesses, too.

Ann Dick, her husband Louis Dick, Lawrence Taft, and Ray Reynolds all described similar

encounters.  At Mr. Stevens' first trial, Mrs. Dick testified that on August 23, 1985 at 4:45 a.m.,

she was driving to Richmond with her neighbors and saw Mr. Stevens' white Dodge pickup

truck coming out of the road from Morattico.[106]  She further testified that the truck had no

running lights and the person driving the truck was wearing a plaid shirt.[107]  A plaid shirt was

later introduced into evidence as belonging to Mr. Stevens.[108]  During the first trial, Mrs. Dick

did not testify to her belief that Mr. Stevens was not in fact the driver of that pickup truck

because Detective Riley instructed her not to do so.[109]  At the second trial, Mrs. Dick admitted

that Detective Riley had specifically told her to ignore the fact that the driver she observed was

much slimmer than Mr. Stevens; Riley instructed her that she should not change her testimony

even if "they (defense counsel) stood on her head."[110]

Mrs. Dick's husband, Louis Dick, a former Maryland State Trooper, was also a witness in

the case; he crabbed in the same area as Mr. Stevens.  At Mr. Stevens' first trial, Mr. Dick

testified that he had seen Mr. Stevens crabbing on his boat around 7:15 a.m. the morning after

Mrs. Harding disappeared, that Mr. Stevens informed Mr. Dick that he got a late start crabbing

---

[104] *Id*. at 193-97.
[105] *Id*. at 193; App. 131, 134.
[106] 2/25/86 Tr. at 75-76.
[107] *Id*. at 75-77.
[108] *Id*. at 86.
[109] 7/9/86 Tr. at 180.
[110] *Id*.

that morning because he had a doctor's appointment, and that he would be late to meet the crab buyer.[111]

However, at the close of the first trial, Mr. Dick became concerned about how his and his wife's testimony were misrepresented in the courtroom, and he expressed this concern to Detective Riley.[112]  At the second trial, Mr. Dick testified that the testimony he had provided at the first trial was the product of intense pressure from Detective Riley.[113]  Louis Dick then testified truthfully at the second trial, stating that he was not sure which morning it was that Mr. Stevens came in late from crabbing.[114]  This was significant:  Mr. Stevens did in fact have a doctor's appointment with Dr. David Antonio on August 22, 1985 (many hours before Mary Harding went missing), as was established by Dr. Antonio's testimony and by business records confirming the appointment.[115]

Riley attempted to elicit false statements from Lawrence Taft, who owned the R&K Store in Lancaster at the time of Mrs. Harding's death.  Mr. Stevens bought his boat fuel from the R&K Store, and he purchased gas on a daily basis, buying just the amount he would need for crabbing on that particular day.[116]  Riley attempted to coerce Taft into claiming that "Emerson Stevens woke [him] up in the middle of the night Mary Harding disappeared so that he could buy

---

[111] 2/25/86 Tr. at 125.
[112] 7/9/86 Tr. at 218 ("Right after –it was the last day of the last trial. When I say in this courtroom and listened to the summary.  After that I talked to the trooper.  I explained to him hat what we had said was twisted in the courtroom.  I told him that something didn't make sense."), 221, 224; see also App. 131, 138-40.
[113] 7/9/86 Tr. at 221-224; 233-34.

[114] 7/9/86 Tr. at 211-12.
[115] 7/10/86 Tr. at 7.
[116] App. 161.

five gallons of gas.  David Riley was extremely aggressive and pushy, insisting that I agree with his story even though it was not true."[117]

Finally, Riley attempted to manipulate Ray Reynolds, who owned a company that purchased seafood directly from the fishermen and who routinely bought crabs from Mr. Stevens.  Riley tried to coerce Reynolds into saying at the first trial that there was no receipt from Mr. Stevens' catch for the morning after Mrs. Harding went missing, despite the fact that Reynolds had indeed found a receipt from Mr. Stevens' catch on that morning.[118]  When Reynolds was initially questioned by Detective Riley, he said that on Friday after the murder, Mr. Stevens came in late with the crabs at around 12:30 p.m., as opposed to his usual time of 10:30 a.m.[119]  On July 10, 1986, the day Reynolds was to testify, he checked his records and realized he had made a mistake when speaking to Riley.[120]  Mr. Stevens was actually late on *Thursday*—the morning of the day Mrs. Harding was abducted and murdered (nearly 12 hours later).  Thursday was the morning that Mr. Stevens had had his appointment with Dr. Antonio. On Friday, August 23, 1985, the day after the abduction and murder, Mr. Stevens had come in at the normal time, and he had his normal load of crabs, as demonstrated by records provided by Ray Reynolds.[121]  When Reynolds informed Detective Riley of his mistake before the first trial, Riley became agitated, yelled profanities at Reynolds, and urged him to stick to his original story when he testified.[122]  Ultimately, Reynolds was not called to testify at either trial.[123]

---

[117] *Id.*
[118] App. 177, 131, 135.
[119] App. 177, 141.
[120] *Id.*
[121] *Id.*
[122] App. 177, 131, 135.
[123] James Parker, Mr. Stevens' trial and appellate lawyer, filed a formal complaint with the Internal Affairs Unit of the Virginia State Police based on Riley's tactics in the investigation of this case, alleging that Riley "committed perjury, suborned perjury, encouraged witnesses to

> **v.    Taken Together, Mr. Stevens' Alibi Witnesses Confirm That He Could Not Have Committed the Murder.**

Finally, Mr. Stevens presented four alibi witnesses at trial, and their testimony would have been deemed far more credible had jurors been privy to all the available evidence of Mr. Stevens' innocence.

Mr. Stevens took the stand and testified that on the evening of August 22, 1985, he was at his cousin Kendrick Walker's home, which was next door to the Stevens' home.[124]  He and his three children left the Walker home at about 9:30, walked next door to their own home, and watched television until 10:00 p.m.[125]  After watching television, Mr. Stevens' turned off the lights, locked the doors, and went to bed.[126]  The next morning, Mr. Stevens woke up at 5:00 a.m. as he normally did, and left the house at 5:45 a.m.[127]

Mr. Stevens' alibi testimony was corroborated by four witnesses.  Mr. Stevens' daughter Jennifer testified that the night before Mrs. Harding went missing, Mr. Stevens was at Mr. Walker's home eating crabs with his son, two daughters, and Mr. Walker.[128]  Mr. Stevens and Mr. Walker were next-door neighbors.[129]  Mr. Stevens and his children arrived at Mr. Walker's home at about 8:30 p.m.[130]  They left Mr. Walker's at approximately 9:30 p.m.[131]  Mr. Walker

---

slant or embellish their testimony, coached and intimidated the witnesses, and badgered, threatened, and intimidated the defendant frequently." App. 168.
[124] 7/11/86 Tr. at 179.
[125] *Id*. at 181.
[126] *Id*. at 181-82.
[127] *Id*. at 182.
[128] *Id*. at 133.
[129] *Id*. at 4.
[130] *Id*. at 132.
[131] 7/11/86 Tr. at 133.  It is not clear exactly what time Mr. Stevens left Mr. Walker's home. Tim Lewis testified that Mr. Stevens left between 10:00 p.m. and 10:30 p.m. 7/10/86 Tr. at 250. Mr. Walker testified that Mr. Stevens left around 9:00 p.m. or 9:30 p.m.  *Id*. at 24.

also testified that Mr. Stevens was at Mr. Walker's home that evening.[132]  Jennifer testified that

when they arrived home she watched about five minutes of television with her sister and then

took a bath.[133]  When she got out of the bath, Mr. Stevens was locking the windows and doors

and then they each went to bed.[134]  His daughter testified that she did not immediately go to

sleep, nor did she hear Mr. Stevens leave the house.[135]  She testified that she would have heard

him if he had left because "[t]he truck is loud and the doors squeak, and the door is right beside

[her] bedroom, and the truck [is parked] beside [her] bedroom window and the truck was

loud."[136]

Tim Lewis was also at Mr. Walker's the night of August 22, 1985, and he testified that

Mr. Stevens was there until between 10:00 p.m. and 10:30 p.m.[137]  Mr. Lewis did not leave Mr.

Walker's home until 1:00 a.m. or 2:00 a.m.[138]  Mr. Lewis testified that Mr. Stevens' truck had a

very distinctive sound when it started and that Mr. Lewis never heard the truck start up between

the time Mr. Stevens left Mr. Walker's and the time that Mr. Lewis left at 1:00 a.m. or 2:00

a.m.[139]

On August 22, 1985, Mr. Stevens' wife Sandra worked the 3:00 p.m. to 11:30 p.m. shift

at a nursing home, which was approximately 35 to 40 minutes away from the Stevens' home.[140]

Mrs. Stevens arrived home "five minutes after 12:00" which was the same time she got home

---

[132] 7/11/86 Tr. at 22-24.
[133] *Id.* at 133.
[134] *Id.*
[135] *Id.*
[136] *Id.* at 134.
[137] 7/10/96 Tr. at 250.
[138] *Id.*
[139] *Id.* at 250-51.
[140] 7/11/86 Tr. at 149.

every time she worked at the nursing home.[141]  When Mrs. Stevens arrived home, at 12:05 a.m., Mr. Stevens was asleep in their bed.[142]  Mrs. Stevens fell asleep around 1:00 a.m. and woke up at 5:00 a.m. that morning when Mr. Stevens got up and went into the kitchen.[143]  Mrs. Stevens testified that Mr. Stevens left the house as he usually did at 6:00 a.m.[144]

Virginia Walker, Mrs. Harding's grandmother-in-law, testified that Mrs. Harding and her children ate dinner at the Walkers' house between 6:30 and 7:00 p.m. on the evening of August 22, 1985.[145]  The medical examiner, Dr. Fierro, testified that Mrs. Harding's stomach contents contained a recent meal, indicating that she was murdered before her stomach completed digestion.[146]  The contents of Mrs. Harding's stomach reveal that Mrs. Harding's last meal was the meal she ate between 6:30 and 7:30 p.m., as testified by Mrs. Walker.  Dr. Fierro concluded that Mrs. Harding died within two or three hours of this meal.[147]  Mrs. Harding called her sister at 9:07 p.m. on the night she was killed.[148]  The phone call lasted fifteen minutes, thus ending at approximately 9:22 p.m.[149]

Given Dr. Fierro's testimony that Mrs. Harding died within two or three hours of her last meal, Mrs. Harding must have been murdered shortly after this phone call.  Mr. Stevens' alibi, as corroborated by four witnesses, places him at Mr. Walker's home and then his own home during this time period, thereby making it impossible for Mr. Stevens to have committed the crime.

---

[141] *Id*. at 150.
[142] *Id*. at 151.
[143] *Id*. at 153.
[144] *Id*.
[145] 7/10/86 Tr. at 102.
[146] 7/8/86 Tr. at 85.
[147] *Id*.
[148] 7/10/86 Tr. at 129.
[149] *Id.*

Had jurors known of the false testimony from critical witnesses, as well as the suppression of exculpatory evidence by the Commonwealth, the unreliability of the expert testimony, and the investigative misconduct by the lead detective, no reasonable juror would have voted to convict Mr. Stevens, particularly in light of the several credible witnesses who bolstered his alibi testimony.  *See Schlup v. Delo*, 513 U.S. 298 (1995); 28 U.S.C. 2244(b)(2)(B)(ii).  Accordingly, this Court must consider the merits of the claims herein.

## APPLICABLE LAW

Each of the claims in the instant petition implicates Mr. Stevens' Sixth and Fourteenth Amendment rights.  First, the Commonwealth knowingly presented false testimony at Mr. Stevens' second trial and suppressed evidence.  Second, the Commonwealth failed to disclose considerable exculpatory information to Mr. Stevens.

Mr. Stevens' prosecutorial misconduct claims are governed by the standards set forth in *Brady v. Maryland*, 373 U.S. 83 (1963) and *Napue v. Illinois*, 360 U.S. 264 (1959).  Under *Brady*, "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87 (1963).  "There are three essential components of a true *Brady* violation: the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).  *Brady* extends to impeachment evidence, *United States v. Bagley*, 473 U.S. 667, 676 (1985), and the failure to disclose favorable evidence constitutes suppression, even if it is known only to the police, *see Giglio v. United States,* 405 U.S. 150, 154-55 (1972); *Kyles v. Whitley,* 514 U.S. 419, 447 (1995).  Prosecutors must disclose

exculpatory and impeaching evidence regardless of whether the defendant asks for the information. *United States v. Agurs*, 427 U.S. 97, 107 (1976).

Evidence is material if it "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435. Materiality must be assessed collectively, and courts must also consider the possibility that the defense could have used evidence to challenge the "reliability of the investigation" as a whole. *Kyles*, 514 U.S. at 446, 437 & n.10. In determining "'the aggregate effect that the withheld evidence would have had if it had been disclosed[,]'" a court "must *both* 'add[] to the weight of the evidence on the defense side . . . all of the undisclosed exculpatory evidence' *and* 'subtract[] from the weight of the evidence on the prosecution's side . . . the force and effect of all the undisclosed impeachment evidence." *Juniper v. Zook*, 876 F.3d 551, 568 (4th Cir. 2017) (quoting *Smith v. Sec'y, Dep't of Corr.*, 572 F.3d 1327, 1347 (11th Cir. 2009)).

Under *Napue v. Illinois* the government "may not knowingly use . . . false testimony." 360 U.S. at 269. It is a due process violation even to "allow[] it to go uncorrected when it appears." *Id.*; *see also Giglio v. United States*, 405 U.S. 150 (1972). "Prosecutorial misconduct occurs not only where the prosecution uses perjured testimony to support its case, but *also where it uses evidence which it knows creates a false impression of a material fact*." *United States v. Cargill*, 17 F. App'x 214, 224 (4th Cir. 2001) (emphasis added). The prosecution is deemed to know that testimony is false if the police know it is false. *Boone v. Paderick,* 541 F.2d 447, 451 (4th Cir. 1976).

The elements of a claim under *Napue* are (1) that the testimony was false, (2) that the prosecution knew it was false, and (3) that the false testimony was material. *Id*. Evidence is material if "there is any reasonable likelihood that the false testimony could have affected the

judgment of the jury." *U.S. v. White*, 238 F.3d 537, 541 (4th Cir. 2001) (internal citations and quotations omitted). *Napue*'s holding "does not cease to apply merely because the false testimony goes only to the credibility of the witness." *Napue*, 360 U.S. at 269. Thus, in determining the materiality of the withheld evidence, the Fourth Circuit has stated that a court "must examine both the importance of the [witness]'s testimony, which would be affected by his credibility, and the weight of the independent evidence of guilt." *Boone*, 541 F.2d at 451. *See also Giglio v. United States*, 405 U.S. 150, 154 (1972) ("A new trial is required if 'the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury.'") (quoting *Napue*, 360 U.S. at 271) (citing *United States v. Bagley*, 473 U.S. 667, 680 (1985) (describing the rule "as a materiality standard under which the fact that testimony is perjured is considered material unless failure to disclose it would be harmless beyond a reasonable doubt")). If the Commonwealth cannot demonstrate that its failure to correct false or misleading testimony was "harmless beyond a reasonable doubt," the Fourteenth Amendment requires a new trial. *Elmore v. Ozmint*, 661 F.3d 783, 830 (4th Cir. 2011) (citing v. *Bagley*, 743 U.S. at 680).

Because the state court ruled on the instant claims without providing Mr. Stevens the opportunity for further factual development (through discovery or an evidentiary hearing), the state court did not consider full merits of the instant claims. Accordingly, Mr. Stevens is entitled to *de novo* review the claims below. *Winston v. Pearson*, 683 F.3d 489, 496-497 (4th Cir. 2012). In the event that this Court disagrees, Petitioner sets out below the bases on which he is entitled to such review as a result of the state court's unreasonable factual or legal determinations.

## CLAIMS FOR RELIEF

**CLAIM I.    THE COMMONWEALTH KNOWINGLY PRESENTED FALSE
TESTIMONY FROM DR. BOON AND SUPPRESSED EVIDENCE
SHOWING THAT IT WAS FALSE.**

The Commonwealth violated Mr. Stevens' due process rights under *Napue* by knowingly

introducing Dr. Boon's false testimony at Mr. Stevens' second trial.  Despite the fact that FBI

investigators had concluded that, "Mary Keyser Harding was dumped within 500 to 600 yards of

where [her body] was eventually located," the Commonwealth instead presented testimony that

the body had moved ten miles from Dr. Boon.[150]  Dr. Boon testified at Mr. Stevens' first trial

how it was possible for Mrs. Harding's body to travel ten miles upstream in the Rappahannock

River from the location of Mr. Stevens' boat to the location where Mrs. Harding's body was

found—in a four-day period—while weighed down by a cinderblock, rope, and chain.[151]

However, in a written response to Schmidt's request to testify at Mr. Stevens' second trial, Dr.

Boon admitted to the deceptive nature of his testimony by calling it "eyewash" (a term he said

Detective Riley had used before the first trial) and emphasizing his lack of knowledge on the

subject matter to which he testified:  "I myself have no direct knowledge of any specific event or

direct observation relating to both the place and time in question."[152]  Dr. Boon's reluctance to

testify appears to have convinced the Commonwealth not to enforce his subpoena:  Dr. Boon did

not testify at the second trial.

---

[150] App. 188.
[151] 7/9/86 Tr. at 267.
[152] App. 105.

The FBI's determination that Mrs. Harding's body was found 500-600 yards from where it was dropped, as well as the letter from Dr. Boon to Schmidt, constitute indisputable proof that the Commonwealth knew that Dr. Boon's testimony was false, but still it introduced the testimony at *both* of Mr. Stevens' trials.  Indeed, in Detective Riley's 10/1/85 investigation report, he noted that Dr. Boon warned him that "at best [his opinion] was merely information speculation," and that there were "too many variables" at issue.[153]  Additionally, this report suggested that Dr. Boon be used for rebuttal purposes only, because "no real conclusion can be made."[154]

The relevance of Dr. Boon's false testimony cannot be overstated.  It undeniably affected the verdict, as this "evidence" was crucial in validating the Commonwealth's theory linking Mr. Stevens to Mrs. Harding's murder.  It was the Commonwealth's theory that after murdering Mrs. Harding the night of August 22, 1985, Mr. Stevens took Mrs. Harding's body out on his boat and threw it into the Rappahannock River near Towles Point.  Four days later, Mrs. Harding's body was discovered ten miles north of Towles Point on the Morattico shore.[155]  Because it was undisputed that Mr. Stevens' boat was docked in the Towles Point area during the early hours of August 23rd, which is when Mrs. Harding's body was deposited in the river, the Commonwealth needed to place the body in Towles Point at that time in order for Mr. Stevens plausibly to have been the perpetrator.[156]  This also made the alleged observations of Esther and Thomas Stevens seem relevant.  Placing Mrs. Harding's body in Towles Point at that time, however, would mean

---

[153] App. 163.
[154] *Id*.
[155] 7/8/86 Tr. at 20.
[156] 7/9/86 Tr. at 136-37; 7/11/86 Tr. at 173.

that the body travelled a ten-mile distance upstream from Towles Point to Morattico, while weighed down by a cinderblock, rope, and chain, in a four-day period.[157]

This is why Dr. Boon's expert testimony on the tidal flow of the Rappahannock River played a crucial role.  Without his testimony, the Commonwealth could not explain how Mrs. Harding's body could have possibly travelled as far as it did from the alleged area where it was deposited, and how Mr. Stevens could have been responsible for depositing the body.  The fact that the Commonwealth read Dr. Boon's testimony from Mr. Stevens' first trial into evidence at his second trial is further validation of its value.  Despite Dr. Boon's express concerns regarding the truthfulness of his testimony and his serious reservations about testifying at the second trial, and despite the fact that the FBI report indicated that the victim's body was dumped within 600 yards of where it was found, the Commonwealth insisted on presenting the false testimony to the jury, in violation of Mr. Stevens' due process rights.  Of course, Dr. Boon's testimony as an "expert" at the second trial could have been prevented altogether had his letter been made available to defense counsel.  Dr. Boon's testimony was doubly dangerous at the second trial because it could not be subjected to cross-examination.

### The State Court's Adjudication Was Unreasonable Under § 2254(d).

To the extent the state court adjudicated this claim on the complete record and full merits, (*Winston v. Pearson,* 683 F.3d at 496), the court did so unreasonably. The state court conceded that it "ha[d] struggled with the issues associated with this claim, perhaps more than any other."[158]  Still, the state court held that the evidence did not suggest that the Commonwealth

---

[157] 7/8/86 Tr. at 20.
[158] App. 276 (12/1/17 Tr. at 22).

Case 3:20-cv-00352-MHL   Document 5   Filed 06/02/20   Page 48 of 73 PageID# 548

knowingly presented false testimony, but instead that the testimony "may have been subject to significant challenge" and "may have been rebutted by conflicting expert testimony."[159]

The state court explained its reasoning by elaborating that:  (1) "Without additional information to determine how Special Agent Pitts drew the conclusion about the location of the body's entry in the Rappahannock River system, the Court concluded [that] its values in impeaching or confronting an expert witness would be severely limited."  (2) "[T]he Court reads Dr. Boon's May 2nd, 1986 letter not as some admission that his prior testimony was false, but rather his sense that his testimony was of limited value in a murder case."[160]

The state court's decision was based on an unreasonable determination of the facts.  First, Dr. Boon's opinion had been characterized as "eyewash" by the Commonwealth (Special Agent Riley) and by Dr. Boon himself, who acknowledged this in a letter to the Commonwealth's Attorney prior to the second trial.[161]  The circuit court dismissed the significance of this by mischaracterizing the evidence.  *See* App. 278 (12/1/17 Tr. at 24 (stating that the "eyewash" comment was an insult to the integrity of Dr. Boon as an expert rather than the truthfulness of the testimony, and stating that Dr. Boon's letter only stated his testimony was of limited value in a murder trial)).  The court's finding here is entirely inconsistent with its adopted definition of "eyewash" as "insincere talk or nonsense."[162]  "Nonsense," by definition, is "words or language having no meaning or containing no intelligible ideas."[163]  Dr. Boon, by his own words, admitted in his letter not that his testimony was of limited value, but that it was of *no* value.

---

[159] App. 279 (12/1/17 Tr. at 25).
[160] App. 277-78 (12/1/17 Tr. at 23-24).
[161] App. 105.
[162] *Id*. at 24.
[163] MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/nonsense (last visited July 24, 2019).

Furthermore, the FBI report, which was only disclosed to Mr. Stevens' counsel in October 2016, concluded that Mrs. Harding's body was "dumped within 500 to 600 yards of where it was eventually located."[164]  The state court improperly minimized the impeachment value of this report because there was no further explanation offered as to how the FBI agent reached that conclusion.[165]  The impeachment value, however, would not have required further explanation; the conclusion itself is powerful evidence and is contrary to Boon's opinion and the Commonwealth's theory of the case.  A jury would likely not have needed more information to embrace the notion that a 100-pound woman, weighted with a heavy chain and cinderblock, did not move more than 500-600 yards.  In any event, had counsel known of the FBI's conclusion – as the Commonwealth did – he could have presented testimony from the agent regarding the basis of the finding.

Taken together, the FBI report, the statement from Special Agent Riley, and the letter from Dr. Boon provide ample evidence that (1) Dr. Boon's testimony was false; and (2) the Commonwealth presented it despite knowledge of its falsity.  At minimum, the Commonwealth was obligated to turn over the "eyewash" letter from Dr. Boon and the portion of the FBI report that contained the above-mentioned conclusion, as both pieces of evidence could have been used to attempt to exclude or impeach Dr. Boon's "expert" testimony.  Such impeachment material would have affected the jury's verdict.  *See, e.g.*, *Jamison v. Collins*, 291 F.3d 380, 389 (6th Cir.

---

[164] App. 188.

In October 2016, Petitioner's counsel was contacted by members of the Sheriff's Office and told that a box of case materials had mysteriously appeared and was now available for review.

Despite the Warden's silence about the suspicious circumstances of this belated disclosure, the state court improperly engaged in speculation as to the Commonwealth's rationale for the decades-late disclosure.  *See* App. 271-72 (12/1/2017 Tr. at 17-18 (hypothesizing that the late disclosure was a result of personnel and building changes rather than improper conduct)).

[165] *See* App. 277-78 (12/1/17 Tr. at 23-24).

2002) (prior statements by accomplice and key prosecution witness that did not include "dramatic testimony" provided during trial was material impeachment evidence).

The state court's dismissal of this claim was unreasonable not only under § 2254(d)(2), but also under § 2254(d)(1), because it was contrary to, or involved an unreasonable application of, clearly established federal law.  Where prosecutors knowingly solicit false testimony or allow it to go uncorrected, relief is *required* if the testimony "may have had an effect on the outcome of the trial."  *Napue v. Illinois*, 360 U.S. 264, 272 (1959).  Here, the evidence shows that the prosecution, at a minimum, allowed Dr. Boon to testify that Mrs. Harding's body could have traveled ten miles in four days, all the while knowing that FBI investigators had reached a different conclusion and that Dr. Boon did not believe his own testimony.  *See United States v. Sutton,* 542 F.2d 1239, 1243 (4th Cir. 1976) ("[T]he prosecution allowed a false impression to be created at trial when the truth would have directly impugned the veracity of its key witness.").  *Napue*, and its progeny, mandate relief.  *Cf. Monroe*, 323 F.3d at 315 (finding that jurors likely would have been more sympathetic to entire defense if prosecution witness was shown to have testified falsely); *Hayes v. Brown*, 399 F.3d 972, 987–88 (9th Cir. 2005) (noting devastating impact on credibility of prosecution's case if it had been forced to disclose that one of its witnesses gave false information and that it solicited the witness's testimony, knowing that he would give false evidence).

Furthermore, evidence is "favorable" if it is either exculpatory or impeaching.  *Strickler*, 527 U.S. at 281-282; *United States v. Bagley*, 473 U.S. 667, 676 (1985); *Walker v. Kelly*, 589 F.3d 127, 145-46 (4th Cir. 2009) (Gregory, J., dissenting) ("[I]mpeachment evidence is, by definition, 'favorable to the accused' for purposes of proving a *Brady* violation.") (citing *Strickler*); *United States v. Spagnoulo*, 960 F.2d 990, 994 (11th Cir. 1992).  There can be no

44

doubt that the FBI's report was impeaching to Dr. Boon's testimony – particularly in light of the surrounding evidence showing that Dr. Boon and Riley knew that the testimony was nonsense.

The state court itself acknowledged that Dr. Boon's testimony may have been subject to significant challenge and/or rebutted by expert testimony.[166]  Given that microscopic hair comparison is now widely accepted to be junk science, there is literally no concrete physical evidence linked Mr. Stevens to this crime.  It is thus impossible to conclude that, had Mr. Stevens been able to mount a real challenge to Dr. Boon using the illegally suppressed evidence, it would not have had an effect on the outcome of the trial.  *See, e.g. Arnold v. McNeil*, 622 F. Supp. 2d 1294, 1319 (M.D. Fla. Mar. 31, 2009) (finding withheld evidence impeaching a police officer's testimony to be material in light of the prosecution's heavy reliance on the officer's credibility).

To the extent that this Court does not agree that this *Napue* claim merits relief, Mr. Stevens submits that, at a minimum, the Commonwealth's failure to disclose the exculpatory evidence on which this claim is based violates its obligations under *Brady v. Maryland*.  *See Chavis v. State of N.C.*, 637 F.2d 213, 224 (4th Cir. 1980) (finding that withholding of a key witness's amended statement constituted a *Brady* violation).  Applying the well-established *Brady* principles, courts have awarded relief in similar situations.  *See, e.g., Giglio,* 405 U.S. at 154-55, 92 S.Ct. 763 (awarding new trial because of suppression of impeaching evidence of one witness); *Spicer v. Roxbury Correctional Institute*, 194 F.3d 547, 560-61 (4th Cir. 1999) (same); *Crivens v. Roth,* 172 F.3d 991, 998-99 (7th Cir. 1999) (same). The state court did not address the related *Brady* claim here, and Mr. Stevens is therefore entitled to *de novo* review of this sub-claim.

---

[166] App. 279 (12/1/2017 Tr. at 25).

**CLAIM II.     THE COMMONWEALTH KNOWINGLY PRESENTED FALSE
TESTIMONY FROM EARL SMITH.**

Earl Smith testified that on Friday morning, August 23, Mr. Stevens picked Smith up an hour later than usual.[167]  Smith also testified that on Friday morning, Mr. Stevens told Louis Dick "to tell Barrack and Reynold he would be late bringing the crabs in.  He had to go to the doctor."[168]  The Commonwealth continued:  Q: "What day was this?" A: "Friday."[169]  On cross Mr. Smith said, "I think it was Friday," "I'm pretty sure it was Friday," but he acknowledged that he could be mistaken.[170]

The Commonwealth knew, however, that Smith's testimony was false, as Smith had told Special Agent Riley during his investigation that Mr. Stevens had picked him up at the usual time of 5:30-6:00 am on that Friday morning – the morning after the victim disappeared.[171]

**The State Court's Adjudication Was Unreasonable Under § 2254(d).**

To the extent the state court adjudicated this claim on the complete record and full merits, (*Winston v. Pearson,* 683 F.3d at 496), the court did so unreasonably.  The state court concluded that any confusion about which day Mr. Stevens was late was corrected on cross-examination and during the testimony of Dr. Antonio and Mr. Stevens, who testified that Mr. Stevens' doctor's appointment was Thursday morning.  The lower court concluded that it did "not believe that Mr. Stevens had demonstrated that the testimony was false or that the Commonwealth knew that it was false."[172]

---

[167] 7/10/86 Tr. at 203.

[168] *Id.*

[169] *Id.  See also id.* at 204 (Smith explains how he recalls that Mr. Stevens was late and says, "[h]e was late and I was wondering what happened.").

[170] *Id.* at 213.

[171] App. 207-09.

[172] App. 282 (12/1/17 Tr. at 28).  Because the lower court did not determine that the Commonwealth knowingly presented false testimony from Smith, it did not address the prejudice

At the time the Commonwealth presented its testimony from Smith, however, it knew (actually or constructively) that Smith previously had told police that the late pickup was on Thursday, not Friday.  The fact that Smith was forced to acknowledge that he "could be mistaken" on cross examination served to create confusion, but not to correct it.  And the presentation of contrary testimony from Mr. Stevens and Dr. Antonio did not mean that any confusion on the jurors' part was resolved, particularly where the Commonwealth did not change its theory of the case or shy away from its assertion that the late pick-up was indeed on Friday.

Indeed, in its closing argument, the Commonwealth summarized Smith's testimony and continued to perpetrate the falsehood, thus eradicating any "clarification" that may have earlier taken place:

> Then, he also described to us the morning of Friday, August 23.  The day after Mary disappeared.  He said something was odd about that morning.  Emerson Stevens came to get me late that day.  He normally came at 6:00.  He came at 7:00 that day.  I sat there and waited. . . .  This is the day, ladies and gentlemen, the defendant says he went out at 6:00 [] and did nothing unusual.[173]

---

prong here.  It is abundantly clear, however, that given the significance of this testimony and the role it played in the Commonwealth's case against Mr. Stevens, there can be no doubt that such false testimony could have affected the jury's verdict.  *See Kyles*, 514 U.S. at 443 ("[a] jury would reasonably have been troubled by the adjustments to [the witness's] original story by the time of the second trial. . . . These developments would have fueled a withering cross-examination, destroying confidence in [the witness's] story and raising a substantial implication that the prosecutor had coached him to give it."); *U.S. v. White*, 238 F.3d 537, 541 (4th Cir. 2001); *see also Owens v. Balt. City State's Attys. Office*, 767 F.3d 379, 397 (4th Cir. 2014) (finding evidence favorable and material where a key witness had told law enforcement several other conflicting accounts of the crime, and "changed his story only because the Officers provided additional details about the crime" and pressured the witness to "incorporate so as to incriminate Owens more directly").  The testimony from Smith was crucial to the Commonwealth's timeline and theory of the case, which included the claim that Mr. Stevens was disposing of the victim's body in the early morning hours of Friday, August 23.  It was also the only corroboration for Esther Stevens' testimony regarding having seen Mr. Stevens' truck at 6:40 a.m. on Friday.  Without this testimony, the Commonwealth would have been unable to set forth an even moderately-coherent theory of how Mr. Stevens could have committed this crime.
[173] 7/12/86 Tr. at 77-78.

Thus, jurors likely did not believe that Mr. Smith's testimony was false, as it was once again highlighted and endorsed by the prosecutor, compounding the damage of Smith's testimony. *See Jenkins v. Artuz*, 294 F.3d 284, 294 (2d Cir. 2002) (finding prosecutor's closing argument that the witness had no reason to lie violated *Napue* because it "plainly sharpened" the prejudice from the witness's misleading testimony); *Brown v. Borg*, 951 F.2d 1011, 1017 (9th Cir. 1991) ("The force of a prosecutor's argument can enhance immeasurably the impact of false or inadmissible evidence."); *DeMarco v. United States*, 928 F.2d 1074, 1076 (11th Cir. 1991) (vacating conviction where prosecutor "not only adopted [the witness's] perjured testimony, but capitalized on it" during closing argument even though defense counsel knew the testimony was false and failed to object); *United States v. Sanfilippo*, 564 F.2d 176, 178 (5th Cir. 1977) ("Coupled with the failure to correct [the witness's] false testimony at the time was the prosecutor's capitalizing on it in his closing argument"); *Boone v. Paderick*, 541 F.2d 447, 450-51 (4th Cir. 1976) (Fourth Circuit ruling that prosecutor's emphasis of witness's altruism, where witness was in reality testifying pursuant to promise not to be prosecuted for crimes, reinforced jury's false impression); *Miller v. Pate*, 386 U.S. 1, 6-7 (1967) (finding due process violation where prosecution presented false evidence and emphasized the importance of that evidence in closing argument).

The state court's dismissal of this claim was unreasonable not only under § 2254(d)(2), but also under § 2254(d)(1), because it was contrary to, or involved an unreasonable application of, clearly established federal law.  Where prosecutors knowingly solicit false testimony or allow it to go uncorrected, relief is *required* if the testimony "may have had an effect on the outcome of the trial."  *Napue v. Illinois*, 360 U.S. 264, 272 (1959).  "The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence,

and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend." *Id.* at 272. *See also United States v. Sutton,* 542 F.2d 1239, 1243 (4th Cir. 1976) ("[T]he prosecution allowed a false impression to be created at trial when the truth would have directly impugned the veracity of its key witness.").

There can be no doubt that Smith's testimony affected the verdict. Smith's testimony was integral to the Commonwealth's case: it supported the theory that Mr. Stevens, who allegedly had rope and a chain in his truck, was late to work because he was weighing down and disposing of Mrs. Harding's body on the morning following her disappearance. Smith's testimony also served the important function of corroborating the testimony of Esther Stevens, who told jurors that she saw Mr. Stevens' truck driving past her house and away from the boat dock at 6:40 a.m. on Friday morning.[174]

To the extent that this Court does not agree this *Napue* claim merits relief, Mr. Stevens submits that, at a minimum, the Commonwealth's failure to disclose the exculpatory evidence on which this claim is based violates its obligations under *Brady v. Maryland*. *See Chavis v. State of N.C.*, 637 F.2d 213, 224 (4th Cir. 1980) (finding that withholding of a key witness's amended statement constituted a *Brady* violation); *Lewis v. Connecticut Com'r of Correction*, 790 F.3d 109, 124 (2d Cir. 2015) (finding *Brady* violation when the prosecution suppressed information about a key witness's prior inconsistent statements and where there was evidence that "[h]is statement changed only after [Detective] Raucci provided critical details about the case"). Had the Commonwealth disclosed Smith's prior statements to defense counsel, counsel could have used these statements to impeach the credibility of Earl Smith and Esther Stevens at trial. The state court did not adjudicate this related claim on the merits and it is entitled to *de novo* review.

---

[174] 7/9/86 Tr. at 202-03.

## CLAIM III.  THE COMMONWEALTH FAILED TO DISCLOSE EXCULPATORY EVIDENCE IN VIOLATION OF *BRADY V. MARYLAND.*

During the course of Mr. Stevens' trial, defense counsel specifically requested the opportunity to review a report that had been generated by the FBI during its involvement in the initial investigation into the death of Mary Harding.  The report was reviewed by the judge *in camera* and ultimately not disclosed to the defendant.[175]  Trial counsel noted that the Commonwealth's Attorney had previously advised him of two salient facts: (1) that the original FBI report was "five inches thick," though "what was turned over to the Court is one inch thick;" and (2) that the prosecutor had previously stated that he "didn't have time to review it."[176]  The trial court declined to turn the evidence over to Mr. Stevens, asserting that it did not believe it was "appropriate," because it did not "believe it contains anything exculpatory."[177]

The *Brady* standard is a permissive one, and courts have frequently urged erring on the side of disclosing too much information rather than too little.[178]  The same suggestion is found in the American Bar Association's guidance on prosecution standards, which admonishes that prosecutors must make "timely disclosure…at the earliest feasible opportunity, of the existence of all evidence or information which tends to negate the guilt of the accused or mitigate the offense charged or which would tend to reduce the punishment of the accused."[179]  Furthermore,

---

[175] *Id.* at 3.

[176] *Id.*

[177] *Id.*

[178] See, e.g., *Muhammad v. Kelly*, 575 F.3d 359, 370 (4th Cir. 2009) (advising prosecutors to "err on the side of disclosure"); *State v. Hamblin*, 239 P.3d 300, 305 (Utah Ct. App. 2010) (commenting that "the better practice for the State is to disclose in a timely fashion any evidence *conceivably required* to be disclosed under *Brady.*") (emphasis added); *United States v. Acosta*, 357 F.Supp.2d 1228, 1245 (D. Nev. 2005) (noting the court "fully expect[s] the prosecutors will make the judgment call *Brady* requires and err in favor of disclosure."); *United States v. Snell*, 899 F.Supp. 17, 22 n.11 (D. Mass. 1995) ("[S]ince the *Brady* obligation is a constitutional one, the Government should err on the side of disclosure to the defense…").

[179] Standard 3-3.11, *Disclosure of Evidence by the Prosecutor*, ABA.

the prosecution is responsible for reviewing the information in its possession for *Brady* evidence and is not excused from a *Brady* violation merely because it was unaware that it had information that was exculpatory.[180]

As explained above, a box of materials related to the investigation into the death of Mary Harding was disclosed to counsel for Mr. Stevens in October 2016.  The box contained significant exculpatory material, including the FBI report (or at least a portion thereof[181]), which was never provided to Mr. Stevens' trial counsel.  Specifically, the newly disclosed materials include the following seven pieces of exculpatory evidence:

1)   "The chain found on the body of [the victim] is similar to the chain used for paton-tonging….Richard Dawson and Julius Ashburn are currently rigging a boat for paton-tonging.  The boat is moored in the [Morattico] Point area of Lancaster County."[182]  This is exculpatory because it suggests that suspect Richard Dawson, rather than Mr. Stevens, had access to (1) a boat that was closer to the location where Mrs. Harding's body was found, and (2) a chain that was the type used to weigh down the victim's body.

2)   The FBI report indicates that there were a number of suspects identified, Richard Dawson among them.  The report connected Dawson to Mrs. Harding's murder for good reason. The report notes that Dawson was a suspect in the death of his wife, who died three weeks before Mrs. Harding was murdered; prior to her death, Dawson's wife applied for an advertised babysitting job with the victim, but was not hired because of the "Dawsons'

---

[180] See *Kyles v. Whitley*, 514 U.S. 419, 438 (1995) (holding that prosecution had violated *Brady*, even though police officers had failed to tell the prosecutor of the exculpatory information).
[181] While it is difficult to be certain, it certainly does not appear that the FBI report contained in the recently disclosed materials is five inches thick.  Indeed, it does not appear to be even one inch thick.
[182] App. 188.

poor reputation."[183]  Dawson was staying with Julius Ashburn after Dawson's wife died, and Ashburn lived close to Mrs. Harding.[184]  Julius Ashburn "is an associate of Emerson Harding, the victim's husband.[185]  "Ashburn is associated with a small white pickup truck;" Dawson had access to a friend's pickup truck; Dawson and Ashburn "partied" near the victim's house during the week of her abduction; Dawson and Ashburn were rigging a boat in the Morattico Point area where the victim's body was found; Dawson reportedly was "hunting for women" for sex after his wife's death."[186]  Also, Dawson was charged with a rape.[187]  Additionally, other documents in the newly disclosed material indicate that there was an altercation at the Bank of Lancaster involving Dawson, who was irate after bank employee Donna Holt told Dawson's wife that her checkbook ledger was incorrect.[188]  Holt and Mary Harding shared a cubicle at the bank, and Mrs. Harding's nameplate was on the front of the cubicle.  Holt reported to the police that she worried that Dawson therefore thought that he was arguing with Mary Harding during the altercation.[189]  Finally, Dawson did not have a credible alibi.  Dawson told police that he was at his brother's house earlier in the evening and returned to his home later that night.[190]  However, Ashburn told police that Dawson was staying with him that

---

[183] App. 189, 212.
[184] App. 189, 211.
[185] App. 189.
[186] *Id.*
[187] App. 214-15.
[188] App. 247.
[189] App. 246-47.  The altercation involving Dawson was the subject of one of the questions investigators were asking all bank employees after Mary Harding's disappearance.  App. 249-50.
[190] App. 243.

night.[191]  This is exculpatory because it points to another individual whom the FBI

believed had motive and opportunity to kill the victim.

3)  Keith Wilmer was also identified as a viable suspect in the newly disclosed material.

Wilmer's wife Brenda worked at the Bank of Lancaster with Mary Harding; Brenda and

Mary were in "daily contact" at the bank.[192]  Wilmer was a solo fisherman, and he

moored his boat at Mud Creek;[193] the victim's body was found "immediately south" of

Mud Creek, approximately 50-100 feet off of Belle Isle Marsh."[194]  During an interview

with FBI agent Pitts on August 28, 1985, Doris Gill, another bank employee, explained

that in the past, Wilmer had followed her home from the bank and made sexual prank

phone calls to her home.  Gill reported that Wilmer was incredibly jealous and suspicious

of his wife, and she believed that he abused Brenda.[195]  Another woman, Gloria Rever,

told police that Wilmer also made anonymous sex phone calls to her.[196]  Wilmer was also

suspected of other acts of sexual and assaultive behavior against women.[197]  The FBI

report further illuminated the reasons Wilmer was a viable suspect, including:  a history

of obscene phone calls and attempted abductions; the fact that his wife worked at the

same bank as the victim; he is a known wife beater; he owns a small light red pickup

truck;[198] his boat is docked near where the victim's body was found; he worked an entire

season with Emerson Harding; while on a boat together, Harding caused an injury to

---

[191] App. 244-45.
[192] App. 217-19.
[193] App. 254.
[194] App. 221.
[195] App. 222-26.
[196] App. 227.
[197] App. 220.
[198] Police believed that this pickup truck may fit the description of a truck near the scene. App. 254.

Wilmer's foot; travel between his home and his boat took him within four miles of the

Harding residence; Wilmer is a waterman, associated with ropes, chains, and seaman's

knots; Wilmer routinely fished at night and had access to gill nets, which were stored in

crab barrels on land that belonged to his father; Wilmer is a suspected peeping Tom;[199] he

reportedly attempted to rape his sister-in-law; he offered another woman $200 to "go into

the woods with him;" Wilmer is timid around men, but aggressive with women; he has a

powerful build, physically capable of committing the offense; Mrs. Harding attended a

wedding reception at Wilmer's; Wilmer did not attend the search for Mrs. Harding; he

works on a boat by himself; and the victim was afraid of Wilmer.[200]  This information is

exculpatory because it points to another individual whom the FBI believed had motive,

capacity, and opportunity to kill Mrs. Harding.

4) According to a report of an interview between Ann Dick and Detective Riley on 9/5/85,

Dick told Riley that she saw Mr. Stevens' truck at the intersection of Route 622 and

Route 354 at 4:55 a.m. on 8/23/85.  Riley reports that Dick observed the single occupant

wearing a plaid shirt, but she did not observe the operator's face (though she could tell

that the person was not Mr. Stevens based on his build).[201] This is exculpatory because it

would have supported her testimony at the second trial, where she explained that,

contrary to her testimony in the first trial, the occupant in the vehicle was *not* Mr.

Stevens.  This testimony was challenged by the Commonwealth, who argued that she

---

[199] According to Riley, being an alleged peeping Tom (without a criminal history) is what made
Emerson Stevens the prime suspect.  App. 345 (Marisa M. Kashino, *A Murder on the
Rappahannock River*, WASHINGTONIAN, June 27, 2019, *available at*
https://www.washingtonian.com/2019/06/27/murder-on-the-rappahannock-river-emerson-
stevens-mary-harding-innocence-project/).
[200]App. 228-229, 231.
[201] 7/9/86 Tr. 173

changed her testimony because she had a vendetta against the Commonwealth after it

charged her for failing to license her small indoor dog.[202]

5) On July 3, 1986, days before the second trial, Commonwealth's Attorney Schmidt wrote

a letter[203] to Detective Riley, which included .a detailed explanation of the information to

which Investigator should testify.  Schmidt sets forth Boles anticipated testimony

regarding meetings between Boles, Riley, and Mr. Stevens.[204]  Investigator Boles was

copied on this letter.  This letter also notes that "Emerson Harding may be an issue.

There is the question of $81,000.00 life insurance proceeds.  There is the question of a

fancy new sports car.  There is a question of dating Cindy Hayden and Jerry Weber's

daughter."[205]  Also, this letter indicated that Hampton and Tracy Lewis cut grass at the

cemetery across from Mary Harding's home on August 22nd and that they had a white

truck that is often parked at the cemetery while cutting the grass.[206]  This letter is

exculpatory for several reasons.  First, it indicates the Commonwealth's attempt to coach

its witnesses, as demonstrated by the prosecutor's recounting of Boles' anticipated

testimony to Riley, whose testimony needed to be consistent with Boles' account.

Second, the letter demonstrates the Commonwealth's concerns that Emerson Harding's

behavior so soon after his wife's murder is suspicious.  Third, it provides an innocent

explanation for a white truck being parked across the street from the victim's house on

the day of her abduction.

---

[202] 7/9/86 Tr. at 194-98.
[203] App. 236-38.
[204] App. 237-38.
[205] App. 236.
[206] App. 237.

6) On August 25, 1985, during his first known interview with law enforcement, Emerson Harding stated, inter alia, that he knew of no one who harbored a grudge against him or his wife.[207]  In an August 30, 1985, phone conversation with Riley, Emerson Harding reported that Mr. Stevens had made a crude comment about Mrs. Harding about a year before her disappearance.[208]  At trial, however, Mr. Harding testified that Mr. Stevens made this crude comment just two weeks before his wife was abducted.[209]  Mr. Harding also testified that on the night before his wife's disappearance, he went out to feed the dog and heard a strange noise in the woods, but could not identify the source.[210]  During his earlier statements to police, however, Mr. Harding said that the only strange thing he noted on that night before was a car driving past the house slowly; he never mentioned a strange noise in the woods.[211]  This is exculpatory because it could have been used to impeach Harding's testimony and to cast suspicion on him.

7)  Several witnesses noted a dark green car parked near the victim's house on 8/22/85 around 9-9:30 p.m.[212]  This is exculpatory, as it points to a vehicle other than a light pickup truck in the vicinity of the Harding house at/near the time of the crime.

Had the Commonwealth disclosed the above-cited items to Mr. Stevens before trial, there is a reasonable probability that the outcome of the trial would have been different.  While any one of these pieces of evidence could have altered the outcome, there can be no doubt that, when considered cumulatively, this undisclosed evidence would have resulted in a not-guilty verdict.

---

[207] App. 240.
[208] App. 241.
[209] 7/10/86 Tr. at 143.
[210] *Id*. at 134-35.
[211] App. 251.
[212] App. 253-54.

This collection of information would have given trial counsel many alternate suspects to investigate and present to the jury, and the information would have injected undeniable reasonable doubt into the Commonwealth's case, which was already weak to begin with.  The withheld information would have also been used by trial counsel to attack the integrity of the investigation.  Had it been disclosed, this evidence would have served to undermine confidence in the outcome of Mr. Stevens' trial, and therefore Mr. Stevens is entitled to relief under *Brady v. Maryland*.

**The State Court's Adjudication Was Unreasonable Under § 2254(d).**

To the extent the state court adjudicated this claim on the complete record and full merits, (*Winston v. Pearson,* 683 F.3d at 496), the court did so unreasonably.  Regarding the *Brady* claims stemming from the FBI report as a whole, the state court, rather than evaluating the evidence, simply accepted the trial court's determination:

> The Court would note that many of the claims here arise from information contained in the aforementioned FBI Report 302.  . . .  Following review of the FBI report, the [trial] Court ruled that it did not contain exculpatory evidence and ordered the material filed. . . . Further, the trial court noted, excuse me, trial counsel noted at the sentencing hearing, the Court decided that in its opinion there was no exculpatory evidence in that summary, and I certainly accept that.[213]

It is unreasonable for a reviewing court to accept as sound a trial court's determination regarding potentially exculpatory evidence without ever actually reviewing that evidence.  As noted above, it is impossible even to know what the judge at Mr. Stevens' trial actually received and reviewed:  the FBI report that was turned over to the trial judge for *in camera* review was, per Mr. Stevens' trial counsel, approximately 20% of the original FBI report.[214]  The state court nevertheless accepted the trial court's determination that the FBI report did not contain

---

[213] App. 284 (12/1/17 Tr. at 30).
[214] *See* footnote 175, *supra*.

exculpatory evidence whole cloth.  The state court made no findings as to whether or why the trial court's decision was reasonable – nor could it have, given that the state court judge does not and cannot know what the trial judge, (now deceased), actually reviewed or thought at the time.

Specifically, the state court then adjudicated the above-numbered claims individually as follows:

**Claim III (1)**[215]:  The state court summarily cast aside this claim because it "relie[d] almost entirely on the FBI report."[216]  The state court's decision to ignore the FBI report was unreasonable for the reasons described above.

**Claim III (2)**[217]:  The state court rejected this claim because "[t]he contents of all of the requests in this portion of Claim IV rest upon the release of the FBI report this Court had previously deemed at the time of trial not to contain exculpatory evidence and not released by the court at the time of trial."[218]  The state court's decision was unreasonable for the reasons described above.

Later, though not specifically in reference to this claim, the state court noted that Richard Dawson had alibi evidence of a long-distance phone call at a time consistent with the murder.[219]  The unreasonable nature of the state court's reasoning is discussed *infra*, Claim III (3).

**Claim III (3)**[220]:  The trial court disposed of this claim, finding that the availability of information about identified suspects "would not have resulted in a different conclusion because the identification of the suspects would also come with credible evidence which creates an alibi

---

[215] Before the state court, this claim was Claim IV (2).
[216] App. 285 (12/1/17 Tr. at 31).
[217] Before the state court, this claim was Claim IV (4).
[218] App. 286 (12/1/17 Tr. at 32).
[219] App. 290-91 (12/1/17 Tr. at 36-37).
[220] Before the state court, this claim was Claim IV (5).

for each of them."[221]  The state court noted that:  (1) alternate suspect Richard Dawson had alibi evidence of a long distance phone call at a time consistent with the murder; (2) Emerson Harding was working offshore at the time of the murder; (3) and Keith Wilmer's wife testified that he was at his residence during the relevant time period.[222]

The state court's reasoning is nonsensical and internally inconsistent.  In the next breath after casting aside the alternate suspects because of their alibis, the state court admits that Mr. Stevens himself had an alibi (in support of which four other people testified) but that "[t]he jury did not accept the alibi evidence presented and made a finding of guilty, indicating they did not find the alibi testimony credible."[223]

At no point does the state court explain why other suspects' alibi evidence should be summarily accepted, while Mr. Stevens' was apparently disbelieved.  At no point does the state court explain what makes the three alternate suspects' alibis "credible."  The state court does not address, for example, the fact that Mr. Dawson's long-distance phone call, which served as his alibi, is not alleged to have lasted the entire window during which Mrs. Harding's murder must have taken place.  The support in the record for that call is only Riley's testimony at trial that Dawson had made a phone call to his ex-wife in Philadelphia at a time that Riley could not recall, except that "it was late.  It was between the time the girl may have disappeared – the earliest time she could have disappeared to midnight or so."[224]

The state court does not offer an explanation for why it considered the alibi testimony from Mr. Wilmer's wife's to be credible, but Mr. Stevens' wife's (and his daughter's and

---

[221] App. 290 (12/1/17 Tr. at 36).
[222] App. 290-91 (12/1/17 Tr. at 36-37).
[223] App. 291 (12/1/17 Tr. at 37).
[224] 7/8/86 Tr. at 190.

neighbors') testimony was not.  The state court does not address the fact that while Mr. Harding was supposedly working offshore at the time of the murder, no reliable boat manifest has ever been located.

Thus, the state court's determination here is based on an unreasonable determination of the facts.

**Claim III (4)**[225]:  The state court disposed of this claim because "[i]ssues regarding the testimony of Ann Dick have been raised in direct appeal and were again addressed in the *habeas* proceedings previously filed."[226]  The state court is simply wrong:  while other arguments related to Ann Dick have been raised in the past, this particular claim regarding Ms. Dick had, in fact, never been raised before Mr. Stevens' 2016 state habeas petition.  The claim raised in the instant petition is based exclusively on interview notes contained in the documents disclosed to Mr. Stevens in October 2016.  The state court's finding that this claim is procedurally barred because it was raised and adjudicated on direct appeal and in Mr. Stevens' initial state habeas proceedings[227] is simply wrong, as the factual basis of the claim was unavailable at those times.

The state court thus failed entirely to address this claim, and therefore AEDPA constitutes no barrier to relief.  If the state court does not address the merits of a properly presented claim, federal review is *de novo*.  *Weeks v. Angelone*, 176 F.3d 249, 258 (4th Cir. 1999) ("When a petitioner has properly presented a claim to the state court but the state court has not adjudicated the claim on the merits, however, our review . . . [under AEDPA] is *de novo*"), *aff'd*, 528 U.S. 225 (2000).

---

[225] Before the state court, this claim was Claim IV (7).
[226] App. 287 (12/1/17 Tr. at 33).
[227] *Id.*

**Claim III (5)**[228]:  The state court found that the Schmidt-Riley letter was not an example of a prosecutor coaching a witness.  "The Court doesn't view this as coaching in any way, but rather as the prosecutor reviewing his case and concerns with the investigator with whom he has, obviously, worked closely through a trial and in preparation of retrial."[229]  The state court's failure to recognize the blatant coaching in the letter is unreasonable.  It is impossible to ignore in the particularly didactic excerpt below, in which Schmidt ensures that Riley and Boles will make consistent statements.  Schmidt instructs:

> On September 5 Boles was with you during the interview of defendant.  You did most of the talking.  The defendant followed the two of you up to the Harding house because it was a neutral location.  The entire interview took 10 to 15 minutes total.  There was some small talk and one or two general questions inquiring whether Emerson saw anything near the house when his truck was up there.  Then the defendant broke into his "litany" after you indicated he was hiding something.  You pressed him for a few minutes longer.  On the way out Bruce asked him whether his truck was the same color.  He was always free to go.[230]

Schmidt also lays out what he believes will be June Deal Stevens' testimony, though he admits to not having even spoken with her yet.[231]  Particularly given the statements of Ann Dick, Louis Dick, Ray Reynolds, and Lawrence Taft – all of whom describe Riley's attempts to elicit false testimony – the state court's characterization of this letter was unreasonable.

Furthermore, the court failed to address the other two crucial arguments in this claim: that the letter further implicated Emerson Harding and provided an alternative explanation for the white truck in front of the Harding house.  This Court should afford this claim *de novo* review as a result.

---

[228] Before the state court, this claim was Claim IV (8).
[229] App. 287 (12/1/17 Tr. at 33).
[230] App. 237.
[231] App. 236.

Even if this Court were to determine that the state court fully adjudicated this claim on the merits, the adjudication was clearly based on an unreasonable determination of the facts. The state court admitted that Mr. Schmidt's letters to Mr. Riley and Mr. Harding contained "concerns, and to the extent that you deem them, the letter to Mr. Harding forewarned him of issues that may be there." It is impossible to reconcile the state court's admission that the prosecutor sent Mr. Harding a "warning" in advance of his testifying with the state court's adamant refusal to acknowledge that "warning" a witness equates to coaching him. Whatever the semantics, it is unreasonable to claim that the letters did not contain exculpatory information. *See White v. Helling*, 194 F.3d 937, 944-45 (8th Cir. 1999) (finding *Brady* violation when the prosecution failed to disclose evidence that a key witness had initially not identified the petitioner and had been coached prior to testifying to such an extent that his testimony could have been excluded all together).

**Claim III (6)**[232]: The state court conceded that Mr. Harding's statements contained inconsistencies, but ruled that "[t]he Court doesn't believe that the availability of the information and the attempted impeachment of Mr. Harding with the information would have resulted in a different verdict."[233] The state court gave no reasoning for its conclusion, which is an unreasonable determination of the facts in light of the evidence presented. *See Monroe v. Angelone*, 323 F.3d 286, 300 (4th Cir. 2003) (affirming a grant of habeas relief when inconsistent statements and other suppressed evidence would have undermined the testimony of key government witnesses); *see also Owens v. Balt. City State's Attys. Office*, 767 F.3d 379, 397 (4th Cir. 2014) (finding evidence favorable and material, where a key witness had told law

---

[232] Before the state court, this claim was Claim IV (9).
[233] App. 289 (12/1/17 Tr. at 35).

enforcement several other conflicting accounts of the crime, and "changed his story only because the Officers provided additional details about the crime" and pressured the witness to "incorporate so as to incriminate Owens more directly").

Mr. Harding—the victim's husband—was a far more likely suspect than Mr. Stevens. Mr. Harding's alibi was never truly corroborated.  It was Mr. Harding who first pointed the finger at Mr. Stevens; clearly, jurors would have found it significant that there were inconsistencies in Mr. Harding's explanation as to why.  Particularly in light of the contents of the letter underlying Claim III(5), which raises concerns about Mr. Harding's behavior, this impeachment information could have resulted in a different verdict.

**Claim III (7)**[234]:  The state court failed entirely to address this claim.  Federal review is thus *de novo*.  *See* discussion Claim III (4), *supra*.

The state court's assessment of whether the above withholdings constituted a *Brady* violation was contrary to, and/or involved an unreasonable application of, clearly established law under § 2254(d)(1).  The circuit court erred by failing to consider the cumulative effect of the undisclosed pieces of evidence in making its materiality determination.  *See Terry Williams v. Taylor*, 529 U.S. 362 (2000); *Kyles v. Whitley*, 514 U.S. 419, at 436 n. 10 (1995) ("We evaluate the tendency and force of the undisclosed evidence item by item; there is no other way.  We evaluate its cumulative effect for the purposes of materiality separately . . ."); *Monroe v. Angelone*, 323 F.3d 286, 302 (4th Cir. 2003); *United States v. Ellis*, 121 F.3d 908, 916 (4th Cir. 1997); *Lovitt v. Warden*, 266 Va. 216, 245, 585 S.E.2d 801, 818 ("...[T]he determination whether undisclosed exculpatory evidence was material must be made by considering its cumulative

---

[234] Before the state court, this claim was Claim IV (10).

63

effect.).  The continued refusal to acknowledge the clearly established federal law in this regard is grounds for this Court's *de novo* review of the claim.

Had the Commonwealth disclosed the items at issue in the proceedings below to Mr. Stevens before trial, there is a reasonable probability that the outcome of the trial would have been different.  "Importantly, a reasonable probability does not mean that [petitioner] 'would more likely than not have received a different verdict' . . . only that the likelihood of a different result is great enough to 'undermine [] confidence in the outcome of the trial.'"  *Wolfe v. Clarke*, 691 F.3d 410, 424 (4th Cir. 2012) (citing *Kyles v. Whitley*, 514 U.S. 419, 434 (1995).  Not only would this collection of information have given trial counsel alternate suspects to pursue, but it also would have injected undeniable reasonable doubt into the Commonwealth's case, particularly in light of the already weak cases presented by the prosecution.  The withheld material included evidence of police misconduct and coercion, as well as prior inconsistent statements by multiple Commonwealth witnesses.  The information could have been used by trial counsel to attack the integrity of the investigation.  Had it been disclosed, this evidence would have served to undermine confidence in the outcome of Mr. Stevens' trial.

## CONCLUSION

Mr. Stevens' wrongful conviction was the result of constitutional violations on the part of the Commonwealth.  Based on the facts and law set forth above, Mr. Stevens has established his entitlement to relief.  But for these constitutional errors, viewed in light of the evidence as a whole, no reasonable juror would have found Mr. Stevens guilty.  This Could should consider the merits of the claims alleged herein and vacate Mr. Stevens' convictions.  In the alternative, Mr. Steven's claims are all based on newly discovered evidence and were all properly pled in

state court, where an evidentiary hearing was requested.  Petitioner did not fail to develop the record below and is entitled to a hearing pursuant to § 2254(e)(2).

## PRAYER FOR RELIEF

WHEREFORE, Petitioner Stevens prays that this Court:

1. Grant the Petition for Writ of Habeas Corpus and vacate Mr. Stevens' wrongful conviction; or, in the alternative

2. Provide Mr. Stevens with an evidentiary hearing in order to present further factual development in support of his claims; and

3. Grant such other relief as may be necessary and appropriate.

Respectfully submitted,

 _/s/ Jennifer L. Givens_____
Jennifer L. Givens
VSB #42269
Deirdre M. Enright*
The Innocence Project
University of Virginia School of Law
580 Massie Road
Charlottesville, VA 22903
434-924-2912

*Licensed in MS and DC

June 2, 2020

**VERIFICATION**

I, Emerson Eugene Stevens, declare under penalty of perjury that I have read this Amended Petition for Writ of Habeas Corpus and affirm that the facts alleged herein are true to the best of my knowledge and recollection.


*Emerson Eugene Stevens*
Emerson E. Stevens

Date: May 28, 2020

**CERTIFICATE OF SERVICE**

I hereby certify that the instant Petition was served on counsel for Respondent, Matthew Dullaghan, Senior Assistant Attorney General, Office of the Attorney General, via the ECF electronic filing system on this 2nd day of June, 2019.


/s/ Jennifer L. Givens