IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

**EMERSON EUGENE STEVENS,**

      Petitioner,

v.                                                                 Civil Action No. **3:20cv352**

**TONYA D. CHAPMAN,**
*Chair, Virginia Parole Board*,

      Respondent.

## <u>MEMORANDUM OPINION</u>

      Emerson Eugene Stevens, a Virginia probationer proceeding with counsel, submitted this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  ("§ 2254 Petition," ECF No. 5.)  Stevens challenges his convictions, following a 1986 jury trial, for first-degree murder and abduction with intent to defile.  Respondent has moved to dismiss on the grounds that, *inter alia*, the statute of limitations applicable to federal habeas petitions bars Stevens's petition.[1] (ECF No. 8.)  Stevens responded in opposition, (ECF No. 12), and Respondent replied, (ECF No. 13).  For the reasons that follow, the Court will deny the Motion to Dismiss and set this matter for an evidentiary hearing.

## I.  INTRODUCTION

      Thirty-four years ago, in 1986, a Virginia jury convicted Stevens of first-degree murder and abduction with intent to defile.  (§ 2254 Pet. 4.)  In 1992, this Court rejected Stevens's first federal habeas application, *Stevens v. Greene*, No. 92cv540 (E.D. Va. Nov. 23, 1992), and the United States Court of Appeals for the Fourth Circuit affirmed, *Stevens v. Greene*, 991 F.2d 791 (4th Cir. 1993).

---

[1] The Court DIRECTS the Clerk to substitute Tonya D. Chapman, Chair of the Virginia Parole Board, as the proper party respondent.  *See* Fed. R. Civ. P. 17(d); Fed R. Civ. P. 25(d).

In 2017, after more than thirty years in prison, Virginia released Stevens on parole.  In

2019, Stevens filed a § 2244 petition in the Fourth Circuit, seeking authorization to file a second

federal habeas application attacking his convictions.  *In re Stevens*, 956 F.3d 229, 231 (4th Cir.

2020).  According to Stevens, new evidence that the Commonwealth of Virginia disclosed to him

in October 2016 proves his innocence.  Finding that Stevens satisfied the requirements of

§ 2244(b)(2)(B),[2] the Fourth Circuit granted him permission to file a second § 2254 Petition.  *In*

*re Stevens*, 956 F.3d at 234.

This Court now addresses Stevens's second § 2254 Petition, in which he maintains his

innocence and raises three claims for review.  This Memorandum Opinion begins with an outline

of Stevens's case and a summary of its procedural history.  In providing the following summary,

the Court need not recite in minute detail every bit of evidence tending to implicate or exonerate

Stevens.  Rather, the Court reviews the evidence with an eye toward assessing whether an

evidentiary hearing is warranted on the record before it.

## II.  PROCEDURAL HISTORY

On August 23, 1985, Mary Harding, a twenty-four-year-old mother of two, went missing

in Lancaster County, Virginia.  (§ 2254 Pet. 1.)  Four days later, on August 27, 1985, police

found her body in the Rappahannock River—strangled and weighed down with a cinderblock.

---

[2] Section 2244(b)(2)(B) allows for filing a second or successive habeas petition when:

(B)(i) the factual predicate for the claim could not have been discovered
previously through the exercise of due diligence; and
(ii) the facts underlying the claim, if proven and viewed in light of the evidence as
a whole, would be sufficient to establish by clear and convincing evidence that,
but for constitutional error, no reasonable factfinder would have found the
applicant guilty of the underlying offense.

28 U.S.C. § 2244(b)(2)(B).

(*Id*.)  Virginia police tied the murder to Stevens, a local crabber on that same river.  C. Jeffers Schmidt Jr., Commonwealth's Attorney for Lancaster County, handled the prosecution.  Special Agent David Riley and the Virginia State Police led the investigation.  (ECF No. 1-2 at 57–68.) The FBI also investigated Mary Harding's death and helped prepare a report for the case.  (*Id*. at 57–59)

### A.    The Commonwealth's Theory of The Case:  Stevens Murdered Harding

After conducting its investigation into Harding's death, the Commonwealth asserted that Stevens murdered Harding based on the following evidence:  1) his truck was seen near Harding's house around the time of her death; 2) he possessed a knife (which he initially lied about owning), that was consistent with the wounds Harding suffered; 3) he was late to pick up his crab pots on the morning after Harding's death, 4) he had the means to transport Harding's body in his boat, weigh it down with a chain, rope, and cinderblock, and drop her in the Rappahannock River near Towles Point; and, 5) a forensic scientist found one brown hair on Stevens's shirt that matched Harding's hair.  Because then-undisputed testimony placed Stevens's boat in the Towles Point area when Harding's body was left in the river during the early hours of August 23, 1985, the Commonwealth needed to establish that the Rappahannock River tidal flow moved Harding's weighted body ten nautical miles upstream in four days for it to be found near Morrattico.  (July 8, 1986 Tr. Transcript 20; July 9, 1986 136–37; July 11, 1986 Tr. Transcript 173.)

### B.    Trial Court Does Not Order the Commonwealth to Disclose the FBI Report

Stevens faced two jury trials for Harding's death.  The first jury, empaneled February 24 through February 27, 1986, was unable to reach a unanimous verdict and did not convict him.

3

(§ 2254 Pet. 4.)  The second jury, empaneled July 7 through July 12, 1986, convicted Stevens of first-degree murder and abduction with intent to defile.  (Mem. Supp. Mot. Dismiss 1–2, ECF No. 9.)  During Stevens's second jury trial, he asked the trial court to order the Commonwealth to provide him with a copy of the FBI report prepared during the investigation of Harding's death.  (July 8, 1986 Tr. Transcript 47.)  Unbeknownst to Stevens, the FBI report included information that:  1) other viable suspects in Harding's death, including a fisherman who used the same type of chain found around Harding's body and who was also suspected of killing his wife three weeks prior to Harding's death; 2) confirmation existed that Harding's body was deposited in the Rappahannock River within 500 to 600 yards of where it was found; and, 3) that Earl Smith, a witness for the Commonwealth, provided false information about his whereabouts and the whereabouts of Stevens on the day of Harding's murder.  (ECF No. 1-2 at 57–59.)

The trial court reviewed the report *in camera* and ruled that it did not contain exculpatory material, thus, the Commonwealth was not obliged to disclose it to Stevens.  (July 9, 1986 Tr. Transcript 3.)  After hearing the evidence presented in July 1986, the jury convicted Stevens.

### C.   In 1989, the Virginia Court of Appeals Affirms Stevens's Convictions

Stevens appealed his convictions.[3]  The Court of Appeals of Virginia affirmed Stevens's convictions in a published opinion issued on March 21, 1989.[4]  The state appellate court summarized the evidence against Stevens as follows:

---

[3] In addition to the Parties' briefing and exhibits (found on the docket or in paper copy), this Court utilizes the Virginia Court of Appeals's 1989 opinion, *Stevens v. Commonwealth*, 379 S.E.2d 469 (Va. Ct. App. 1989), for its summary regarding the evidence adduced at Stevens's July 1986 trial.  Respondent's Motion to Dismiss similarly relies on the 1989 opinion.  (Mem. Supp. Mot. Dismiss 6–8.)  Given the age of the case, and as explained in Respondent's Reply (ECF No. 13 at 2 n.7), certain Virginia Supreme Court records were destroyed as a matter of course at the time.

The victim's body was found on August 27, 1985[,] in the Rappahannock River. A cinderblock was tied to her neck by a rope and chain. Her body was cut in six or seven places, but death was caused by asphyxiation, resulting from the rope wrapped around her neck. The time of death could not be precisely determined. Her body had been in the water for several days, and the medical examiner concluded that she died or "suffered some extreme incident that caused digestion to quit within two or three hours" of a meal. She had eaten dinner at her grandmother's home at approximately 7:00 p.m. on August 22, 1985, and she disappeared that same night. Thus, the Commonwealth concludes that death occurred sometime after 10:00 p.m. on the night of August 22, 1985. *The evidence supporting the defendant's conviction is entirely circumstantial.*

*Stevens v. Commonwealth*, 379 S.E.2d 469, 470 (Va. App. 1989) (emphasis added). Because the

evidence presented was entirely circumstantial, the Virginia Court of Appeals explained that

"the circumstances of motive, time, place, means, and conduct must all concur to form an

unbroken chain linking the defendant to the crime beyond a reasonable doubt" to affirm

Stevens's murder conviction. *Id.* at 470–71 (internal quotation marks and citations omitted).

---

Stevens also filed a 352 page "appendix" to support his § 2254 Petition. Stevens does not delineate exhibits in the appendix. As a result, the Court refers to the ECF page numbers when citing the appendix.

[4] As Respondent explains in her Motion to Dismiss, Stevens briefed five questions in his direct appeal:

1. Did the trial court commit reversible error by denying defendant's motions to strike the Commonwealth's evidence as being insufficient to find guilt beyond a reasonable doubt?
2. Did the trial court commit reversible error when it denied the defendant's motion to set aside the verdict due to the Commonwealth Attorney's improper trial conduct?
3. Did the trial court commit reversible error when it denied the defendant's motion to set aside the verdict due to the misconduct of the Commonwealth Attorney in not providing defendant with exculpatory evidence?
4. Did the trial court commit reversible error in denying defendant's motion for the court to disqualify itself, and for a change of venue?
5. Did the trial court commit reversible error in denying defendant's instructions A and B and failing to properly instruct the jury?

(Mem. Supp. Mot. Dismiss 3, ECF No. 9) (citing App. Br., *Stevens v. Commonwealth*, Record No. 1124-86-2 (Dec. 4, 1987) at 4–5).

5

Regarding motive, the Virginia Court of Appeals stated that nothing in the record explained why Stevens would murder Mary Harding:

> There was little evidence that the defendant had a motive to murder the victim. There was evidence of some sexually suggestive remarks by the defendant about the victim.  The defendant's brother-in-law testified that "sometime back" he and the defendant had a conversation about the victim during which the defendant said, "I sure would like to get some of that stuff" and "that sure is a good looking woman, that Mary Harding."  On cross-examination he said that the statements were not made recently but were made "four or five months ago or something like that."  Two Sundays before the victim disappeared, her husband was fishing with some other people in a boat at a place called "Mary's Hole" (the victim's first name was Mary).  The defendant, with two other people, approached in another boat and, while laughing, told the victim's husband, "you know this place real good."
>
> There was no affirmative evidence of any sexual assault or of any sexual relationship between the defendant and the victim.  The medical examiner was unable to conclude whether she had any sexual injury because of the body's decomposition.

*Stevens*, 379 S.E.2d at 471.

Regarding the time and place of death, the Virginia Court of Appeals observed that a witness, Clyde Dunaway, testified that Stevens was in the vicinity of the victim's house the night she disappeared:

> The evidence indicates that the defendant was near the victim's home about the estimated time of her death on the night of her disappearance.  At about 9:50 p.m. of the evening the victim disappeared, a witness [Clyde Dunaway,] returning to his home from work saw the defendant's truck parked about 250 feet west of the victim's house.  Upon being questioned by the police concerning the presence of his truck near the victim's home at the time she disappeared, the defendant initially and repeatedly denied his truck was there.  However, he finally told the police that his truck was there that particular night.  He said that after he left the "Walkers' house" with his three children, he went to visit his sister and brother-in-law; that when he "got to this vicinity," he pulled his truck off of the shoulder of the road, stepped out of it, and relieved himself.  He got back into his truck and went on to his sister and brother-in-law's home where he visited for approximately an hour.  He later admitted that this explanation he gave about visiting his brother-in-law and sister was false.

*Stevens*, 379 S.E.2d at 471.

Regarding the means that Stevens used to kill Mary Harding, the Virginia Court of Appeals pointed to evidence showing that Stevens had a rope, a chain, and a knife in his truck prior to her murder, and that her injuries were consistent with knife wounds:

> On the defendant's boat there were fragments of rope described as "small twine like a thread . . . used for a technique called whipping a rope to keep the ends together."  The police investigator who found the fragments said this "whipping material was similar to the rope found on the victim," but acknowledged that it was not unusual to find rope of that type on boats.  A waterman who had worked on the defendant's boat during the summer the victim disappeared said that, prior to the disappearance, the defendant's truck was dirty and that it "had everything in the back of it."  He said this included rope, chain and a knife.  He added that after the disappearance "[a]ll of it was gone."  He said that the truck had been "cleaned up real nice."

> An acquaintance of the defendant's testified that on August 8, 1985 he was with the defendant in the defendant's truck when they assisted a disabled automobile.  He said that he saw a chain in the defendant's truck which he said looked like the chain found on the victim's body and added "if it ain't the chain it's the twin of it."  He also said that there was rope in the back of the truck and that a knife was taken from the truck's dashboard to cut the rope.  He said the knife was in a case.

> After the murder, an investigator found a knife sheath on the truck's dashboard.  The sheath corresponds to a particular kind of knife called a "Wildcat Skinner," which is the kind of knife that the defendant's acquaintance had seen in the defendant's truck.  However, when the investigator confronted the defendant, he denied ever having a knife of that description.  The medical examiner described the victim's injuries as consistent with the injuries that a "Wildcat Skinner" knife would inflict.

*Stevens*, 379 S.E.2d at 471–72.

Regarding Stevens' conduct after the murder, the Virginia Court of Appeals summarized the evidence as follows:

> A witness, [Clyde Dunaway,] saw his truck near the victim's home on the evening she disappeared.  The defendant first denied this and then gave a false explanation for its presence.  Furthermore, his boat was not in its slip at 3:30 a.m. on the night

7

the victim disappeared but was seen returning about a half an hour later.  His truck was then seen going toward his home and away from the dock at 6:40 a.m. that same morning.  At that time he was seen wearing a plaid shirt.  The police later found a plaid shirt in his truck.  *On the shirt they found a hair identified as being microscopically alike in all identifiable characteristics as the victim's hair.*  The examiner said the hair could have come from the victim but could not conclusively trace it to the victim.  The defendant's truck was cleaned and chain, rope and knife were missing from it following the victim's disappearance.  When confronted by the police about the knife, the defendant began "shaking all over . . . both hands were shaking so bad he had to put them in his pockets."

*Stevens*, 379 S.E.2d at 472 (emphasis added).

The jury also heard testimony from Earl Smith about Stevens's whereabouts the morning after Harding's murder.  Smith testified that during one week in August 1985, he was helping Stevens pull crab pots because Stevens had an injured arm.  (July 10, 1986 Tr. Transcript 202.) Smith testified that while Stevens normally picked him up around 6:00 a.m., Stevens picked him up one hour late, at 7:00 a.m., on the morning in question, implying that Stevens was late because he had killed Harding and disposed of her body during the early morning hours of Friday, August 23, 1985.  On cross-examination, Smith testified that he "could be mistaken" about which morning Stevens was late to pick him up that week.  Indeed, Stevens showed that he had a doctor's appointment with Dr. David Antonio on August 22, 1985, roughly twelve hours before Harding went missing, which he confirmed through Dr. Antonio's testimony and business records.  (July 10, 1986 Tr. Transcript 7.)  During its closing argument, however, the Commonwealth relied on Smith's testimony to support its theory that Stevens was late because he had been disposing of Harding's body:

Smith also described to us the morning of Friday, August 23.  The day after Mary disappeared.  He said something was odd about that morning.  Emerson Stevens came to get me late that day.  He normally came at 6:00.  He came at 7:00 that day.  I sat there and waited. . .  This is the day, ladies and gentleman, the defendant says he went out at 6:00 [] and did nothing unusual.

8

(July 12, 1986 Tr. Transcript 77–78.)

The Virginia Court of Appeals summarized the evidence supporting Stevens's guilt,

which the Commonwealth produced at trial, as follows:

> When viewed in the light most favorable to the Commonwealth the evidence in this case is as follows:  the victim died sometime after 10:00 p.m., August 22, 1985; the defendant's truck was seen parked about 250 feet from her home at about 9:50 p.m. that same evening; upon being questioned by the police he admitted that his truck was there only after first repeatedly denying it; the defendant's boat was not at its usual location at 3:30 a.m. the following morning but was seen coming back toward that location at about 4:00 a.m.; the defendant himself was seen driving away from that dock at about 6:40 a.m. in his truck wearing a plaid shirt; *a plaid shirt was later found by police in his truck containing a hair microscopically identical to the victim's hair*; fragments of small twine similar to twine found on the victim were found on the defendant's boat; the chain found on the victim's body was described as identical to a chain previously seen in the defendant's truck; *a knife identified as one seen in the defendant's truck prior to the victim's disappearance*, but which the defendant denied having, was capable of inflicting the victim's injuries; the defendant's truck was, prior to the victim's disappearance, dirty and had "everything in the back of it," including rope, chain and a knife, but was clean and missing those items after the victim's disappearance; the defendant, in addition to first denying that his vehicle was parked in the vicinity of the victim's home on the night of her disappearance, gave a false explanation for its presence there; he denied ever having had the knife identified as being in his truck prior to the victim's disappearance; he denied that his boat had been away from its dock in the early morning hours following the victim's disappearance; and the body was found in the Rappahannock River approximately twenty miles from Tappahannock.  *We find that these circumstances do concur to form an unbroken chain linking the defendant to the crime and, therefore, the jury could have determined his guilt beyond a reasonable doubt.*

*Stevens*, 379 S.E.2d at 472–73 (emphasis added).  The Virginia Court of Appeals denied

Stevens' claims and affirmed his convictions and sentence.  On May 17, 1989, the Virginia Court

of Appeals denied Stevens's petition for rehearing *en banc*.  On November 2, 1989, the Supreme

Court of Virginia refused Stevens's further appeal.  (Mem. Supp. Mot. Dismiss 3) (citing *Stevens*

*v. Commonwealth*, Record No. 890720 (Va. Nov. 2, 1989)).

9

**D.    The Trial Court Appoints a Special Prosecutor to Investigate Issues of Perjury and Prosecutorial Misconduct in Stevens's Trial, Resulting in a Perjury Conviction for one of the Commonwealth's Main Witnesses**

Stevens filed several postconviction motions in the Lancaster County trial court.  (Resp. Ex. A, ECF No. 12-1 at 8–9.)  "[F]ollowing the conviction and sentencing of [Stevens], the Court appointed a special prosecutor to investigate issues of perjury and prosecutorial misconduct raised by the defendant."  (*Id.* 9.)

After an independent investigation, "[t]he special prosecutor successfully prosecuted and convicted of perjury, Clyde Dunaway, a material Commonwealth witness," who had testified that he had seen Stevens's "truck parked about 250 feet west of Mary Harding's house" the night she disappeared.  (*Id.* 9, 11.)  The "investigation also revealed that the Lancaster County Commonwealth Attorney knew or should have known that Dunaway's testimony was perjured."  (*Id.* 9.)  Before Stevens's trial, Dunaway had repeatedly inquired about the $20,000 reward that had been offered for information relating to Harding's disappearance, but he testified at trial that he had never inquired about the reward.[5]  (July 9, 1986 Tr. Transcript at 103, 120.)

**E.    Stevens Unsuccessfully Seeks Postconviction Relief**

Having exhausted his options for a direct appeal, Stevens sought state habeas relief based on the prosecution's improper closing argument and failure to disclose exculpatory evidence.  (Mem. Supp. Mot. Dismiss, Ex. A, ECF No. 9-1.)  The state court rejected this application.  (Mem. Supp. Mot. Dismiss, Ex. B, ECF No. 9-2.)  The Virginia Court of Appeals denied as untimely Stevens's appeal.  (Mem. Supp. Mot. Dismiss 4.)

---

[5] Records suggest that Dunaway may have initially linked Stevens to Harding's murder. (ECF No. 1-2 at 33–34 ("Emerson Stevens was not considered a suspect until such time as his cousin, Clyde Dunaway, reported that he had seen the Stevens truck on the highway some distance from the driveway entrance to the victim's home.")).

Turning next to federal court, Stevens filed his first application for federal habeas relief in 1992. The district court denied his application, and a panel of the Fourth Circuit dismissed Stevens's appeal for having no merit. *Stevens v. Greene*, 991 F.2d 791 (4th Cir. 1993). Between 1993 and 2016, Stevens did not seek postconviction relief in state or federal court.

### F.    In 2015, the FBI Deems Microscopic Hair Analysis Unreliable Evidence, Particularly in Cases Tried Between 1980 and 2000

Myron T. Scholberg, "a former FBI hair and fiber analyst, forensic consultant, and part-time employee of the Commonwealth of Virginia's Northern Virginia Crime Lab," provided testimony at Stevens's trial regarding three brown hairs recovered from Stevens's shirt. Prior to trial, Scholberg "examined three hairs that had been recovered from [Stevens's] red plaid shirt, and compared them to known hairs from the defendant and the victim." (Aff. Myron T. Scholberg, ECF No. 1-1 at 81–82.) Scholberg "concluded that two of these recovered hairs were brown hairs of Caucasian origin that were microscopically like the known head hairs of [Stevens], and therefore could have originated from him." (*Id.*) Scholberg further "concluded that the third recovered hair, was also a brown hair of Caucasian origin, was microscopically alike in all identifiable characteristics to known head hairs of the victim, Mary Harding." (*Id.*) The Commonwealth relied on this evidence in its closing argument, summarizing Scholberg's testimony as stating, "[w]hile it's a possibility it's not [Harding's] hair, it is unlikely in the populace there will be two peoples' hair [that Scholberg] cannot tell the difference in with [his] great experience." (July 12, 1986 Tr. Transcript at 52.)

Twenty-five years after Stevens's trial, Scholberg provided an affidavit in 2011 recognizing that "hair analysis was limited in important ways" and "testimony linking microscopic hair analysis with particular defendants is highly unreliable." (Aff. Myron T.

11

Scholberg, ECF No. 1-1 at 81–82.)  Scholberg cited a 2009 National Academy of Sciences report, in which researchers concluded that a "match" found using microscopic hair comparison means only that hairs have the "same microscopic characteristics, but [a match] cannot uniquely identify one person."  (*Id.*)  Scholberg supported Stevens's request to submit the hairs recovered from Stevens's shirt in 1985 for DNA testing.  In 2011, however, the hairs could no longer be tested due to the years that had passed since Stevens's trial and the corresponding decay of the hair samples.  (§ 2254 Pet. 18 n.50.)

As Stevens observes in his briefing, in 2015, the Justice Department and FBI formally recognized that "nearly every examiner in an elite FBI forensic unit gave flawed testimony in almost all trials in which they offered evidence against criminal defendants over more than a two-decade period before 2000."  *See* Spencer S. Hsu, *FBI Admits Flaws in Hair Analysis Over Decades*, WASH. POST, Apr. 18, 2015; *see also* FBI Press Release, *FBI Testimony on Microscopic Hair Analysis Contained Errors in at Least 90 Percent of Cases in Ongoing Review*, (FBI Apr. 20, 2015), available at: https://www.fbi.gov/news/pressrel/press-releases/fbi-testimony-on-microscopic-hair-analysis-contained-errors-in-at-least-90-percent-of-cases-in-ongoing-review, ("The United States Department of Justice (DOJ), the Federal Bureau of Investigation (FBI), the Innocence Project, and the National Association of Criminal Defense Lawyers (NACDL) reported today that the FBI has concluded that the *examiners' testimony in at least 90 percent of trial transcripts the Bureau analyzed as part of its Microscopic Hair Comparison Analysis Review contained erroneous statements*." (emphasis added)).  Stevens similarly challenges the microscopic hair evidence offered in his case as invalid and unreliable.

12

(§ 2254 Pet. 18) (accord and citing same).  Stevens notes that "[w]ithout the hair, there is . . . no

reliable physical evidence connecting Mr. Stevens to Mrs. Harding's death."  (*Id.*)

G.      **In May 2016, the Medical Examiner Recants Her Trial Testimony and Opines that a Post-Mortem Encounter with a Motorboat Propeller caused Harding's Lacerations**

In May 2016, Marcella F. Fierro, M.D., "former Chief Medical Examiner for the

Commonwealth of Virginia," provided a declaration in which she recanted her medical opinion

regarding the source of Harding's lacerations and her testimony linking the wounds Harding

suffered to Stevens's Wildcat Skinner knife.  (ECF No. 1-2 at 27.)  At trial, the Commonwealth

relied on Dr. Fierro's testimony during closing, arguing among other things, that Stevens had

"slashed [Harding's] body to drain the blood to draw the crabs so they would do their work."

(July 12, 1986 Tr. Transcript 14.)

In her 2016 declaration, Fierro explains that she "performed a post-mortem examination

on the body and the remains of Mary K. Harding in connection with the investigation of her

murder in Lancaster, Virginia in 1985."  (ECF No. 1-2 at 27.)  Dr. Fierro was "qualified as an

expert witness and testified for the Commonwealth in both" of Stevens's trials.  (*Id.*)  After

reviewing the original case files and consulting with other medical experts, Dr. Fierro concluded

in 2016 "that the wounds on Ms. Harding's body were caused by a propeller rather than a knife,

and that these cuts were inflicted post-mortem."  (*Id.* at 28.)  Dr. Fierro explains that her

> revised opinion is based upon reconsideration of the size, location, length, depth,
> parallel nature, and periodicity of the wounds.  The cuts are more consistent with
> a post-mortem encounter with a propeller for several reasons.  First, the wounds
> are not in the usual location of cutting wounds caused by a knife as found in usual
> stabbing deaths.  Additionally, the cuts show periodicity, that is they occur at
> regular intervals, which would also be inconsistent with usual knife wounds.
> Also, most knife wounds are not as long as the cuts found on Ms. Harding's body.

Finally, Ms. Harding's body was discovered in shallow water in an area that was heavily trafficked by propeller boats.

(*Id.*)  Dr. Fierro states that she maintains a "policy that upon discovery of a mistake or error on [her] part – [she] should move as quickly as possible to correct [her] error and [her] opinion accordingly."  (*Id.* at 29.)  She avers that she "submit[ed] this affidavit in an attempt to do so in [Stevens's] case."  (*Id.*)

### H.    In October 2016, Stevens Receives from the Commonwealth a Box of Materials About His Case, Giving Rise to the Instant § 2254 Petition

On October 4, 2016, more than twenty-three years after Stevens's 1986 conviction and while he remained in state custody, Stevens filed a second petition in the state circuit court seeking habeas corpus relief.  (Mem. Supp. Mot. Dismiss, Ex. C, ECF No. 9-3.)  At that time, Stevens observed that:  1) Dunaway had been convicted of perjury for testifying falsely at Stevens's trial; 2) the State knew about Dunaway's false testimony; 3) the hair tying Stevens to Harding was called into doubt by the FBI's own evidentiary metrics; and, 4) the medical examiner changed her testimony, averring that the laceration wounds on Harding's body were not caused by Stevens's knife.[6]

Shortly after filing his 2016 state habeas petition, "Counsel [for Stevens] was informed that a box of materials generated and/or kept by the Commonwealth recently had been located and was available for review in the Lancaster courthouse."  (§ 2254 Pet. 4–5.)  The record suggests that Stevens received the box after a new Commonwealth's Attorney and Sherriff began working in Lancaster County.  (*See* Resp. 7 n.2.)

---

[6] In April 2013, Counsel for Stevens obtained some access to a "prosecutor's file." (Mem. Supp. Mot. Dismiss 11.)  As discussed in this Memorandum Opinion and accompanying Order, prior to the evidentiary hearing the Parties will need to provide precise information to the Court as to what Stevens had access to and when.

### 1.    <u>Materials Found in the Box</u>

Counsel for Stevens claims that he had been searching for these materials "for decades" and that the box "included numerous documents supportive of Mr. Stevens' actual innocence and inconsistent with the Commonwealth's case against [him]." (*Id.*)  Although Stevens does not list in his § 2254 Petition what, exactly, the box contained, (*see* § 2254 Pet. 5), the Court can discern from his arguments and the Appendix attached to his Petition some of the information that seems to have been included:

- An FBI report from the initial 1985 trial period, in which "investigators concluded that "[b]ecause of the tidal actions and currents of the Rappahannock River, it is currently estimated that the body of Mary Keyser Harding was dumped within 500 to 600 yards of where it was eventually located,"

- The FBI report's identification of Richard Dawson as a suspect;

- The FBI report's identification of Keith Wilmer as a suspect;

- Information about Earl Smith making a false statement to police during the course of the investigation;[7]

- Anne Dick's statement "that she saw Mr. Stevens' truck at the intersection of Route 622 and Route 354 at 4:55 a.m. on 8/23/25.  Riley reports that Dick observed the single occupant wearing a plaid shirt, but she did not observe the operator's face (though she could tell that the person was not Mr. Stevens based on his build);

- A July 3, 1986 letter from the prosecutor, C. Jeffers Schmidt, to Special Agent Riley, in which he discussed the anticipated trial testimony of certain witnesses;

- Alleged inconsistencies in Emerson Harding's statements to police, including the timing of Stevens's crude comment about the victim;

---

[7] For instance, Agent Riley's notes state that Earl Smith "knowingly lied in his first statement to police" during the investigation into Harding's murder, (ECF No. 1-2 at 76), but Stevens did not have access to those notes.  The Parties should clarify what, exactly, Smith lied about and what constituted Smith's "first statement." (*Id.*)

- Statements that witnesses saw "a dark green car parked hear the victim's house on 8/22/85 around 9-9:30 p.m.," a vehicle different from Stevens's "light pickup truck;"

- A May 2, 1986 letter from Dr. Boon, the Commonwealth's Expert regarding tidal flow, written to Commonwealth's Attorney Jeffers Schmidt, in which Boon explains that the testimony he provided at Stevens's first trial was not useful:

> I gave what simply amounted to background information on the Rappahannock River system since I myself have no knowledge of any specific event or direct observation relating to both the place and time in question. Was this testimony truly of use to you or the court?
>
> In a brief 'interview' before my last appearance at the Circuit Court, your associate, Lt. Riley, applied what may be the correct term to my testimony in this case. He called it 'eyewash.' I ventured that it was expensive eyewash in view of the distances I travelled and the time away from projects at the Institute.[8]

(ECF No. 1-2 at 51–59, 76–78.)  Stevens says that the July 3, 1986 letter from the Commonwealth's Attorney to Special Agent Riley about anticipated trial testimony had not been disclosed before 2016.  (Resp. 5, ECF No. 12.)

On October 21, 2016, the state habeas court granted Stevens's unopposed motion for leave to file an amended pleading, without prejudice to the Respondent's right to assert procedural defenses to the petition itself and to claims asserted in the petition.  (Mem. Supp. Mot. Dismiss 4–5.)  In addition to adding arguments based on the materials found in the October 2016 box, Stevens provided affidavits from three of the jurors at his trial, attesting that they relied on the hair evidence to convict Stevens.  (ECF No. 1-1 at 2–5.)

---

[8] Counsel for Stevens states that the former Legal Director of the Innocence Project Clinic, which currently represents him, recorded the contents of this letter in 2013.  (§ 2254 Pet. 13.)

2.    **In December 2016, Stevens Amends his State Habeas Petition after Receiving the October 2016 Box of Materials**

On December 19, 2016, Stevens filed an amended petition for a writ of habeas corpus in state court, asserting the following five claims for relief:

1) The Commonwealth knowingly used the false testimony of Clyde Dunaway; and counsel was ineffective for failing to raise this due process violation on direct appeal.
2) The Commonwealth knowingly used the false testimony of Dr. Boon.
3) The Commonwealth knowingly used the false testimony of Earl Smith; or, failed to satisfy its obligation under *Brady v. Maryland*[9] to disclose Smith's prior statements.
4) The Commonwealth violated *Brady* by failing to disclose exculpatory evidence.
5) Trial counsel was ineffective for failing to present the testimony of Ray Reynolds.

(Mem. Supp. Mot. Dismiss, Ex. C, ECF No. 9-3.)  Respondent moved to dismiss his habeas petition.

3.    **The State Habeas Court Dismisses Stevens's Habeas Petition**

In 2017, while Stevens sought postconviction relief, Virginia released him on parole.  *In re Stevens*, 956 F.3d at 231.  On December 1, 2017, the state habeas court held a hearing on the petition and granted Respondent's motion to dismiss.  (ECF No. 1-3 at 20–60.)  The state habeas court recognized the "unusual circumstances" present in Stevens's case, including that the primary evidence relied upon to obtain Stevens's conviction had since been called into doubt:

This case presents a number of, what the Court can only describe as, unusual circumstances.  The medical examiner has changed her conclusions regrading the

---

[9] In *Brady v. Maryland*, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  373 U.S. 83, 87 (1963).  The Supreme Court subsequently extended the *Brady* disclosure rule to material impeachment evidence, *Giglio v. United States*, 405 U.S. 150, 154–55 (1972), and jettisoned any requirement that a defendant must request exculpatory evidence in order to be entitled to its disclosure, *United States v. Agurs*, 427 U.S. 97, 107 (1976).

cut marks found on the body.  Initially concluding that they were the result of a
knife, which was a very large focus, if you read the transcript, a very large focus
of testimony of a number of the witnesses of the Commonwealth.  The issue about
the knife and its disposition can only be read as being adverse because of the
statements Mr. Stevens made and representations about the disposition of the
knife.  The medical examiner has now concluded, upon review, that the slashes
are consistent with a motor boat propeller.

Additionally, there is an entire body of scientific evidence that has developed,
calling into question the reliability of hair evidence which was presented central
to the case made by the Commonwealth.

> . . .

There are issues that were raised, and I would just say to counsel, I know that is
significant to counsel for the petitioner, that this FBI report was found, and some
other documents, in a box that was in the Sheriff's Office.  There's a suggestion
that there was some kind of improper conduct that requires some further scrutiny.
. . . I am not sure that the location of the box by Deputy Hogge of the Sheriff's
Office is anything other than a function of [subsequent] changes and not some
negative attempt or intent to conceal, hide information. . . . These raise serious
concerns.

(ECF No. 1-3 at 36–37.)  Nevertheless, the state habeas court granted Respondent's motion and

dismissed Stevens's habeas petition because "the relief through *habeas corpus*, taking into

account the procedural bars under the statute, the standards by which the Court must review it

are limited."  (ECF No. 1-3 at 58.)

Regarding Stevens's claim that the Commonwealth knowingly used Dunaway's perjured

testimony and that Stevens received ineffective assistance of counsel, the state habeas court

dismissed those two claims as untimely because Dunaway's perjured testimony was an issue

previously available to Stevens, which he raised in his first habeas petition, as was his ineffective

assistance of counsel claim.  (ECF No. 1-3 at 37–38, 57.)

Regarding whether the Commonwealth knowingly presented false testimony from Dr.

Boon—an issue raised in the instant § 2254 Petition—the state habeas court concluded that the

18

claim lacked merit and did not have "evidence of a *Napue* violation."[10]  (ECF No. 1-3 at 44.)  The state habeas court found that the Commonwealth did not knowingly present false testimony from Dr. Boon; rather, it merely had "a conclusion that the hypothetical presented [Harding's weighted body traveling up river ten to twenty miles in four days,] was possible based upon an understanding of tidal currents in the Rappahannock River system."  (*Id.* at 44.)  The state habeas court commented that "[a]s is true with much of expert testimony, it may have been subject to significant challenge."  (*Id.*)  The state habeas court commented, however, that it "has struggled with the issues associated with this claim, perhaps more than any other," because of the information contained in the FBI report, which stated Harding's body would not have traveled more than 600 yards after being disposed of in the Rappahannock River.  (ECF No. 1-3 at 40–41.)

Regarding whether the Commonwealth knowingly presented false testimony from Earl Smith—an issue in the instant § 2254 Petition—the state habeas court concluded that Stevens did not demonstrate "that the testimony was false or that the Commonwealth knew it was false" because "[t]he confusion about [whether Stevens's was late on the morning in question] . . . was corrected upon cross-examination."  (ECF No. 1-3 at 47.)  The state habeas court acknowledged that Detective Riley's interview notes from September 5, 1985 stated "Smith:  Stevens picked him up the next morning, Friday, August 23rd, 1985, to go crabbing at the usual time, 5:30 to 6:00 a. m."  (*Id.* at 46.)  The state habeas court further determined that the failure to disclose these interview notes to Stevens did not constitute a *Brady* violation because Stevens could have corrected Smith's testimony during cross-examination.  (*Id.* at 46–48.)

---

[10] *Napue v. Illinois*, 360 U.S. 264 (1959), holds that a State denies a defendant due process by knowingly offering or failing to correct false testimony.

Regarding whether the Commonwealth violated *Brady* for failing to disclose exculpatory evidence—an issue in the instant § 2254 Petition that also overlaps with the claim regarding Smith's testimony—the state habeas court concluded that Stevens did not establish such a violation.  (ECF No. 1-3 at 48–57.)  The state habeas court questioned the Commonwealth's decision to withhold information, stating that "[m]any of the questions in this case, in fact, most of what has been raised in the petition for habeas corpus would not have arisen had there been a full and complete disclosure of information."  (ECF No. 1–3 at 55.)  Regarding the disclosure of the FBI report, the state habeas court stated "[t]he contents of all of the requests in this portion of Claim IV rest upon the release of the FBI report [that the trial court] had previously deemed at the time of trial not to contain exculpatory evidence and not released by [that court] at the time of trial."  (*Id*. at 51.)  The state habeas court did not evaluate whether the trial court's 1986 ruling that the FBI report lacked *Brady* material had any continuous binding effect as Stevens sought postconviction relief.

After reviewing Stevens's claim regarding the alleged *Brady* violations, the state habeas court summarized:

> This is cumulative of the FBI report and a number of the other documents which have been submitted by both sides in this proceeding and issues of disclosure or nondisclosure.
>
> It is this Court's position in reviewing discovery, personal involvement in doing this, that the government should release as much information as it possibly can in every case which doesn't place in danger a witness or another defendant.  I strongly believe that the government should adhere to the highest standards of disclosure to insure that the system of justice works properly and to avoid trial by surprise.  Many prosecutors disagree with this idea.  Fortunately, today, the prosecutors with whom I work regularly exceed the expected standards.  Many of the questions in this case, in fact, most of what has been raised in the petition for habeas corpus would not have arisen had there been a full and complete disclosure of information.

      Having said that, applying the standard as the Court understands it, the various subparts of Claim IV raise questions as to whether the availability of all of the information of the investigations and identified suspects would have provided adequate impeachment information and exculpatory evidence to produce a different result. It is suggested by the petitioner that had he had the information about other potential suspects, they would have produced evidence about each of those suspects to raise potential reasonable doubt as to the defendant's guilt. The Court concludes, however, it would not have resulted in a different conclusion because the identification of the suspects would also come with credible evidence which creates an alibi for each of them.

(*Id.* at 54–55.)

On February 7, 2018, the state habeas court entered an order incorporating its holdings from the December 1, 2017 hearing, and dismissed Stevens's state habeas petition. (ECF No. 1-3 at 61.) On September 18, 2018, the Supreme Court of Virginia refused Stevens's appeal of the circuit court's order and denied his petition for rehearing on November 20, 2018.

On August 2, 2019, the United States Court of Appeals for the Fourth Circuit received Stevens's application under 28 U.S.C. § 2444(b), seeking leave to file a successive petition. *In re Stevens*, 956 F.3d 229 (4th Cir. 2020). According to Stevens, new evidence that the Commonwealth of Virginia disclosed to him in 2016 proves his innocence. Finding that Stevens satisfied the requirements of § 2244(b)(2)(B), the Fourth Circuit granted him permission to file a second § 2254 Petition in this Court. *In re Stevens*, 956 F.3d at 234. Stevens filed his second § 2254 Petition in this Court.

### III.  SUMMARY OF CLAIMS

In the § 2254 Petition at bar, Stevens brings three claims based on newly discovered evidence:

| | |
|---|---|
| Claim One | The [prosecution] knowingly presented false testimony from Dr. John Boon about how the victim's body may have moved in the Rappahannock River, and the state suppressed evidence showing the testimony was false. |
| Claim Two | The [prosecution] knowingly presented false testimony from Earl Smith that Stevens was late picking him up to pull crab pots the morning after the murder, and the state suppressed evidence showing the testimony was false. |
| Claim Three | The [prosecution] withheld evidence that supports Stevens's innocence.[11] |

(§ 2254 Pet. i, ii, 39, 46, 50.)  Based on the foregoing claims, Stevens argues that but for these constitutional errors, viewed in light of the evidence as a whole, no reasonable juror would have found him guilty.  (*Id*. 64.)  Stevens asks this Court to consider the merits of the claims alleged and vacate his convictions.  In the alternative, Stevens argues that his claims are based on newly discovered evidence, which he properly pled in state court.  (*Id*.)  Stevens contends that he did not fail to develop the record below and is entitled to a hearing pursuant to § 2254(e)(2).[12]  (*Id*. 65.)

---

[11] In his response, Stevens withdraws two subparts of this claim.  He withdraws his claim that the Commonwealth improperly withheld evidence concerning a dark green car because he did not present it to the state habeas court.  He also withdraws his assertion that the Commonwealth withheld information about testimony from Ann Dick because he had raised those issues on direct appeal and in prior habeas actions.  (Resp. 5, ECF No. 12.)

[12] Section 2254(e) provides:

If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that--

Respondent filed a Motion to Dismiss, asserting that this Court should dismiss Stevens's habeas petition because he does not satisfy the two prongs of § 2244(b)(2)(B): (1) Stevens does not satisfy the due diligence requirements for bringing a second habeas petition; and, (2) the facts underlying Stevens's claim, if proven and viewed in light of the evidence as a whole, do not establish that no reasonable fact finder would have found him guilty. (Mem. Supp. Mot. Dismiss 9.) Respondent further contends that all of Stevens's claims are time barred, and that this Court should not apply *Schlup v. Delo*, 513 U.S. 298 (1995), to excuse any of his procedurally defaulted claims. (*Id.* 24.) Additionally, Respondent argues that the Commonwealth did not knowingly present false testimony at trial and did not fail to disclose exculpatory, material information in violation of *Brady v. Maryland*. (*Id.* 41, 46, 49.) For these reasons, Respondent asks this Court to grant the Motion to Dismiss. Stevens responded in opposition to the Motion, and Respondent replied. The Court turns now to the applicable standards of review and an evaluation of Stevens's claims.

## IV.  ANALYSIS

The Court will deny the Motion to Dismiss and schedule this matter for an evidentiary hearing. The Court first determines that it may hear the § 2254 Petition because Stevens was on parole when he filed his petition. Next, the Court finds that, at this procedural posture, Stevens

---

(A) the claim relies on--
(i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
(ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254.

sufficiently states that he acted with the requisite diligence and that no reasonable factfinder would find him guilty but for the constitutional errors alleged.  Without an evidentiary hearing, the Court will not decide whether the Commonwealth has met its burden to establish procedural default as to any of Stevens's claims.

A.    **The Court May Hear the § 2254 Petition Because Stevens Was on Parole**

The Court first determines that it may consider Stevens's § 2254 Petition because he was on parole when the petition was filed.  *See In re Stevens*, 956 F.3d at 232 n.1 (leaving open the question of whether this Court has jurisdiction to hear Stevens's § 2254 Petition).

"An applicant need only be in custody when the application for habeas corpus is filed." *United States v. Swaby*, 855 F.3d 233, 238–39 (4th Cir. 2017) (internal quotation marks and citation omitted).  The United States Court of Appeals for the Fourth Circuit has concluded in the § 2254 context that a petitioner's release from prison on parole does not necessarily moot his habeas petition challenging a parole board's earlier finding of parole ineligibility because the petitioner continued to suffer "collateral consequences with respect to the duration of his parole and probation." *Townes v. Jarvis*, 577 F.3d 543, 546–47 (4th Cir. 2009).  In the context of an analogous § 2255 motion, a prisoner on supervised release is considered "in custody" for the purposes of reviewing postconviction relief.  *Swaby*, 855 F.3d at 239 (citation omitted).

Here, the collateral consequences Stevens continues to suffer because of his state convictions and his parole term at the time of filing ensure that his case is not moot.  *See Carafas v. LaVallee*, 391 U.S. 234, 237–38 (1968); *see also Wilson v. Flaherty*, 689 F.3d 332, 336 (4th Cir. 2012) (recognizing that being "in custody" for habeas jurisdiction does not refer just to physical confinement but also to parole served as part of a sentence involving physical

confinement).  Moreover, the record does not show that the Commonwealth had "unconditionally released" Stevens when it granted him parole in 2017.  *Carafas*, 391 U.S. at 238 n.12 (observing that "[i]f there has been, or will be, an unconditional release from custody before inquiry can be made into the legality of detention, it has been held that there is no habeas corpus jurisdiction.").  As a result, the Court may consider Stevens's § 2254 Petition.  The Court turns next to the threshold AEDPA requirements under § 2244(b)(2)(B).

### B.     <u>AEDPA Threshold Requirements</u>

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) restricts the jurisdiction of the district courts to hear second or successive applications for federal habeas corpus relief by prisoners attacking the validity of their convictions and sentences by establishing a "gatekeeping mechanism."  *Felker v. Turpin*, 518 U.S. 651, 657 (1996) (internal quotation marks omitted).  "Before a second or successive application permitted by this section is filed in the district court, the applicant shall move in the appropriate court of appeals for an order authorizing the district court to consider the application."  28 U.S.C. § 2244(b)(3)(A).

As happened here, the court of appeals examines the application to determine whether it contains any claim that satisfies § 2244(b)(2) (for state prisoners) or § 2255 (for federal prisoners).  "If so, the appellate court authorizes the prisoner to file the entire application in the district court, even if some of the claims in the application do not satisfy the applicable standards."  *United States v. Winestock*, 340 F.3d 200, 205 (4th Cir. 2003), *abrogated in part on other grounds by United States v. McRae*, 793 F.3d 392 (4th Cir. 2015).

The Fourth Circuit's determination that Stevens satisfies § 2244(b)(2)(B) "is 'tentative in the following sense:  the district court must dismiss the [petition] that [the Fourth Circuit has]

25

allowed the applicant to file, without reaching the merits of the [petition], if the court finds that the [petitioner] has not satisfied the requirements for the filing of such a [petition].'" *McLeod v. Peguese*, 337 F. App'x 316, 324 (4th Cir. 2009) (quoting *Bennett v. United States*, 119 F.3d 468, 470 (7th Cir. 1997)). Thus, this Court must act as a second gate and examine Stevens's claims and dismiss them if they do not satisfy § 2244(b)(2)(B). *See United States v. MacDonald*, 641 F.3d 596, 604 (4th Cir. 2011).

Because Stevens brings claims pursuant to § 2244(b)(2)(B), he must demonstrate that: "the factual predicate for the claim could not have been discovered previously through the exercise of due diligence;" and "the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense." 28 U.S.C. § 2244(b)(2)(B)(i), (ii). Even though the Fourth Circuit granted Stevens's motion for authorization to file a second or successive petition, "[c]learing this threshold is only [his] first step." *In re Stevens*, 956 F.3d at 233 n.2. Before a court can review the merits of a successive application, "it must determine that the applicant actually 'satisfies the requirements of' § 2244(b)." *Id.* (quoting 28 U.S.C. § 2244(b)(4)).

This Court reviews Stevens's claims in three parts, as required under § 2244(b)(2)(B). First, the Court examines whether, at this stage, Stevens has shown that he acted with the requisite due diligence when seeking habeas relief. Second, the Court evaluates whether Stevens alleges constitutional error. And third, the Court considers whether Stevens demonstrates that but for constitutional error, no reasonable factfinder would have found him guilty of the underlying offense.

### 1. **Stevens's Actions Show Due Diligence As Required in § 2244(b)(2)(B)(i)**

At this procedural posture, the Court finds Stevens exercised due diligence in filing his habeas petition. Because the Commonwealth did not provide relevant information to Stevens about his case that it had in its possession until October 2016, and the withheld items could not have been previously acquired, even with his due diligence, the Court finds that he satisfies the first requirement of § 2244(b)(2)(B)(i). Also, Stevens did not obtain the medical examiner's declaration recanting her trial testimony until May 2016—five months before he filed his state habeas petition. And in 2015, the year before Stevens filed his state habeas petition, the Justice Department and FBI formally recognized that experts gave flawed testimony in almost all trials in which they offered hair comparison evidence against criminal defendants, including at the time of Stevens's 1986 trial.

### a. **Claim 1 – Due Diligence – Dr. Boon**

In his first claim, Stevens contends that the Commonwealth knowingly presented false testimony from Dr. Boon regarding whether Harding's body could travel miles in the Rappahannock River after being discarded, and suppressed evidence showing that such testimony was false. Stevens points to two items supporting this claim: (1) a May 2, 1986 letter from Dr. Boon, the Commonwealth's Expert regarding tidal flow, written to Commonwealth's Attorney Jeffers Schmidt; and, (2) the FBI report stating that investigators concluded that "[b]ecause of the tidal actions and currents of the Rappahannock River, it is currently estimated that the body of Mary Keyser Harding was dumped within 500 to 600 yards of where it was eventually located." (ECF No. 1-2 at 57.)

Respondent argues, however, that Stevens does not demonstrate the requisite diligence for this claim because in 2013 Counsel for Stevens received some information regarding the Dr. Boon letter and because the existence of the FBI report was known to Stevens during his trial. (Mem. Supp. Mot. Dismiss 10.)

On this record, the Court finds that Stevens has made the requisite showing for due diligence. Stevens did not have access to the FBI report until 2016. Indeed, Stevens requested a copy of the report during his trial, but, with the trial court's approval, the Commonwealth did not disclose it.[13] While Stevens knew the FBI report existed, the Commonwealth did not provide it to him, meaning he could not access it despite making such requests. Moreover, the FBI report was in the Commonwealth's possession, so it was incumbent on the State to set the record straight. *Banks v. Dretke*, 540 U.S. 668, 675–76 (2004) ("When police or prosecutors conceal significant exculpatory or impeaching material in the State's possession, it is ordinarily incumbent on the State to set the record straight.").

Once Stevens obtained the FBI report in 2016, he promptly filed a motion to amend his state habeas petition based on the exculpatory statements found in the report. Although Respondent argues that "Stevens's knowledge of the contents of the report is not the proper inquiry," (Mem. Supp. Mot. Dismiss 10), this does not diminish the fact that Stevens did not have access to the report until thirty years after his trial and that it contains exculpatory information.

Similarly, the 1986 letter from Dr. Boon to the Commonwealth's Attorney *coupled with* the information in the FBI report about the Rappahannock River provides the foundation for

---

[13] Stevens could have believed that the FBI report did not contain exculpatory information because the state trial court had reviewed it *in camera* and did not order its disclosure.

Claim 1.  The letter and the FBI report, when read together, plainly suggest that Harding's weighted body was deposited within 500 to 600 yards of where it was eventually located, meaning that it could not have moved *miles up the river* in four days from where Stevens supposedly abandoned her.  Although Counsel for Stevens may have had access in 2013 to the letter concerning Dr. Boon's testimony, the box of materials disclosed to Stevens in October 2016 underlies this habeas petition.  At this juncture, the Court finds Stevens acted with due diligence as to his first claim.

### b.  Claim 2 – Due Diligence – Earl Smith

In his second claim, Stevens asserts that the Commonwealth knowingly presented false testimony from Earl Smith.  Stevens points to the FBI report and information received in 2016 to support this claim.  Specifically, the FBI report, included in the October 2016 box, contains the investigation notes of the lead detective, Agent Riley, from his interview of Smith in September 1985.  (ECF No. 1-2 at 78.)  Agent Riley's notes stated that Smith "rode around drinking beer with [Stevens] and Ernest Talley on the afternoon of Thursday, 8/22/85, in Stevens' white pickup truck. . . . Stevens picked him up the next morning (Friday, 8/23/85) to go crabbing at the usual time of 5:30 – 6:00 a.m."  (*Id.*)  These notes demonstrate that Stevens picked Smith up at the regular time the morning after Harding's disappeared, and nothing unusual occurred for Smith or Stevens on the day in question.

Despite Agent Riley's notes, the Commonwealth relied on Smith's testimony at trial to link Stevens to Harding's disappearance, stating that

> Smith also described to us the morning of Friday, August 23.  The day after Mary disappeared.  He said something was odd about that morning.  Emerson Stevens came to get me late that day.  He normally came at 6:00.  He came at 7:00 that

day.  I sat there and waited. . .  This is the day, ladies and gentleman, the defendant says he went out at 6:00 [] and did nothing unusual.

(July 12, 1986 Tr. Transcript 77–78.)  Prior to 2016, Stevens did not know that Smith had "knowingly lied in his first statement to police" during the investigation into Harding's murder, (ECF No. 1-2 at 76), nor did Stevens have access to Agent Riley's notes regarding Smith's erroneous testimony on which the Commonwealth relied.

Respondent argues, however, that Stevens has had this information available to him since 2013.  (Mem. Supp. Mot. Dismiss 11.)  The Court has no way to verify on this record whether the information in the October 2016 box was the same as that available to Counsel for Stevens in 2013 when reviewing a "prosecutor's file."  At this juncture, the Court finds Stevens acted with due diligence as to his second claim.

### c.  Claim 3 – Due Diligence – *Brady* Violation

Stevens's third claim rests on *Brady v. Maryland*, asserting that the Commonwealth committed numerous *Brady* violations by withholding exculpatory evidence.  Based on the FBI report and other documents contained in the October 2016 box, Stevens argues there are at least five sets of facts that are exculpatory because they identify other viable suspects, provided impeachment evidence, or would have provided alternative theories that undermine the Commonwealth's case against him that would have provided impeachment evidence.  (§ 2254 Pet. 51–55.)

When raising *Brady* claim in the postconviction context, "a defendant cannot conduct the reasonable and diligent investigation . . . to preclude a finding of procedural default when the evidence is in the hands of the State."  *Strickler v. Greene*, 527 U.S. 263, 287–88 (1999) (internal quotation marks omitted).  In the context of the materially indistinguishable diligence provision

of § 2254(e)(2)(A)(ii), "[d]iligence . . . depends upon whether the prisoner made a reasonable

attempt, in light of the information available at the time, to investigate and pursue claims in state

court."[14]  *Williams v. Taylor*, 529 U.S. 420, 435 (2000); *see id.* at 432, (in discussing due

diligence requirement, explaining, "a person is not at fault when his diligent efforts to perform an

act are thwarted, for example, by the conduct of another[;] [f]ault lies, in those circumstances, . .

. with the person who interfered with the accomplishment of the act").  "When police or

prosecutors conceal significant exculpatory or impeaching material in the State's possession, it is

ordinarily incumbent on the State to set the record straight."  *Banks v. Dretke*, 540 U.S. 668,

675–76 (2004).

Here, nothing in the record reveals that Stevens should have known about the undisclosed

box of materials relevant to his case, nor was it made accessible to his Counsel until 2016.  At

most, Stevens knew only that the FBI report existed, but not that it contained exculpatory

information regarding other suspects, information about Harding's weighted body in the

Rappahannock River, and Smith's false statements.  And although he requested a copy of the

FBI report in 1986, he did not receive it for thirty years.  It does not appear to this Court that

Stevens had other ways of obtaining the files.[15]  Only after personnel changes occurred at the

---

[14] As the Fourth Circuit has explained, "due diligence inquiries under § 2254(e)(2)(A)(ii) and § 2244(b)(2)(B)(i) involve two different points of reference.  Namely, § 2254(e)(2)(A)(ii) is tethered to the petitioner's prior state court proceedings, whereas § 2244(b)(2)(B)(i) is tethered to the petitioner's prior federal habeas proceedings."  *Long v. Hooks*, 972 F.3d 442, 469 n.14 (4th Cir. 2020).  But, as in *Long*, that distinction makes no difference here because the record suggests that the Commonwealth continued to withhold evidence after both proceedings had concluded.

[15] Relevant to this due diligence prong, courts have found that a *Brady* violation does not occur when a defendant had other ways to obtain the relevant information.  *See United States v. Clark*, 928 F.2d 733, 738 (6th Cir. 1991) ("No *Brady* violation exists where a defendant 'knew or should have known the essential facts permitting him to take advantage of any exculpatory

Lancaster County Sheriff's Office and Commonwealth Attorney's Office, and Stevens retained habeas counsel, did the October 2016 box of materials with the FBI report included reveal itself.

Respondent argues, however, that because Stevens knew about the existence of the FBI report, "any claims based on the FBI report have been available to Stevens since his direct appeal in 1989." (Mem. Supp. Mot. Dismiss 11.) Respondent contends that Stevens does not demonstrate the requisite diligence because the trial court conducted an *in camera* review of the FBI file and did not order the Commonwealth to disclose it, and Stevens received some information in 2013 regarding Dr. Boon. (*Id.* 10.)

At this procedural posture, the Court cannot discern how Stevens could have otherwise obtained a copy of the FBI report except from having the Commonwealth give it to him. Indeed, Stevens sought it at trial and was denied. The State retained it in its possession and never provided it to him. The Commonwealth cannot use the trial court's 1986 *in camera* ruling as a perpetual shield. On this record, the Court finds that Stevens acted with the requisite due diligence as to Claim 3.

---

information,' . . . or where the evidence is available to defendant from another source."); *United States v. Dimas*, 3 F.3d 1015, 1019 (7th Cir. 1993) (when "the defendants might have obtained the evidence themselves with reasonable diligence . . . , then the evidence was not 'suppressed' under *Brady* and they would have no claim"); *United States v. Roy*, 781 F.3d 416, 421 (8th Cir. 2015) ("The government does not suppress evidence in violation of *Brady* by failing to disclose evidence to which the defendant had access through other channels."); *Cunningham v. Wong*, 704 F.3d 1143, 1154 (9th Cir. 2013) (finding no suppression when defense counsel knew witness had been shot and was treated by medical personnel following the shooting, so the medical records were "easily attainable").

## 2.  The Constitutional Error Requirement in § 2244(b)(2)(B)(ii)

At this procedural posture, the Court finds Stevens has adequately alleged constitutional error for the three claims raised in his habeas petition.

### a.  The Rules Announced in *Napue* and *Brady*

Stevens contends that a constitutional error underlies each of his claims, relying on the rules that the United States Supreme Court set forth in *Napue* and *Brady*.

In *Napue*, the Supreme Court reiterated the principle "that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment."  360 U.S. 264, 269 (1959).  The *Napue* Court recognized that "[t]he same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears."  *Id.*; *see also United States v. Basham*, 789 F.3d 358, 376 (4th Cir. 2015) ("[T]he Due Process Clause obliges the government not [to] use false evidence, including false testimony." (internal quotation marks omitted)).  "Indeed, if it is established that the government knowingly permitted the introduction of false testimony reversal is 'virtually automatic.'"  *United States v. Wallach*, 935 F.2d 445, 456 (2d Cir. 1991) (quoting *United States v. Stofsky*, 527 F.2d 237, 243 (2d Cir. 1975)).  And the Fourth Circuit has held that "[e]vidence may be false either because it is perjured, or, though not itself factually inaccurate, because it creates a false impression of facts which are known not to be true."[16]  *Hamric v. Bailey*, 386 F.2d 390, 394 (4th Cir. 1967).

---

[16] Relevant here, the United States Court of Appeals for the Ninth Circuit has observed that "[e]very *Napue* claim has an implicit accompanying *Brady* claim:  Whenever the prosecution knowingly uses false testimony, it has a *Brady* obligation to disclose that witness's perjury to the defense."  *Jackson v. Brown*, 513 F.3d 1057, 1076 n.12 (9th Cir. 2008).

33

In *Brady,* the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused" violates due process where the evidence is "material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  373 U.S. at 87. Evidence is material if it would reasonably "put the whole case in such a different light as to undermine confidence in the verdict," and materiality must be assessed collectively.  *Id.* at 435–36.

In the *Brady* context, a defendant's failure to request favorable evidence does not leave the government free of all obligation.  *See United States v. Agurs*, 427 U.S. 97 (1976).  In *United States v. Bagley*, an opinion issued shortly before Stevens went to trial in 1986, the Supreme Court explained that regardless of whether a defendant has made a request, favorable evidence is material, and constitutional error results from its suppression by the government, "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." 473 U.S. 667, 682 (1985) (opinion of Blackmun, J.); *id.* at 685, (White, J., concurring in part and concurring in judgment).  Moreover, the prosecutor's duty encompasses both impeachment material and exculpatory evidence, and it includes material that is "known only to police investigators and not to the prosecutor."  *Kyles v. Whitley*, 514 U.S. 419, 438 (1995).

Along these lines, "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf."  *Monroe v. Angelone*, 323 F.3d 286, 299 (4th Cir. 2003)  "Significantly, a *Brady* violation has three essential elements: (1) the evidence must be favorable to the accused; (2) it must have been suppressed by the

government, either willfully or inadvertently; and (3) the suppression must have been material, *i.e.*, it must have prejudiced the defense at trial." *Id.* at 299–300 (citation omitted).

### b. __Claim 1 – Constitutional Error – Dr. Boon__

In his first claim, Stevens contends that the Commonwealth knowingly presented false testimony from Dr. Boon and suppressed evidence, a May 2, 1986 letter from Dr. Boon and the FBI report, showing that such testimony was false. Stevens asserts that the Commonwealth used Dr. Boon's testimony to create the false impression that Harding's weighted body could have traveled ten miles upstream on the four days in question. Based on this information, Stevens contends the Commonwealth violated his due process rights under *Napue* by knowingly introducing Dr. Boon's false testimony at his second trial. (§ 2254 Pet. 39.) In the alternative, Stevens argues that the Commonwealth violated *Brady* when it did not disclose information regarding the Rappahannock River and the testimony on which it relied at trial. (§ 2254 Pet. 45.)

Because the FBI report had been turned over in full to the Virginia State Police, the Commonwealth was responsible for being aware of its contents. And a significant disparity exists between the Commonwealth's testimony at trial, arguing that Harding's weighted body could have traveled ten miles upstream, and the contents in the FBI report, which states that it could not.

Respondent argues, however, that the Commonwealth did not violate *Napue* or *Brady* because Dr. Boon's testimony stated only that it was a possibility that a human body anchored by a chain and cinder block could move ten miles upstream in four days. (Mem. Supp. Mot. Dismiss 42.) Respondent asserts that, in contrast to Dr. Boon's testimony, "[t]he FBI summary . . . stated only that 'it is currently estimated' that Harding's body had been "dumped within 500

35

to 600 yards of where it was eventually located."  Because the FBI report is not dated, Respondent claims "no conclusion could be drawn regarding when that estimate was 'current.'" (*Id.* 43.)  Respondent contends that Stevens's argument fails because "[m]ere inconsistencies in testimony by government witnesses do not establish the government's knowing use of false testimony." (*Id.*) (internal quotation marks and citation omitted).

Simply put, whether Harding's weighted body could travel ten miles upstream in four days is not a mere inconsistency on this record.  The Commonwealth had in its possession information that impeached Dr. Boon's testimony, including a letter from Dr. Boon himself questioning why his testimony was useful, and a detailed FBI report concerning the investigation of Harding's death and its estimation that her weighted body could not move ten miles *upstream*. Whether the FBI report was dated is of no moment.  The Commonwealth was responsible for knowing the contents of the FBI report and certainly had knowledge of Dr. Boon's 1986 letter. At this procedural posture, Stevens demonstrates that a *Napue* error exists based on the Commonwealth's decision to allow such information to go uncorrected in the face of the FBI report and Dr. Boon's letter.

### c. **Claim 2 – Constitutional Error – Earl Smith**

In his second claim, Stevens asserts that the Commonwealth knowingly presented false testimony from Earl Smith.  Stevens again rests this claim on the constitutional errors described in *Napue* and *Brady*.

The record shows that Smith was working with Stevens the week Harding disappeared. Smith testified that Stevens always picked him up for work around 6:00 a.m, but that on the morning after Harding went missing, Stevens was an hour late.  The Commonwealth theorized

that Stevens was late because he was disposing of Harding's body in the Rappahannock River. On cross examination, Smith admitted that he could be mistaken about which day Stevens was late.  In fact, Stevens presented evidence that he had been late a different morning that week because he had a doctor's appointment.  Although Smith's testimony was impeached, the Commonwealth relied heavily on his incorrect direct testimony during its closing argument, suggesting that Stevens was late because he was disposing of Harding's body.

Based on evidence found in the October 2016 box, Stevens claims the Commonwealth knew Smith's initial testimony about Stevens arriving late was false, failed to correct it, and used it to "create[ ] a false impression of facts which are known not to be true."  *See Hamric*, 386 F.2d at 394.  Specifically, the FBI report, included in the October 2016 box, held the investigation notes of the lead detective, Virginia State Police Special Agent David Riley, when he interviewed Smith in September 1985.  Detective Riley reported then that Smith stated Stevens "picked him up the next morning (Friday, 8/23/85) to go crabbing at the usual time of 5:30 – 6:00 a.m."  The materials also referenced Smith's false statements made to the police, calling into question his truthfulness as a witness.

Respondent argues, however, that "Stevens has . . . failed to establish that any nondisclosure of the statements [regarding Smith] was material, in violation of *Brady*."  (Mem. Supp. Mot. Dismiss 47.)  Respondent further contends that "Stevens did not demonstrate that the testimony was false or that the prosecutor knew of the alleged falsity."  (*Id*.)

Because it is a constitutional violation to allow false testimony to go uncorrected, *Napue*, 360 U.S. at 269, and to knowingly use the testimony to create a false impression of a material fact, *Hamric*, 386 F.2d at 394, Stevens's second claim also demonstrates constitutional error

Alternatively, Stevens has demonstrated that withholding such material information may have violated *Brady*.  Smith's testimony was necessary for the Commonwealth's timeline and theory of the case, which included the claim that Stevens was disposing of Harding's body in the early morning hours of Friday, August 23.  It was also the only corroboration for Esther Stevens's testimony regarding having seen Stevens's truck at 6:40 a.m. on Friday.  Without this testimony, the Commonwealth would have struggled to set forth a theory of how Stevens could have committed this crime.

### d.  Claim 3 – Constitutional Error – *Brady* Violation

In his third claim, Stevens asserts that the Commonwealth violated *Brady* when it withheld information about his case.  Based on the FBI report and other documents contained in the October 2016 box, Stevens claims there are at least five exculpatory facts that identify other viable suspects, provided impeachment material, or provided alternative theories that undermine the Commonwealth's theory.

The five subparts of this claim are:

1) An unattributed statement in the FBI report that "The chain found on the body of [the victim] is similar to the chain used for paton-tonging.  Richard Dawson and Julius Ashburn are currently rigging a boat for paton-tonging;"

2) The FBI report's identification of Richard Dawson as a suspect;

3) The FBI report's identification of Keith Wilmer as a suspect;

4) A letter from the prosecutor, C. Jeffers Schmidt, to Special Agent Riley, in which he discussed the anticipated trial testimony of certain witnesses; and,

5) Alleged inconsistencies in Emerson Harding's statements to police, including the timing of Stevens's "crude comment" about the victim.

38

(§ 2254 Pet. 51–56.)  The exculpatory facts Stevens identifies are favorable to him and could be used collectively to undermine confidence in the verdict.

Respondent argues, however, that the FBI report was not suppressed because the state trial court had reviewed it *in camera* and determined that it need not be disclosed.  (Mem. Supp. Mot. Dismiss 50.)  In support of this argument, Respondent cites an unpublished opinion from the United States Court of Appeals for the Ninth Circuit finding that  "[w]ith respect to [the agent's] rough notes, the record demonstrates that the government disclosed the evidence to the court for an *in camera* review at Ramussen's request.  The government therefore did not violate *Brady* because the notes were not suppressed."  *United States v. Rasmussen*, 43 F. App'x 48, 50 (9th Cir. 2002).   Respondent also points to Defense counsel's acquiescence to the Circuit Court's ruling at sentencing, noting that "the Court decided that in its opinion there was no exculpatory evidence in that summary, and I certainly accept that."  (Mem. Supp. Mot. Dismiss 50.)

The Court recognizes that this is an unusual issue given the state trial court's *in camera* review of the FBI report in 1986.  Nevertheless, the Court considers that the FBI report, along with other materials in the October 2016 box, include exculpatory information sufficient to require an evidentiary hearing.

### 3.  The Requirement to Assess Whether Any Reasonable Factfinder Would Have Found Petitioner Guilty as Set Forth in § 2244(b)(2)(B)(ii)

Under the AEDPA, Stevens's second § 2254 petition can survive only if he demonstrates "the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense."

§ 2244(b)(2)(B)(ii).  This is also referred to as the "actual innocence" standard and can serve as a "gateway" through which otherwise procedurally defaulted or out-of-time claims can be addressed.[17]  *Long*, 972 F.3d at 470.

In viewing the "evidence as a whole," a court makes its § 2244(b)(2)(B)(ii) decision "unbounded 'by the rules of admissibility that would govern at trial' -- based on 'all the evidence, including that alleged to have been illegally admitted [and that] tenably claimed to have been wrongly excluded or to have become available only after the trial.'"  *United States v. MacDonald*, 641 F.3d 596, 612 (4th Cir. 2011) (quoting *Schlup*, 513 U.S. at 327–28).  "Or, to say it another way, the 'court must consider all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under [evidentiary rules].'"  *Id.* (quoting *House v. Bell,* 547 U.S. 518, 538 (2006)).  The question, then, is whether the newly discovered evidence, and all the evidence old and new, clearly and convincingly demonstrates that "but for constitutional error, no reasonable factfinder" would have found Stevens guilty of these crimes.  § 2244(b)(2)(B)(ii).

Here, the Court concludes that the record warrants an evidentiary hearing to determine whether the newly discovered evidence, and all the evidence old and new, *clearly and convincingly* demonstrate that "but for constitutional error, no reasonable factfinder" would have found Stevens guilty of these crimes.  § 2244(b)(2)(B)(ii).  As the Virginia Court of Appeals

---

[17] Stevens must also demonstrate his § 2254 petition was filed within the AEDPA statute of limitations.  *See* 28 U.S.C. § 2244(d).  If Stevens "proves actual innocence as a gateway pursuant to § 2244(b)(2)(B), he necessarily survives the lower hurdle for statute of limitations purposes pursuant to § 2244(d)(1)."  *Long v. Hooks*, 972 F.3d at 468 (citing *McQuiggin v. Perkins*, 569 U.S. 383 (2013) (concluding that cases in which new evidence shows "it is more likely than not that no reasonable juror would have convicted [the petitioner]" can bypass the one-year limitations period in § 2244(d)(1) (internal quotation marks omitted)).

Because the Court determines that on this record an evidentiary hearing is needed, the Court will evaluate timeliness on a more complete record.

remarked in 1989, the evidence linking Stevens to Harding's death was entirely circumstantial. The jury hung in Stevens's first trial.  There was no apparent motive.  Since Stevens's conviction, a key witness for the Commonwealth was convicted of perjury for testifying falsely in his case, microscopic hair comparison has been deemed scientifically invalid—calling into doubt the only physical evidence used to prosecute Stevens, and the medical examiner recanted her testimony regarding Harding's wounds, expressly stating that the wounds are consistent with a motor boat propeller rather than a knife.  Stevens also received in October 2016 a box of materials from the Commonwealth with exculpatory information that he had previously not seen. On this record, the Court finds that Stevens makes the requisite showing to proceed under § 2244(b)(2)(B)(ii).

### C.    Because This Record Warrants an Evidentiary Hearing, the Court Declines to Address the Commonwealth's Timeliness and Procedural Default Defenses at This Juncture

An appropriate showing of actual innocence would allow Stevens to avoid the statute of limitations or procedural default.[18]  Accordingly, the Court declines to further address those defenses at this juncture.

The Court reminds the Parties, as did the Fourth Circuit, that seeking a pardon from the Governor may be the more expeditious pursuit given the length of time it requires to obtain habeas relief in federal court and the limiting parameters the AEDPA imposes on review.  *See In re Stevens*, 956 F.3d at 234 (discussing pardon powers).

---

[18] Before a state prisoner can bring a § 2254 petition in federal district court, the prisoner must first have "exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A).  The burden of proving that a claim has been exhausted in accordance with a "state's chosen procedural scheme" lies with the petitioner.  *Mallory v. Smith*, 27 F.3d 991, 994–95 (4th Cir. 1994).

### IV.  Conclusion

For the foregoing reasons, the Court will deny Respondent's Motion to Dismiss, (ECF

No. 8), and set this matter for an evidentiary hearing.

An appropriate order shall issue.

/s/

M. Hannah Lauck
United States District Judge

M. Hannah Lauck
United States District Judge

Date: March 30, 2021
Richmond, Virginia

42